UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-30136-MAP

DONOVAN BROTHERS, INC., and ELSIE M.
LAFOND,

        Plaintiffs

v.

JOSEPH FONTAINE, JOANNE HEBERT and
ROBERT W. PIKE, JR., as they are the Zoning
Board of Appeals of the Town of Montgomery,
and ELWIN R. CLARK, JR., as he is the
Building Inspector & Zoning Enforcement
Officer of the Town of Montgomery; and
WAYNE L. MORSE, Chairman, CHARLES R.
PECKHAM, and DANIEL JACQUES, as they
are the Board of Selectmen of the Town of
Montgomery,

        Defendants

AFFIDAVIT OF JANE THIELEN

I, Jane Thielen, being under oath and competent to testify, do depose and state, based

upon my personal knowledge, and my review of the official records of the Town of

Montgomery, Massachusetts, as follows:

1.      I am the Administrative Secretary for the Town of Montgomery, Massachusetts,

and have held that position since July, 1988.

2.      As part of my duties as Administrative Secretary, I have access to all the official

records of the Town of Montgomery, including those records maintained by the Town Clerk and

the Zoning Board of Appeals.

3.      The Town of Montgomery first adopted zoning bylaws by vote of Town Meeting

on July 21, 1956.

4.    Attached hereto as Exhibit A is a true and complete copy of the zoning bylaws adopted by the Town on July 21, 1956.

5.    On September 20, 1971, the Town amended the 1956 zoning bylaws to create a set of zoning and other bylaws entitled: "New and Revised General, Zoning and Building Code Bylaws of Montgomery, Massachusetts."

6.    Attached hereto as Exhibit B is a true and complete copy of the zoning bylaws as amended by the Town on September 20, 1971.

7.    Between 1971 and the present, the Town's zoning bylaws remained the same with respect to removal of gravel, loam, sand and stone from any land in the Town, and with respect to the treatment of nonconforming uses.

8.    Attached hereto as Exhibit C is a true and complete copy of the zoning bylaws presently in place in the Town.

9.    The Town's records do not contain any evidence that the Town's Zoning Board of Appeals ever issued a special permit allowing earth removal from the property off Carrington Road in the Town now owned by Donovan Brothers, Inc., and described in a deed dated October 12, 2006, recorded with the Hampden County Registry of Deeds in Book 16254, Page 561.

10.    Attached hereto as Exhibit D is a true copy of a letter to the Town's Building Inspector, dated December 23, 2004, from an attorney representing Dennis and Joann Page of 122 Carrington Road.

11.    Attached hereto as Exhibit E is a true and complete copy of a cease and desist order issued by the Town's Building Inspector on January 13, 2005, to Elsie M. LaFond and Donovan Brothers, Inc.

12.     Attached hereto as Exhibit F is a true and complete copy of a letter dated February 9, 2005, from counsel for Elsie M. LaFond and Donovan Brothers, Inc., to the Town Clerk, appealing the Building Inspector's January 13, 2005 order.

13.     Attached hereto as Exhibit G is a true and complete copy of a decision of the Zoning Board of Appeals dated April 18, 2005, as it was filed with the Town Clerk.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 28th DAY OF NOVEMBER, 2006

_Jane Thielen_
Jane Thielen

299719/MONT/0007

# EXHIBIT A

*Approved by Attorney General July 21, 1956*
*See Record Book No. 6 P. 11*

ZONING BY-LAW FOR THE TOWN OF MONTGOMERY ADOPTED BY VOTE OF TOWN MEETING JULY 21,1956:

Section I  Purpose

    1-1.  The purpose of this By-Law is to provide for the Town of Montgomery all the protection authorized by the General Laws of the Commonwealth of Massachu-setts, Chapter 40A and any amendments thereof.

Section II Establishment of Districts

    2-1.  Types of Districts:  For the purpose of this By-Law the Town of Montgomery shall be considered an Agricultural-Residential District.

Section III
    Use Regulations:  No structure or land shall hereafter be used or occupied and no structure shall hereafter be erected, maintained or altered unless in con-formity with the regulations for an Agricultural-Residential District.

    3-1. Agricultural Residential District

        a.  Permitted uses

            (1)  Farm (excluding commercial raising of swine or fur-bearing animals) and nursery, including the display and sale of natural products raised in the Town.
            (2)  Detached one-family dwelling.
            (3)  Religious, educational or municipal use.
            (4)  Renting of rooms or furnishing of board for not more than (4) persons in a dwelling regularly occupied for residential purposes.

        b.  Uses Permitted on Special Authorization:
        In an Agricultural-Residential District the Board of Appeals may in a specific case, after a public hearing with due notice given, authorize any of the following additional uses subject to appropriate conditions where such are deemed necessary to protect the neighborhood and Town:
            (1)  Aviation field, golf course, boat livery, riding stable and ski tow
            (2)  Private club not conducted for profit
            (3)  Gravel, loam, sand and stone removal
            (4)  Conversion of a one-family dwelling, existing at the time of adop-tion of this By-Law, into a two-family dwelling, provided the lot is at least 30,000 square feet in area.
            (5)  Use of a trailer as a dwelling for a period of 60 days - Renewals may be granted at the discretion of the Board of Appeals.

        c.  Accessory Uses in Agricultural-Residential District:
        In an Agricultural-Residential District the following uses are hereby specifically declared to be customary accessory uses within the meaning of this by-Law:
            (1)  Use of a room or rooms in a dwelling for customary home occupations conducted by resident occupants, such as dressmaking, millinery, or for the work of a resident member of a recognized profession.
            (2)  Use of premise or building thereon in connection with his trade by a resident carpenter, electrician, painter, plumber or other arti-san, provided that no manufacturing or business requiring sub-stantially continuous employment be carried on therein.
            (3)  Display of not more than two signs pertaining to a permitted use with a total area of not more than (12) square feet.

Section IV   Area, Yard, Floor Area and Coverage Regulations

    4-1. A dwelling hereafter erected in Agricultural-Residential District shall be lo-cated on a plot having not less than 20,000 square feet of area and not less than 150 feet of frontage on a way.  A lot or parcel of land having an area or frontage of lesser amounts than required above may be considered as coming within the area and frontage requirements of this section provided such lot or parcel of land was listed in the tax records, or shown in a plan or de-scribed in a deed duly recorded or registered at the time of adoption of this By-Law, and did not, at the time of such adoption adjoin other land of the same owner available for use in connection with such lot or parcel.

    4-2  A dwelling hereafter erected and any addition to an existing structure shall be located not less than 40 feet from the traveled way, and in no case closer than 30 feet to the property line.

4-3 A dwelling hereafter erected and any addition to an existing structure shall be so located on the lot as to provide a side yard of not less than 25 feet, and a rear yard of not less than 25 feet.

4-4 A dwelling hereafter erected shall have not less than a minimum first floor area of 600 square feet.

## Section V  General Regulations

5-1 Non-conforming Uses:
The lawful use of any structure or land existing at the time of the enactment or subsequent amendment of this By-Law may be continued although such structure or use does not conform with provisions of the By-Law.

   a. Alteration:  A non-conforming use may not be altered or reconstructed if the cost of such alterations exceeds (50%) of the replacement valuation of the structure at the time of the change.

   b. Restoration:  No structure damaged by fire or other causes to the extent of more than (75%) of its replacement valuation shall be repaired or rebuilt except in conformity with the By-Law.

   c. Extensions:  No increase in the extent of the non-conforming use of a structure or lot may be made.

   d. Abandonment:  A non-conforming use which has been discontinued for a period of more than (1) year shall not be re-established and any future use shall conform with this By-Law.

   e. Changes:  Once changed to a conforming use, no structure or land shall be permitted to revert to a non-conforming use.

5-2 Accessory Buildings

   a. No accessory building shall be located in any front yard.  No accessory building shall be located in any side yard nearer to the side lot line than (25) feet, nor in the rear yard nearer to the rear lot line than 25 feet.

## Section VI  Administration

6-1 Enforcement.  This by-law shall be enforced by the Board of Selectmen, either directly or by an inspector appointed by them; and upon any well founded information as to a violation, the said Board shall take immediate steps to enforce this by-law in any manner provided by law.

   Permits:  Permits will be required only for new construction and may only be issued by the Board of Selectmen.

6-2 Board of Appeals.  There shall be a Board of Appeals of (3) members and (2) associate members appointed by the Selectmen as provided in Chapter 40A of the General Laws which shall act on all matters within its jurisdiction under this By-Law in the manner prescribed in Chapter 40A of the General Laws.

6-3 Validity.  The invalidity of any section or provision of this By-Law shall not invalidate any other section or provision hereof.

6-4 Amendments:  This By-Law or any portion thereof may be amended by a 2/3 vote at any regular town meeting, as provided for and in pursuance of the provisions G. L. Ch. 40A.

Signed:  Milo E. Cushman, Chairman

Fred McQuat

David A. Bodurtha

Board of Selectmen

# EXHIBIT B

NEW AND REVISED

GENERAL

ZONING AND BUILDING CODE

BYLAWS

OF

MONTGOMERY, MASSACHUSETTS

# CONTENTS

1. General Bylaws . . . . . . . . .

2. Zoning Bylaw . . . . . . . . .

3. Building Code . . . . . . . . .

4. Administration . . . . . . . .

New and Revised General, Zoning and Building Code Bylaws of Montgomery, Massachusetts, approved by the Town at a Special Meeting on September 20, 1971 and approved by the Attorney General on January 19, 1972.

Pg. 7

# GENERAL BYLAWS

## TOWN OF MONTGOMERY, MASSACHUSETTS

### ARTICLE I

**Section 1**

These Bylaws are hereby entitled "General Bylaws" for the Town of Montgomery, Massachusetts, to distinguish them from Bylaws of the Town dealing with special subjects such as "Zoning" and "Building Code" Bylaws.

### ARTICLE 2

### THE CALLING OF TOWN MEETINGS

**Section 1**

Any town meeting shall be called by posting attested copies of the warrant at Helm's Carriage Shed, Carrington Road; Town Hall, Main Road; and corner of Main Road and Pitcher Street, at least seven days before the day of said meeting, by a duly authorized person.

**Section 2**

The annual town election shall be held on the second Monday in February. The polls shall open at 1:00 p.m., and close at 7:00 p.m.. The annual town meeting shall be held on the Saturday following, starting at 7:00 p.m.

**Section 3**

The town clerk shall be instructed to send a written notice of a caucus or town meeting to each family who has at least one registered voter therein.

(1)

## ARTICLE 3

### TOWN MEETINGS AND PROCEDURES THEREAT

**Section 1**

Ten per cent (10%) of the registered voters registered 3 days before any Annual or Special Town Meeting shall constitute a quorum at Annual and Special Town Meetings.

**Section 2**

A motion shall be reduced to writing upon request to the Moderator.

**Section 3**

All votes, unless otherwise provided by the General Laws or these Bylaws shall be taken in the first instance by a yes or no voice vote. If the Moderator is in doubt as to the vote, or if any town member shall question the vote, the Moderator shall call for a standing vote.

**Section 4**

If a motion for a secret ballot is made, a two-thirds vote is needed (ch. 39, Section 15, General Laws).

**Section 5**

Persons desiring recognition by the Moderator should raise their hands and, when so recognized, stand and address the Moderator as "Mr. Moderator", and all questions asked of any person shall be asked through the Moderator.

**Section 6**

When recognized by the Moderator, no person shall speak more than once on the same subject to the exclusion of any other person who may desire to speak.

(2)

**Section 7**

The Moderator shall appoint all committees of the Town unless the Town otherwise specifically directs.

**Section 8**

No person shall be referred to disrespectfully.

**Section 8**

No motion, the effect of which would be to dissolve the meeting, shall be in order until all articles in the warrant have been acted upon.

**Section 10**

The proceedings of town meetings shall be governed by the rules of practice contained in Town Meeting Time, except as modified by law or by these Bylaws; and failure to perform any or all of the foregoing sections regarding procedure shall not invalidate, impair or destroy the power of any town meeting to conduct business otherwise lawfully before it. Such requirements shall be construed only as a guide to the orderly conduct of business and for the better information of the citizens concerning town affairs.

### ARTICLE 4

### FINANCE COMMITTEE

**Section 1**

The Finance Committee should consist of five members, as follows: only one Selectman, the Town Treasurer, and three voters who shall be elected annually, all to serve for a term of three years. Each of the elected members shall be elected as follows:-- one for one year, one for two years, and one for three years, to rotate after the first election.

(3)

## Section 2

The remaining members of the Finance Committee and the Board of Selectmen, at a joint meeting, shall have the power to fill vacancies of the Finance Committee that occur until the next annual town meeting.

## Section 3

They shall consider all articles involving the expenditure, appropriating, raising or borrowing of money in any warrant for a meeting held during their term of office, and shall make a report thereon, together with their recommendations to the meeting held concerning such articles.

## Section 4

Heads of departments shall have the right to appear before the Committee and be heard in respect to such estimates and matters relevant to their respective departments. It shall be the duty of the Finance Committee to investigate the cost of maintenance and expenditures of the different departments of the Town, and recommend in detail the amounts to be appropriated for each department for the ensuing year.

## ARTICLE 5

## CONCERNING TOWN OFFICERS AND REPORTS

## Section 1

Each Town Board shall elect a chairman and a clerk.

## Section 2

The annual reports of all Town officers and committees shall be published in the annual town report which shall also contain:

A. A complete list of the elected town officers with their salaries or compensations.

B. A complete list of the appointees for the year, with their salaries or compensations.

C. A copy of the warrant for the annual meeting next to be held.

D. A statement of all actions taken at the last annual town meeting and all special town meetings since that time and of expenditures made during the past year.

E. All such other matters as deemed expedient by the Board of Selectmen.

F. These books shall be distributed to all voters before the annual town meeting.

G. A list of all properties and their value.

## SELECTMEN

## Section 3

They shall have the authority to prosecute, defend, or in a case not involving an expenditure exceeding one thousand dollars, to compromise all litigations to which the town is a party, and to employ special counsel, whenever, in their judgment, necessity therefor arises.

## Section 4

The Board of Selectmen shall have authority to accept on behalf of the town any deed or other instrument conveying to the Town in fee simple, or an easement in any land, in any case when such conveyance shall not require the payment of any consideration therefor by the Town.

## Section 5

The Board of Selectmen shall have the authority to hire all labor and equipment and to hire

any and all elected town officials to work for the town in a full time or part time capacity if the need arises; or to delegate such authority.

## ARTICLE 6
## CURFEW

Section 1

No person under the age of fifteen years shall be or remain in or upon any street or public place in the Town, at night, after the hour of 9:00 o'clock, between the first day of April and the 30th day of September, both inclusive, of each year; or at night, after the hour of eight o'clock between the first day of October and the 31st day of March, both inclusive, of each year, unless he is actually employed in some work which makes it necessary; or is accompanied by a person properly having general care or custody of him or engaged in the performance of some mission or duty directed by a person having his general care or custody.

Any person violating any of the provisions of this section shall be liable to a penalty not exceeding five dollars for each offense.

In enforcing this section, a police officer may, in his discretion, warn and send home any child who for the first time violates the provisions of this section, and shall report such action to the chief of police, who shall cause notice thereof to be sent to the parent, guardian or other person having the care of such child.

## ARTICLE 7
## JUNK CARS

Section 1

Unless properly licensed under the General Laws of Massachusetts, no person, firm, or corporation shall place or store outdoors on land owned or under his or its control, nor shall any person, firm or corporation allow to be placed or stored outdoors on land owned or controlled by him on it, more than one unregistered motor vehicle for a period in excess of three (3) months.

## ZONING BYLAW FOR THE TOWN OF MONTGOMERY, MASSACHUSETTS

## ARTICLE 1
## PURPOSE

Section 1

The purpose of this Bylaw is to provide for the Town of Montgomery all the protection authorized by the General Laws of the Commonwealth of Massachusetts, Chapter 40A and any amendments thereof.

## ARTICLE 2
## ESTABLISHMENT OF DISTRICTS

Section 1

Types of Districts: For the purpose of this Bylaw the Town of Montgomery shall be considered an Agricultural-Residential District.

# ARTICLE 3

## USE REGULATIONS

### Section 1

#### Agricultural-Residential District

No structure or land shall hereafter be used or occupied and no structure shall hereafter be erected, maintained or altered unless in conformity with the regulations for an Agri-cultural-Residential District.

A. Permitted uses: --

1. Farm (excluding commercial raising of swine or fur-bearing animals) and nursery, including the display and sale of natural products raised in the Town.

2. Detached one-family dwelling.

3. Religious, educational or municipal use.

4. Renting of rooms or furnishing of board for not more than four (4) persons in a dwelling regularly occupied for resi-dential purposes.

B. Uses Permitted on Special Authorization of the Board of Appeals. The Board of Appeals, may, in a specific case, after a public hearing, with due notice given, authorize the following: --

1. Private club not conducted for profit.

2. Conversion of a one-family dwelling, existing at the time of adoption of this Bylaw, into a two family dwelling, pro-vided the lot is at least 60,000 square feet in area.

3. Use of a trailer or mobile home as a temporary dwelling for a period of 60

(8)

days while a permanent home is being constructed. Renewals may be granted at the discretion of the Board of Appeals. This Bylaw is not to be con-strued as meaning a trailer or mobile home is permitted as a permanent dwelling. The term "trailer or mobile home", as used here is defined in General Laws, Chapter 140, § 32 L, as follows: -- "a dwelling unit built on a chassis and containing complete electrical, plumbing and sanitary facilities, and designed to be installed on a temporary or permanent foun-dation for permanent living quarters.

4. Commercial use of property, including billboards and advertising on buildings, subject to appropriate conditions where such are deemed necessary to protect the neighborhood and town.

C. Accessory Uses in Agriculture - Residential District: -- In an Agricultural-Residential District the following uses are hereby specifically declared to be customary accessory uses within the meaning of this Bylaw: --

1. Use of a room or rooms in a dwelling for customary home occupations con-ducted by resident occupants, such as dressmaking, millinery, or for the work of a resident member of a recognized profession.

2. Use of premises or building thereon in connection with his trade by a resi-dent carpenter, electrician, painter, plumber or other similar trade, pro-vided that no manufacturing or business requiring continuous employment of more than one person be carried on therein.

(9)

3. Display of not more than two signs pertaining to a permitted use with a total area of not more than twelve (12) square feet.

## ARTICLE 4

### AREA, YARD, FLOOR AREA AND COVERAGE REGULATIONS

**Section 1**

A dwelling hereafter erected in Agricultural-Residential District shall be located on a plot having not less than 40,000 square feet of area and not less than 200 feet of frontage on a way. A lot or parcel of land having an area or front-age of lesser amounts than required above may be considered as coming within the area and frontage requirements of this section provided such lot or parcel of land was listed in the Assessor's records, or shown in a plan or described in a deed duly recorded or registered at the Registry of Deeds at the time of adoption of this Bylaw.

**Section 2**

A dwelling hereafter erected and any addition to an existing structure shall be located not less than 40 feet from the nearest part of any way.

**Section 3**

A dwelling hereafter erected and any addition to an existing structure shall be so located on the lot as to provide a side yard of not less than 25 feet, and a rear yard of not less than 25 feet.

**Section 4**

A dwelling hereafter erected shall have not less than a minimum first floor area of 600 square feet.

(10)

## BUILDING CODE FOR THE TOWN OF MONTGOMERY, MASSACHUSETTS

## ARTICLE 1

### PURPOSE

The purposes of this Bylaw are to promote the health, safety, and the general welfare of all the in-habitants of the Town of Montgomery, and to protect and conserve the value of property and the beauty of the town, to reduce the hazard from fire by regulating the use of land, and the location and use of buildings and structures and the area of open spaces about them.

For the purposes of this law, the Town of Montgomery, under the authority granted by General Laws, Chapter 143, Section 3, does hereby make this Bylaw to be hereafter known and designated as the Building Code for the Town of Montgomery, Massachusetts.

## ARTICLE 2

### GENERAL PROVISIONS

**Section 1**

Except as hereinafter provided, no buildings shall be erected, altered or repaired except in conformity with the provisions of this Bylaw.

**Section 2**

No public buildings shall be erected, altered, or repaired except in conformity with the provisions of Chapter 143 of the General Laws.

**Section 3**

No dwelling houses or other structures more than eight feet in length or breadth and seven feet in height, shall hereafter be erected,

(11)

altered, or repaired except in conformity with ... the provisions of this Bylaw.

**Section 4**

No person shall construct, alter or substantially repair any building or structure without having first obtained a permit for the same from the Building Inspector.

**Section 5**

Each application for a permit shall contain a general description of the proposed work; and a plot plan indicating the location of the proposed well, septic tank and leach field, and shall be accompanied by two sets of plans and specifications. Said plans and specifications shall be signed by the applicant. When the permit is issued, one set of plans and specifications shall be signed by the Building Inspector and returned to the applicant for filing at the site of the work. The other set shall be filed with the Building Inspector. The permitted work shall proceed in accordance with the set of plans and specifications signed by the Building Inspector.

**Section 6**

FEES: The fee for the permit shall be $1.00 per $1,000.00 estimated cost of the work, not to exceed $25.00, with a minimum fee of $1.00. This will be payable upon application of building permit.

No person shall erect any foundation or building, or make any extension in the external wall of any structure, or any part thereof, which is to be placed within 40 feet of a way, or place dedicated to public use, before making application to the Board of Selectmen for the location of the lines and grades of such way or place dedicated to public use.

**Section 7**

No building will be erected within 25 feet of an

a butter's property line; and all building lots will ... consist of a minimum frontage of 200 feet and contain a minimum of 40,000 square feet.

**Section 8**

All permits for new residence construction shall be granted only upon provision of acceptable water systems and acceptable sanitary systems of sewage disposal.

**Section 9.**

No owner or occupant of land shall permit fire or other ruins to be left, but shall remove the same within one year. All abandoned wells must be filled or permanently covered.

**Section 10**

No new dwelling or old dwelling which has been unoccupied for a period of one year may be occupied until a Certificate of Compliancy with this Bylaw has been issued by the Building Inspector.

## ARTICLE 3
## REPAIRS AND RENOVATIONS

**Section 1**

Repairs or renovations of buildings may be made without a building permit provided the cost does not exceed $1500 for labor and materials, and such repairs or renovations do not include the cutting away of any supporting timbers, stone, cement or brick wall, in whole or in part, the removal of which would tend to weaken the structure.

# ARTICLE 4

## GENERAL REQUIREMENTS

### Section 1

All excavations for buildings shall be properly guarded and protected to prevent injury to persons or adjoining property. All excavations for buildings shall be at least six inches clear of the foundation walls, and no back filling shall be done until the masonry walls have been approved by the Building Inspector. All dwellings hereafter shall be erected on a solid foundation of at least a minimum of an eight inch wall. If of eight inch block wall construction, buttresses shall be every 12 feet. All footings shall be a minimum of eight inches by sixteen inches with a frost line of four feet.

### Section 2

#### Chimneys and Fireplaces

A.  All masonry chimneys built hereafter in any building used for habitation, business, or public assembly, shall be built of brick or other non-combustible material, constructed from the ground up.

B.  No smoke pipe or metal flue shall pass through any wooden partition without a safety thimble or fireproof material, the thimble to extend the full thickness of the partition.

C.  Adequate steel lintels or masonry arches shall be used over all fireplaces or grate openings. All jambs and the back of all fireplaces, range or grate openings shall be at least 8 inches thick, except self-forming fireplaces may have 4 inch masonry walls.

D.
1.  All masonry chimneys shall have a terra cotta flue lining which shall start at least one foot below floors or ceilings and at least one foot below lowest thimble, and

shall be carried up to at least 18 inches above the highest point of the roof. Flue lining shall extend at least to the top of the chimney.

2.  No hearth shall be laid on any wood or combustible material except for temporary support during construction and all framing and boarding shall be at least one inch away from any chimney.

3.  Hood type fireplaces by approval of the Building Inspector.

E.  All chimneys shall be fire-stopped at every floor.

### Section 3

The opening through each floor for all verticle ducts for pipes, wires, and other similar purposes, shall be properly fire-stopped with incombustible material.

# ARTICLE 5

## DWELLING HOUSES

### Section 1

#### FLOOR TIMBERS - Size and spacing of timbers:--

| Span | Size Joists | Attic Distance on Center | Bridging |
|---|---|---|---|
| 12 feet | 2 x 6 | 16 inches | 1 row |
| 14 feet | 2 x 6 | 16 inches | 2 rows |

| Span | Size Joists | Other Floors Distance on Center | Bridging |
|---|---|---|---|
| 12 feet | 2 x 8 | 16 inches | 1 row |
| 14 feet | 2 x 10 | 16 inches | 1 row |
| 16 feet | 2 x 10 | 16 inches | 1 row |
| 18 feet | 2 x 12 | 16 inches | 2 rows |

The foregoing table is based on the use of spruce timber.

At each floor the joists shall be doubled under all partitions, and spiked together, or separators shall be used between the same. For trimmers or headers around all openings and where the span is excessive, a suitable truss shall be framed in partitions.

All beams and joists shall be free from imperfections that may impair their strength and shall be of such dimensions and materials as the purpose for which the building is used requires.

No bridging shall be more than eight feet from the end of any beam or joists. There shall not be more than eight feet between each row of bridging. All bridging shall be of suitable strength or subject to approval of the Building Inspector.

Every column, post and other vertical support shall be of sufficient strength to bear safely the weight and proportion of the load of each floor and wall depending upon it for support.

Studs shall be placed not more than sixteen inches on center.

The carrying partition shall have blocking every four feet on horizontal plane or mid-stories.

Lintels or headers over all openings in wooden stud bearing walls and partitions shall be doubled and shall be set on edge. The spans of such lintels or headers shall not exceed those given in the following table:--

| Span | Lintel or Header |
| --- | --- |
| Up to 4 feet | 2 - two by fours |
| 4 to 5-1/2 feet | 2 - two by sixes |
| 5-1/2 to 7 feet | 2 - two by eights |
| Over 7 feet | 2 - two by tens or sufficient size to support opening |

(16)

## Section 2

### RAFTERS:--

The maximum spans for wooden roof rafters in dwellings shall not exceed those given in the following table. The span shall be considered as the horizontal distance between supports from plate to ridge or intermediate supports to the ridge.

| Size of Joists (Nominal) In Inches | Spacing Joists Center to Center In Inches | Length Feet In. | |
| --- | --- | --- | --- |
| 2 x 6 | 16 | 12 | 8 |
|  | 24 | 12 | 2 |
| 2 x 8 | 12 | 15 | 11 |
|  | 16 | 14 | 8 |
|  | 24 | 12 | 11 |
| 2 x 10 | 12 | 17 | 5 |
|  | 16 | 15 | 11 |
|  | 24 | 14 | 1 |

## Section 3

Rain water leaders shall not be placed to discharge water upon a sidewalk, and no part of any building shall be constructed so as to discharge water, snow, ice, or waste material upon a public way or a place dedicated to public use.

## ARTICLE 6

### INSPECTOR OF BUILDINGS

## Section 1

The Board of Selectmen shall be responsible for the enforcement of this Bylaw and annually, in February, and subsequent to the Annual Town Meeting, shall appoint an Inspector of Buildings to hold office for one year from the first of April following and until his successor is appointed.

(17)

**Section 2**

The person appointed Inspector of Buildings shall receive such compensation as fixed by the Board of Selectmen within the appropriation for Inspector of Buildings and no other fees or compensation shall be allowed or paid him. No Inspector of Buildings may inspect or approve his own work or any job that he has a personal or financial interest in.

**Section 3**

He shall be under the supervision of the Board of Selectmen and shall be subject to the rules and regulations they may prescribe for the proper conduct of his office. He shall submit an annual report in January of each year for the work of his office for publication in the Town Report.

**Section 4**

The Inspector of Buildings shall make inspection of all building operations in the town, and he may for this purpose enter upon the premises where such operations are carried on at all reasonable times and shall report to the Board of Selectmen all violations of this ordinance and building code, or of the conditions of any permits issued.

## ARTICLE 7

## NON-CONFORMING USES

**Section 1**

Any non-conforming uses (building, structure, or use of land existing at the time of enactment of the Bylaw, and which does not conform to the regulations) may continue in its present use except that any non-conforming use may not be:--

A. Changed to another non-conforming use.

B. Re-established after voluntary discontinuance for one year, except to use conforming with regulations of this Bylaw.

C. Extended.

(18)

## ADMINISTRATION

1. **Board of Appeals**

There shall be a Board of Appeals of three (3) members and two (2) associate members appointed by the Selectmen as provided in Chapter 40A of the General Laws which shall act on all matters concerning Zoning, Building Code, and Subdivision, if any, within its jurisdiction under this Bylaw in the manner prescribed in Chapter 40A of the General Laws.

2. **Enforcement**

This Bylaw shall be enforced by the Board of Selectmen, either directly or by an Inspector appointed by them; and upon any well founded information as to a violation, the said Board shall take immediate steps to enforce this Bylaw in any manner provided by law. A complaint regarding a violation of this Bylaw should be presented to the Selectmen in writing and the complainant should be prepared to appear in court to sign a complaint against violating party.

3. **Violations**

Any person violating any of the conditions under which a permit or special permit is issued, or any decision rendered by the Board of Appeals, or any of the provisions of this Bylaw, shall be subject to criminal prosecution by indictment or complaint brought before the District Court, and the offending party may be fined a sum not exceeding fifty dollars ($50.00) for each offense. Each day that such violation continues shall constitute a separate offense.

4. **Validity**

The invalidity of any section or pro-

(19)

5.

Amend-
ment

This Bylaw or any portion thereof
may be amended by a two-thirds
(2/3) vote at any regular town meet-
ing, as provided for and in pursuance
of the provisions of General Laws,
Chapter 40A.

vision of this Bylaw shall not in-
validate any other section or pro-
vision hereof.

(20)

*Amendments to Zoning Bylaw*

Article 2. To see if the Town will vote to revise Article 2 Section 7 of the Zoning and Building Code Bylaws to read as follows: No building will be erected within 25 feet of an abutter's property line and all building lots will consist of a minimum frontage of 300 feet and contain a minimum of 3 acres.

no motion made to accept

Article 3. Voted, to amend the General Bylaws Article 4 Section 1 "Finance Committee" to read as follows: The Finance Committee should consist of five voters who shall be appointed by the Moderator annually, all to serve for a term two for three years; to rotate after the first year. And to add a section to be numbered five and to read as follows: No Town employees or members of other Town boards shall be appointed to the Finance Committee.

Affirmative 71 — Negative 2

Article 4. Voted, to approve reducing the Town's share of Gateway Regional School Budget from $286,397.10 to $274,-681.10.

Affirmative — Oral Unanimous Vote

Article 5. Voted, to transfer the sum of $500.00 from the Post Rehabilitation Fund to the Constable's Fund for the purchase of police uniforms.

Affirmative 72 — Negative 1

Article 6. Other business presented from the floor: A motion to request the Board of Selectmen to appoint a committee to study the issuance of kennel licenses. Also some determination as to whether or not a leash law should be established in the Town of Montgomery.

Affirmative 28 — Negative 21

## SPECIAL TOWN MEETING

### July 16, 1973

Article 1. Section 1. Voted, to accept Article 4, Section 1 of the Zoning and Building Code Bylaws, amended to read as follows: A dwelling hereafter erected in Agricultural-Residential District shall be located on a plot having not less than 3½ acres of area and not less than 300 feet of frontage on a way.

Affirmative 60 — Negative 25

24

General Provisions Section 7 amended to read as follows: No building will be erected within 25 feet of an abutter's property line, and all building lots will consist of a minimum frontage of 300 feet and contain a minimum of 2½ acres.

Affirmative 69 — Negative 20

Article 7. Voted, to transfer the sum of $500.00 from Revenue Sharing Entitlement 3 to the Senior Citizens' Committee Fund.

Affirmative 69 — Negative 20

Article 8. Voted, to amend the wording to read, "Planning Board" rather than "Planning Committee."

Unanimous Vote

Voted, The Moderator will appoint a Planning Board to serve from the time of Appointment until the next annual election, at which time they become elective officers if permitted within town charter.

Affirmative 64 — Negative 20

Approval of the Amendments to Zoning and Building Code Bylaws of Montgomery adopted under Article 1. and 2. of the Warrant for the Special Town Meeting held on July 16, 1973 were submitted to the Attorney General on August 3, 1973 with the approval of the Attorney General endorsed thereon on Sept. 5, 1973.

Approval of the Amendment to bylaws adopted under Article 3 (Finance Committee) of the warrant at the Special Town Meeting held on May 29, 1973 were submitted to the Attorney General on July 3, 1973 and received on August 29, 1973 with the approval of the Attorney General endorsed thereon.

## SPECIAL TOWN MEETING

### August 16, 1973

Article 1. Voted, to transfer the sum of $235.95 from Revenue Sharing Account Entitlement 3 for the purpose of an Arc Welder for the town garage.

Affirmative — Oral Unanimous Vote

Article 2. Voted, to transfer the sum of $330.00 from

25

ARTICLE 37. Voted to appoint a committee to plan the observance for the Memorial Day Services for 1999.

Unanimous voice vote

ARTICLE 38. Other business: Janet Goodman was given a proclamation from the Board of Selectmen on her retirement as Librarian for the Town of Montgomery for the past 10 years. She was congratulated for her outstanding service and dedication for the excellent job she had done. There was a standing ovation. There being no other business to discuss, the meeting was adjourned at 9:05 P.M. by the Town Moderator.

| | |
|---|---|
| Number of registered voters | 495 |
| Number or voters present: | 68 |
| Quorum: | 10% |

Recorded by:  Judith L. Murphy, Town Clerk

SPECIAL TOWN MEETING WARRANT
NOVEMBER 18, 1998

The Special Town Meeting was called to order by the Town Moderator Robert Pike, Jr. at 7:11 P.M. in the Union Hall following the Planning Board Public Hearing at 7:05 P.M. and resulted in the following actions:

ARTICLE  1.  Voted to raise and appropriate the sum of $6,000.00 for the Building Maintenance Account.

Passed- 2 Opposed

ARTICLE  2.  Failed to accept the provisions of Massachusetts General Law, Chapter 140, Section 147A, "Bylaws Relative to Regulations of Dogs".

Failed-  37 No/24 Yes

ARTICLE  3.  Voted to amend the Zoning Bylaws by adding Article 5- "Telecommunication Facilities".   *Approved by Attorney General 2/17/1999*

Passed-  67 Yes/1 No

ARTICLE  4.  Failed to amend Article 7 of the Town General Bylaw, "Junk Cars", by the adoption in its place of the new Article 7, "Unregistered Vehicles".

Failed on Recount-  39 No/37 Yes

ARTICLE  5.  Passed over this article which was to adopt a General Bylaw Article 8, "Dog Regulations".

ARTICLE  6.  Failed to adopt a General Bylaw Article 9, "Outside Storage".

Failed-  43 No/33 Yes

ARTICLE  7.  Failed to adopt a General Bylaw Article 10, "Recycling".

Failed-  50 No/21 Yes

ARTICLE  8.  Failed to adopt a General Bylaw Article 11, "Swimming Pools".

Failed-  54 No/1 Yes

43

# ARTICLE 6
## DRIVEWAY STANDARD

**Section 1.  Definition:**

1.  A driveway shall be defined as the portion of a lot which is prepared for vehicular access to and from a public way.
2.  Common driveways shall not be allowed in the Town of Montgomery.

**Section 2.  Procedure:**

1.  The property owner, or authorized agent, shall follow the driveway permit process as outlined on the driveway application form.  The property owner shall be liable for all fines for non-compliance and all damages to the public road.
2.  No driveway shall be constructed without having obtained a driveway application from the Montgomery Town Secretary.  The completed application must be reviewed and approved by the Conservation Commission, the Highway Superintendent and the Planning Board.  If it is determined that the driveway will impact a "wet-land", then the applicable laws regarding wet-lands will apply to the construction of the Driveway.
3.  The Planning Board shall issue the permit within twenty-one (21) days or shall render a decision in writing specifying the reasons for denial, and shall base that decision upon the opinion of the Highway Superintendents considerations of Public Safety.  If no action is taken by the Planning Board, the permit shall be deemed granted.
4.  The construction of the driveway shall conform in all respects to the construction standards set by the Town of Montgomery, and shall be performed within one (1) year of the date of issuance of the permit.  A permit may be extended by the Planning Board for one additional year upon written request by the applicant.

**Section 3.  Construction:**

1.  The Superintendent of Highways will inspect the installation of driveway entrances from the property line to the intersection of any public way.  This shall include any necessary culverts, ditches, embankments, warning signs, paving or blacktop.
2.  These standards shall apply to all new driveway openings and shall apply to any existing driveway openings when a change to layout, size, width, drainage or location occurs.
3.  Driveways shall be connected to the street in such a way as to provide safe vehicular entry to and exit from the street at an angle of between 60 and 90 degrees, and so as not to create any hazards for other vehicles, or impede the use of said public way,  to emergency vehicles such as Police,  Fire trucks and Ambulances.
4.  Driveways shall be constructed to allow emergency vehicles to turn into the driveway from both directions on the road and to traverse the full length of the driveway up to the dwelling (zoning regulation).  Driveways shall begin at the edge of the paved or dirt road with a minimum width of twenty-four (24) feet, reducing to no less than twelve (12) feet wide with minimum six (6) foot radius transitions on each side of the driveway and containing to its terminus, maintaining the minimum twelve (12) foot width.
5.  The entrance grade must be no more than a 6% slope from that of the road grade, back to the property line - or twenty (20) feet into the driveway from the edge of the existing road surface, so that there is a flat area for a vehicle to rest before proceeding out into the road.
6.  Driveways shall be connected to the public street in such a way as not to create a danger of overloading or impeding the operation of street drainage facilities, and so as not to create a danger of flooding or erosion on  other lots.
7.  If it is deemed by the Highway Superintendent that a culvert or culverts is required, he shall determine the size (width and length) of said culvert.
8.  The driveway must be located no less than 25 feet from the abutter's property line.

**Section 4.  Costs:**

1.   Any and all costs incurred in the construction of such Driveway(s) shall be the responsibility of the landowner or his agent.  Driveway permits may require that the landowner or his agent install, at his own expense, such facilities as are deemed necessary to insure all standards are met.  This may include culverts, ditches, embankments, warning signs, paving or blacktop, (if the driveway is being paved) from the edge of the road surface back to the property line.

**Section 5.  Penalties and Fines:**

1.   The following penalties and fines shall be imposed upon the landowner or his agent for any infractions of the standards set forth in this Bylaw regarding Driveway Standards.

Upon being cited in writing by the Highway Superintendent, the landowner will have 30 days in which to correct (or have corrected) the infraction.  Unless the infraction is corrected, fines will be imposed on the 31st day after written notice has been received.

Enforcement Agent:  Selectboard

| Maximum Fine Allowed: | $100.00 daily |
|---|---|
| 1st Offense: | WARNING |
| 2nd Offense: | $25.00 |
| 3rd Offense | $50.00 |
| 4th Offense: | $100.00 each day |

Each day a violation exists shall be deemed to be a separate violation.

Voted and accepted at December 4, 2002 Special Town Meeting
Approved by Attorney General on April 16, 2003

## SPECIAL TOWN MEETING WARRANT
### December 2, 2004

The Special Town Meeting was called to order by the Town Moderator, Robert Pike, Jr., at 7:35 PM in the Union Hall and resulted in the following action:

ARTICLE 1.   Voted to accept the layout of Sunset Lane as a public town way, and, to the extent that any portion of said Sunset Lane has heretofore been laid out and accepted as a public way, the relocation and alteration of the layout of Sunset Lane as a public way, as shown on a plan entitled: "Proposed Layout of Sunset Lane in Montgomery, Mass. dated September 2, 2004, prepared by E. B. Holmberg & Associates of Chesterfield, Mass., and to see if the Town will further vote to authorize the Board of Selectmen to acquire by gift, purchase or eminent domain, rights in the land within that portion of the layout of Sunset Lane hereby accepted, altered and relocated, sufficient to use said street for all purposes for which public ways are used in the Town of Montgomery.

Passed – Unanimous voice vote

ARTICLE 2.   Failed to accept the layout of Avery Road as a public town way, and, to the extent that any portion of said Avery Road has heretofore been laid out and accepted as a public way, the relocation and alteration of the layout of Avery Road a public way, as shown on a plan entitled: "Proposed Layout of Avery Road in Montgomery, Mass. dated September 2, 2004, prepared by E. B. Holmberg & Associates of Chesterfield, Mass., and to see if the Town will further vote to authorize the Board of Selectmen to acquire by gift, purchase or eminent domain, rights in the land within that portion of the layout of Avery Road hereby accepted, altered and relocated, sufficient to use said street for all purposes for which public ways are used in the Town of Montgomery; or take any other action thereon.

Failed -- 21 Ayes,  25  Nayes

ARTICLE 3.   Voted to adopt the following new Zoning By-law entitled **Article 7  - "Phased Growth By-law"** to read as follows; or take any other action thereon:

A.  Purpose

The purpose of this Phased Growth By-law is to promote orderly growth in the Town, consistent with the rate of growth experienced over the previous five calendar years (from 1998 through 2003).  The Town seeks to ensure that growth occurs in a manner that can be adequately supported by Town services; particularly, that services such as public safety, schools, roads and human services are provided at a level of quality expected by the citizenry and affordable to the Town.

This article will provide the town, its boards and its agencies with:
-   information, time and capacity to incorporate such growth into a master plan for the community;
-   **the opportunity to establish a 6-year capital improvements plan for the Town and to begin implementing the plan in the annual budget process;**
-   appropriate and effective land use regulations consistent with such a master plan;
-   the governmental tools necessary to preserve and enhance existing community character and the value of property; and,
-   municipal policies necessary to further the general purposes set forth in this section of these bylaws.

For the period from 1998 through 2003, an average of five (5) building permits for residential dwelling units have been issued each year in the Town of Montgomery.  Consequently, upon approval and implementation of this bylaw, no more than six (6) new building permits for residential dwelling units will be issued in any consecutive twelve (12) month time period.

B.  Definitions

The following terms are defined as followed for the purposes of clarity within this bylaw:

1.   Administrative Permit:  A permit issued by the Planning Board at a regular meeting verifying that the proposed use meets the required conditions set forth in this bylaw.

2. Building Permit:  An official document or certification that is issued by the Building Inspector and which authorizes the construction, alteration, enlargement, conversion, reconstruction, remodeling, rehabilitation, erection, demolition, moving or repair of a building or structure.

3. Dwelling Unit:  A single unit containing one or more rooms connected together, providing complete, independent living facilities for one or more persons, including permanent provisions for living, sleeping, eating, cooking and sanitation.

C. Residential Limitation

1. The Building Inspector shall issue building permits for construction of new dwelling units only if the following are true:

   a) Multiple Permits for Development:  Building permit issuance will result in not more than three (3) new dwelling units being authorized by the Town, within any twelve (12) month period, for any parcel, including all contiguous properties which have been in the same ownership at any time after the effective date of this bylaw.

   b) Total Number of Permits Town-wide:  Building permit issuance will bring the town-wide total to no more than five (5) dwelling units authorized within the previous twelve (12) months, counting any current application but not permits which have lapsed or been withdrawn.  This number shall not include up to one (1) additional dwelling unit reserved for residential units designated by the Planning Board through an Administrative Permit as authorizing Special Needs Housing.

2. Special Needs Housing:  In this case, "Special Needs Housing" shall mean dwelling units for elderly or handicapped persons, where occupancy of the units is restricted to elderly or handicapped persons through a properly executed and recorded deed restriction running with the land.  For the purpose of this section, "elderly" shall mean persons over the age of sixty (60), "handicapped" shall mean persons deemed so by the laws of the State of Massachusetts.  A total of one (1) building permit shall be reserved under this bylaw, in any twelve (12) consecutive month period, for issuance to Special Needs Housing applicants.  Such dwelling units shall be designated as meeting special housing needs under an Administrative Permit granted by the Planning Board.

D. General Provisions

1. Building Permit Amendments:  No change may be made to an existing building permit without approval of the Planning Board and the Building Inspector as required by the State Building Code, 780 CMR 113 and 113.9.

E. Exemptions

The following developments are specifically exempt from limits of the Phased Growth bylaw and shall not affect the number of building permits to be issued in any twelve (12) month period:

1. An application for a building permit for the enlargement, restoration or reconstruction of a dwelling in existence at the date of application for a building permit, provided that no additional residential unit is created.

2. Residential dwelling units associated with an education or religious institution that is exempt from zoning use regulations per M.G.L. Chapter 40A, Section 3.

F. **Time Limitation**

**This Phased Growth Bylaw shall be in effect for a period of six (6) years after its adoption on its effective date.  After this time period, the regulations of this bylaw shall no longer apply to development proposals in Montgomery.**

Passed Unanimously;  48 Ayes, 0 Nayes

**Approved by the Attorney General on March 25, 2005**
**Effective date is December 2, 2004**

51

# EXHIBIT C

ZONING BY-LAW FOR THE TOWN OF MONTGOMERY, MASS.

ARTICLE 1

PURPOSE

Section 1

The purpose of this Bylaw is to provide for the Town of Montgomery all the protection authorized by the General Laws of the Commonwealth of Massachusetts, Chapter 40A and any amendments thereof.

ARTICLE 2

ESTABLISHMENT OF DISTRICTS

Section 1

Types of Districts: For the purpose of this Bylaw the Town of Montgomery shall be considered an Agricultural-Residential District.

ARTICLE 3

USE REGULATIONS

No structure or land shall hereafter be used or occupied and no structure shall hereafter be erected, maintained or altered unless in conformity with the regulations for an Agricultural-Residential District.

Section 1

Agricultural-Residential District

A.    Permitted uses:

1.  Farm (excluding commercial raising of swine or fur-bearing animals) and nursery, including the display and sale of natural products raised in the town.

2.  Detached one-family dwelling.

3.  Religious, educational or municipal use.

4.  Renting of rooms or furnishing of board for not more than four (4) persons in a dwelling regularly occupied for residential purposes.

B.    Uses Permitted on Special Authorization of the Board of Appeals. The Board of Appeals, may, in a specific case, after a public hearing, with due notice given, authorize the following:

1.  Private club not conducted for profit.

2.  Conversion of a one-family dwelling, existing at the time of adoption of this Bylaw, into a two family dwelling, provided the lot is at least 60,000 square feet in area.

3.  Use of a trailer or a mobile home as a temporary dwelling for a period of 60 days. Renewals may be granted at the discretion of the Board of Appeals.

4.  Use of a trailer or mobile home as a permanent dwelling provided it meets all building, zoning and sanitation codes of the town.  The term "trailer or mobile home" as used here is defined in General Laws, Chapter 140, §32 L. as follows:  "a dwelling unit built on chassis and containing complete electrical, plumbing and sanitary facilities, and designed to be installed on a temporary or permanent foundation for permanent living quarters.

NOTE:

   If trailers and mobile homes are not to be allowed, add the following sentences to the above 3 and drop 4:

   "This Bylaw is not to be construed as meaning a trailer or mobile home is permitted as a permanent dwelling.  The term, "trailer or mobile home," as used here is defined in General Laws, Chapter 140, §32 L. as follows:  "a dwelling unit built on a chassis and containing complete electrical, plumbing and sanitary facilities, and designed to be installed on a temporary or permanent foundation for permanent living quarters.

5.  Commercial use of property, including billboards and advertising on buildings, subject to appropriate conditions where such are deemed necessary to protect the neighborhood and town.

C.  Accessory Uses in Agriculture – Residential District:

   In an Agricultural-Residential District the following uses are hereby specifically declared to be customary accessory uses within the meaning of this Bylaw:

1.  Use of a room or rooms in a dwelling for customary home occupations conducted by resident occupants, such as dressmaking, millinery, or for the work of a resident member of a recognized profession.

2.  Use of premises or building thereon in connection with his trade by a resident carpenter, electrician, painter, plumber or other similar trade, provided that no manufacturing or business requiring continuous employment of more than one person be carried on therein.

3.  Display of not more than two signs pertaining to a permitted use with a total area of not more than twelve (12) square feet.

ARTICLE 4

AREA, YARD, FLOOR AREA AND COVERAGE REGULATIONS

Section 1

A dwelling hereafter erected in Agricultural-Residential District shall be located on a plot having not less than 2½ acres of area and not less than 300 feet of frontage on a way.  A lot or parcel of land having an area or frontage of lesser amounts than required above may be considered as coming within the area and frontage requirements of this section provided such lot or parcel of land was listed in the Assessor's records, or shown in a plan or described in a deed duly recorded or registered at the Registry of Deeds at the time of adoption of this Bylaw, and did not, at the time of such adoption adjoin other adjacent land of the same owner available for use in connection with such lot or parcel.

Section 2

A dwelling hereafter erected and any addition to an existing structure shall be located not less than 40 feet from the nearest part of any way.

Section 3

A dwelling hereafter erected and any addition to an existing structure shall be so located on the lot as to provide a side yard of not less than 25 feet, and a rear yard of not less than 25 feet.

Section 4

A dwelling hereafter erected shall have not less than a minimum first floor area of 600 square feet, and shall not exceed 35 feet in overall height.

# ARTICLE 5
# TELECOMMUNICATION FACILITIES

## Section I - Purpose of Bylaw

The authority to write and enact this bylaw is granted under the Telecommunications Act of 1996 and the Home Rule Amendment to the Constitution of Massachusetts Article II, Section 1. This bylaw is intended to serve the best interests of the citizens of Montgomery.

The express purpose of this bylaw is not to restrict the construction or use of the telecommunication facilities within the Town of Montgomery, but rather to minimize the adverse impacts of the siting of personal wireless service facilities on adjacent properties, residential neighborhoods and the overall health, safety, environmental quality and visual character of the Town of Montgomery.

The Town seeks to achieve this by regulating the placement, construction and appearance of telecommunications facilities and by promoting the shared use of existing facilities to reduce the need for new facilities, thereby lessening the impact upon the environment and character of the Town. It is the intent of this bylaw to require any and all providers of personal wireless services, telecommunications facilities and communications devices to seek reasonable and viable alternatives to tower construction.

For purposes of this section of the Zoning Bylaw, the following definitions shall apply.

    A. **Personal Wireless Services, ("Services")** - Commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services.

    B. **Personal Wireless Services Facilities ("Facilities")** - Any and all materials, equipment, storage structures, towers, dishes and antennas, used by a commercial carrier to provide telecommunications and/or data services.

    C. **Tower** - Any antennae mounting structure (excluding buildings), used by a commercial carrier to provide telecommunication and/or data services, that is utilized primarily to support reception or transmission equipment and that is measured twelve (12') feet or more in its longest vertical dimension. The term "Tower" includes, but is not limited to, self supporting, monopole and lattice towers.

    D. **Communications Device** - Any antennae, dish or panel mounted out of doors on an already existing building or structure used by a commercial carrier to provide telecommunications and/or data services. The term "communications device" does not include a tower.

## Section II - General Requirements

    A. **Special Permits**

    No personal wireless services facility or tower shall be built in the Town of Montgomery unless the Planning Board issues a special permit. The special permit shall be issued if the Planning Board finds that the permit is consistent with this Bylaw under Section III.B. The Special Permit that has been issued for any personal wireless service facility over fifty (50) feet in height shall be valid for fifteen (15) years. At the end of that time period, the wireless facility shall be removed by the carrier or a new Special Permit shall be required. An application for a special permit for a personal wireless services facility shall include: A topographical site plan, including contour lines at intervals no greater than 2 feet and in an appropriate scale prepared by a professional engineer licensed to practice in the Commonwealth, shall be provided to the Planning Board for any proposed wireless communication facility.

This plan shall include a map of appropriate scale showing the location and orientation of the proposed site and the areas covered by proposed device(s) of different signal strengths and their interface with adjacent service areas. It shall also include:

1. The seal(s) of the licensed professional(s) who prepared the plans
2. All access roads
3. The placement of all proposed towers and structures as may be necessary.
4. Adequate safety precautions for the protection of the facility and the public.
5. The clearing of natural vegetation, showing that it is limited to that which is necessary for the construction, operation and maintenance of the facility.
6. All setbacks
7. Adequate drainage to prevent erosion.
8. All pre-existing conditions, including buildings and natural features.
9. Topographical site plan showing the entire fall zone.
10. A town-wide map showing the other existing personal wireless service facilities in the Town and outside the Town within one mile of its corporate limits.
11. Applicant shall provide individual propagation charts for the proposed facility as well as all known facilities, either proposed or existing, in Montgomery and all abutting towns. Propagation charts shall be provided in overlay format which allows comparison as both individual and overlapping footprints at typical transmission range for PCS, Cellular and any other signal type likely to apply. Overlays shall clearly demonstrate signal interface/overlap.

B. **Type of Tower**
The only free-standing towers allowed are monopoles and lattice towers with associated antenna and /or panels.

C. **Exemptions**
This by law does not apply to the construction or use facilities by a federally licensed amateur radio operator as protected by Mass. Gen. Laws c.40A, sec. 3, provided that (1) the tower is not used or licensed for any commercial purpose; (2) the tower does not exceed 100 feet; and (3) the tower will be removed if the use is discontinued for one year.

D. **Setbacks**
1. The minimum distance from a tower to the property line on which it is located shall be the height of the tower plus 25 feet, with a minimum of one hundred seventy-five feet (175') plus one half the width of the tower base.

2. The setbacks for equipment storage buildings or storage sheds shall comply with the setback requirements for buildings of the zoning district within which the tower is located.

E. **Safety**
1. Towers, necessary facility structures, buildings and appurtenances shall be installed, maintained and operated in accordance with applicable federal, state and local codes, standards and regulations and shall be designed to withstand sustained winds and gusts of all applicable standards. A certification of compliance must be made by a Massachusetts registered structural engineer that the applicant has complied with all requirements outlined herein.

2. A "fall zone" radius, equal to the height of the tower plus 25 feet, with a minimum of one hundred seventy-five feet (175') plus one half the width of the tower base, shall be required for all towers. Height shall be measured above grade, at the center of the proposed facility. Fall zone radius must be contained entirely within the boundaries of the parcel of land on which the facility is located. "Fall zone" radius shall not contain structures (ie: houses, barns, sheds, garages, etc.) unrelated to the telecommunications facility, but should contain "buffer" trees. A fall zone beyond the standard setbacks is not required for telecommunication facilities mounted on existing structures. (ie: church steeples, silos, etc.)

3. No tower climbing apparatus shall be lower than fifteen (15) feet from the ground.

4. Fencing shall be provided to control access to the site of the tower and shall be of sufficient height to prevent access. Access gate shall be locked at all times. Fence shall be minimum of 8 feet from base of tower and of a minimum height of 6 feet high, no razor wire shall be used.

5. Lighting shall be limited to that only needed for emergencies and/or as required by the FAA. Lighting of equipment structures and other facilities on site shall be shielded from abutting properties. There shall be total cutoff of all light at the property lines of the parcel to be developed, and foot-candle measurements at the property line shall be 0.0 initial foot-candles when measured at grade.

6. In a case where an emergency generator might be required, the generator and accompanying fuel tank shall be installed under the direction of the town fire chief or his or her agent.

F. Height
   1. There shall be a presumption that towers shall be no higher than 100 feet, (height shall be measured above grade, at the center of the proposed facility), with an allowance for an additional ten (10) feet extension for each co-location spot.

   2. In no case shall a tower exceed 150 feet in the Town of Montgomery.

G. Aesthetics
   1. Any Wireless communications facility shall minimize, to the extent feasible, adverse visual effects on the environmental landscape. Facilities shall be designed and constructed to be suitably screened from abutters and residential neighborhoods. The maximum amount of natural vegetation shall be preserved and additional vegetative screening from abutters and residential neighborhoods shall be planted where deemed necessary by the Planning Board.

   2. Communications devices shall be situated on or attached to a building or structure in such a manner that they are screened whenever possible, shall be painted or otherwise colored to minimize their visibility, and shall be integrated into such structures or buildings in a manner that blends with the structure or building. The above shall be at the discretion of the Planning Board. Any wireless facilities located on or within a historic structure shall not alter the character-defining features, distinctive construction methods, or original historic materials of the building. Any alteration made to a historic structure to accommodate a wireless facility shall be fully reversible. Wireless facilities within a historic district shall be concealed within or behind existing architectural

features, or shall be located so that they are not visible from public roads and viewing areas within the district.

3. Free standing antennas or dishes shall be located on the landscape, screened and painted in a manner so as to minimize visibility from abutting streets and residents. To the extent feasible, all network interconnections shall be installed under ground, and all electric services to the site shall be installed underground.

4. Proposed buildings or structures shall be specifically designed and constructed to be aesthetically and architecturally appropriate to the site and zoning district.

5. Any personal wireless service facility that is located within 300 feet of a scenic vista, scenic landscape or scenic road - as designated by the Selectboard of the Town of Montgomery- shall not exceed the height of vegetation at the proposed location.

H.  Signs
    1. The Special Permit Holder shall post the following signs:
       a.  a "No Trespassing" sign,
       b.  any signs required to warn of danger,
       c.  a sign providing the following information,
           1.) Identification of the facility
           2.) name, address, phone number, and emergency phone number of the landowner
           3.) name, address, phone number, and emergency phone number of the Special Permit Holder
           4.) if the land owner is the Town, the name, address, phone number and emergency number of the police.

    2. The signs shall comply with the requirements of the zoning bylaws of the Town of Montgomery. The Special Permit Holder shall file all of the information listed in "H" with the police within seven (7) days of the granting of a special permit. The Special Permit Holder shall not post any other signs.

I.  Discontinuation and Modification
    1. The Special Permit Holder shall file with the Town Clerk, with copies to the Planning Board, and the Building Inspector, by December 31st of each year, a statement that the Special Permit Holder continues to operate the Tower, personal wireless services and communications devices. The statement will also list all co-locators using the towers.

    2. Towers and /or facilities, etc. that are not used for more than one (1) year shall be removed by the person or entity to whom the special permit is issued. Removal of the tower or facility and restoration of the site to its pre-existing condition shall occur within 180 days of the discontinuance of use. The special permit holder may request that the Planning Board extend the 180 day period. An extension of time shall not be allowed unless the Planning Board finds that special circumstances warrant granting the extension.

       Removal of the tower or facility shall include, but not be limited to:
           a. Removal of antennas, foundations and all subsurface utilities, mount, equipment shelters and security barriers from the subject property.
           b. Proper disposal of the waste materials from the site in accordance with local and state regulations.

3.  A plan shall be submitted, as part of the application for a special permit for any wireless communications facility, to return the site to pre-existing condition including the plantation of replacement trees, grading and removal of all structure and waste or any other work that may be required with a bond to be held by the town in the amount of an applicant-provided estimate at equivalent costs for such work. To ensure that this subsection is complied with, the applicant for the siting of a tower shall provide a performance bond payable to the Town of Montgomery. The amount shall be determined by using the industry standard of "R.H. Means" or some comparable engineering firm.

4.  The Planning Board shall not issue a special permit until the Treasurer receives the performance bond referred to above in subsection II.I.3.

5.  If the facility is not removed within 180 days, the Town shall be empowered to use the bond referred to in Subsection II.I.4 for the removal of said facility. No facility shall remain out of operation for a period of two years without being removed at the owner's expense.

6.  If a tower or facility permitted under this Bylaw is damaged or destroyed, it may not be rebuilt without obtaining a new special permit.

7.  A modification of a wireless facility may be considered equivalent to an application for a new personal wireless facility and will require a Special Permit when the following events apply:
    a.  The applicant and/or co-applicant wants to alter the terms of the Special Permit by changing the personal wireless service facility in one or more of the following ways:
        1.) Change in the number of facilities permitted on the site
        2.) Change in technology used for the personal wireless service facility
    b.  The applicant and/or co-applicant wants to add any equipment or additional height not specified in the original design filing.

8.  At such time that a licensed carrier plans to abandon or discontinue operation of a wireless facility, such carrier shall notify the Town by certified U.S. mail of the proposed date of abandonment or discontinuation of operations. Such notice shall be given no less than 30 days prior to abandonment or discontinuation of operations. In the event that a licensed carrier fails to give such notice, the wireless facility shall be considered abandoned upon such discontinuation of operations.

J. Environmental Standards
    1.  Audible impacts from generators and/or other sources shall be minimized. Noise levels are to be measured from the property lines of each abutter of the land on which the tower is installed and shall not exceed 50 decibels. Roof-mounted or side-mounted equipment or wireless facilities shall not generate noise in excess of 50 db at ground level at the base of the building closest to the antenna.

    The applicant shall provide a statement listing the existing and maximum future projected measurements of noise from the proposed wireless facility, measured in decibels Ldn (logarithmic scale, accounting for greater sensitivity at night) for the following:
        a.  Existing, or ambient: the measurements of existing noise.
        b.  Existing plus proposed wireless facility: maximum estimate of noise from the proposed wireless facility plus the existing noise environment.

Such statement shall be certified and signed by a qualified acoustical engineer, stating that the noise measurements are accurate and meet the Noise Standards of this Bylaw. Noise measurements shall be certified on a yearly basis, and the Town shall be given a <u>written report</u> of said certification.

2.  The applicant shall provide a statement listing the existing and maximum future projected measurements of RFR from the proposed wireless facility, for the following situations:
    a. Existing, or ambient: the measurement of existing RFR
    b. Existing plus proposed personal wireless facilities: maximum estimate of RFR from the proposed wireless facility plus the existing RFR environment.

    Such statement shall be certified and signed by a qualified RF engineer, stating that RFR measurements are accurate and meet FCC Guidelines. RFR measurements shall be certified on a yearly basis, and the Town shall be given a <u>written report</u> of said certification.

3.  Personal wireless service facilities shall not be located in wetlands. Locating of wireless facilities in wetland buffer areas shall be avoided whenever possible and disturbance to wetland buffer areas shall be minimized.

4.  The applicant shall list location, type and amount (including trace elements) of any materials proposed for use within the personal wireless services facility that are considered hazardous by the federal, state or local government. No hazardous waste shall be discharged on the site of any personal wireless service facility. If any hazardous materials are to be used on site, there shall be provisions for full containment of such materials. An enclosed containment area shall be provided with a sealed floor, designed to contain at least 110% of the volume of the hazardous materials stored or used on the site.

5.  Stormwater run-off shall be contained on-site to the extent possible.

## Section III Filing Procedure and Standard of Review

A.  Procedure
    1.  The Planning Board shall promulgate regulations for submission of applications under this bylaw. These regulations will be used by the Planning Board to review applications and to attach conditions to the Special Permit.

    2.  If the applicant is not the owner of the land, the owner shall sign the application. The applicant shall also submit a signed contract between the applicant and the owner. If the owner is a public entity, the applicant shall submit authorization from the entity. If the Town is the owner, a lease agreement between the Town and the applicant shall establish authorization from the Town.

    3.  The Planning Board shall not approve any application that does not comply with all requirements of this bylaw.

    4.  The Planning Board shall, because of the Town of Montgomery's proximity to the Barnes Airport of Westfield, refer all applications to the City of Westfield Airport Commission for Review. The Airport Commission shall certify that the application is acceptable to the Commission prior to any action on the special permit. If the Airport Commission fails to act within forty-five (45) days of submission of the application, the application shall be deemed approved by the Commission.

B. **Standard of Review**

1. The Planning Board shall act in accordance with the standards and requirements set forth herein. The Planning Board may grant a Special Permit if it finds that the applicant has met the requirements of the bylaw and the General Laws Chapter 40A and that the proposal is in harmony with the general purpose and intent of the Town of Montgomery zoning ordinances.

2. The Planning Board shall act on a Special Permit request within the time required by Mass. General Laws c40A, sec. 9. and any denial shall be in writing and supported by substantial evidence contained in the record.

C. **Requirements**

1. Upon submission of the application for a Special Permit, the applicant shall arrange to fly a three foot diameter fluorescent colored balloon at the primary site at the maximum height of the proposed installation, or at the request of the applicant and discretion of the Planning Board, request to substitute a crane for the balloon at the tower location. The balloon or crane shall be flown or in place for a minimum of three (3) days, one day of which must be a weekend day. Said object must be in place for a minimum of six (6) daylight hours on each of the above days. In the case of inclement weather, the Planning Board may require additional days of "testing".

   In either case, photos shall be taken from eight (8) locations by the Montgomery Planning Board, clearly showing the balloon or crane during the test. These shall be labeled as to the location from which the photo was taken, in order to ascertain the visual impact on the public. The date and location of the test described above shall be advertised at least fourteen (14) days, but not more than twenty-one (21) days, before a public hearing on a special permit under this bylaw in the Country Journal, Springfield Union News and the Westfield Evening News newspapers with a general circulation in the Town of Montgomery. The cost of said advertising shall be borne by the applicant. The Montgomery Planning Board shall be granted access to the site to verify the exact location of the test.

2. Communication Devices shall, if feasible, be located on pre-existing buildings, structures or towers, provided such installation shall preserve the character of the structure. The applicant shall have the burden of proving that there are no feasible pre-existing building, structures or towers. If a pre-existing tower is not appropriate but the site is, the old structure may be dismantled and the new tower constructed in its place.

   In the event that a co-location is found to be not feasible, a written statement of the reasons for the infeasibility shall be submitted to the Town. The Town may retain a technical expert in the field of RF engineering to verify if co-location at the site is not feasible or is feasible given the design configuration most accommodating to co-location. The cost for such a technical expert will be at the expense of the applicant. The Town may deny a Special Permit to an applicant that has not demonstrated a good faith effort to provide for co-location.

3. Shared use of towers by commercial carriers is required unless such shared use is shown to be not technologically feasible. Whenever feasible, accommodations shall be made for the installation of antennae, repeaters or other such devices to benefit Montgomery Town services.

4. All Towers and associated structures shall be designed to accommodate the maximum number of users technologically practical, with a minimum of three (3) additional users each utilizing three (3) bays of panel type antenna arrays.

5. Annual certification of compliance with the Federal Communications Commission, Federal Aviation Administration and all applicable federal, state and local laws, rules and regulations must be provided for all Facilities. Copies of this certification shall be sent to the Town of Montgomery for their files.

6. If a tower is on Town property, a Certificate of Insurance for liability coverage in the amount of $ 1,000,000.00 must be provided naming the Town as the additional insured.

7. If a tower is on Town property, an agreement shall be made whereby the applicant agrees to indemnify and hold the Town harmless against any claim for injury or damage resulting from or arising out of use or occupancy of the Town owned property by the applicant.

8. Necessary Equipment storage buildings or storage sheds shall not exceed one (1) story in height, no more than three hundred (300) square feet in floor area shall be available for each user; any necessary buildings or storage sheds added to a site must be attached to and abut the original building or storage shed and must be compatible in appearance with it.

9. The Planning Board may require the investigation and testing of more than 1 site by the applicant. No site shall be closer than 2.5 miles, measured in a straight, level line, to any other tower, existing or proposed.

10. The applicant shall provide equipment brochures for the proposed personal wireless service facility – such as manufacturer's specifications or trade journal reprints shall be provided for the antennas, mounts, equipment shelters, cables as well as cable runs, and security barrier, if any.

11. The applicant shall provide a list of materials for the proposed wireless facility specified by generic type and specific treatment (eg. anodized aluminum, stained wood, painted fiberglass, etc.). These shall be provided for the antennas, mounts, equipment shelters, cables as well as cable runs, and security barrier, if any.

12. Appearance of the proposed wireless facility shall be shown by at least two photographic superimposition's of the facility within the subject property. The photographic superimposition's shall be provided for the antennas, mounts, equipment shelters, cables as well as cable runs, and security barrier, if any, for the total height, width and breadth.

13, The applicant shall be responsible for an application fee of $225.00 which will cover mailing costs, advertisements in local newspapers and any necessary inspections by town officials. This application fee shall be subject to change by the Selectboard in order to cover all necessary costs incurred by the town.

Upon approval of the special permit, a building permit must be secured by the applicant. The cost of said building permit is based upon a fee of five dollars ($5.00) per Thousand dollars ($1000.00) of projected cost of any and all related structures – to include, but not limited to, the telecommunication tower and its out-buildings. The cost of said

building permit shall include a minimum of three (3) inspections by the town building inspector and/or his assigns.

14. The applicant shall be responsible for all fees and expenses incurred by the Town of Montgomery during the initial application and annual inspection processes; including, but not limited to site visitation fees, newspaper publishing fees, and impartial Cell Tower Consultant fees, RF engineer fees, acoustical engineer fees and all Town Attorney fees.

## Section IV  Regulatory Compliance

Annual certification demonstrating structural integrity and continuing compliance with current standards of the FCC, FAA and the American National Standards Institute shall be filed with the Building Inspector by the Special Permit Holder, and shall be reviewed by a licensed professional engineer hired by the Town and paid for by the Special Permit Holder.  Annual certification shall be obtained on the anniversary date of completion of the tower structure as established by the Montgomery building inspector.

A. If the FCC or FAA regulations are changed, the Special Permit Holder shall bring the facility into compliance within six months or earlier if a more stringent compliance standard is included in the regulation.

B. Failure to comply with any provision of this bylaw or regulations promulgated hereunder shall be grounds  for removal of non-complying structures, buildings or devices at the owner's expense.

C. Notwithstanding the provisions of Section II.I.6. of this Bylaw, if a facility becomes obsolete, the special permit holder shall promptly remove the facility.

D. Any special permit for wireless communications facilities shall be subject to review for renewal at five year intervals.   Prior to renewal, the Planning Board may require the replacement of the current facility with the least obtrusive and/or lowest height facility available at the time of the permit renewal.  The topographical site survey shall be reviewed and any necessary adjustments shall be made to the performance bond as part of the renewal process.

E. The National Environmental Policy Act (NEPA) applies to all applications for personal wireless service facilities.  It requires that an Environmental Assessment (EA) be filed with the FCC prior to beginning operations for any wireless facility proposed in or involving any of the following:
   a. Wilderness areas
   b. Wildlife preserves
   c. Endangered species habitat
   d. Historical sites
   e. Indian religious sites
   f. Flood plain
   g. Wetlands
   h. High intensity white lights in residential neighborhoods
   i. Excessive radio frequency radiation exposure
At the time of application filing, an EA that meets FCC requirements shall be submitted to the Town for each wireless facility site that requires such an EA to be submitted to the FCC.

F. After the personal wireless services facility is operational, the applicant shall submit, within 60 days of the completion of beginning operations, and at annual intervals from the

beginning of operations, existing measurements of noise from the wireless facility. Such measurements shall be signed by an acoustical engineer, stating that noise measurements are accurate and meet the Noise Standards sub-section of this Bylaw.

G. After the wireless facility is operational, the applicant shall submit, within 60 days after beginning operations, and at annual intervals from the date of beginning operations, existing measurements of RFR from the wireless facility. Such measurements shall be signed by a certified by an RF engineer, stating that RFR measurements are accurate and meet FCC Guidelines as specified in the Radio Frequency Standards section of the Bylaw.

H. The applicant and co-applicant shall maintain the wireless facility in good condition. Such maintenance shall include, but shall not be limited to, painting, structural integrity of the mount and security barrier, and maintenance of the buffer areas and landscaping.

I. A copy of all annual certifications and reports shall be sent to the Clerk of the Town of Montgomery for filing with their records.

**Section V.**

A determination of invalidity or unconstitutionality of any specific section of this bylaw shall not invalidate any other section; and every other provision and section shall continue in full force and effect.

# ARTICLE 6
## DRIVEWAY STANDARD

Section 1.  **Definition:**
1.  A driveway shall be defined as the portion of a lot which is prepared for vehicular access to and from a public way.
2.  Common driveways shall not be allowed in the Town of Montgomery.

Section 2.  **Procedure:**
1.  The property owner, or authorized agent, shall follow the driveway permit process as outlined on the driveway application form.  The property owner shall be liable for all fines for non-compliance and all damages to the public road.
2.  No driveway shall be constructed without having obtained a driveway application from the Montgomery Town Secretary.  The completed application must be reviewed and approved by the Conservation Commission, the Highway Superintendent and the Planning Board.  If it is determined that the driveway will impact a "wet-land", then the applicable laws regarding wet-lands will apply to the construction of the Driveway.
3.  The Planning Board shall issue the permit within twenty-one (21) days or shall render a decision in writing specifying the reasons for denial, and shall base that decision upon the opinion of the Highway Superintendents considerations of Public Safety.  If no action is taken by the Planning Board, the permit shall be deemed granted.
4.  The construction of the driveway shall conform in all respects to the construction standards set by the Town of Montgomery, and shall be performed within one (1) year of the date of issuance of the permit.  A permit may be extended by the Planning Board for one additional year upon written request by the applicant.

Section 3.  **Construction:**
1.  The Superintendent of Highways will inspect the installation of driveway entrances from the property line to the intersection of any public way.  This shall include any necessary culverts, ditches, embankments, warning signs, paving or blacktop.
2.  These standards shall apply to all new driveway openings and shall apply to any existing driveway openings when a change to layout, size, width, drainage or location occurs.
3.  Driveways shall be connected to the street in such a way as to provide safe vehicular entry to and exit from the street at an angle of between 60 and 90 degrees, and so as not to create any hazards for other vehicles, or impede the use of said public way, to emergency vehicles such as Police,  Fire trucks and Ambulances.
4.  Driveways shall be constructed to allow emergency vehicles to turn into the driveway from both directions on the road and to traverse the full length of the driveway up to the dwelling (zoning regulation).  Driveways shall begin at the edge of the paved or dirt road with a minimum width of twenty-four (24) feet, reducing to no less than twelve (12) feet wide with minimum six (6) foot radius transitions on each side of the driveway and containing to its terminus, maintaining the minimum twelve (12) foot width.
5.  The entrance grade must be no more than a 6% slope from that of the road grade, back to the property line - or twenty (20) feet into the driveway from the edge of the existing road surface, so that there is a flat area for a vehicle to rest before proceeding out into the road.
6.  Driveways shall be connected to the public street in such a way as not to create a danger of overloading or impeding the operation of street drainage facilities, and so as not to create a danger of flooding or erosion on  other lots.
7.  If it is deemed by the Highway Superintendent that a culvert or culverts is required, he shall determine the size (width and length) of said culvert.
8.  The driveway must be located no less than 25 feet from the abutter's property line.

Section 4.  **Costs:**
1.   Any and all costs incurred in the construction of such Driveway(s) shall be the responsibility of the landowner or his agent.  Driveway permits may require that the landowner or his agent install, at his own expense, such facilities as are deemed necessary to insure all standards are met.  This may include culverts, ditches, embankments, warning signs, paving or blacktop, (if the driveway is being paved) from the edge of the road surface back to the property line.

Section 5.  **Penalties and Fines:**
1.   The following penalties and fines shall be imposed upon the landowner or his agent for any infractions of the standards set forth in this Bylaw regarding Driveway Standards.

Upon being cited in writing by the Highway Superintendent, the landowner will have 30 days in which to correct (or have corrected) the infraction.  Unless the infraction is corrected, fines will be imposed on the 31st day after written notice has been received.

Enforcement Agent:  Selectboard

| Maximum Fine Allowed: | $100.00 daily |
|---|---|
| 1st Offense: | WARNING |
| 2nd Offense: | $25.00 |
| 3rd Offense | $50.00 |
| 4th Offense: | $100.00 each day |

Each day a violation exists shall be deemed to be a separate violation.

## ADMINISTRATION

1. Board of Appeals

There shall be a Board of Appeals of three (3) members and two (2) associate members appointed by the Selectmen as provided in Chapter 40A of the General Laws which shall act on all matters concerning Zoning, Building Code and Subdivision, if any, within its jurisdiction under this Bylaw in the manner prescribed in Chapter 40A of the General Laws.

2. Enforcement

This Bylaw shall be enforced by the Board of Selectmen, either directly or by an Inspector appointed by them; and upon any well founded information as to violation, the said Board shall take immediate steps to enforce this Bylaw in any manner provided by law. A complaint regarding a violation of this Bylaw should be presented to the Selectmen in writing and the Complainant should be prepared to appear in court to sign a complaint against the violating party.

3. Violations

Any person violating any of the conditions under which a permit or special permit is issued, or any decision rendered by the Board of Appeals, or any of the provisions of this Bylaw, shall be subject to criminal prosecution by indictment or complaint brought before the District Court, and the offending party may be fined a sum not exceeding fifty dollars ($50.00) for each offense. Each day that such violation continues shall constitute a separate offense.

4. Validity

The validity of any section or provision of this Bylaw shall not invalidate any other section or provision hereof.

5. Amendments

This Bylaw or any portion thereof may be amended by a two-thirds (2/3) vote at any regular town meeting, as provided for and in pursuance of the provisions of General Laws, Chapter 40A.

TOWN OF MONTGOMERY
PHASED GROWTH ZONING BYLAW

A. Purpose

The purpose of this Phased Growth By-law is to promote orderly growth in the Town, consistent with the rate of growth experienced over the previous five calendar years (from 1998 through 2003). The Town seeks to ensure that growth occurs in a manner that can be adequately supported by Town services; particularly, that services such as public safety, schools, roads and human services are provided at a level of quality expected by the citizenry and affordable to the Town.

This article will provide the town, its boards and its agencies with:

- information, time and capacity to incorporate such growth into a master plan for the community;
- **the opportunity to establish a 6-year capital improvements plan for the Town and to begin implementing the plan in the annual budget process;**
- appropriate and effective land use regulations consistent with such a master plan;
- the governmental tools necessary to preserve and enhance existing community character and the value of property; and,
- municipal policies necessary to further the general purposes set forth in this section of these bylaws.

For the period from 1998 through 2003, an average of five (5) building permits for residential dwelling units have been issued each year in the Town of Montgomery. Consequently, upon approval and implementation of this bylaw, no more than six (6) new building permits for residential dwelling units will be issued in any consecutive twelve (12) month time period.

B. Definitions

The following terms are defined as followed for the purposes of clarity within this bylaw:

1. Administrative Permit: A permit issued by the Planning Board at a regular meeting verifying that the proposed use meets the required conditions set forth in this bylaw.

2. Building Permit: An official document or certification that is issued by the Building Inspector and which authorizes the construction, alteration, enlargement, conversion, reconstruction, remodeling, rehabilitation, erection, demolition, moving or repair of a building or structure.

3. Dwelling Unit: A single unit containing one or more rooms connected together, providing complete, independent living facilities for one or more persons, including permanent provisions for living, sleeping, eating, cooking and sanitation.

C. Residential Limitation

1. The Building Inspector shall issue building permits for construction of new dwelling units only if the following are true:

   a) Multiple Permits for Development: Building permit issuance will result in not more than three (3) new dwelling units being authorized by the Town, within any twelve (12) month period, for any parcel, including all contiguous properties which have been in the same ownership at any time after the effective date of this bylaw.

   b) Total Number of Permits Town-wide: Building permit issuance will bring the town-wide total to no more than five (5) dwelling units authorized within the previous twelve (12) months, counting any current application but not permits which have lapsed or been withdrawn. This number shall not include up to one (1) additional dwelling unit reserved for residential units designated by the Planning Board through an Administrative Permit as authorizing Special Needs Housing.

2. Special Needs Housing: In this case, "Special Needs Housing" shall mean dwelling units for elderly or handicapped persons, where occupancy of the units is restricted to elderly or handicapped persons through a properly executed and recorded deed restriction running with the land. For the purpose of this section, "elderly" shall mean persons over the age of sixty (60), "handicapped" shall mean persons deemed so by the laws of the State of Massachusetts. A total of one (1) building permit shall be reserved under this bylaw, in any twelve (12) consecutive month period, for issuance to Special Needs Housing applicants. Such dwelling units shall be designated as meeting special housing needs under an Administrative Permit granted by the Planning Board.

D. General Provisions
1. Building Permit Amendments: No change may be made to an existing building permit without approval of the Planning Board and the Building Inspector as required by the State Building Code, 780 CMR 113 and 113.9.

E. Exemptions
The following developments are specifically exempt from limits of the Phased Growth bylaw and shall not affect the number of building permits to be issued in any twelve (12) month period:
1. An application for a building permit for the enlargement, restoration or reconstruction of a dwelling in existence at the date of application for a building permit, provided that no additional dwelling unit is created.
2. Residential dwelling units associated with an education or religious institution that is exempt from zoning use regulations per M.G.L. Chapter 40A, Section 3.

## F. Time Limitation
**This Phased Growth Bylaw shall be in effect for a period of six (6) years after its adoption on its effective date. After this time period, the regulations of this bylaw shall no longer apply to development proposals in Montgomery.**

Passed at a Special Town Meeting held on December 2, 2004
Approved by Attorney General's Office on March 25, 2005
Effective Date is December 2, 2004

# BUILDING CODE
## FOR THE TOWN OF
## MONTGOMERY, MASSACHUSETTS

### ARTICLE 1
### PURPOSE

The purposes of this Bylaw are to promote the health, safety, and the general welfare of all the inhabitants of the Town of Montgomery, and to protect and conserve the value of property and the beauty of the town, to reduce the hazard from fire by regulating the use of land, and the location and use of buildings and structures and the area of open spaces about them.

For the purposes of this law, the Town of Montgomery, under the authority granted by General Laws, Chapter 143, Section 3, does hereby make this bylaw to be hereafter known and designated as the Building Code for the Town of Montgomery, Massachusetts.

### ARTICLE 2
### GENERAL PROVISIONS

**Section 1**

Except as hereinafter provided, no buildings shall be erected, altered or repaired except in conformity with the provisions of this Bylaw.

**Section 2**

No public buildings shall be erected, altered, or repaired except in conformity with the provisions of Chapter 143 of the General Laws.

**Section 3**

No dwelling houses or other structures more than eight feet in length or breadth and seven feet in height, shall hereafter be erected, altered, or repaired except in conformity with the provisions of this Bylaw.

**Section 4**

No person shall construct, alter or substantially repair any building or structure without having first obtained a permit for the same from the Building Inspector.

**Section 5**

Each application for a permit shall contain a general description of the proposed work; and a plot plan indicating the location of the proposed well, septic tank and leach field, and shall be accompanied by two sets of plans and specifications. Said plans and specifications shall be signed by the applicant. When the permit is issued, one set of plans and specifications shall be signed by the Building Inspector and returned to the applicant for filing at the site of the work. The other set shall be filed with the Building Inspector. The permitted work shall proceed in accordance with the set of plans and specifications signed by the Building Inspector.

FEES:  The fee for the permit shall be $1.00 per $1,000.00 estimated cost of the work, not to exceed $25.00, with a minimum fee of $1.00.  This will be payable upon application of building permit.

## Section 6

No person shall erect any foundation or building, or make any extension in the external wall of any structure, or any part thereof, which is to be placed within 40 feet of a way, or place dedicated to public use, before making application to the Board of Selectmen for the location of the lines and grades of such way or place dedicated to public use.

## Section 7

No building will be erected within 25 feet of an abutter's property line, and all building lots will consist of a minimum frontage of 300 feet and contain a minimum of  2½ Acres.

## Section 8

All permits for new residence construction shall be granted only upon provision of acceptable water systems and acceptable sanitary systems of sewage disposal.

## Section 9

No owner or occupant of land shall permit fire or other ruins to be left, but shall remove the same within one year.  All abandoned wells must be filled or permanently covered.

## Section 10

No new dwelling or old dwelling which has been unoccupied for a period of one year may be occupied until a Certificate of Compliancy with this Bylaw has been issued by the Building Inspector.

## ARTICLE 3
### REPAIRS AND RENOVATIONS

## Section 1

Repairs or renovations of buildings may be made without a building permit provided the cost does not exceed $1500 for labor and materials, and such repairs or renovations do not include the cutting away of any supporting timbers, stone, cement or brick wall, in whole or in part, the removal of which would tend to weaken the structure.

## ARTICLE 4
### GENERAL REQUIREMENTS

## Section 1

All excavations for buildings shall be properly guarded and protected to prevent injury to persons or adjoining property.  All excavations for buildings shall be at least six inches clear of the foundation walls, and no back filling shall be done until the masonry walls have been approved by the Building Inspector.  All dwellings hereafter shall be erected on a solid foundation of at least a minimum of an eight inch wall.  If of eight inch block wall construction, buttresses shall be every 12 feet.  All footings shall be a minimum of eight inches by sixteen inches with a frost line of four feet.

At each floor the joists shall be doubled under all partitions, and spiked together, or separators shall be used between the same.  For trimmers or headers around all openings and where the span is excessive, a suitable truss shall be framed in partitions.

All beams and joists shall be free from imperfections that may impair their strength and shall be of such dimensions and materials as the purpose for which the building is used requires.

No bridging shall be more than eight feet from the end of any beam or joists. There shall not be more than eight feet between each row of bridging.  All bridging shall be of suitable strength or subject to approval of the Building Inspector.

Every column, post and other vertical support shall be of sufficient strength to bear safely the weight and proportion of the load of each floor and wall depending upon it for support.

Studs shall be placed not more than sixteen inches on center.

The carrying partition shall have blocking every four feet on horizontal plane or mid-stories.

Lintels or headers over all openings in wooden stud bearing walls and partitions shall be doubled and shall be set on edge.  The spans of such lintels or headers shall not exceed those given in the following table:--

| Span | Lintel or Header |
| --- | --- |
| Up to 4 feet | 2 - two by fours |
| 4 to 5-1/2 feet | 2 - two by sixes |
| 5-1/2 to 7 feet | 2 - two by eights |
| Over 7 feet | 2 - two by tens or sufficient size to support opening |

Section 2

RAFTERS:--

The maximum spans for wooden roof rafters in dwellings shall not exceed those given in the following table.  The span shall be considered as the horizontal distance between supports from plate to ridge or intermediate supports to the ridge.

| Size of Joists (Nominal) In Inches | Spacing Joists Center to Center In Inches | Length | |
| --- | --- | --- | --- |
| | | Feet | Inches |
| 2 x 6 | 16 | 12 | 8 |
| | 24 | 11 | 2 |
| 2 x 8 | 12 | 15 | 11 |
| | 16 | 14 | 8 |
| | 24 | 12 | 11 |
| 2 x 10 | 12 | 17 | 5 |
| | 16 | 15 | 11 |
| | 24 | 14 | 1 |

**Section 3**

Rain water leaders shall not be placed to discharge water upon a sidewalk, and no part of any building shall be constructed so as to discharge water, snow, ice, or waste material upon a public way or a place dedicated to public use.

## ARTICLE 6
### INSPECTOR OF BUILDINGS

**Section 1**

The Board of Selectmen shall be responsible for the enforcement of this Bylaw and annually, in February, and subsequent to the Annual Town Meeting, shall appoint an Inspector of Buildings to hold office for one year from the first of April following and until his successor is appointed.

**Section 2**

The person appointed Inspector of Buildings shall receive such compensation as fixed by the Board of Selectmen within the appropriation for Inspector of Buildings and no other fees or compensation shall be allowed or paid him. No Inspector of Buildings may inspect or approve his own work or any job that he has a personal or financial interest in.

**Section 3**

He shall be under the supervision of the Board of Selectmen and shall be subject to the rules and regulations they may prescribe for the proper conduct of his office. He shall submit an annual report in January of each year of the work of his office for publication in the Town Report.

**Section 4**

The Inspector of Buildings shall make inspection of all building operations in the town, and he may for this purpose enter upon the premises where such operations are carried on at all reasonable times and shall report to the Board of Selectmen all violations of this ordinance and building code, or of the conditions of any permits issued.

## ARTICLE 7
### NON-CONFORMING USES

**Section 1**

Any non-conforming uses (building, structure, or use of land existing at the time of enactment of the Bylaw, and which does not conform to the regulations) may continue in its present use except that any non-conforming use may not be: --

A. Changed to another non-conforming use.

B. Re-established after voluntary discontinuance for one year, except to use conforming with regulations of this Bylaw.

C. Extended.

## ADMINISTRATION

1. **Board of Appeals.**  There shall be a Board of Appeals of three (3) members and two (2) associate members appointed by the Selectmen as provided in Chapter 40A of the General Laws which shall act on all matters concerning Zoning, Building Code, and Subdivision, if any, within its jurisdiction under this Bylaw in the manner prescribed in Chapter 40A of the General Laws.

2. **Enforcement**  This Bylaw shall be enforced by the Board of Selectmen, either directly or by an Inspector appointed by them; and upon any well founded information as to a violation, the said Board shall take immediate steps to enforce this Bylaw in any manner provided by law. A complaint regarding a violation of this Bylaw should be presented to the Selectmen in writing and the complainant should be prepared to appear in court to sign a complaint against the violating party.

3. **Violations**  Any person violating any of the conditions under which a permit or special permit is issued, or any decision rendered by the Board of Appeals, or any of the provisions of this Bylaw, shall be subject to criminal prosecution by indictment or complaint brought before the District Court, and the offending party may be fined a sum not exceeding fifty dollars ($50.00) for each offense.  Each day that such violation continues shall constitute a separate offense.

4. **Validity**  The invalidity of any section or provision of this Bylaw shall not invalidate any other section or provision hereof.

5. **Amendments**  This Bylaw or any portion thereof may be amended by a two-thirds (2.3) vote at any regular town meeting, as provided for and in pursuance of the provisions of General Laws, Chapter 40A.

# EXHIBIT D

# LAW OFFICE OF MEILMAN & COSTA, P.C.

70 WELLS AVENUE, SUITE 200
NEWTON, MA 02459

STEPHANIE K. MEILMAN
(MASS., WASH. & COLO.)
NELSON J. COSTA
(MASS.)
D. SEAN MCMAHON
(MASS.)

TELEPHONE  (617) 969-9500
FACSIMILE  (617) 969-0030

December 23, 2004

**VIA FEDERAL EXPRESS**

Thomas Clark, Building Inspector
Town of Montgomery
161 Main Road
Montgomery, MA  01805

Re:    Request for Cease and Desist Order

Dear Mr. Clark:

I am writing on behalf of my clients, Dennis and Joann Page of 122 Carrington Road, Montgomery, Massachusetts. I am writing to request that you issue an order to Ms. Elsie M. Lafond, who is the owner of the property that abuts the Page's property and is identified by the Town of Montgomery Assessor's Office as Parcel ID 1 350 8 (hereinafter "the subject property"), to cease and desist gravel pit activities. The reason for this request is that Ms. Lafond, or her designee, has recently begun to use the subject property as a gravel pit in violation of the Zoning Bylaw of the Town of Montgomery.

Pursuant to Massachusetts General Law chapter 40A section 7, a town's building inspector is charged with enforcement of its zoning bylaws. Also pursuant to that statute, no permit or license shall be granted for a new use of land that would be in violation of a zoning bylaw. M.G.L. c. 40A § 7. Pursuant to these statutory provisions, we are directing this request to you for your action. If you decline to act to enforce the Zoning Bylaw of the Town of Montgomery in response to this request, you are required to notify us in writing within fourteen (14) days of your receipt of this request.

The basis for this request is that the use of the subject property as a gravel pit is in violation of uses permitted by the Zoning Bylaw of the Town of Montgomery. As of November, 2004, the use of the subject property changed from agricultural to a gravel pit. A simple visual inspection of the subject property confirms that it is now being used as a gravel pit. My clients' residence abuts the subject property and they have informed me that this new activity began this past fall.

Pursuant to Article 2, Section 1 of the Zoning Bylaw of the Town of Montgomery, the entire Town of Montgomery is designated as an Agricultural-Residential District. Pursuant to Article 3, Section 1 A, the permitted uses of property designated as Agricultural-Residential are: farm and nursery; detached one-family dwelling; religious, educational, or municipal; and the renting of rooms or board for not

Thomas Clark, Building Inspector
Town of Montgomery
12/23/2004
Page 2

more than four (4) persons in a dwelling. The permitted uses of property so-designated do not include use as a gravel pit. Such use is in direct violation of the zoning bylaw and interferes with Page's permitted use of their property as a one-family dwelling. Upon information and belief, the owner of the property did not obtain a change of use permit from the Town of Montgomery or any other permit or order that would allow for the use of the property in contravention of the town's zoning bylaw. As this new use of the property is not in compliance with the town's zoning bylaw and no permit or other order excepting the property from the town's zoning bylaw has been granted, we are requesting that you issue an order to Ms. Elsie M. Lafond as the owner of the subject property to cease and desist from using it as a gravel pit.

You should be aware that a separate parcel of property in the area of the subject property that is also owned by Ms. Elsie M. Lafond has been used as a gravel pit. This property is identified by the Town of Montgomery Assessor's Office as Parcel ID 1 236 88. This property does not directly abut the Page's property and is not the subject of this request.

To assist your understanding of the area in question, we have provided an aerial photograph of the area. The photograph was taken in April of 2001 and shows the Page's property, the subject property, and the property that has been used as a gravel pit near the train tracks and the Westfield River. The photograph confirms that the subject property was not being used as a gravel pit as of April, 2001 when the photograph was taken. The dotted lines drawn on the photograph show the approximate extent of the new gravel pit use. The additional pictures show the gravel pit activity at the subject property and were taken from the locations indicated by the corresponding numbers on the aerial photograph.

If you have any questions regarding this request, please do not hesitate to contact me. I look forward to hearing from you.

Very truly yours,

Nelson J. Costa

C:    Dennis and Joann Page (w/enclosures)
      Martin O'Connell, Esq. (w/enclosures)

\\Relia-tech\my documents\sec2001-4\Page\Ltr req cease order 122304.doc

# EXHIBIT E



*The Commonwealth of Massachusetts*

# TOWN OF
# MONTGOMERY

161 Main Road, Montgomery, Massachusetts 01085

### Building Department

January 13, 2005

Elsie M. Lafond
32 Littleville Road
Huntington, MA 01050

RE:  Cease and Desist Order for Gravel Pit
    Property Located off Carrington Road in the Town of Montgomery
    Identified in Assessors Records as ID#'s 1-350-8 and 1-236-88

Dear Mrs. Lafond,

    I have received a letter from the Law Office of Meilman & Costa, P.C., attorneys for Dennis and Joan Page regarding the above referenced property. This letter requested that the building inspector issue a cease and desist order concerning the use of your property as a gravel pit. I have reviewed the Town's records as well as the zoning bylaws. Based on my review, I have determined that the present use of your property as a gravel pit is unlawful. I am hereby ordering you to cease and desist use of the above referenced property as a gravel pit. This order is to be effective immediately.

Sincerely yours,

*Elwin R. Clark Jr.*

Elwin R. Clark, Jr.
Building Inspector &
Zoning Enforcement Officer

Cc:  Gail Donovan of Donovan Bros. Inc.
    Frank Antonucci of Antonucci & Associates
    Nelson J. Costa of Law Office of Meilman & Costa, P.C.
    Jonathan D. Eichman of Kopelman and Paige P.C., Town Attorney

# EXHIBIT F

FEB 10 AM 11:00

# FRANK E. ANTONUCCI, ESQ.
## COUNSELOR AT LAW

83 STATE STREET, SUITE 203
SPRINGFIELD, MA 01103-2009
(413) 737-4667
(800) 325-1109
FAX (413) 731-0602
Email Admin@Antonucci-Law.Com

36 CLIFFWOOD STREET
LENOX, MA 01240
(413) 637-3400
FAX (413) 637-0295
Email LENOX@Antonucci-Law.Com

OTHER OFFICES IN:
WESTFIELD, MA
GREAT BARRINGTON, MA

ADDRESS REPLY TO: [ X ] SPRINGFIELD

[ ] LENOX

FRANK E. ANTONUCCI
MICHAEL E. KOKONOWSKI
THOMAS A. KOKONOWSKI

February 9, 2005

Judith Murphy, Town Clerk
Town of Montgomery
161 Main Road
Montgomery, MA  01085

RE    :    *Notice of Appeal Under G.L. c.40A, § 8 & 15*
            *Property Located off Carrington Road in the Town of Montgomery, MA ("Premises")*

*Appellant #1*    :    *Mr. Gale Donovan d/b/a Donovan Brothers, Inc. ("Appellant #1")*
                        *87 Worthington Road, Montgomery, MA  01085*

*Appellant #2*    :    *Ms. Elsie M. Lafond, 32 Littleville Road, Huntington, MA, 01050 ("Appellant #2")*

*Nature of Appeal:*    This is an appeal to the permit granting authority under the procedures of the Massachusetts Zoning Act, G.L. c. 40A, § 8 & 15, taken by a person aggrieved by the Order of the Town of Montgomery Building Inspector & Zoning Enforcement Officer, Elwin R. Clark, Jr., ordering the Appellants to:

> *"...cease and desist use of the above referenced property as a gravel pit.  This order is to be effective immediately."*

(A copy of said Cease and Desist Order is attached hereto as "Exhibit A").  The Appellants seek action from the Building Inspector & Zoning Enforcement Officer, Elwin R. Clark, Jr., to reverse this Order.

## Grounds for Appeal:

1.    On or about January 13, 2005, the Building Inspector and Zoning Enforcement Officer for the Town of Montgomery served upon the Appellant, Elsie M. Lafond, the owner of record of the subject property and the Appellant, Mr. Gale Donovan of Donovan Brothers, Inc., a copy of Exhibit A attached hereto.  The Building Inspector and Zoning Enforcement Officer further verbally indicated to Mr. Donovan that he should cease and desist all operations and the extracting of gravel on the aforementioned property.  At that time, the Appellant, Gale Donovan d/b/a Donovan Brothers, Inc., was a prospective purchaser of the subject property.

Page 2
February 9, 2005

2.    The property owner and Appellant #2, Elsie M. Lafond, has allowed the Appellant Gale Donovan d/b/a Donovan Brothers, Inc. to extract gravel from the Carrington Road property for a number of years prior to January 13, 2005. Prior to January 13, 2005 the Appellants had not been approached by nor were they provided with any information concerning the alleged violation of the Zoning Bylaws of the Town of Montgomery that gives rise to the apparent Cease And Desist Order.

3.    On or about January 13, 2005 as aforementioned, the Building Inspector and Zoning Enforcement Officer issued the Cease And Desist Order that is the subject of this appeal. Said Cease And Desist Order should be revered on the grounds that:

    a.    Said Cease And Desist Order is outside the scope of authority of the Building Inspector and Zoning Enforcement Officer;

    b.    Said Cease And Desist Order is based upon an error of law;

    c.    Said Cease And Desist Order is not substantiated by the facts in this matter;

    d.    Said Cease And Desist Order is based upon a legally untenable ground and/or is made upon an unlawful procedure and/or is otherwise not in accordance with law and/or is unreasonable, whimsical, capricious and/or arbitrary;

    e.    Said Cease And Desist Order fails to adequately notify the Appellants of the basis under which he and she are not in compliance with the *". . .Town's records as well as the zoning bylaws",* including which alleged permits, variances and/or licenses the Appellants are required to obtain in accordance with Massachusetts General Laws, building codes, and/or the Town of Montgomery's Zoning Bylaws.

**Relief Requested:**  The Appellants request that the Zoning Board exercise powers pursuant to the Massachusetts Zoning Act, the Town of Montgomery Zoning Bylaws and Ordinances and, after public notice and hearing, reverse the Cease and Desist Order of the Building Inspector and Zoning Enforcement Commissioner.

Respectfully submitted,

Gale Donovan d/b/a Donovan Brothers, Inc. and
Elsie M. Lafond, Appellants

By Their Attorney,

Frank E. Antonucci, Esq.

FEA/sms
Enclosures (Exhibit A)

Via Certified Mail, R.R.R.
#7004 1160 0006 1275 0297

Via Federal Express Overnight Mail
#8493 5751 0494





*The Commonwealth of Massachusetts*

# TOWN OF MONTGOMERY

161 Main Road, Montgomery, Massachusetts 01085

## Building Department

January 13, 2005

Elsie M. Lafond
32 Littleville Road
Huntington, MA 01050

RE:  Cease and Desist Order for Gravel Pit
Property Located off Carrington Road in the Town of Montgomery
Identified in Assessors Records as ID#'s 1-350-8 and 1-236-88

Dear Mrs. Lafond,

I have received a letter from the Law Office of Meilman & Costa, P.C., attorneys for Dennis and Joan Page regarding the above referenced property. This letter requested that the building inspector issue a cease and desist order concerning the use of your property as a gravel pit. I have reviewed the Town's records as well as the zoning bylaws. Based on my review, I have determined that the present use of your property as a gravel pit is unlawful. I am hereby ordering you to cease and desist use of the above referenced property as a gravel pit. This order is to be effective immediately.

Sincerely yours,



Elwin R. Clark, Jr.
Building Inspector &
Zoning Enforcement Officer

Cc:  Gail Donovan of Donovan Bros. Inc.
Frank Antonucci of Antonucci & Associates
Nelson J. Costa of Law Office of Meilman & Costa, P.C.
Jonathan D. Eichman of Kopelman and Paige P.C., Town Attorney

# EXHIBIT G

Montgomery Zoning Board of Appeals
Montgomery, Mass.

April 18, 2005

Gale Donovan dba Donovan Brothers
87 Worthington Road
Huntington, Ma   01050

Dear Mr. Donovan:

We wish to inform you that the Montgomery Zoning Board of Appeals
met for the second time on 4/14/05 and concluded the hearing on
your appeal for relief from the Cease and Desist order issued by
the Town Building Inspector, Mr. Clark.

We had originally met on 3/15/05 to discuss the Order and found we
ran into much opposition from the Carrington Road abutters.  We
heard testimony from both sides and concluded that a meeting
extension for one month was in order.  Both sides were asked to
meet with each other and see if they could come to an agreement.
No agreement was reached although you and some others did try.

The Zoning board had a vote after learning no agreement was
forthcoming and several people were heard giving more input.  The
board had a split decision (2 for the Cease and Desist and 1
against).  Mass general law requires a unanimous decision and
therefore the Board of Appeals is required to leave the Cease and
Desist Order in place.

If you have questions, please call me.

Sincerely,
Robert W. Pike Jr.. Chairman


Robert Pike                    Joanne Hebert                    Joseph Fontaine