UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-30136-MAP

DONOVAN BROTHERS, INC., and ELSIE M.
LAFOND,

       Plaintiffs

v.

JOSEPH FONTAINE, JOANNE HEBERT and
ROBERT W. PIKE, JR., as they are the Zoning
Board of Appeals of the Town of Montgomery,
and ELWIN R. CLARK, JR., as he is the
Building Inspector & Zoning Enforcement
Officer of the Town of Montgomery; and
WAYNE L. MORSE, Chairman, CHARLES R.
PECKHAM, and DANIEL JACQUES, as they
are the Board of Selectmen of the Town of
Montgomery,

       Defendants

AFFIDAVIT OF
JONATHAN D. EICHMAN

I, Jonathan D. Eichman, do hereby depose and state that:

1.      I am an attorney with Kopelman and Paige, P.C. and a member in good standing of the Bar of the Commonwealth of Massachusetts.

2.      Kopelman and Paige, P.C., has been counsel for the defendants throughout the above-captioned matter.

3.      Attached hereto as Exhibit A is a true and complete of a deed dated October 12, 2006, and recorded with the Hampden County Registry of Deeds ("Registry") in Book 16254, Page 561, which copy I obtained from the Registry's website.

4.      Attached hereto as Exhibit B is a true and complete copy of a plan recorded with the Registry in Plan Book 343, Page 61.

5.      Attached hereto as Exhibit C is a true and complete copy of a deed recorded with the Registry in Book 2600, Page 501.

6.      Attached hereto as Exhibit D is a true and complete copy of a deed recorded with the Registry in Book 9540, Page 417, and a true and complete copy of a deed recorded with the Registry in Book 9540, Page 419.

7.      Attached hereto as Exhibit E is a true copy of a portion of the transcript of the Deposition of Elwin R. Clark, Jr.

8.      On August 19, 2005, the defendants propounded interrogatories and document requests upon each of the plaintiffs.

9.      Attached hereto as Exhibit F is a true and complete copy of Defendants' First Set of Interrogatories Propounded to the Plaintiff, Donovan Brothers, Inc.

10.     Attached hereto as Exhibit G is a true and complete copy of Defendants' First Set of Interrogatories Propounded to the Plaintiff, Elsie M. LaFond.

11.     Attached hereto as Exhibit H is a true and complete copy of Defendants' First Request for Production of Documents Propounded to Defendant, Elsie M. LaFond.

12.     Attached hereto as Exhibit I is a true and complete copy of Defendants' First Request for Production of Documents Propounded to Defendant, Donovan Brothers, Inc.

13.     Attached hereto as Exhibit J is a true and complete copy of Answers of the Plaintiff, Donovan Brothers, Inc., to Defendants' First Set of Interrogatories.

14.     Attached hereto as Exhibit K is a true and complete copy of Plaintiff, Elsie M. LaFond's Answers to Defendants' First Set of Interrogatories.

15.     Elsie LaFond has never supplemented her initial Answers to Interrogatories, and has never provided the defendants with responses to the document requests propounded upon her.

16.     Attached hereto as Exhibit L is a true and complete copy of Plaintiff's, Donovan Brothers, Inc., Responses to Defendants' First Request for Production of Documents, which comprises Donovan Brothers only response to the defendants' document requests.

17.     Attached hereto as Exhibit M is a true and complete copy of Plaintiff Donovan Brothers, Inc.'s Supplemental and Amended Answers to Defendants' Interrogatories.

18.     Attached hereto as Exhibit N is a true and complete copy of Plaintiff Donovan Brothers, Inc.'s Second Set of Supplemental Answers to Defendants' Interrogatories.

19.     Attached hereto as Exhibit O are true and complete copies of the minutes of the December 23, 2004, February 10, 2005, and February 15, 2005, meetings of the Board of Selectmen of the Town of Montgomery, Massachusetts.

20.     Attached hereto as Exhibit P is a true copy of a portion of the transcript of the Deposition of Daniel Jacques.

21.     Attached hereto as Exhibit Q is a true copy of a portion of the transcript of the Deposition of Charles R. Peckham.

22.     Attached hereto as Exhibit R is a true copy of a portion of the transcript of the Deposition of Wayne L. Morse.

23.     Attached hereto as Exhibit S is a true copy of a portion of the transcript of the Deposition of Joseph Fontaine.

24.     Attached hereto as Exhibit T is a true copy of a portion of the transcript of the Deposition of Robert W. Pike, Jr.

25.    Attached hereto as Exhibit U is a true copy of a portion of the transcript of the

Deposition of Joanne Hebert.


SIGNED UNDER THE PENALTIES OF PERJURY THIS 30th DAY OF
NOVEMBER, 2006


*/s/ Jonathan D. Eichman*
Jonathan D. Eichman (BBO# 641227)


299749/MONT/0007

# EXHIBIT A

Massachusetts Quitclaim Deed (Individual)

*KNOW ALL MEN BY THESE PRESENTS* that I, **ELSIE M. LAFOND,**

of 32 Littleville Road, Huntington, Hampshire County, Massachusetts

in consideration of **FORTY SEVEN THOUSAND AND 00/100 ($47,000.00) DOLLARS**

grant to **DONOVAN BROS, INC.,** a corporation duly organized and existing under the

laws of the Commonwealth of Massachusetts, having its principal place of business at

Worthington Road, Huntington, Hampshire County, Massachusetts

Bk 16254 Pg561  #91567
10-13-2006 @ 11:15a

**with quitclaim covenants**

Certain real estate situated in Montgomery, Hampden County, Massachusetts, being more
particularly described in Exhibit "A" attached hereto and made a part hereof.

WITNESS my hand and seal this     12ᵗʰ    day of October, 2006.

_Mary L. Darling_                    _Elsie M. LaFond_
                                     Elsie M. LaFond

## COMMONWEALTH OF MASSACHUSETTS

Hampden, ss.

On this    12ᵗʰ    day of October, 2006, before me, the undersigned notary public,

personally appeared ELSIE M. LAFOND, proved to me through satisfactory evidence of

identification, which was ~~valid driver's license,~~ *personally known to me* to be the person whose name is signed on the

preceding or attached document, and acknowledged to me that she signed it voluntarily for

its stated purpose.

Martin O'Connell, Notary Public
My commission expires 12/17/10

*(handwritten left margin, vertical): PROPERTY ADDRESS: CHARINGTON (?) MONTGOMERY, MA*

EXHIBIT "A"

That tract of land in Montgomery, Hampden County, Massachusetts, bounded and described as follows:

Bounded on the West by the Westfield River and the old Mill yard; on the North by land of Holly Clark and Son; now or formerly; on the East by the highway leading by B. H. Kagwins house and land of Joseph F. Allyn and on the South by land of R.W. Clark, now or formerly - containing seventy-five (75) acres, more or less.

**EXCEPTING THEREFROM** the following parcels of land:

MASSACHUSETTS STATE EXCISE TAX
HAMPDEN COUNTY REGISTRY OF DEEDS
Date: 10-13-2006 @ 11:15am
Ctl#: 530          Doc#: 91567
Fee: $214.32  Cons: $47,000.00

Exception Parcel 1

That tract of land, with the buildings thereon, located on the Westerly side of Carrington Road in Montgomery, County of Hampden, Commonwealth of Massachusetts, bounded and described as follows:

Beginning at an iron pin located seven hundred and thirty (730) feet Southerly of the point located directly under the power line on said Westerly side of Carrington Road; thence running Southerly along said Carrington Road, two hundred and fifty (250) feet to an iron pin on said Road and other land of Isidore G. LaFond; thence running Westerly, and at right angles with said Road, along other land of said Isidore G. LaFond, two hundred (200) feet to an iron pin at other land of Isidore G. LaFond; thence running Northeasterly along other land of Isidore G. LaFond; in a straight line, three hundred and forty-three (343) feet to an iron pin located one hundred forty-five (145) feet Westerly of the point of beginning; thence running Easterly along other land of Isidore G. LaFond, one hundred forty-five (145) feet, in a straight line, to the iron pin at the point of beginning.

Exception Parcel 2

The land in Montgomery granted to DANIEL JACQUES and TINA M. JACQUES as tenants by the entirety of Montgomery, Hampden County Massachusetts with quitclaim covenants bounded and described as follows:

Beginning at a pin on the westerly line of Carrington Road at the southerly most point of land presently of the Grantee, thence,

| | |
|---|---|
| S 06° 48' 11" E | a distance of 83.65 feet along Carrington Road to a pin thence, |
| N 76° 36' 43" W | a distance of 251.30 feet to a drill hole in a concrete dam thence, |
| N 14° 04' 34" E | a distance of 398.43 feet to an iron post, thence |

S 08° 13' 38" W                     a distance of 340.92 to a rail road tie post, thence,

S 82° 36' 29" E                     a distance of 188.00 feet to the place of beginning.

As described in a deed dated May 20, 1998 and recorded in Hampden County Registry of Deeds at Book 10291, Page 423. The second exception constituting Parcel "A" on a plan of land prepared for Elsie M. Lafond dated May 8, 1998 by Linwood H. Fisk which plan is recorded in Plan Book 307, Page 116.

BEING the property deeded to the Grantor herein by deed of Deborah J. Pilgrim, Mary St. Jean, Constance A. LaFond and Donald H. LaFond, by deed dated June 22, 1996 recorded in Hampden County Registry of Deeds at Book 9540, Page 417.

SUBJECT to the easement from Guy A. Fisk to New England Telephone & Telegraph Company, dated July 19, 1937, recorded in Hampshire Deeds, Book 926, Page 139.

BEING a portion of TRACT 3 conveyed to Louis W. LaFond by Deed of Isidore G. Lafond dated February 11, 1960 and recorded in the Hampshire County Registry of Deeds, Book 1320, Page 314. Louis W. LaFond died on December 23, 1987. See Hampshire County Probate Court #92P0392A1. SEE ALSO Deed from Pheobe Kirway, alias, Executor under the Will of Mary Rivard, otherwise Mary Maud Rivard, to Isidore G. LaFond dated March 30, 1958 and recorded in the Hampden County Registry of Deeds, Book 2600, Page 501.

Meaning and intending to convey and hereby conveying all my right, title and interest in property shown on a plan entitled "Survey of Property in Montgomery, Mass. for Donovan Bros., Inc." dated November 3, 2004, updated September 18, 2006, and recorded in the Hampden County Registry of Deeds in Plan Book 343 , Page 61 .

DONALD E. ASHE, REGISTER
HAMPDEN COUNTY REGISTRY OF DEEDS

# EXHIBIT B

# EXHIBIT C

501 ⑥

6596

KNOW ALL MEN BY THESE PRESENTS THAT I, PHEEBE KIRWAN,

OTHERWISE PHOEBE KIRWAN, OF SPRINGFIELD, HAMPDEN COUNTY, MASSACHUSETTS,

EXECUTOR under the WILL of ~~ADMINISTRATOR-DE-BONIS-NON-TRUSTEE-OR-GUARDIAN~~
~~OR-CONSERVATOR-OR-TRUSTEE-UNDER-DECLARATION-OR-VOLUNTARY-OR-COMMISSIONER~~
Mary Rivard, otherwise Mary Maud Rivard, late of Montgomery, in the
County of Hampden, Commonwealth of Massachusetts,
by power conferred by the Probate Court of Hampden County, under License
issued on March 7, 1958, Probate Case No. 106834,

and every other power,
for Five Thousand ($5000.00) ----------------------------------------- Dollars
paid, grant to    ISIDORE G. LAFOND, HUNTINGTON, HAMPSHIRE COUNTY, MASSACHUSETTS,

the land in  Montgomery, Hampden County, Massachusetts, together with the
buildings thereon, bounded and described as follows:

Bounded on the West by the Westfield River and the old Mill yard;
on the North by land of Holly Clark and Son, now or formerly; on the
East by the Highway leading by B. H. Kagwins house and land of Joseph F.
Allyn and on the South by land of R. W. Clark, now or formerly; containing
seventy five (75) acres, more or less.

Being the same premises conveyed to Mary Maud Rivard and Louis
Isedore Rivard, Jr. by deed of George B. Aldrich et ux., dated May 5,
1923 and recorded in Hampden County Registry of Deeds, Book 1178,
Page 210, and EXCEPTING from the above described parcel of land so
much as was deeded off to George F. Kirwan et ux., by deed of Mary Maud
Rivard (Widow) dated December 20, 1954 and recorded in Hampden County
Registry of Deeds, Book 2449, Page 496. Reference is also made to
deed of E. Boise Lewis, as Administrator of the Estate of Louis Isadore
Rivard, Jr. to Mary Maud Rivard, Recorded in said Registry in Book 2448,
Page 429.

COMMONWEALTH OF MASSACHUSETTS
DEEDS EXCISE
APR 1958
$595

HAMPDEN

 

Witness my hand and seal this 20th day of March 19 58

Joseph P. Ferriter

Pheeby Kirwan otherwise
Pheebe Kirwan, otherwise Phoebe
Kirwan, Executrix of the WILL of
Mary Rivard, otherwise Mary Maud
Rivard, late of Montgomery, deceased

The Commonwealth of Massachusetts

Hampden        ss.            March 20th., 19 58

Then personally appeared the above named  Pheebe Kirwan, otherwise Phoeby Kirwan
Executrix of the Will of Mary Rivard, otherwise, Mary Maud Rivard,
and acknowledged the foregoing instrument to be her  free act and deed, before me

Joseph P. Ferriter

RECEIVED
APR 4 1958
AT 11:47 M
REC'D FROM THE ORIGINAL

Joseph P. Ferriter    ~~Notary Public~~ Justice of the Peace

My commission expires Feb. 20, 19 65

# EXHIBIT D

Massachusetts Quitclaim Deed (Individual)

KNOW ALL MEN BY THESE PRESENTS that we, **DEBORAH J. PILGRIM** of 185 West Road, Westfield, Hampden County, **MARY ST. JEAN** of 44 Littleville Road, Huntington, Hampshire County, **CONSTANCE A. LaFOND** of 32 Littleville Road, Huntington, Hampshire County, and **DONALD H. LaFOND** of 32 Littleville Rd., Hampshire County, all in Massachusetts,

for one dollar

grant to **ELSIE M. LaFOND** of 32 Littleville Road, Huntington, Hampshire County, Massachusetts          **with quitclaim covenants**

all our right, title and interest in and to the following property:

That tract of land in Montgomery, Hampden County, Massachusetts, with the buildings thereon, bounded and described as follows:

Bounded on the West by the Westfield River and the old Mill yard; on the North by land of Holly Clark and Son; now or formerly; on the East by the highway leading by B. H. Kagwins house and land of Joseph F. Allyn and on the South by land of R.W. Clark, now or formerly - containing seventy-five (75) acres, more or less.

EXCEPTING THEREFROM the following parcel of land:

that tract of land, with the buildings thereon, located on the Westerly side of Carrington Road in Montgomery, County of Hampden, Commonwealth of Massachusetts, bounded and described as follows:

Beginning at an iron pin located seven hundred and thirty (730) feet Southerly of the point located directly under the power line on said Westerly side of Carrington Road; thence running Southerly along said Carrington Road, two hundred and fifty (250) feet to an iron pin on said Road and other land of Isidore G. LaFond; thence running Westerly, and at right angles with said Road, along other land of said Isidore G. LaFond, two hundred (200) feet to an iron pin at other land of Isidore G. LaFond; thence running Northeasterly along other land of Isidore G. LaFond; in a straight line, three hundred and forty-three (343) feet to an iron pin located one hundred forty-five (145) feet Westerly of the point of beginning; thence running Easterly along other land of Isidore G. LaFond, one hundred forty-five (145) feet, in a straight line, to the iron pin at the point of beginning.

SUBJECT TO the easement from Guy A. Fisk to New England Telephone & Telegraph Company, dated July 19, 1937, recorded in Hampshire Deeds, Book 926, Page 139.

BEING TRACT 3 conveyed to Louis W. LaFond by Deed of Isidore G. Lafond dated February 11, 1960 and recorded in the Hampshire County Registry of Deeds, Book 1320, Page 314, a certified copy of which is recorded herewith.  Louis W. LaFond died on December 23, 1987, see Hampshire County Probate Court #92P0392A1.  SEE ALSO Deed from Phoebe Kirway, alias, Executor under the Will of Mary Rivard, otherwise Mary Maud Rivard, to Isidore G. LaFond dated March 30, 1958 and recorded in the Hampden County Registry of Deeds, Book 2600, Page 501.

NO TITLE EXAMINATION PERFORMED AT REQUEST OF GRANTEE.

WITNESS our hands and seals this 22nd day of June, 1996.

Witness _____       _Deborah J. Pilgrim_
                                         Deborah J. Pilgrim

Witness _____       _Mary St. Jean_
                                         Mary St. Jean

Witness _____       _Constance A. LaFond_
                                         Constance A. LaFond

Witness _____       _Donald H. LaFond_
                                         Donald H. LaFond

BK:09840-0418 96-06-28  3:02 #041743

## COMMONWEALTH OF MASSACHUSETTS

Hampden, ss.                                                    June 22, 1996

Then personally appeared the above-named DEBORAH J. PILGRIM, MARY
ST. JEAN, CONSTANCE A. LaFOND and DONALD H. LaFOND and acknowledged the
foregoing instrument to be their free act and deed, before me,

_____
Martin O'Connell, Notary Public
My commission expires: 1/31/97

DONALD E. ASHE, REGISTER
HAMPDEN COUNTY REGISTRY OF DEEDS

Massachusetts Quitclaim Deed (Individual)

BK08840-0419 96-06-28  3:02 #041744

KNOW ALL MEN BY THESE PRESENTS that I, **LOUIS A. LaFOND,**

of P.O. Box 32, Lady Lake, Lake County, Florida

for no monetary consideration

grant to **ELSIE M. LaFOND** of 32 Littleville Road, Huntington, Hampshire

County, Massachusetts                    **with quitclaim covenants**

all my right, title and interest in and to the following property:

That tract of land in Montgomery, Hampden County, Massachusetts, with the buildings thereon, bounded and described as follows:

Bounded on the West by the Westfield River and the old Mill yard; on the North by land of Holly Clark and Son; now or formerly; on the East by the highway leading by B. H. Kagwins house and land of Joseph F. Allyn and on the South by land of R.W. Clark, now or formerly - containing seventy-five (75) acres, more or less.

EXCEPTING THEREFROM that tract of land, with the buildings thereon, located on the Westerly side of Carrington Road in Montgomery, County of Hampden, Commonwealth of Massachusetts, bounded and described as follows:

Beginning at an iron pin located seven hundred and thirty (730) feet Southerly of the point located directly under the power line on said Westerly side of Carrington Road; thence running Southerly along said Carrington Road, two hundred and fifty (250) feet to an iron pin on said Road and other land of Isidore G. LaFond; thence running Westerly, and at right angles with said Road, along other land of said Isidore G. LaFond, two hundred (200) feet to an iron pin at other land of Isidore G. LaFond; thence running Northeasterly along other land of Isidore G. LaFond; in a straight line, three hundred and forty-three (343) feet to an iron pin located one hundred forty-five (145) feet Westerly of the point of beginning; thence running Easterly along other land of Isidore G. LaFond, one hundred forty-five (145) feet, in a straight line, to the iron pin at the point of beginning.

SUBJECT TO the easement from Guy A. Fisk to New England Telephone & Telegraph Company, dated July 19, 1937, recorded in Hampshire Deeds, Book 926, Page 139.

BEING TRACT 3 conveyed to Louis W. LaFond by Deed of Isidore G. LaFond dated February 11, 1960 and recorded in the Hampshire County Registry of Deeds, Book 1320, Page 314, a certified copy of which is recorded herewith. Louis W. LaFond died on December 23, 1987, see Hampshire County Probate Court #92P0392A1. SEE ALSO Deed from Pheobe Kirway, alias, Executor under the Will of Mary Rivard, otherwise Mary Maud Rivard, to Isidore G. LaFond dated March 30, 1958 and recorded as aforesaid in Book 2600, Page 501.

NO TITLE EXAMINATION PERFORMED AT REQUEST OF GRANTEE.

WITNESS my hand and seal this _14_ day of _June_, 1996.

_____            _____
Witness                              Louis A. LaFond

RP:09540-0420 96-06-28 3:02 #041744

### STATE OF FLORIDA

County of Lake                                                    June 14 , 1996

    Then personally appeared the above-named LOUIS A. LaFOND and acknowledged the foregoing instrument to be his free act and deed, before me,

_____
, Notary Public
My commission expires

DONALD E. ASHE, REGISTER
HAMPDEN COUNTY REGISTRY OF DEEDS

# EXHIBIT E

Vol. I, Pgs. 1-78

UNITED DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. No. 05-30136-MAP

-------------------------------------

DONOVAN BROTHERS, INC.,                )

AND ELSIE LAFOND,                      )

      Plaintiffs                     )

vs.                                    )

JOSEPH FONTAINE, JOANNE HEBERT         )

and ROBERT W. PIKE, JR., as            )

they are the Zoning Board of           )

Appeals of the Town of Montgomery,     )

and ELWIN R. CLARK, JR., as he         )

is the Building Inspector & Zoning      )

Enforcement Officer of the Town of     )

Montgomery,                            )

      Defendants                     )

                                       )

-------------------------------------

DEPOSITION OF ELWIN R. CLARK, JR.

Friday, October 14, 2005

11:30 a.m. - 1:20 p.m.

ANTONUCCI & ASSOCIATES

83 State Street

Springfield, Massachusetts  01103

- - - - - Sandra A. Deschaine, RPR - - - - -

COURT REPORTING SERVICES

P.O. BOX 15272

Springfield, Massachusetts  01115

(413) 786-7233  Fax (413) 786--0299

Deposition of: Elwin Clark                Volume 1                        October 14, 2005
Donovan Brothers, et al vs. Joseph Fontaine, et al

Page 2

1  APPEARANCES:
2  ANTONUCCI & ASSOCIATES
3      L. Jeffrey Meehan, Esquire
4      83 State Street
5      Springfield, Massachusetts 01103
6      (413) 737-4667 Fax (413) 731-0602
7      on behalf of the Plaintiffs
8
9  KOPELMAN AND PAIGE, P.C.
10      Jonathan D. Eichman, Esquire
11      31 St. James Avenue
12      Boston, MA  02116
13      (617) 556-0007  FAX (617) 654-1735
14      on behalf of the Defendants
15
16
17
18
19
20
21
22
23
24

Page 4

1      ELWIN R. CLARK, JR., Deponent, having
2  first been satisfactorily identified by the
3  production of his driver's license and duly
4  sworn by the Notary Public, was examined and
5  testified as follows:
6
7  EXAMINATION BY MR. ANTONUCCI:
8
9      Q.  Could you please identify
10  yourself?
11      MR. ANTONUCCI:  Usual
12  stipulations?
13      MR. EICHMAN:  Yes, that's fine.
14      MR. ANTONUCCI:  Read and sign?
15      MR. EICHMAN:  Yes, I think so.
16      MR. ANTONUCCI:  Do you want a
17  copy?
18      MR. EICHMAN:  Yes, I think so.
19
20  EXAMINATION BY MR. ANTONUCCI:
21
22      Q.  Could you state your full name
23  for us?
24      A.  Elwin Ray Clark, Junior.

Page 3

1           I N D E X
2  -------------------------------------------
   WITNESSES:                    PAGE
3  -------------------------------------------
4  Elwin Clark
5      By Mr. Antonucci          4
6  -------------------------------------------
   EXHIBITS:    DESCRIPTION    PAGE
7  -------------------------------------------
8  Exhibit 1  Letter dated 1/18/05    74
9  Exhibit 2  Letter dated 12/23/04   74
10  Exhibit 3  Zoning Bylaw for the
          Town of Montgomery    74
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1      Q.  Mr. Clark, I'm Frank Antonucci,
2  and I represent Mr. Gail Donovan and Donovan
3  Brothers of Huntington, and I'm going to ask
4  you questions regarding a cease and desist
5  order issued against Donovan Brothers for
6  property located in Montgomery owned by
7  Elsie Lafond who I also represent.
8      If you don't understand my
9  questions, just let me know and I'll try to
10  rephrase it, because I can, and maybe many
11  lawyers, have a tendency to be overly legal
12  and make it a little difficult to understand
13  the question.  So just let me know and I'll
14  try to rephrase the question.  If you need
15  take to talk to your attorney, who is here
16  with you today, let me know and I'll leave
17  the room so you can have some privacy with
18  him.
19      A.  All right.
20      Q.  If you need a break for other
21  purposes, let me know.
22      A.  Auh-huh.
23      Q.  Unless you otherwise indicate I'm
24  going to assume you understood the question

2 (Pages 2 to 5)

Case 3:05-cv-30136-MAP    Document 45-3    Filed 11/30/2006    Page 4 of 12
Deposition of: Elwin Clark    Volume I    October 14, 2005
Donovan Brothers, et al vs. Joseph Fontaine, et al

Page 62

1  time?
2       MR. EICHMAN: I think this is me
3  but go ahead.
4       **A. And he said that we are going to**
5  **handle one cease and desist order at a time.**
6       MR. ANTONUCCI: Is that you,
7  Attorney Eichman?
8       MR. EICHMAN: I don't remember
9  saying that. It's possible. I just don't
10  remember.
11      Q. Is there any reason why you
12  singled out Mr. Donovan as opposed to
13  Mr. Peckham or Mr. Morse's relative?
14      **A. It's never been a conflict**
15  **before, that's the problem.**
16      Q. Well, you would agree with me,
17  sir, based upon your answer and the advice
18  that you received, that your opinion is that
19  the zoning bylaws don't permit gravel pits
20  to be operated in the Town of Montgomery; is
21  that correct?
22      **A. Yes.**
23      Q. Why haven't you closed down all
24  of them?

Page 63

1       MR. EICHMAN: I think you asked
2  that before. Objection. If you want to
3  explain why you don't have an answer. I
4  thought he answered it.
5       Q. Can I have your answer?
6       **A. I explained before that the**
7  **lawyer said we are going to do this one step**
8  **at a time.**
9       Q. And you interpreted that to just
10  deal with Donovans?
11      **A. Exactly.**
12      Q. Is there any other reason why
13  you've only dealt with Donovans?
14      **A. No.**
15      Q. Do you think it's fair to close
16  Donovan's down and let the others operate?
17      MR. EICHMAN: Objection, don't
18  answer that.
19      Q. Is there anything different about
20  the nature or operation of the other gravel
21  pits as opposed to the one that Mr. Donovan
22  was operating on the Lafond property, other
23  than location and size?
24      **A. No.**

Page 64

1       Q. They were all similar or the
2  same?
3       **A. Except for the location.**
4       Q. Did you talk with any abutters of
5  the Lafond property prior to issuing the
6  cease and desist order?
7       **A. No.**
8       Q. Is there anything else you did
9  with respect to the investigation of the
10  operation of the gravel pit operated by
11  Donovan Brothers, other than what you've
12  told us about today, namely look for records
13  in the town, go to the property on two
14  occasions, speak with Mr. Donovan, speak
15  with an attorney who we're not sure who that
16  is?
17      **A. No.**
18      Q. Anything else you did?
19      **A. No.**
20      Q. Have you ever issued a cease and
21  desist order against anybody else in the
22  Town of Montgomery in your capacity as a
23  building inspector over the years?
24      **A. No.**

Page 65

1       Q. This is the first and only one
2  you've ever issued?
3       **A. Exactly.**
4       Q. And if I understand the cease and
5  desist order, the basis for the cease and
6  desist order is that you've determined that
7  it was unlawful; isn't that correct?
8       **A. Yes.**
9       Q. And that's based upon what you
10  say in the letter was your review of the
11  town records and the zoning bylaws; is that
12  correct?
13      **A. I have to talk to —**
14      MR. EICHMAN: Well, the question
15  is, is that what you said in the letter?
16  You can just look at the letter.
17      Q. That's what you said in the
18  letter, right?
19      **A. Yes.**
20      Q. And you've described to us what
21  you looked at, what you attempted to find?
22      **A. Right.**
23      Q. Is there anything else that you
24  based it upon in the way of documents?

17 (Pages 62 to 65)

Case 3:05-cv-30136-MAP    Document 45-3    Filed 11/30/2006    Page 5 of 12
Deposition of: Elwin Clark                    Volume 1                    October 14, 2005
Donovan Brothers, et al vs. Joseph Fontaine, et al

Page 66

1    A.  I would say no.
2    Q.  And did you look at the current
3  zoning bylaws after you issued the letter of
4  the 13th, if I'm understanding you
5  correctly?
6    A.  They're in the process -- I don't
7  know how to explain myself about that.
8  They're in the process of being changed or
9  whatever.
10    Q.  Well, I'm a little confused, and
11  I'm not trying to go over ground because I'm
12  just as anxious to get this over with as you
13  are, believe it or not.  And I'll try to
14  keep it as simple as possible?
15    A.  Thank you.
16    Q.  Did you look at the zoning bylaws
17  that you showed me, which are 1956, dated
18  1956, did you look at this prior to January
19  13th?
20    A.  No, I did not.
21    Q.  Did you look at the current, the
22  existing, not the new proposed, but the
23  existing bylaws prior to January 13th?
24    A.  As far as I'm concerned, there is

Page 67

1  to be no gravel pits in the Town of
2  Montgomery.
3    Q.  Upon what do you base that?
4    A.  Because it's a one- and
5  two-family community and that's it.
6    Q.  And that's what you always
7  understood since the seventies?
8    A.  Exactly.
9    Q.  And that's the basis for you
10  issuing the cease and desist order?
11    A.  Yes.
12    Q.  Would it make a difference to you
13  if the Donovan operation was not a new
14  operation but had been going on for a number
15  of years, as to whether or not that they
16  were in violation and therefore unlawful?
17    MR. EICHMAN:  Objection.  You can
18  answer if you know.
19    A.  No.
20    Q.  No, you don't know or no, you --
21    A.  No, it wouldn't make any
22  difference.
23    Q.  Would it make any difference to
24  you if you had in fact found a permit or

Page 68

1  license for them to operate given to
2  Mr. Donovan or Ms. Lafond under the old
3  zoning bylaws?
4    A.  I would say yes.
5    Q.  Now, with respect to the letter
6  from Mr. Costa dated the 23rd, you were
7  acting on the basis of this complaint by
8  Mr. Page sent to you through Mr. Costa; is
9  that correct?
10    A.  Yes.
11    Q.  And within that letter, there's
12  an indication that there are apparently two
13  separate parcels owned by Ms. Lafond.  Are
14  you aware of that?
15    A.  Yes.
16    Q.  This complaint in fact dealt with
17  the portion or the parcel that abutted
18  Mr. Page; is that correct?
19    A.  To my understanding.
20    Q.  On the second page in fact, in
21  the second paragraph and I'll just read it
22  quickly, "You should be aware that a
23  separate parcel of property in the area of
24  the subject property that is also owned by

Page 69

1  Ms. Lafond has been used as a gravel pit.
2  This property is identified," and gives the
3  assessor's identification, and it says,
4  "This is not a subject of this request"; is
5  that correct?
6    A.  Yes.
7    Q.  Were you acting on this complaint
8  only?
9    A.  Yes.
10    Q.  You didn't receive any complaint
11  from Mr. Jasques, the other abutter?
12    A.  No.
13    Q.  Is it fair to say that your cease
14  and desist order and your inspection and
15  your determination deals just with the
16  parcel abutting Mr. Page?
17    A.  Yes.
18    Q.  And you received an aerial
19  photograph of the property; is that correct?
20    A.  Yes.
21    Q.  Do you still have that, if you
22  know?
23    MR. EICHMAN:  I didn't see it in
24  the file.

18 (Pages 66 to 69)

Vol. I, Pgs. 1-78

UNITED DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. No. 05-30136-MAP

----------------------------------

                                       )

DONOVAN BROTHERS, INC.,           )

AND ELSIE LAFOND,                )

           Plaintiffs        )

vs.                                )

JOSEPH FONTAINE, JOANNE HEBERT   )

and ROBERT W. PIKE, JR., as    )

they are the Zoning Board of    )

Appeals of the Town of Montgomery, )

and ELWIN R. CLARK, JR., as he   )

is the Building Inspector & Zoning )

Enforcement Officer of the Town of )

Montgomery,                     )

           Defendants        )

                                         )

----------------------------------

DEPOSITION OF ELWIN R. CLARK, JR.

Friday, October 14, 2005

11:30 a.m. - 1:20 p.m.

ANTONUCCI & ASSOCIATES

83 State Street

Springfield, Massachusetts  01103

- - - - - Sandra A. Deschaine, RPR - - - - -

COURT REPORTING SERVICES

P.O. BOX 15272

Springfield, Massachusetts  01115

(413) 786-7233  Fax (413) 786--0299

Case 3:05-cv-30136-MAP    Document 45-3    Filed 11/30/2006    Page 7 of 12
Deposition of: Elwin Clark                Volume I                        October 14, 2005
Donovan Brothers, et al vs. Joseph Fontaine, et al

Page 2

1   APPEARANCES:
2   ANTONUCCI & ASSOCIATES
3      L. Jeffrey Meehan, Esquire
4      83 State Street
5      Springfield, Massachusetts 01103
6      (413) 737-4667 Fax (413) 731-0602
7      on behalf of the Plaintiffs
8
9   KOPELMAN AND PAIGE, P.C.
10     Jonathan D. Eichman, Esquire
11     31 St. James Avenue
12     Boston, MA  02116
13     (617) 556-0007 FAX (617) 654-1735
14     on behalf of the Defendants
15
16
17
18
19
20
21
22
23
24

Page 4

1        ELWIN R. CLARK, JR., Deponent, having
2   first been satisfactorily identified by the
3   production of his driver's license and duly
4   sworn by the Notary Public, was examined and
5   testified as follows:
6
7   EXAMINATION BY MR. ANTONUCCI:
8
9        Q.  Could you please identify
10  yourself?
11       MR. ANTONUCCI:  Usual
12  stipulations?
13       MR. EICHMAN:  Yes, that's fine.
14       MR. ANTONUCCI:  Read and sign?
15       MR. EICHMAN:  Yes, I think so.
16       MR. ANTONUCCI:  Do you want a
17  copy?
18       MR. EICHMAN:  Yes, I think so.
19
20  EXAMINATION BY MR. ANTONUCCI:
21
22       Q.  Could you state your full name
23  for us?
24       A.  Elwin Ray Clark, Junior.

Page 3

1            I N D E X
2   ------------------------------------------
    WITNESSES:                  PAGE
3   ------------------------------------------
4   Elwin Clark
5      By Mr. Antonucci          4
6   ------------------------------------------
    EXHIBITS:    DESCRIPTION       PAGE
7   ------------------------------------------
8   Exhibit 1  Letter dated 1/18/05      74
9   Exhibit 2  Letter dated 12/23/04     74
10  Exhibit 3  Zoning Bylaw for the
               Town of Montgomery        74
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1        Q.  Mr. Clark, I'm Frank Antonucci,
2   and I represent Mr. Gail Donovan and Donovan
3   Brothers of Huntington, and I'm going to ask
4   you questions regarding a cease and desist
5   order issued against Donovan Brothers for
6   property located in Montgomery owned by
7   Elsie Lafond who I also represent.
8        If you don't understand my
9   questions, just let me know and I'll try to
10  rephrase it, because I can, and maybe many
11  lawyers, have a tendency to be overly legal
12  and make it a little difficult to understand
13  the question.  So just let me know and I'll
14  try to rephrase the question.  If you need
15  take to talk to your attorney, who is here
16  with you today, let me know and I'll leave
17  the room so you can have some privacy with
18  him.
19       A.  All right.
20       Q.  If you need a break for other
21  purposes, let me know.
22       A.  Auh-huh.
23       Q.  Unless you otherwise indicate I'm
24  going to assume you understood the question

2 (Pages 2 to 5)

Page 30

1   A.  Exactly.
2   Q.  Jane Thielen told you?
3   A.  Yes.
4   Q.  Did you get an increase in pay
5   for this new responsibility?
6   A.  No.
7   Q.  And were you given anything in
8   writing from her indicating that you should
9   do this?
10  A.  No.
11  Q.  Did you have any communication
12  from the selectmen that this is now, as your
13  supervisor, that the select board was now
14  directing you to do this?
15  A.  No.
16  Q.  If I understand you correctly,
17  you had no conversation with them with
18  respect to this new position, at that time?
19  A.  Right.
20  Q.  And you had no discussion with
21  them with respect to the actual inspection
22  and determination as to the allegations
23  contained in the letter of the 23rd?
24      MR. EICHMAN:  Objection, form.

Page 31

1   You can answer.  If you can answer.  If you
2   want him to repeat it, just ask him.
3   A.  Can you repeat the question?
4   Q.  Did you have any discussion with
5   the selectmen with respect to the
6   allegations in Mr. Costa's letter with
7   regard to a violation of the zoning bylaws?
8   A.  No.
9   Q.  So any communication you had from
10  the town with respect to this new
11  responsibility and this inspection was with
12  Jane Thielen?
13      THE WITNESS:  Can we go off the
14  record?
15      MR. ANTONUCCI:  Do you want me to
16  leave the room again?
17      THE WITNESS:  No.
18      MR. EICHMAN:  If you have a
19  question, you can simply say you don't
20  understand, ask him to rephrase.
21  A.  I don't understand and the second
22  thing is —
23      MR. EICHMAN:  Wait a minute.
24  Q.  You don't understand the

Page 32

1   question?
2   A.  Exactly.
3   Q.  What I'm understanding is, is
4   that sometime after the 23rd you went to
5   Town Hall and Jane Thielen, in whatever
6   capacity or title she has, gave you this
7   letter and said this is your responsibility
8   to inspect.  You are now the code enforcer
9   in addition to being the building inspector,
10  this is part of your duties; I'm right to
11  that point?
12  A.  Yes.
13  Q.  And she told you you'll have to
14  go down there and check this situation out?
15  A.  Yes.
16  Q.  The allegations in the letter of
17  December 23rd?
18  A.  Yes.
19  Q.  And you accepted that
20  responsibility?
21  A.  Yes.
22  Q.  You didn't question her?
23  A.  No.
24  Q.  You didn't question the selectmen

Page 33

1   as to why you were now, for the first time
2   since 1973, having to do this; is that
3   correct?
4   A.  Yes.
5   Q.  And you never, correct me if I'm
6   wrong, talked to the selectmen before you
7   wrote to Ms. Lafond on the 13th?
8   A.  Well, it was my new duties.
9   Q.  I know it.  But did you talk to
10  the selectmen?
11  A.  No.
12  Q.  Who was it that was giving you
13  those new duties?
14  A.  I feel the selectmen were all in
15  conflict of interest again.
16  Q.  But who gave you the duties to go
17  out and do this?
18  A.  The letter that I received from
19  the — I can't remember what the attorney's
20  name is.
21  Q.  Well, Attorney Costa complained
22  about a situation, right, within this
23  letter?
24  A.  Yes.

9 (Pages 30 to 33)

Case 3:05-cv-30136-MAP    Document 45-3    Filed 11/30/2006    Page 9 of 12
Deposition of: Elwin Clark                Volume I                    October 14, 2005
Donovan Brothers, et al vs. Joseph Fontaine, et al

Page 58

1  desist order, you indicated you reviewed the
2  town records as well as the zoning bylaws;
3  is that correct?
4      A.  Yes.
5      Q.  That's what you said in your
6  cease and desist order.  I'm referring to
7  the letter dated the 13th.  And you said, "I
8  have determined that the present use of your
9  property," this is the letter to
10  Mrs. Lafond, "as a gravel pit is unlawful";
11  is that correct?
12      A.  Right.
13      Q.  That's what it says?
14      A.  Right.
15      Q.  Tell me the basis for that
16  opinion that it was unlawful.
17      MR. EICHMAN:  If you know.
18      THE WITNESS:  Well, it's the
19  lawyer again.
20      MR. EICHMAN:  He's not asking you
21  what you told your lawyer.
22      THE WITNESS:  No, what the lawyer
23  told me.
24      MR. EICHMAN:  Which lawyer?  I

Page 59

1  don't believe it was me.
2      THE WITNESS:  No, it wasn't.
3      MR. EICHMAN:  Was it an attorney
4  that you were --
5      Q.  I'll ask him.  You've made
6  reference to a lawyer, other than attorney
7  Eichman, who is the town lawyer?
8      A.  Right.
9      Q.  Did you confer with a private
10  lawyer regarding this situation, your own
11  personal lawyer?
12      A.  The town's personal lawyer, yep.
13      Q.  Identify who the town's personal
14  lawyer is.
15      MR. EICHMAN:  You can answer
16  that.  Do you remember his name?
17      THE WITNESS:  No.
18      Q.  When did you talk with this
19  lawyer, whoever he is?
20      A.  After I figured that this was an
21  issue.
22      Q.  What was an issue?
23      A.  About gravel pits in the Town of
24  Montgomery.

Page 60

1      Q.  And this was the town's personal
2  lawyer you're saying, someone other than
3  Attorney Eichman?
4      A.  Because the town --
5      Q.  I'm just trying to identify who
6  the person is.  Was he someone else in
7  Mr. Eichman's office?
8      A.  I think he was.
9      Q.  So it was someone with Kopelman
10  and Paige?
11      A.  Seeing as how --
12      Q.  We're on the record.
13      A.  Seeing as how --
14      MR. EICHMAN:  Wait a minute.  I
15  don't think there's a question in front of
16  him at this point.  It seems like the last
17  question was, was he from Kopelman And Paige
18  and the answer was yes and I think that's
19  where we stopped.
20      Q.  Was the lawyer from Boston,
21  Westfield, Montgomery, Huntington?  Where
22  was he from?
23      A.  I think it was from Worcester.
24      Q.  Did you talk with him on the

Page 61

1  phone or meet with him in person?
2      A.  Talked to him on the phone.
3      Q.  And who was it that put you in
4  contact with this person?
5      A.  Let me explain myself.
6      MR. EICHMAN:  Just answer the
7  question first.
8      Q.  Who was it that put you in touch
9  with this person?
10      A.  The selectmen were all in
11  conflict of interest, supposedly, so they
12  told me that I would have to get my own
13  lawyer.
14      Q.  Did you get your own lawyer or
15  did they give you the name of a lawyer you
16  should talk to?
17      A.  Jane Thielen gave me the name of
18  a lawyer.
19      Q.  And did you call this lawyer?
20      A.  Yeah, I talked to him.
21      Q.  Did you call him?
22      A.  Jane Thielen called him for me,
23  yeah.
24      Q.  Were you in Town Hall at the

16 (Pages 58 to 61)

Case 3:05-cv-30136-MAP    Document 45-3    Filed 11/30/2006    Page 10 of 12
Deposition of: Elwin Clark                                Volume I                                October 14, 2005
Donovan Brothers, et al vs. Joseph Fontaine, et al

Page 62

1  time?
2          MR. EICHMAN: I think this is me
3  but go ahead.
4      **A. And he said that we are going to**
5  **handle one cease and desist order at a time.**
6          MR. ANTONUCCI: Is that you,
7  Attorney Eichman?
8          MR. EICHMAN: I don't remember
9  saying that. It's possible. I just don't
10  remember.
11      Q. Is there any reason why you
12  singled out Mr. Donovan as opposed to
13  Mr. Peckham or Mr. Morse's relative?
14      **A. It's never been a conflict**
15  **before, that's the problem.**
16      Q. Well, you would agree with me,
17  sir, based upon your answer and the advice
18  that you received, that your opinion is that
19  the zoning bylaws don't permit gravel pits
20  to be operated in the Town of Montgomery; is
21  that correct?
22      **A. Yes.**
23      Q. Why haven't you closed down all
24  of them?

Page 63

1          MR. EICHMAN: I think you asked
2  that before. Objection. If you want to
3  explain why you don't have an answer. I
4  thought he answered it.
5      Q. Can I have your answer?
6      **A. I explained before that the**
7  **lawyer said we are going to do this one step**
8  **at a time.**
9      Q. And you interpreted that to just
10  deal with Donovans?
11      **A. Exactly.**
12      Q. Is there any other reason why
13  you've only dealt with Donovans?
14      **A. No.**
15      Q. Do you think it's fair to close
16  Donovan's down and let the others operate?
17          MR. EICHMAN: Objection, don't
18  answer that.
19      Q. Is there anything different about
20  the nature or operation of the other gravel
21  pits as opposed to the one that Mr. Donovan
22  was operating on the Lafond property, other
23  than location and size?
24      **A. No.**

Page 64

1      Q. They were all similar or the
2  same?
3      **A. Except for the location.**
4      Q. Did you talk with any abutters of
5  the Lafond property prior to issuing the
6  cease and desist order?
7      **A. No.**
8      Q. Is there anything else you did
9  with respect to the investigation of the
10  operation of the gravel pit operated by
11  Donovan Brothers, other than what you've
12  told us about today, namely look for records
13  in the town, go to the property on two
14  occasions, speak with Mr. Donovan, speak
15  with an attorney who we're not sure who that
16  is?
17      **A. No.**
18      Q. Anything else you did?
19      **A. No.**
20      Q. Have you ever issued a cease and
21  desist order against anybody else in the
22  Town of Montgomery in your capacity as a
23  building inspector over the years?
24      **A. No.**

Page 65

1      Q. This is the first and only one
2  you've ever issued?
3      **A. Exactly.**
4      Q. And if I understand the cease and
5  desist order, the basis for the cease and
6  desist order is that you've determined that
7  it was unlawful; isn't that correct?
8      **A. Yes.**
9      Q. And that's based upon what you
10  say in the letter was your review of the
11  town records and the zoning bylaws; is that
12  correct?
13      **A. I have to talk to --**
14          MR. EICHMAN: Well, the question
15  is, is that what you said in the letter?
16  You can just look at the letter.
17      Q. That's what you said in the
18  letter, right?
19      **A. Yes.**
20      Q. And you've described to us what
21  you looked at, what you attempted to find?
22      **A. Right.**
23      Q. Is there anything else that you
24  based it upon in the way of documents?

17 (Pages 62 to 65)

Case 3:05-cv-30136-MAP     Document 45-3     Filed 11/30/2006     Page 11 of 12
Deposition of: Elwin Clark                    Volume I                    October 14, 2005
Donovan Brothers, et al vs. Joseph Fontaine, et al

Page 66

1    A.  I would say no.
2    Q.  And did you look at the current
3 zoning bylaws after you issued the letter of
4 the 13th, if I'm understanding you
5 correctly?
6    A.  They're in the process -- I don't
7 know how to explain myself about that.
8 They're in the process of being changed or
9 whatever.
10    Q.  Well, I'm a little confused, and
11 I'm not trying to go over ground because I'm
12 just as anxious to get this over with as you
13 are, believe it or not.  And I'll try to
14 keep it as simple as possible?
15    A.  Thank you.
16    Q.  Did you look at the zoning bylaws
17 that you showed me, which are 1956, dated
18 1956, did you look at this prior to January
19 13th?
20    A.  No, I did not.
21    Q.  Did you look at the current, the
22 existing, not the new proposed, but the
23 existing bylaws prior to January 13th?
24    A.  As far as I'm concerned, there is

Page 67

1 to be no gravel pits in the Town of
2 Montgomery.
3    Q.  Upon what do you base that?
4    A.  Because it's a one- and
5 two-family community and that's it.
6    Q.  And that's what you always
7 understood since the seventies?
8    A.  Exactly.
9    Q.  And that's the basis for you
10 issuing the cease and desist order?
11    A.  Yes.
12    Q.  Would it make a difference to you
13 if the Donovan operation was not a new
14 operation but had been going on for a number
15 of years, as to whether or not that they
16 were in violation and therefore unlawful?
17       MR. EICHMAN:  Objection.  You can
18 answer if you know.
19    A.  No.
20    Q.  No, you don't know or no, you --
21    A.  No, it wouldn't make any
22 difference.
23    Q.  Would it make any difference to
24 you if you had in fact found a permit or

Page 68

1 license for them to operate given to
2 Mr. Donovan or Ms. Lafond under the old
3 zoning bylaws?
4    A.  I would say yes.
5    Q.  Now, with respect to the letter
6 from Mr. Costa dated the 23rd, you were
7 acting on the basis of this complaint by
8 Mr. Page sent to you through Mr. Costa; is
9 that correct?
10    A.  Yes.
11    Q.  And within that letter, there's
12 an indication that there are apparently two
13 separate parcels owned by Ms. Lafond.  Are
14 you aware of that?
15    A.  Yes.
16    Q.  This complaint in fact dealt with
17 the portion or the parcel that abutted
18 Mr. Page; is that correct?
19    A.  To my understanding.
20    Q.  On the second page in fact, in
21 the second paragraph and I'll just read it
22 quickly, "You should be aware that a
23 separate parcel of property in the area of
24 the subject property that is also owned by

Page 69

1 Ms. Lafond has been used as a gravel pit.
2 This property is identified," and gives the
3 assessor's identification, and it says,
4 "This is not a subject of this request"; is
5 that correct?
6    A.  Yes.
7    Q.  Were you acting on this complaint
8 only?
9    A.  Yes.
10    Q.  You didn't receive any complaint
11 from Mr. Jasques, the other abutter?
12    A.  No.
13    Q.  Is it fair to say that your cease
14 and desist order and your inspection and
15 your determination deals just with the
16 parcel abutting Mr. Page?
17    A.  Yes.
18    Q.  And you received an aerial
19 photograph of the property; is that correct?
20    A.  Yes.
21    Q.  Do you still have that, if you
22 know?
23       MR. EICHMAN:  I didn't see it in
24 the file.

18 (Pages 66 to 69)

Case 3:05-cv-30136-MAP    Document 45-3    Filed 11/30/2006    Page 12 of 12
Deposition of: Elwin Clark                Volume I                October 14, 2005
Donovan Brothers, et al vs. Joseph Fontaine, et al

Page 70

1    A.  I don't think I received one of
2  those.
3    Q.  You don't think you received a
4  photograph?
5    A.  No.
6    Q.  Do you know if anybody else in
7  Town Hall got a copy of that?
8    A.  No, I don't.
9    Q.  Did you appear at the Zoning
10  Board of Appeals hearings on this subject
11  matter before the Zoning Board of Appeals,
12  did you appear?
13    A.  No.
14    Q.  You didn't show up; is that
15  correct?
16    A.  Right.
17    Q.  So you didn't present any
18  evidence, is that correct; in other words,
19  you didn't come and testify?
20    A.  No.
21    Q.  You didn't offer any evidence; is
22  that correct?
23    A.  I personally like Gail Donovan.
24    Q.  I understand that.  And I think

Page 71

1  Ms. Donovan likes you, and I'm sure that
2  everybody else in the Town of Montgomery,
3  more or less, like everybody.  But you
4  didn't show up at the meeting, right?  There
5  were two meetings?
6    A.  Right.
7    Q.  You weren't there?
8    A.  Right.
9    Q.  Did you provide any information
10  to the Zoning Board of Appeals members prior
11  to that meeting regarding your inspection
12  and your determination?
13    A.  No.
14    Q.  Did you send them a letter
15  outlining your thoughts?
16    A.  No.
17    Q.  Did you talk to any members of
18  the Board of Appeals regarding this matter
19  prior to your meetings?
20    A.  No.
21    Q.  Did any of them call you up and
22  say, Tommy, what's this all about?  What did
23  you issue this on?  What does your
24  investigation show?

Page 72

1    A.  No.
2    Q.  Did you talk with Attorney Costa
3  at any time after his letter of the 23rd of
4  December?
5    A.  No.
6    Q.  Did you talk with Attorney Costa
7  at any time from the 23rd up till today?
8    A.  No.
9    Q.  Anybody from his office?
10    A.  No.
11    Q.  Did you speak with Mr. Page at
12  any time from the 23rd to the present time
13  regarding the subject matter?
14    MR. EICHMAN:  Go ahead.
15    A.  He called me up and said that
16  Gail Donovan cracked his foundation on his
17  house.
18    Q.  That was after you got the letter
19  from Mr. Costa or before?
20    A.  Before.
21    Q.  Have you had an opportunity to
22  examine any Interrogatories, written?
23    MR. EICHMAN:  If I may, we've
24  gone over this verbally on the phone.  I've

Page 73

1  got a draft put together based on his
2  answers but we haven't signed them yet.
3    MR. ANTONUCCI:  And the same with
4  the Request for Production of Documents?
5    MR. EICHMAN:  I don't know if
6  he's looked at them yet.  By the way, this
7  is building inspector'S file here, so you're
8  welcome to look at them here while we're
9  here.
10    MR. ANTONUCCI:  For the purpose
11  of time, because I did indicate this
12  wouldn't be particularly lengthy, I'm going
13  to mark the two documents we referred to
14  Number 1 and 2.  It would be the letter of
15  December 23rd, 2004, and I think we had a
16  copy of the cease and desist order, which
17  might be this one right here, and that's
18  dated January 13th.  And I'm also going to
19  mark as the third document the -- I think
20  these are the same.
21    MR. EICHMAN:  These are coming
22  out of the file now.
23    MR. ANTONUCCI:  Okay.  We'll make
24  copies and give you back the originals.

19 (Pages 70 to 73)

# EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-30136-KPN

DONOVAN BROTHERS, INC., and ELSIE M.
LAFOND,

       Plaintiffs

v.

JOSEPH FONTAINE, JOANNE HEBERT and
ROBERT W. PIKE, JR., as they are the Zoning
Board of Appeals of the Town of Montgomery, and
ELWIN R. CLARK, JR., as he is the Building
Inspector & Zoning Enforcement Officer of the
Town of Montgomery,

       Defendants

### DEFENDANTS' FIRST SET
### OF INTERROGATORIES PROPOUNDED TO PLAINTIFF,
### DONOVAN BROTHERS, INC.

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the above-named

defendants (hereinafter, "Defendants"), hereby request that the plaintiff, Donovan Brothers, Inc.

(hereinafter, "Donovan Brothers") answer the following interrogatories, under oath, within 45

days.  The answers must be based on all information available to Donovan Brothers, its

attorneys, agents, and representatives, and on all records in the custody and control of such

persons.  Donovan Brothers is reminded that Rule 26(e) of the Federal Rules of Civil Procedure

requires it to file supplementary answers promptly upon receipt of information indicating that

any answers filed were inaccurate or incomplete when made and in other specific circumstances.

### DEFINITIONS AND INSTRUCTIONS

As used in these interrogatories, the following terms shall have the following meanings:

"Complaint" means the complaint initiating the instant litigation, together with all subsequent amendments thereto.

"Plaintiff," "You," or "Donovan Brothers" shall mean the plaintiff, Donovan Brothers, Inc., its representatives, servants, agents, employees, and anyone acting or purporting to act on its behalf.

"Town" means the Town of Montgomery, Massachusetts, a municipal corporation having an address of 161 Main Road, Montgomery, MA 01085, its representatives, servants, agents, employees, and anyone acting or purporting to act on the Town's behalf.

"Selectmen" means the duly elected members of the Board of Selectmen for the Town of Montgomery.

"Property" means the property on Carrington Road in the Town designated as parcels 1-350-8 and 1-236-88 by the Town's Assessor.

"Gravel Bank" means that portion of the Property presently devoted to the removal and sale of gravel and other earth materials, or previously devoted to such activity and not reclaimed for other uses.

"Earth Materials" means gravel, stone, ledge, sand, loam, topsoil, and any other inert substance on the Property at or beneath ground level.

"Person" means any natural person or any legal, business, or government unit, agency, or authority, including a trust.

A "representative" of a person means any officer, director, agent, employee, attorney, trustee, or other representative of such person.

"Document" shall include the meaning set forth in Fed.R.Civ.P. 34(a), and shall include, without limitation, any writing, plan, map, sketch, recording, computer file or database, electronic mail, photograph or any tangible item, whether original or duplicate, from which

information in the form of words, numbers, or pictures can be derived by examination or other means.

"Communication" means any written, electronic, oral or other form of transmission of fact, information, inquiries, or opinion, including any utterance, notation, or statement of any nature whatsoever, and including without limitation telephone conversations, internal or external discussions, face-to-face meetings or exchanges of documents (as defined below), whether directly or through copying. A request for a description in detail of any communication among or between specified parties includes communications involving persons in addition to those specified, and communications directed to or intended for any other person.

"Concerning" means referring to, alluding to, responding to, relating to, connected with, commenting on, in respect of, about, regarding, discussing, showing, describing, transcribing, mentioning, reflecting, analyzing, explaining, evidencing, recording, memorializing, depicting, or pertaining to.

"Describe in detail" means to provide a complete factual summary, chronologically setting forth the substance of, the evidence supporting, and identifying (as defined below) any person participating in, witnessing, or having knowledge of, whether first-hand or otherwise, any fact, action, occurrence, conduct, event, circumstance, or communication concerning the item in question.

"Identify" means the following:

(a)     when used in connection with a natural person, to state the full name of such person, the last known business or residential address of such person, including telephone numbers, and the business affiliation and position of such person during the relevant time period;

(b)     when used in connection with a legal or business entity, to state the full name of such entity and the address of its principal place of business and to identify any representative of such entity who has knowledge relating to any information in connection with which such entity has been identified; and

(c)     when used in connection with a document or documents (whether privileged or not), to state the date, author, recipient(s), nature, subject matter, current location and custodian, and whether it was made, sent, recorded or maintained in the ordinary course of business. If a privilege is asserted regarding any document, "identify" means, in addition to the above, to provide the specific bases for asserting the privilege (e.g. attorney-client communication, attorney work product, or other).

"State the basis" means to:

a.     identify each and every document (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of the Plaintiffs' information regarding the alleged facts or legal conclusions referred to by the interrogatory;

b.     identify each and every communication, which forms any part of the source of the Plaintiffs' information regarding the alleged facts or legal conclusions referred to by the interrogatory;

c.     state separately the acts or omissions to act on the part of any persons (identifying the acts or omissions to act by stating their nature, time, and place and identifying the person involved) which form any part of the Plaintiffs' information regarding the alleged facts or legal conclusions referred to tin the interrogatory; and

d.     state separately any other fact, which forms the basis of the Plaintiffs' information regarding the alleged facts or conclusions, referred to in the interrogatory.

The word "and" and the word "or" shall mean, where the context permits, "and/or". Words used in the singular shall, where the context permits, include the plural, and words used in the plural shall, where the context permits, include the singular.

These interrogatories require supplemental responses to the extent required by Fed.R.Civ.P. 26(e). In addition, these interrogatories shall be deemed to be a continuing request for supplemental responses pursuant to Fed.R.Civ.P. Rule 26(e) (3).

If any information responsive to any of the interrogatories contained herein is claimed to be privileged or otherwise protected from discovery in whole or in part, identify each person who has knowledge of such information or to whom such information has been communicated, and

state with particularity the nature and basis of the claim of privilege in sufficient detail to permit the Court to adjudicate the validity of such claim.

If any of the interrogatories contained herein are claimed to be objectionable, then:

(a)    identify the portion of such interrogatory that is claimed to be objectionable and state the nature and basis of the objection with sufficient particularity and in sufficient detail to permit the court to adjudicate the validity of the objection;

(b)    identify any information withheld from production pursuant to such objection with sufficient particularity and in sufficient detail to permit the Court to determine that the information falls within the scope of such objection; and

(c)    provide an answer to so much of each such interrogatory as is not claimed to be objectionable.

## INTERROGATORIES

INTERROGATORY NO. 1

Please state your full name, age, residence address, occupation, and business address, and the source of your authority to provide answers to the herein interrogatories on behalf of Donovan Brothers.

INTERROGATORY NO. 2

Please describe in detail, by a metes and bounds description, if possible, or by readily identifiable monuments:

a)    the exact boundaries of the Gravel Bank; and

b)    the exact boundaries of the Property.

INTERROGATORY NO. 3

Please describe in detail:

a)    the interests Donovan Brothers holds in the Property; the name of the person(s) from whom it acquired such interest; the consideration paid for such interest; and the date and recording information for the instrument by which Donovan Brothers took title to such interest;

5

b)    all persons other than Donovan Brothers, holding at the same time as Donovan Brothers, an interest in the Property; the location, nature and extent of such interest; the name of the person from whom such interest was acquired; the consideration paid for such interest; and the date and recording information for the instrument establishing record title to such interest;

c)    the interests Donovan Brothers hold in any property abutting the Property; the name of the person(s) from whom it acquired such interest; the consideration paid for such interest; and the date and recording information for the instrument by which Donovan Brothers took title to such interest.

INTERROGATORY NO. 4

Please describe in detail when Donovan Brothers first began using the Gravel Bank for earth removal operations, and set forth the periods of time Donovan Brothers used the Gravel Bank for such purpose between the time it first came into operation and the present. "In operation" shall include those periods of time when the Gravel Bank was not being actively used for earth removal purposes, but had not been reclaimed for other uses.

INTERROGATORY NO. 5

Please describe in detail all Donovan Brothers' use of the Gravel Bank that took place in the ten years prior to the date of your answer, and please identify each document or other source on which you rely to provide such description. Include in your description:

a.    the total amount, in cubic yards, of all earth materials removed by Donovan Brothers from the Gravel Bank and disposed of by sale or otherwise during that time;

b.    the price or other consideration paid for each sale of such earth material, the dates of such sales, and the full name and address of each buyer;

     c.     the dates, or if exact dates are not known, the number of times and total duration

of time the Property was used to excavate, blast, crush, screen, and otherwise prepare earth

materials to allow for their sale;

     d.     all Donovan Brothers' use of the Gravel Bank during that time for purposes other

than the removal of earth materials;

     e.     the names and addresses of each person employed by who worked in or used the

Gravel Bank during that time, the type of work performed or use made, and the dates of such

work and/or use, or, if exact dates are not known, the number of times such work and/or use took

place and the total duration of that time.

INTERROGATORY NO. 6

     Please set forth, to the best of your knowledge, and identify each document or other

source on which you rely to provide your answer, the total estimated amount, in cubic yards, of

saleable earth materials remaining on the Property, distinguishing as to type of earth material;

INTERROGATORY NO. 7

     Please identify each communication Donovan Brothers has had with persons who own

property near or abutting the Gravel Bank concerning the operation or sale of the Gravel Bank,

setting forth the date of such communication, the persons participating and the substance of the

communication, and identify each document which references or memorializes such

communication.

INTERROGATORY NO. 8

     Please identify each communication Donovan Brothers has had with the Town, the

Defendants, or any of the Selectmen concerning the operation or sale of the Gravel Bank, setting

forth the date of such communication, the persons participating and the substance of the

communication, and identify each document which references or memorializes such communication.

INTERROGATORY NO. 9

Please describe in detail each contract, lease, license, or other agreement Donovan Brothers had entered into concerning the sale or use of any part of the Property or the Gravel Bank, including in your description the date and substance of such agreements, and identify any document which references or memorializes such agreements.

INTERROGATORY NO. 10

Please state the basis for Donovan Brothers' contention that use of the Property for the removal and sale of earth materials is a lawful use under both the Town's zoning and general bylaws.

INTERROGATORY NO. 11

Please describe in detail all losses which Donovan Brothers claims were incurred as a result of actions taken by the Defendants, the Town, or the Selectmen that deprived Donovan Brothers of rights secured by the Constitution and laws of the United States.

INTERROGATORY NO. 12

If any statement has been taken or received from the Defendants, the Town, or any of the Selectmen, whether written or oral, regarding in any way the allegations set forth in the Complaint, please state:

      a.     the name and address of the person from whom each such statement was obtained;

      b.     the date of any such statement;

      c.     the substance of any such statement;

d.    the name and address of the person presently in possession or custody of such

statement.

INTERROGATORY NO. 13

Please provide the name, address, and relation to Donovan Brothers of each person (other

than your attorney) known by Donovan Brothers to have witnessed or to have factual knowledge

concerning the allegations set forth in the Complaint, and describe in detail what was witnessed

or what knowledge such person possesses.

INTERROGATORY NO. 14

Please provide the name and address of each person whom Donovan Brothers believes is

similarly situated to itself for purposes of demonstrating the deprivation of equal protection

alleged in the Complaint.

INTERROGATORY NO. 15

Please describe in detail what facts Donovan Brothers contends support its allegation that

the Defendants, Town, or Selectmen acted with malice and/or bad faith to deprive Donovan

Brothers of its rights secured under the Constitution and laws of the United States.

INTERROGATORY NO. 16

Please describe in detail what, if any, residency requirement was applied by the

Defendants in taking the actions alleged in the Complaint.

INTERROGATORY NO. 17

Please describe in detail each action Donovan Brothers alleges the Defendants, the Town,

or the Selectmen took that ultimately resulted in the deprivation of Donovan Brothers' rights

secured under the Constitution and laws of the United States.

INTERROGATORY NO. 18

Please identify:

(a)    all persons furnishing information upon which your answers are based, stating for each such person the person's address and the interrogatory for which information was furnished;

(b)    all persons, in addition to those referred to directly above, whom Donovan Brothers has reason to believe may have personal knowledge relative to these interrogatories; and

(c)    all documents referred to in answering these interrogatories not otherwise identified herein.

INTERROGATORY NO. 19

Please identify all persons whom Donovan Brothers expects to call as witnesses at a trial of this matter, specifying the subject and substance of each witness's testimony.

INTERROGATORY NO. 20

Please identify all expert witnesses whom Donovan Brothers expects to call at a trial of this matter, stating fully, and in detail, for each such expert: a) the name, address, and occupation and/or profession of such experts; b) the subject matter about which each such expert is expected to testify; c) the substance of the facts and opinions about which each such expert is expected to testify; and d) a summary of the grounds for each such opinion.

INTERROGATORY NO. 21

Please identify all documents Donovan Brothers intends to introduce as evidence in a trial of this matter not otherwise identified herein.

INTERROGATORY NO. 22

Please identify, and state the basis for your identification, each and every authorization, permit or decision Donovan Brothers or anyone else of whom Donovan Brothers is aware has

applied for or received, from any legislative, administrative, quasi-judicial, or judicial body, facilitating use of the Property for earth removal purposes.

INTERROGATORY NO. 23

Please state the basis for Donovan Brothers' contention that the alleged acts of the Defendants were based upon a legally untenable ground.

INTERROGATORY NO. 24

Please state the basis for Donovan Brothers' contention that the alleged acts of the Defendants were arbitrary and capricious.

INTERROGATORY NO. 25

Please identify all insurance agreements which may provide Donovan Brothers coverage for the losses alleged in the Complaint.

DEFENDANTS,

By their attorneys,

Joel B. Bard (BBO# 029140)
Jonathan D. Eichman (BBO# 641227)
Kopelman and Paige, P.C.
Town Counsel
31 St. James Avenue
Boston, MA  02116
(617) 556-0007

259160/MONT/0007

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on _8/1/06_

11

# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-30136-KPN

DONOVAN BROTHERS, INC., and ELSIE M.
LAFOND,

       Plaintiffs

v.

JOSEPH FONTAINE, JOANNE HEBERT and
ROBERT W. PIKE, JR., as they are the Zoning
Board of Appeals of the Town of Montgomery, and
ELWIN R. CLARK, JR., as he is the Building
Inspector & Zoning Enforcement Officer of the
Town of Montgomery,

       Defendants

## DEFENDANTS' FIRST SET
## OF INTERROGATORIES PROPOUNDED TO PLAINTIFF,
## ELSIE M. LAFOND

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the above-named

defendants (hereinafter, "Defendants"), hereby request that the plaintiff, Elsie M. LaFond

(hereinafter, "LaFond") answer the following interrogatories, under oath, within 45 days. The

answers must be based on all information available to LaFond, her attorneys, agents, and

representatives, and on all records in the custody and control of such persons. Ms. LaFond is

reminded that Rule 26(e) of the Federal Rules of Civil Procedure requires him to file

supplementary answers promptly upon receipt of information indicating that any answers filed

were inaccurate or incomplete when made and in other specific circumstances.

## DEFINITIONS AND INSTRUCTIONS

As used in these interrogatories, the following terms shall have the following meanings:

"Complaint" means the complaint initiating the instant litigation, together with all subsequent amendments thereto.

"Plaintiff," "You," or "LaFond" shall mean the plaintiff, Elsie M. LaFond, her representatives, servants, agents, employees, and anyone acting or purporting to act on her behalf.

"Town" means the Town of Montgomery, Massachusetts, a municipal corporation having an address of 161 Main Road, Montgomery, MA 01085, its representatives, servants, agents, employees, and anyone acting or purporting to act on the Town's behalf.

"Selectmen" means the duly elected members of the Board of Selectmen for the Town of Montgomery.

"Property" means the property on Carrington Road in the Town designated as parcels 1-350-8 and 1-236-88 by the Town's Assessor.

"Gravel Bank" means that portion of the Property presently devoted to the removal and sale of gravel and other earth materials, or previously devoted to such activity and not reclaimed for other uses.

"Earth Materials" means gravel, stone, ledge, sand, loam, topsoil, and any other inert substance on the Property at or beneath ground level.

"Person" means any natural person or any legal, business, or government unit, agency, or authority, including a trust.

A "representative" of a person means any officer, director, agent, employee, attorney, trustee, or other representative of such person.

"Document" shall include the meaning set forth in Fed.R.Civ.P. 34(a), and shall include, without limitation, any writing, plan, map, sketch, recording, computer file or database, electronic mail, photograph or any tangible item, whether original or duplicate, from which

information in the form of words, numbers, or pictures can be derived by examination or other means.

"Communication" means any written, electronic, oral or other form of transmission of fact, information, inquiries, or opinion, including any utterance, notation, or statement of any nature whatsoever, and including without limitation telephone conversations, internal or external discussions, face-to-face meetings or exchanges of documents (as defined below), whether directly or through copying. A request for a description in detail of any communication among or between specified parties includes communications involving persons in addition to those specified, and communications directed to or intended for any other person.

"Concerning" means referring to, alluding to, responding to, relating to, connected with, commenting on, in respect of, about, regarding, discussing, showing, describing, transcribing, mentioning, reflecting, analyzing, explaining, evidencing, recording, memorializing, depicting, or pertaining to.

"Describe in detail" means to provide a complete factual summary, chronologically setting forth the substance of, the evidence supporting, and identifying (as defined below) any person participating in, witnessing, or having knowledge of, whether first-hand or otherwise, any fact, action, occurrence, conduct, event, circumstance, or communication concerning the item in question.

"Identify" means the following:

(a)    when used in connection with a natural person, to state the full name of such person, the last known business or residential address of such person, including telephone numbers, and the business affiliation and position of such person during the relevant time period;

(b)    when used in connection with a legal or business entity, to state the full name of such entity and the address of its principal place of business and to identify any representative of such entity who has knowledge relating to any information in connection with which such entity has been identified; and

(c)     when used in connection with a document or documents (whether privileged or not), to state the date, author, recipient(s), nature, subject matter, current location and custodian, and whether it was made, sent, recorded or maintained in the ordinary course of business.  If a privilege is asserted regarding any document, "identify" means, in addition to the above, to provide the specific bases for asserting the privilege (e.g. attorney-client communication, attorney work product, or other).

"State the basis" means to:

a.     identify each and every document (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of the Plaintiff's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

b.     identify each and every communication, which forms any part of the source of the Plaintiff's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

c.     state separately the acts or omissions to act on the part of any persons (identifying the acts or omissions to act by stating their nature, time, and place and identifying the person involved) which form any part of the Plaintiff's information regarding the alleged facts or legal conclusions referred to tin the interrogatory; and

d.     state separately any other fact, which forms the basis of the Plaintiff's information regarding the alleged facts or conclusions, referred to in the interrogatory.

The word "and" and the word "or" shall mean, where the context permits, "and/or".

Words used in the singular shall, where the context permits, include the plural, and words used in the plural shall, where the context permits, include the singular.

These interrogatories require supplemental responses to the extent required by Fed.R.Civ.P. 26(e).  In addition, these interrogatories shall be deemed to be a continuing request for supplemental responses pursuant to Fed.R.Civ.P. Rule 26(e) (3).

If any information responsive to any of the interrogatories contained herein is claimed to be privileged or otherwise protected from discovery in whole or in part, identify each person who has knowledge of such information or to whom such information has been communicated, and

state with particularity the nature and basis of the claim of privilege in sufficient detail to permit the Court to adjudicate the validity of such claim.

If any of the interrogatories contained herein are claimed to be objectionable, then:

(a)    identify the portion of such interrogatory that is claimed to be objectionable and state the nature and basis of the objection with sufficient particularity and in sufficient detail to permit the court to adjudicate the validity of the objection;

(b)    identify any information withheld from production pursuant to such objection with sufficient particularity and in sufficient detail to permit the Court to determine that the information falls within the scope of such objection; and

(c)    provide an answer to so much of each such interrogatory as is not claimed to be objectionable.

## INTERROGATORIES

INTERROGATORY NO. 1

Please state your full name, age, residence address(es), occupation, and business address.

INTERROGATORY NO. 2

Please describe in detail, by a metes and bounds description, if possible, or by readily identifiable monuments:

a)    the exact boundaries of the Gravel Bank; and

b)    the exact boundaries of the Property.

INTERROGATORY NO. 3

Please describe in detail:

a)    the interests you hold in the Property; the name of the person(s) from whom you acquired such interest; the consideration paid for such interest; and the date and recording information for the instrument by which you took title to such interest;

b)    all persons other than you, holding at the same time as you, an interest in the Property; the location, nature and extent of such interest; the name of the person from whom

such interest was acquired; the consideration paid for such interest; and the date and recording information for the instrument establishing record title to such interest;

   c)  the interests you hold in property abutting the Property; the name of the person(s) from whom you acquired such interest; the consideration paid for such interest; and the date and recording information for the instrument by which you took title to such interest.

INTERROGATORY NO. 4

   Please describe in detail when the Gravel Bank first came into operation, and set forth the periods of time the Gravel Bank was used for earth removal operations between the time it first came into operation and the present. "In operation" shall include those periods of time when the Gravel Bank was not being actively used for earth removal purposes, but had not been reclaimed for other uses.

INTERROGATORY NO. 5

   Please describe in detail all use of the Gravel Bank of which you are aware that took place in the ten years prior to the date of your answer, and please identify each document or other source on which you rely to provide such description. Include in your description:

   a.  the total amount, in cubic yards, of all earth materials removed from the Gravel Bank and disposed of by sale or otherwise during that time;

   b.  the price or other consideration paid for each sale of such earth material, the dates of such sales, and the full name and address of each buyer;

   c.  the dates, or if exact dates are not known, the number of times and total duration of time the Property was used to excavate, blast, crush, screen, and otherwise prepare earth materials to allow for their sale;

   d.  all use of the Gravel Bank during that time for purposes other than the removal of earth materials;

e.    the names and addresses of each person who worked in or used the Gravel Bank during that time, the type of work performed or use made, and the dates of such work and/or use, or, if exact dates are not known, the number of times such work and/or use took place and the total duration of that time.

INTERROGATORY NO. 6

Please set forth, to the best of your knowledge, and identify each document or other source on which you rely to provide your answer, the total estimated amount, in cubic yards, of saleable earth materials remaining on the Property, distinguishing as to type of earth material;

INTERROGATORY NO. 7

Please identify each communication you have had with persons who own property near or abutting the Gravel Bank concerning the operation or sale of the Gravel Bank, setting forth the date of such communication, the persons participating and the substance of the communication, and identify each document which references or memorializes such communication.

INTERROGATORY NO. 8

Please identify each communication you have had with the Town, the Defendants, or any of the Selectmen concerning the operation or sale of the Gravel Bank, setting forth the date of such communication, the persons participating and the substance of the communication, and identify each document which references or memorializes such communication.

INTERROGATORY NO. 9

Please describe in detail each contract, lease, license, or other agreement you have entered into concerning the sale or use of any part of the Property or the Gravel Bank, including in your description the date and substance of such agreements, and identify any document which references or memorializes such agreements.

INTERROGATORY NO. 10

Please state the basis for your contention that use of the Property for the removal and sale of earth materials is a lawful use under both the Town's zoning and general bylaws.

INTERROGATORY NO. 11

Please describe in detail all losses which you claim were incurred as a result of actions taken by the Defendants, the Town, or the Selectmen that deprived you of rights secured by the Constitution and laws of the United States.

INTERROGATORY NO. 12

If any statement has been taken or received from the Defendants, the Town, or any of the Selectmen, whether written or oral, regarding in any way the allegations set forth in the Complaint, please state:

    a.    the name and address of the person from whom each such statement was obtained;

    b.    the date of any such statement;

    c.    the substance of any such statement;

    d.    the name and address of the person presently in possession or custody of such statement.

INTERROGATORY NO. 13

Please provide the name, address, and relation to you of each person (other than your attorney) known by you to have witnessed or to have factual knowledge concerning the allegations set forth in the Complaint, and describe in detail what was witnessed or what knowledge such person possesses.

## INTERROGATORY NO. 14

Please provide the name and address of each person whom you believe is similarly situated to you for purposes of demonstrating the deprivation of equal protection you allege in the Complaint.

## INTERROGATORY NO. 15

Please describe in detail what facts you contend support your allegation that the Defendants, Town, or Selectmen acted with malice and/or bad faith to deprive you of your rights secured under the Constitution and laws of the United States.

## INTERROGATORY NO. 16

Please describe in detail what, if any, residency requirement was applied by the Defendants in taking the actions alleged in the Complaint.

## INTERROGATORY NO. 17

Please describe in detail each action you allege the Defendants, the Town, or the Selectmen took that ultimately resulted in the deprivation of your rights secured under the Constitution and laws of the United States.

## INTERROGATORY NO. 18

Please identify:

(a)    all persons furnishing information upon which your answers are based, stating for each such person the person's address and the interrogatory for which information was furnished;

(b)    all persons, in addition to those referred to directly above, who you have reason to believe may have personal knowledge relative to these interrogatories; and

(c)    all documents referred to in answering these interrogatories not otherwise identified herein.

### INTERROGATORY NO. 19

Please identify all persons whom you expect to call as witnesses at a trial of this matter, specifying the subject and substance of each witness's testimony.

### INTERROGATORY NO. 20

Please identify all expert witnesses whom you expect to call at a trial of this matter, stating fully, and in detail, for each such expert: a) the name, address, and occupation and/or profession of such experts; b) the subject matter about which each such expert is expected to testify; c) the substance of the facts and opinions about which each such expert is expected to testify; and d) a summary of the grounds for each such opinion.

### INTERROGATORY NO. 21

Please identify all documents you intend to introduce as evidence in a trial of this matter not otherwise identified herein.

### INTERROGATORY NO. 22

Please identify, and state the basis for your identification, each and every authorization, permit or decision you or anyone else you are aware of has applied for or received, from any legislative, administrative, quasi-judicial, or judicial body, facilitating use of the Property for earth removal purposes.

### INTERROGATORY NO. 23

Please state the basis for your contention that the alleged acts of the Defendants were based upon a legally untenable ground.

### INTERROGATORY NO. 24

Please state the basis for your contention that the alleged acts of the Defendants were arbitrary and capricious.

INTERROGATORY NO. 25

Please identify all insurance agreements which may provide you coverage for the losses

alleged in the Complaint.

DEFENDANTS,

By their attorneys,

_____

Joel B. Bard (BBO# 029140)
Jonathan D. Eichman (BBO# 641227)
Kopelman and Paige, P.C.
Town Counsel
31 St. James Avenue
Boston, MA  02116
(617) 556-0007

259160/MONT/0007

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail/hand on __8/19/05__

_____

# EXHIBIT H

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-30136-KPN

DONOVAN BROTHERS, INC., and ELSIE M.
LAFOND,

       Plaintiffs

v.

JOSEPH FONTAINE, JOANNE HEBERT and
ROBERT W. PIKE, JR., as they are the Zoning
Board of Appeals of the Town of Montgomery, and
ELWIN R. CLARK, JR., as he is the Building
Inspector & Zoning Enforcement Officer of the
Town of Montgomery,

       Defendants

## DEFENDANTS FIRST REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED TO PLAINTIFF, ELSIE M. LAFOND

The Defendants, pursuant to Fed.R.Civ.P. 34, hereby request that the plaintiff, Elsie M. LaFond, (hereinafter, "LaFond") produce for inspection and copying all of the following which are in her or her attorney's possession, custody or control by producing said items and an answer to this request at the office of Kopelman and Paige, P.C., 31 St. James Avenue, Boston, Massachusetts 02116 within 30 days of service, or by delivering to the above address the requested documents within 30 days of service. The term "document" is not limited to documents in the possession of the defendant, but includes all documents of which LaFond, her agents or representatives have knowledge.

## DEFINITIONS AND INSTRUCTIONS

As used in these interrogatories, the following terms shall have the following meanings:

"Complaint" means the complaint initiating the instant litigation, together with all subsequent amendments thereto.

"Plaintiff," "You," or "LaFond" shall mean the defendant, Elsie LaFond, her representatives, servants, agents, employees, and anyone acting or purporting to act on her behalf.

"Town" means the Town of Montgomery, Massachusetts, a municipal corporation having an address of 161 Main Road, Montgomery, MA 01085, its representatives, servants, agents, employees, and anyone acting or purporting to act on the Town's behalf.

"Selectmen" means the duly elected members of the Board of Selectmen for the Town of Montgomery.

"Property" means the property on Carrington Road in the Town designated as parcels 1-350-8 and 1-236-88 by the Town's Assessor.

"Gravel Bank" means that portion of the Property presently devoted to the removal and sale of gravel and other earth materials, or previously devoted to such activity and not reclaimed for other uses.

"Earth Materials" means gravel, stone, ledge, sand, loam, topsoil, and any other inert substance on the Property at or beneath ground level.

"Person" means any natural person or any legal, business, or government unit, agency, or authority, including a trust.

A "representative" of a person means any officer, director, agent, employee, attorney, trustee, or other representative of such person.

"Concerning" means referring to, alluding to, responding to, relating to, connected with, commenting on, in respect of, about, regarding, discussing, showing, describing, transcribing,

mentioning, reflecting, analyzing, explaining, evidencing, recording, memorializing, depicting, or pertaining to.

"Constituting" means embodying, evidencing, comprising, encompassing, forming, or composing.

"Document" shall include the meaning set forth in Fed.R.Civ.P. 34(a) and shall include, without limitation, any writing, plan, map, sketch, recording, computer file or database, electronic mail, photograph, or any tangible item, whether original or duplicate, from which information in the form of words, numbers, images, or sound can be derived by examination or other means.

If the defendant claims that a document requested is privileged or otherwise protected from discovery in whole or in part, please identify such document in sufficient detail to enable the Court to rule upon the claim of privilege, including in such description the document's date, its author(s), its title (if any), the person(s) to whom the document is directed (if any), the number of pages, and the substance thereof (to the extent not privileged).

If any of the requests contained herein are claimed to be objectionable, then:

(a)    identify the portion of such request that is claimed to be objectionable and state the nature and basis of the objection with sufficient particularity and in sufficient detail to permit the court to adjudicate the validity of the objection;

(b)    identify any document withheld from production pursuant to such objection with sufficient particularity and in sufficient detail to permit the Court to determine that the information falls within the scope of such objection; and

(c)    provide a response to so much of each such request as is not claimed to be objectionable.

Where any copy or copies of any document whose production is sought, whether a draft or final version, is/are not identical to any other copy thereof, by reason of alterations, notes,

comments, initials, underscoring, indication of routing, or other material contained thereon or attached thereto, all such non-identical copies shall be produced separately.

The word "and" and the word "or" shall mean, where the context permits, "and/or".

Words used in the singular shall, where the context permits, include the plural, and words used in the plural shall, where the context permits, include the singular.

This request requires supplemental responses to the extent required by Fed.R.Civ.P.26(e).

## **DOCUMENTS TO BE PRODUCED**

REQUEST NO. 1

All plans, maps, sketches, photographs, or metes and bounds descriptions depicting or concerning any part of the Gravel Bank or the Property.

REQUEST NO. 2

All deeds, licenses or leases allowing for or otherwise concerning the use, purchase, or sale of the Gravel Bank or the Property.

REQUEST NO. 3

All documents upon which you relied to provide, or otherwise concern, your answer to Interrogatory No. 4 of the Defendants' First Set of Interrogatories Propounded to the Plaintiff, Elsie M. LaFond.

REQUEST NO. 4

All documents identified in your answer to Interrogatory No. 5 of the Defendants' First Set of Interrogatories Propounded to the Plaintiff, Elsie M. LaFond, including, without limitation, contracts or receipts for the previous ten years concerning:

    a.       purchase or sale of the Property;

    b.       use of the Property;

    c.      sale of earth materials taken from the Gravel Bank;

    d.      excavation, blasting, crushing, screening, and otherwise preparing earth materials taken from the Gravel Bank to allow for their sale;

    e.      sale, purchase, or rental of equipment and vehicles for use in relation to the Gravel Bank;

    f.      hiring of and wages paid to persons working in or using the Gravel Bank;

    g.      improvements added or made to the Gravel Bank, or to the Property for use in relation to the Gravel Bank;

    h.      purchase of materials for use in working the Gravel Bank;

    i.      use of the Gravel Bank for purposes other than the removal of earth materials;

## REQUEST NO. 5

All commercial general liability, automobile liability, and excess liability insurance policies and declaration sheets providing coverage to you for activities or occurrences directly related to use of the Gravel Bank.

## REQUEST NO. 6

All documents setting forth facts supporting your contention that use of the Property for the removal and sale of earth materials is a lawful use under both the Town's zoning and general bylaws.

## REQUEST NO. 7

All documents setting forth facts supporting your contention that the Defendants applied a residency requirement in taking the actions alleged in the Complaint.

REQUEST NO. 8

All documents setting forth facts supporting your contention that other persons are similarly situated to you for purposes of demonstrating the deprivation of equal protection you allege in the Complaint.

REQUEST NO. 9

All documents setting forth facts supporting your contention that the Defendants, Town, or Selectmen acted with malice and/or bad faith to deprive you of your rights secured under the Constitution and laws of the United States.

REQUEST NO. 10

All documents that identify or concern each action you allege the Defendants, the Town, or the Selectmen took that ultimately resulted in the deprivation of your rights secured under the Constitution and laws of the United States.

REQUEST NO. 11

All documents offering factual support for, or otherwise detailing or concerning those losses which you claim were incurred as a result of actions taken by the Defendants, the Town, or the Selectmen that deprived you of rights secured by the Constitution and laws of the United States.

REQUEST NO. 12

All documents setting forth facts supporting your contention that the alleged acts of the Defendants were based upon a legally untenable ground.

REQUEST NO. 13

All documents setting forth facts supporting your contention that the alleged acts of the Defendants were arbitrary and capricious.

REQUEST NO. 14

All employment records maintained by you for persons you employed who had or have duties concerning the operation of the Gravel Bank, as such records reference those duties.

REQUEST NO. 15

Your Federal Income Tax returns for the years 2000 to the present as they reference or directly concern your ownership or use of the Gravel Bank.

REQUEST NO. 16

All permits or other authorizations obtained from Federal, State or local authorities providing for use of the Gravel Bank.

REQUEST NO. 17

All ledgers and accounts kept by you concerning the operation of the Gravel Bank.

REQUEST NO. 18

All appraisals, appraisal reports, and any documents related thereto, concerning the Gravel Bank or the Property.

REQUEST NO. 19

All reports, studies, test results or surveys concerning the Gravel Bank or the Property, including environmental studies and groundwater testing.

REQUEST NO. 20

All documents identified in your answer to Interrogatory No. 6 of the Defendants' First Set of Interrogatories Propounded to the Plaintiff, Elsie M. LaFond, and all documents not so identified that nonetheless support your answer to said Interrogatory.

REQUEST NO. 21

All documents identified in your answer to Interrogatory No. 7 of the Defendants' First Set of Interrogatories Propounded to the Plaintiff, Elsie M. LaFond, and all documents not so identified that nonetheless support your answer to said Interrogatory.

REQUEST NO. 22

All documents identified in your answer to Interrogatory No. 8 of the Defendants' First Set of Interrogatories Propounded to the Plaintiff, Elsie M. LaFond, and all documents not so identified that nonetheless support your answer to said Interrogatory.

REQUEST NO. 23

All documents identified in your answer to Interrogatory No. 18(c) of the Defendants' First Set of Interrogatories Propounded to the Plaintiff, Elsie M. LaFond, and all documents not so identified that nonetheless support your answer to said Interrogatory.

REQUEST NO. 24

All documents identified in your answer to Interrogatory No. 21 of the Defendants' First Set of Interrogatories Propounded to the Plaintiff, Elsie M. LaFond, and all documents not so identified that nonetheless support your answer to said Interrogatory.

REQUEST NO. 25

All statements identified in your answer to Interrogatory No. 12 of the Defendants' First Set of Interrogatories Propounded to the Plaintiff, Elsie M. LaFond, that are in your possession, custody and control.

REQUEST NO. 26

All documents, not otherwise produced in response to the herein Requests, concerning your use of the Gravel Bank, or others use of the Gravel Bank during the time you owned the Property.

DEFENDANTS,

By their attorneys,

Joel B. Bard (BBO# 029140)
Jonathan D. Eichman (BBO# 641227)
Kopelman and Paige, P.C.
Town Counsel
31 St. James Avenue
Boston, MA  02116
(617) 556-0007

259192/MONT/0007

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on 8/19/05

9

# EXHIBIT I

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-30136-KPN

DONOVAN BROTHERS, INC., and ELSIE M.
LAFOND,

        Plaintiffs

v.

JOSEPH FONTAINE, JOANNE HEBERT and
ROBERT W. PIKE, JR., as they are the Zoning
Board of Appeals of the Town of Montgomery, and
ELWIN R. CLARK, JR., as he is the Building
Inspector & Zoning Enforcement Officer of the
Town of Montgomery,

        Defendants

---

### DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED TO PLAINTIFF, DONOVAN BROTHERS, INC.

The Defendants, pursuant to Fed.R.Civ.P. 34, hereby request that the plaintiff, Donovan

Brothers, Inc. (hereinafter, "Donovan Brothers") produce for inspection and copying all of the

following which are in its or its attorney's possession, custody or control by producing said items

and an answer to this request at the office of Kopelman and Paige, P.C., 31 St. James Avenue,

Boston, Massachusetts 02116 within 30 days of service, or by delivering to the above address the

requested documents within 30 days of service.  The term "document" is not limited to

documents in the possession of the defendant, but includes all documents of which Donovan

Brothers, its agents or representatives have knowledge.

### DEFINITIONS AND INSTRUCTIONS

As used in these interrogatories, the following terms shall have the following meanings:

"Complaint" means the complaint initiating the instant litigation, together with all subsequent amendments thereto.

"Plaintiff," "You," or "Donovan Brothers" shall mean the plaintiff, Donovan Brothers, Inc., its representatives, servants, agents, employees, and anyone acting or purporting to act on its behalf.

"Town" means the Town of Montgomery, Massachusetts, a municipal corporation having an address of 161 Main Road, Montgomery, MA 01085, its representatives, servants, agents, employees, and anyone acting or purporting to act on the Town's behalf.

"Selectmen" means the duly elected members of the Board of Selectmen for the Town of Montgomery.

"Property" means the property on Carrington Road in the Town designated as parcels 1-350-8 and 1-236-88 by the Town's Assessor.

"Gravel Bank" means that portion of the Property presently devoted to the removal and sale of gravel and other earth materials, or previously devoted to such activity and not reclaimed for other uses.

"Earth Materials" means gravel, stone, ledge, sand, loam, topsoil, and any other inert substance on the Property at or beneath ground level.

"Person" means any natural person or any legal, business, or government unit, agency, or authority, including a trust.

A "representative" of a person means any officer, director, agent, employee, attorney, trustee, or other representative of such person.

"Concerning" means referring to, alluding to, responding to, relating to, connected with, commenting on, in respect of, about, regarding, discussing, showing, describing, transcribing,

mentioning, reflecting, analyzing, explaining, evidencing, recording, memorializing, depicting, or pertaining to.

"Constituting" means embodying, evidencing, comprising, encompassing, forming, or composing.

"Document" shall include the meaning set forth in Fed.R.Civ.P. 34(a) and shall include, without limitation, any writing, plan, map, sketch, recording, computer file or database, electronic mail, photograph, or any tangible item, whether original or duplicate, from which information in the form of words, numbers, images, or sound can be derived by examination or other means.

If the defendant claims that a document requested is privileged or otherwise protected from discovery in whole or in part, please identify such document in sufficient detail to enable the Court to rule upon the claim of privilege, including in such description the document's date, its author(s), its title (if any), the person(s) to whom the document is directed (if any), the number of pages, and the substance thereof (to the extent not privileged).

If any of the requests contained herein are claimed to be objectionable, then:

(a)    identify the portion of such request that is claimed to be objectionable and state the nature and basis of the objection with sufficient particularity and in sufficient detail to permit the court to adjudicate the validity of the objection;

(b)    identify any document withheld from production pursuant to such objection with sufficient particularity and in sufficient detail to permit the Court to determine that the information falls within the scope of such objection; and

(c)    provide a response to so much of each such request as is not claimed to be objectionable.

Where any copy or copies of any document whose production is sought, whether a draft or final version, is/are not identical to any other copy thereof, by reason of alterations, notes,

comments, initials, underscoring, indication of routing, or other material contained thereon or attached thereto, all such non-identical copies shall be produced separately.

The word "and" and the word "or" shall mean, where the context permits, "and/or".

Words used in the singular shall, where the context permits, include the plural, and words used in the plural shall, where the context permits, include the singular.

This request requires supplemental responses to the extent required by Fed.R.Civ.P.26(e).

## DOCUMENTS TO BE PRODUCED

REQUEST NO. 1

All plans, maps, sketches, photographs, or metes and bounds descriptions depicting or concerning any part of the Gravel Bank or the Property.

REQUEST NO. 2

All deeds, licenses or leases allowing for or otherwise concerning the use, purchase, or sale of the Gravel Bank or the Property.

REQUEST NO. 3

All documents upon which you relied to provide, or otherwise concern, your answer to Interrogatory No. 4 of the Defendants' First Set of Interrogatories Propounded to the Plaintiff, Donovan Brothers, Inc.

REQUEST NO. 4

All documents identified in your answer to Interrogatory No. 5 of the Defendants' First Set of Interrogatories Propounded to the Plaintiff, Donovan Brothers, Inc., including, without limitation, contracts or receipts for the previous ten years concerning:

a.    purchase or sale of the Property;

b.    use of the Property;

4

c.    sale of earth materials taken from the Gravel Bank;

d.    excavation, blasting, crushing, screening, and otherwise preparing earth materials taken from the Gravel Bank to allow for their sale;

e.    sale, purchase, or rental of equipment and vehicles for use in relation to the Gravel Bank;

f.    hiring of and wages paid to persons working in or using the Gravel Bank;

g.    improvements added or made to the Gravel Bank, or to the Property for use in relation to the Gravel Bank;

h.    purchase of materials for use in working the Gravel Bank;

i.    use of the Gravel Bank for purposes other than the removal of earth materials;

REQUEST NO. 5

All commercial general liability, automobile liability, and excess liability insurance policies and declaration sheets providing coverage to Donovan Brothers for activities or occurrences directly related to use of the Gravel Bank.

REQUEST NO. 6

All documents setting forth facts supporting your contention that use of the Property for the removal and sale of earth materials is a lawful use under both the Town's zoning and general bylaws.

REQUEST NO. 7

All documents setting forth facts supporting your contention that the Defendants applied a residency requirement in taking the actions alleged in the Complaint.

5

REQUEST NO. 8

All documents setting forth facts supporting your contention that other persons are similarly situated to you for purposes of demonstrating the deprivation of equal protection you allege in the Complaint.

REQUEST NO. 9

All documents setting forth facts supporting your contention that the Defendants, Town, or Selectmen acted with malice and/or bad faith to deprive you of your rights secured under the Constitution and laws of the United States.

REQUEST NO. 10

All documents that identify or concern each action you allege the Defendants, the Town, or the Selectmen took that ultimately resulted in the deprivation of your rights secured under the Constitution and laws of the United States.

REQUEST NO. 11

All documents offering factual support for, or otherwise detailing or concerning those losses which you claim were incurred as a result of actions taken by the Defendants, the Town, or the Selectmen that deprived you of rights secured by the Constitution and laws of the United States.

REQUEST NO. 12

All documents setting forth facts supporting your contention that the alleged acts of the Defendants were based upon a legally untenable ground.

REQUEST NO. 13

All documents setting forth facts supporting your contention that the alleged acts of the Defendants were arbitrary and capricious.

REQUEST NO. 14

All employment records maintained by you for persons you employed who had or have duties concerning the operation of the Gravel Bank, as such records reference those duties.

REQUEST NO. 15

Your Federal Income Tax returns for the years 2000 to the present as they reference or directly concern your ownership or use of the Gravel Bank.

REQUEST NO. 16

All permits or other authorizations obtained from Federal, State or local authorities providing for use of the Gravel Bank.

REQUEST NO. 17

All ledgers and accounts kept by you concerning the operation of the Gravel Bank.

REQUEST NO. 18

All appraisals, appraisal reports, and any documents related thereto, concerning the Gravel Bank or the Property.

REQUEST NO. 19

All reports, studies, test results or surveys concerning the Gravel Bank or the Property, including environmental studies and groundwater testing.

REQUEST NO. 20

All documents identified in your answer to Interrogatory No. 6 of the Defendants' First Set of Interrogatories Propounded to Plaintiff, Donovan Brothers, Inc., and all documents not so identified that nonetheless support your answer to said Interrogatory.

REQUEST NO. 21

All documents identified in your answer to Interrogatory No. 7 of the Defendants' First Set of Interrogatories Propounded to Plaintiff, Donovan Brothers, Inc., and all documents not so identified that nonetheless support your answer to said Interrogatory.

REQUEST NO. 22

All documents identified in your answer to Interrogatory No. 8 of the Defendants' First Set of Interrogatories Propounded to Plaintiff, Donovan Brothers, Inc., and all documents not so identified that nonetheless support your answer to said Interrogatory.

REQUEST NO. 23

All documents identified in your answer to Interrogatory No. 18(c) of the Defendants' First Set of Interrogatories Propounded to Plaintiff, Donovan Brothers, Inc., and all documents not so identified that nonetheless support your answer to said Interrogatory.

REQUEST NO. 24

All documents identified in your answer to Interrogatory No. 21 of the Defendants' First Set of Interrogatories Propounded to Plaintiff, Donovan Brothers, Inc., and all documents not so identified that nonetheless support your answer to said Interrogatory.

REQUEST NO. 25

All statements identified in your answer to Interrogatory No. 12 of the Defendants' First Set of Interrogatories Propounded to Plaintiff, Donovan Brothers, Inc., that are in your possession, custody and control.

REQUEST NO. 26

All documents, not otherwise produced in response to the herein Requests, concerning your use of the Gravel Bank, or others use of the Gravel Bank during the time you used the Gravel Bank.

DEFENDANTS,

By their attorneys,

Joel B. Bard (BBO# 029140)
Jonathan D. Eichman (BBO# 641227)
Kopelman and Paige, P.C.
Town Counsel
31 St. James Avenue
Boston, MA  02116
(617) 556-0007

259204/MONT/0007

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail/hand on 8/19/05

9

# EXHIBIT J

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-30136-KPN

| | |
|---|---|
| DONOVAN BROTHERS, INC., and<br>ELSIE M. LAFOND,<br><br>      Plaintiffs<br><br>v.<br><br>JOSEPH FONTAINE, JOANNE HEBERT and<br>ROBERT W. PIKE, JR., as they are the Zoning<br>Board of Appeals of the Town of Montgomery,<br>and ELWIN R. CLARK, JR., as he is the Building<br>Inspector & Zoning Enforcement Officer of the<br>Town of Montgomery,<br><br>      Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ANSWERS OF THE PLAINTIFF, DONOVAN BROTHERS, INC.,**

**TO DEFENDANTS' FIRST SET OF INTERROGATORIES**

1.    Please state your full name, age, residence address, occupation, and business address, and

the source of your authority to provide answers to the herein interrogatories on behalf of Donovan

Brothers.

**Answer:**    Gayle Donovan, age 78, Harlan St., Chesterfield, MA, self-employed of sand and gravel

business on Worthington Road in Huntington, MA.

2.    Please describe in detail, by a metes and bounds description, if possible, or by readily identifiable

monuments:

a) the exact boundaries of the Gravel Bank; and

b) the exact boundaries of the Property.

**Answer***:*    a) & b)I do not have the exact metes and bounds. The property is known as 13+/- acres on

Carrington Road in Montgomery, Hampden County, MA.  The property is described in the

1

Hampden County Registry of Deeds at Book 9540, Page 417, Book 9540, Page 419, Book 946, Page 297, Book 9965, Page 18 and Book 9540, Page 413. Excepting so much of the property as previously deeded to various parties and constituting the remainder of the property owned by Elsie LaFond on Carrington Road in Montgomery, MA. The deed can be obtained from the Hampden County Registry of Deeds in Springfield, MA, or viewed online at their website. I do not have a more accurate description of the Property or the Gravel Bank in my possession. The entire Property is part of the Gravel Bank.

3.    Please describe in detail:

     a)    the interests Donovan Brothers holds in the Property; the name of the person(s) from whom it acquired such interest; the consideration paid for such interest; and the date and recording information for the instrument by which Donovan Brothers took title to such interest;

     b)    all persons other than Donovan Brothers, holding at the same time as Donovan Brothers, an interest in the Property; the location, nature and extent of such interest; the name of the person from whom such interest was acquired; the consideration paid for such interest; and the date and recording information for the instrument establishing record title to such interest;

     c)    the interests Donovan Brothers hold in any property abutting the Property; the name of the person(s) from whom it acquired such interest; the consideration paid for such interest; and the date and recording information for the instrument by which Donovan Brothers took title to such interest.

**Answer:**    a)    Donovan Brothers has a Purchase and Sale Agreement and an Option on the Property in question that was acquired from Elsie LaFond. The Consideration for the Property is $47,000.00. The consideration for the Option on the Property also

2

includes my obligation to pay any and all closing costs, attorney's fees involved in this litigation and other good and sufficient consideration.

b)      Elsie LaFond at this time currently has the title to the Property subject to the Purchase and Sale Agreement and Option that I hold. I believe that Elsie LaFond obtained the Property upon the death of her husband. I do not believe any consideration was paid. I do not know the date and recording of any instruments dealing with this Property other than those deed references outlined in my answer to interrogatory #2.

c)      Please see my answer to 3(a).

4.      Please describe in detail when Donovan Brothers first began using the Gravel Bank for earth removal operations, and set forth the periods of time Donovan Brothers used the Gravel Bank for such purpose between the time it first came into operation and the present. "In operation" shall include those periods of time when the Gravel Bank was not being actively used for earth removal purposes, but had not been reclaimed for other uses.

**Answer:**      To the best of my knowledge and recollection, Donovan Brothers began using the Property in question in the 1970's. I do not know the exact date at this time. I reserve the right to amend this Answer as research continues to determine the exact date that gravel removal on this site began. To the best of my recollection, the gravel has been removed on a continuous basis since graveling began in the 1970's. At times, portions of the Property were used for agricultural purposes by or on behalf of Elsie LaFond.

5.      Please describe in detail all Donovan Brothers' use of the Gravel Bank that took place in the ten years prior to the date of your answer, and please identify each document or other source on which you rely to provide such description. Include in your description:

a.      the total amount, in cubic yards, of all earth materials removed by Donovan Brothers the Gravel Bank and disposed of by sale or otherwise during that time;

3

b.    the price or other consideration paid for each sale of such earth material, the dates

of such sales, and the full name and address of each buyer;

c.    the dates, or if exact dates are not known, the number of times and total duration

of time the Property was used to excavate, blast, crush, screen, and otherwise prepare earth

materials to allow for their sale;

d.    all Donovan Brothers' use of the Gravel Bank during that time for purposes other

than the removal of earth materials;

e.    the names and addresses of each person employed by who worked in or used the

Gravel Bank during that time, the type of work performed or use made, and the dates of

such work and/or use, or, if exact dates are not known, the number of times such work

and/or use took place and the total duration of that time.

**Answer:**    a)    Approximately 200,000 cubic yards of earth have been removed by Donovan

Brothers and disposed of by sale.

b)    When I began removing gravel from the site in the 1970's I paid 15¢ per cubic yard.

At the time that the Cease And Desist order went into effect I was paying $1.00 per

cubic yard.  I do not have the names and addresses of each buyer as the material

was processed into various products and sold to numerous individuals.  I have no

records to indicate where that particular gravel ended up or was sold.

c)    No such records exist to indicate that exact dates or approximate dates that the

activities inquired about occurred.  I can only state that since the beginning of the

time that I began using the site in question the property has been used every year

from graveling purposes thereafter.

d)    Donovan Brothers has used the gravel pit for the removal of gravel.  The property

has previously been used for agricultural purposes during the same period of time.

e)    I have employed the following people on a continuous basis:  Michael Donovan,

4

Mathew Donovan and Mark Donovan.  Also during the period of time that the gravel bank has been used I have hired various seasonal employees.  None of these individuals worked exclusively at the gravel bank.  They did work at the gravel bank, they either drove trucks or heavy equipment.  No records exist as to the exact dates, number of times that these individuals worked at the gravel pit in question.

6.   Please set forth, to the best of your knowledge, and identify each document or other source on which you rely to provide your answer, the total estimated amount, in cubic yards, of saleable earth materials remaining on the Property, distinguishing as to type of earth material;

**Answer:**   No documents were reviewed.  Estimated amount in cubic yards of material removed from the gravel bank is based upon my observation, recollection and estimating abilities.

7.   Please identify each communication Donovan Brothers has had with persons who own property near or abutting the Gravel Bank concerning the operation or sale of the Gravel Bank, setting forth the date of such communication, the persons participating and the substance of the communication, and identify each document which references or memorializes such communication.

**Answer:**   I met with the owners of the abutting property, Mr. Jacques and Mr. Page at their property on a Saturday morning.  I do not recall the exact date.  I believe that Elsie LaFond was present with me at that time.  There was a general discussion as to what I would do with respect to the property once I purchased it.  I indicated that I needed to remove the gravel as it was my livelihood and without this material I would go out of business.  Additionally, I showed them the area to be graveled.  I also explained to them that I would reclaim the property by replacing loam, grading it as well as seeding it once I was through.  I also answered their questions with respect to the extent of the graveling that would take place.  These people told me that they did not want any gravel pit operation on the site.  They also indicated that they would like to buy the property and they would set up terms for my

5

operation. I responded that I would prefer to deal with one owner as I had with Elsie

LaFond as opposed to two. To the best of my recollection I did not meet with the abutters

thereafter. However, my son-in-law and a friend met on my behalf and explained to the

abutters the restrictions that I would abide by regarding the scope, size and nature of my

operation as well as the period of time that the operation would evolve. That meeting took

place prior to the vote by the Zoning Board of Appeals on whether or not to lift the Cease

And Desist Order. I later authorized my attorney to provide that information to the

attorney for the Town and I direct your attention to the letter dated 8/17/05 from Attorney

Antonucci to Attorney Eichman. I believe that this letter more or less describes the oral

communications that took place directly or indirectly with the abutters of the property.

8.     Please identify each communication Donovan Brothers has had with the Town, the Defendants, or

any of the Selectmen concerning the operation or sale of the Gravel Bank, setting forth the date of

such communication, the persons participating and the substance of the communication, and

identify each document which references or memorializes such communication.

**Answer:**     As indicated in my Answer to Interrogatory #7 I spoke with the abutters directly, myself as

well as through my representatives. Mr. Jacques is a member of the Select Board.

Therefore, he is the only Selectman I believe I have spoken to regarding this matter. I have

not spoken to the Town other than expressing my position to the Zoning Board of Appeals

through my representative. My attorney my have spoken to the Town, the Selectman or the

Zoning Board of Appeals and I would suggest that you contact them in terms of

communications beyond the letter dated 8/17/05.

9.     Please describe in detail each contract, lease, license, or other agreement Donovan Brothers had

entered into concerning the sale or use of any part of the Property or the Gravel Bank, including in

your description the date and substance of such agreements, and identify any document which

references or memorializes such agreements.

6

**Answer:**    Please see the attached copy of the Purchase and Sale Agreement entered into between Elsie LaFond and me.  It is my understanding that my attorney later received confirmation from the Ms. LaFond's attorney indicating that Donovan Brothers held the option on the property until the issue to be litigated in this case was determined.

10.    Please state the basis for Donovan Brothers' contention that use of the Property for the removal and sale of earth materials is a lawful use under both the Town's zoning and general bylaws.

**Answer:**    No Answer required by me.  My attorney tells me this question calls for a legal conclusion. I have relied upon my attorney to provide a basis for my contention that I could continue to use this property.  I understand that the basis for this contention is the zoning bylaws, town ordinances in affect at the time as well as Massachusetts case law and the Mass. General Laws.

11.    Please describe in detail all losses which Donovan Brothers claims were incurred as a result of actions taken by the Defendants, the Town, or the Selectmen that deprived Donovan Brothers of rights secured by the Constitution and laws of the United States.

**Answer:**    I am now paying $3.00 per ton for gravel and am purchasing it from Mr. Peckham, a Town Selectman.  This is a greater cost by approximately one-third than what I was paying for the material removed from the LaFond property.  Additionally, I believe I would have realized a greater profit had I been able to purchase the property and remove the gravel at my convenience.  In addition to the additional cost I can only operate in terms of obtaining material when it is convenient for Mr. Peckham.  I have also purchased gravel from another gravel pit in the Town of Montgomery owned by Mr. Thomas Pomeroy.  I pay approximately 50¢ per cubic yard but also have to supply labor and equipment to remove the material as well as to reclaim the property and supply other labor and material to Mr. Pomeroy.  Based on my best estimation I am paying more than $1.00 per cubic yard from

Mr. Pomeroy under this arrangement. I have also had to turn down jobs as I am without

material to supply potential customers. Because of the lack of material to operate my

business, at this time I can foresee that I will be out of business within the next year unless

I can obtain access to the material at the gravel pit bank in question.

12.    If any statement has been taken or received from the Defendants, the Town, or any of the

Selectmen, whether written or oral, regarding in any way the allegations set forth in the

Complaint, please state:

a.    the name and address of the person from whom each such statement was

obtained;

b.    the date of any such statement;

c.    the substance of any such statement;

d.    the name and address of the person presently in possession or custody of such

statement.

**Answer:**    a) – d) None.


13.    Please provide the name, address, and relation to Donovan Brothers of each person (other

than your attorney) known by Donovan Brothers to have witnessed or to have factual knowledge

concerning the allegations set forth in the Complaint, and describe in detail what was witnessed or

what knowledge such person possesses.

**Answer:**    The defendants in this action, the Selectman and Mr. Page, who is an abutter to the

property, possibly some of my employees and other residents of the Town of Montgomery

who I cannot identify but who were at attendance at the Zoning Board of Appeals

meetings.

14.    Please provide the name and address of each person whom Donovan Brothers believes is

similarly situated to itself for purposes of demonstrating the deprivation of equal protection

alleged in the Complaint.

**Answer:**      I do not know all of the individuals who are similarly situated for the purposes of

demonstrating a deprivation of equal protection.  However, I know that the certain

Selectmen, Mr. Peckham, Mr. Pomeroy and approximately two other individuals are

operating active gravel pits in the Town of Montgomery at this time.  As indicated above, I

have purchased gravel from two of these individuals since the Cease And Desist Order has

been in effect.  Also, my attorney tells me that discovery is ongoing at this time and he has

not yet conducted depositions or received responses to our discovery documents.  I

respectfully request the opportunity to supplement this answer once that discovery has been

completed.

15.      Please describe in detail what facts Donovan Brothers contends support its allegation that

the Defendants, Town, or Selectmen acted with malice and/or bad faith to deprive Donovan

Brothers of its rights secured under the Constitution and laws of the United States.

**Answer:**      My attorney tells me that discovery is ongoing at this time and he has not yet conducted

depositions or received responses to our discovery.  I respectfully request the opportunity

to supplement this answer once that discovery has been completed.

16.      Please describe in detail what, if any, residency requirement was applied by the Defendants in

taking the actions alleged in the Complaint.

**Answer:**      Discovery is ongoing at this time and my attorney has not conducted depositions or

received responses to discovery.  I respectfully request the opportunity to supplement this

answer once that discovery has been completed.

17.      Please describe in detail each action Donovan Brothers alleges the Defendants, the Town,

or the Selectmen took that ultimately resulted in the deprivation of Donovan Brothers' rights

secured under the Constitution and laws of the United States.

**Answer:**      Please see my answer to interrogatory #16.

9

18.   Please identify:

  (a)   all persons furnishing information upon which your answers are based, stating for

        each such person the person's address and the interrogatory for which information was

        furnished;

  (b)   all persons, in addition to those referred to directly above, whom Donovan

        Brothers has reason to believe may have personal knowledge relative to these

        interrogatories; and

  (c)   all documents referred to in answering these interrogatories not otherwise

        identified herein.

**Answer:**   a)   Gayle Donovan, Harlan St., Chesterfield, MA.

        b)   Discovery is ongoing at this time and my attorney has not conducted depositions or

             received responses to discovery.  I respectfully request the opportunity to

             supplement this answer once that discovery has been completed.

        c)   None.

19.   Please identify all persons whom Donovan Brothers expects to call as witnesses at a trial

      of this matter, specifying the subject and substance of each witness's testimony.

**Answer:**   My attorney tells me that discovery is ongoing at this time and he has not conducted

        depositions or received responses to discovery.  I respectfully request the opportunity to

        supplement this answer once that discovery has been completed.  However, my attorney

        tells me that we do expect that, other than myself, Michael Donovan, the defendant

        members of the Zoning Board of Appeals, the Building Inspector and the Selectman in the

        Town of Montgomery will testify.  I do not know who else my attorney intends to call to

        testify at the trial of this matter as discovery is not complete.

20.   Please identify all expert witnesses whom Donovan Brothers expects to call at a trial of

      this matter, stating fully, and in detail, for each such expert: a) the name, address, and occupation

and/or profession of such experts; b) the subject matter about which each such expert is expected to testify; c) the substance of the facts and opinions about which each such expert is expected to testify; and d) a summary of the grounds for each such opinion.

**Answer:**      I do not know who my attorney intends to call as an expert in this case.  However, I do believe that he may call Mr. Ron Dahle, P.O. Box 344, Farmington, CT  06034-0344.  Mr. Dahle is the owner and operator of quarries and graveling operations in Massachusetts and Connecticut.  I believe that Mr. Dahle would qualify as an expert in being able to provide an estimate as to the amount of lost income because of Donovan Brothers inability to be able to gravel the property in question.  I believe that Mr. Dahle will testify based upon his training, education and experience in the Aggregates business as well as his personal observations of the property in question and his extensive knowledge of the economics of the sand and gravel business.  I believe that the grounds for his opinions to which he will be testifying will be his personal observations and information provided to him by Donovan Brothers regarding their former operation.  I reserve the right to supplement this information and possibly identify other expert witnesses because discovery is not complete at this time.

21.    Please identify all documents Donovan Brothers intends to introduce as evidence in a trial of this matter not otherwise identified herein.

**Answer:**      I do not know what documents my attorney intends to offer at the trial of this matter. However, I expect he will offer into evidence certified copies of the deeds in questions, the Purchase and Sale Agreement, the Town bylaws that have been in effect over the past 50 years in the Town of Montgomery as well as documents that would clarify the loss that I have sustained as a result of this situation.  This answer will be supplemented once a decision is made with regard to what documents will be offered.

22.    Please identify, and state the basis for your identification, each and every authorization,

11

permit or decision Donovan Brothers or anyone else of whom Donovan Brothers is aware has

applied for or received, from any legislative, administrative, quasi-judicial, or judicial body,

facilitating use of the Property for earth removal purposes.

**Answer:**    I do not understand this question but I do not have a permit or license from the Town of

Montgomery.

23.    Please state the basis for Donovan Brothers' contention that the alleged acts of the Defendants

were based upon a legally untenable ground.

**Answer:**    I am relying upon my attorney to draft the Complaint and pursue my claim.  I do not know

what he feels legally untenable grounds are.  However, I do know that I am not being

treated the way other individuals who operate gravel pits in the Town of Montgomery are

treated.

24.    Please state the basis for Donovan Brothers' contention that the alleged acts of the Defendants

were arbitrary and capricious.

**Answer:**    I am relying upon my attorney to draft the Complaint and pursue my claim.  I do not know

what he feels legally untenable grounds are. However, I do know that I am not being

treated the way other individuals who operate gravel pits in the Town of Montgomery are

treated.

25.    Please identify all insurance agreements which may provide Donovan Brothers coverage for the

losses alleged in the Complaint.

**Answer:**    I have insurance on all of my vehicles as well as general liability insurance.  The insurance

has been obtained through King and Cushman Agency in Northampton, MA.  I do not have

copies of the policies available at this time.  The information can be obtained from that

insurance agency.

Signed under the pains and penalties of perjury this 25th day of October 2005.

_____
Gayle Donovan


THE PLAINTIFF
DONOVAN BROTHERS, INC.
BY THEIR ATTORNEY


Frank E. Antonucci, Esq.
83 State Street, Suite 203
Springfield, MA 01103-1009
(413) 737-4667 (ph)
(413) 731-0602 (fax)
BBO#020260

13

## CERTIFICATE OF SERVICE

I, Frank E. Antonucci, hereby certify that I have served a copy of the foregoing Answers on the defendants in this matter on this 25th day of October 2005 to counsel of record by hand-delivering the original signed document to counsel at U.S. District Court as follows:

Joel B. Bard and Jonathan D. Eichman, Kopelman and Paige, P.C., 31 St. James Avenue, Boston, MA, 02116.

Frank E. Antonucci, Esq.
83 State Street, Suite 203
Springfield, MA  01103-2009
BBO #020260
(413) 737-4667 (ph)
(413) 731-0602 (fax)

# EXHIBIT K

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-30136-KPN

DONOVAN BROTHERS, INC., and )
ELSIE M. LAFOND, )
)
      Plaintiffs )
)
v. )
)
JOSEPH FONTAINE, JOANNE HEBERT and )
ROBERT W. PIKE, JR., as they are the Zoning )
Board of Appeals of the Town of Montgomery, )
and ELWIN R. CLARK, JR., as he is the Building )
Inspector & Zoning Enforcement Officer of the )
Town of Montgomery, )
)
      Defendants )
)

## PLAINTIFF ELSIE M. LAFOND'S ANSWERS TO

## DEFENDANTS' FIRST SET OF INTERROGATORIES

1.    Please state your full name, age, residence address(es), occupation, and business address.

**Answer:**    Elsie M. LaFond, ~~Elsie M Fond~~ Rd., Huntington, MA 01050. 32 Littleville

2.    Please describe in detail, by a metes and bounds description, if possible, or by readily

identifiable monuments:

    a)    the exact boundaries of the Gravel Bank; and

    b)    the exact boundaries of the Property.

**Answer:**    a) & b) I do not have the exact metes and bounds. The property is known as 13+/-

acres on Carrington Road in Montgomery, Hampden County, MA. The property is

described in the Hampden County Registry of Deeds at Book 9540, Page 417, Book

9540, Page 419, Book 946, Page 297, Book 9965, Page 18 and Book 9540, Page 413.

Excepting so much of the property as previously deeded to various parties and

1

constituting the remainder of the property owned by Elsie LaFond on Carrington Road in Montgomery, MA. The deed can be obtained from the Hampden County Registry of Deeds in Springfield, MA, or viewed online at their website. I do not have a more accurate description of the Property or the Gravel Bank in my possession. The entire Property is part of the Gravel Bank.

3.  Please describe in detail:

a)  the interests you hold in the Property; the name of the person(s) from whom you acquired such interest; the consideration paid for such interest; and the date and recording information for the instrument by which you took title to such interest;

b)  all persons other than you, holding at the same time as you, an interest in the Property; the location, nature and extent of such interest; the name of the person from whom such interest was acquired; the consideration paid for such interest; and the date and recording information for the instrument establishing record title to such interest;

c)  the interests you hold in property abutting the Property; the name of the person(s) from whom you acquired such interest; the consideration paid for such interest; and the date and recording information for the instrument by which you took title to such interest.

Answer:    a)  I am the owner of the property in question.

b)  I signed a Purchase and Sale Agreement with Mr. Gayle Donovan, a copy of which is enclosed in this discovery material. I have also provided him an option to extend this agreement until the litigation in question has been completed.

c)  I do not know the date and the reference with respect to the Title. I believe it can be obtained from the Hampden County Registry of Deeds.

2

4.    Please describe in detail when the Gravel Bank first came into operation, and set forth the periods of time the Gravel Bank was used for earth removal operations between the time it first came into operation and the present. "In operation" shall include those periods of time when the Gravel Bank was not being actively used for earth removal purposes, but had not been reclaimed for other uses.

**Answer:**    I believe Donovan Brothers began extracting gravel from the property in the 1970's. I do not know the exact date. To the best of my knowledge, there was never a period of time from the beginning of their operation until this date when they have not used the property in question.

5.    Please describe in detail all use of the Gravel Bank of which you are aware that took place in the ten years prior to the date of your answer, and please identify each document or other source on which you rely to provide such description. Include in your description:

   a.    the total amount, in cubic yards, of all earth materials removed from the Gravel Bank and disposed of by sale or otherwise during that time;

   b.    the price or other consideration paid for each sale of such earth material, the dates of such sales, and the full name and address of each buyer;

   c.    the dates, or if exact dates are not known, the number of times and total duration of time the Property was used to excavate, blast, crush, screen, and otherwise prepare earth materials to allow for their sale;

   d.    all use of the Gravel Bank during that time for purposes other than the removal of earth materials;

   e.    the names and addresses of each person who worked in or used the Gravel Bank during that time, the type of work performed or use made, and the dates of such work and/or use, or, if exact dates are not known, the number of times such work and/or use took place and the total duration of that time.

3

**Answer:**

    a)  I do not know the total amount of cubic yards and earth materials removed from the gravel pit.

    b)  Mr. Donovan began paying 15¢ per cubic yard and most recently paid $1.00 per cubic yard for gravel taken from the property.

    c)  I do not believe there was any blasting, crushing or screening done on the premises, but I am not sure. Excavation began in the 1970's and continued up until the time of the Cease And Desist Order.

    d)  Besides taking gravel out of the gravel pit there was a portion of the gravel property that had crops grown on it.

    e)  Donovan Brothers. I do not know the dates, times or who specifically worked there.

6.    Please set forth, to the best of your knowledge, and identify each document or other source on which you rely to provide your answer, the total estimated amount, in cubic yards, of saleable earth materials remaining on the Property, distinguishing as to type of earth material;

**Answer:**    No answer required.

7.    Please identify each communication you have had with persons who own property near or abutting the Gravel Bank concerning the operation or sale of the Gravel Bank, setting forth the date of such communication, the persons participating and the substance of the communication, and identify each document which references or memorializes such communication.

**Answer:**    Please refer to Gayle Donovan's answer to #7 in this regard as I do not have a specific recollection of a meeting with the abutters.

8.    Please identify each communication you have had with the Town, the Defendants, or any of the Selectmen concerning the operation or sale of the Gravel Bank, setting forth the date

4

of such communication, the persons participating and the substance of the communication, and identify each document which references or memorializes such communication.

**Answer:**    None, to the best of my knowledge.  However, my attorney may have communicated at some time, I do not know.

9.    Please describe in detail each contract, lease, license, or other agreement you have entered into concerning the sale or use of any part of the Property or the Gravel Bank, including in your description the date and substance of such agreements, and identify any document which references or memorializes such agreements.

**Answer:**    None.

10.    Please state the basis for your contention that use of the Property for the removal and sale of earth materials is a lawful use under both the Town's zoning and general bylaws.

**Answer:**    **Objection**: This interrogatory calls for a legal conclusion and I believe that I have left a determination in this regard to my attorneys as to the basis for this contention.  However, from my understanding, I believe that this use is permitted under the zoning and general bylaws of the Town of Montgomery.

11.    Please describe in detail all losses which you claim were incurred as a result of actions taken by the Defendants, the Town, or the Selectmen that deprived you of rights secured by the Constitution and laws of the United States.

**Answer:**    I have lost the income that I derive from the Donovan Brothers for the material that they remove from my property.  Additionally, I have not been able to sell the property at a fair and reasonable price based upon its actual cash value because of the Cease And Desist Order and the Town's refusal to let the property be used as it has been used since the 1970's, as a gravel pit.  This has deprived me of a significant amount of money that I need in my retirement

5

12.     If any statement has been taken or received from the Defendants, the Town, or any of the Selectmen, whether written or oral, regarding in any way the allegations set forth in the Complaint, please state:

     a.     the name and address of the person from whom each such statement was obtained;

     b.     the date of any such statement;

     c.     the substance of any such statement;

     d.     the name and address of the person presently in possession or custody of such statement.

**Answer:**     None.

13.     Please provide the name, address, and relation to you of each person (other than your attorney) known by you to have witnessed or to have factual knowledge concerning the allegations set forth in the Complaint, and describe in detail what was witnessed o/what knowledge such person possesses.

**Answer:**     Mr. Page, Mr. Jacques, the Zoning Board of Appeals, the Selectman in the Town of Montgomery, Gayle Donovan, Gayle Donovan's employees and residents of the Town of Montgomery whose names and identities I cannot provide.

14.     Please provide the name and address of each person whom you believe is similarly situated to you for purposes of demonstrating the deprivation of equal protection you allege in the Complaint.

**Answer:**     **Objection:**  This interrogatory calls for a legal conclusion that I believe my attorney is best able to answer.  However, I know that I am not able to receive income from selling gravel when others in the Town of Montgomery are able to do so at this time.

15.     Please describe in detail what facts you contend support your allegation that the Defendants, Town, or Selectmen acted with malice and/or bad faith to deprive you of your

6

rights secured under the Constitution and laws of the United States.

**Answer:**    My attorney advises me that discovery is ongoing at this time and he has not yet conducted depositions or received responses to discovery. I respectfully request the opportunity to supplement this answer once that discovery has been completed.

16.    Please describe in detail what, if any, residency requirement was applied by the Defendants in taking the actions alleged in the Complaint.

**Answer:**    My attorney advises me that discovery is ongoing at this time and he has not yet conducted depositions or received responses to discovery. I respectfully request the opportunity to supplement this answer once that discovery has been completed.

17.    Please describe in detail each action you allege the Defendants, the Town, or the Selectmen took that ultimately resulted in the deprivation of your rights secured under the Constitution and laws of the United States.

**Answer:**    My attorney advises me that discovery is ongoing at this time and he has not yet conducted depositions or received responses to discovery. I respectfully request the opportunity to supplement this answer once that discovery has been completed.

18.    Please identify:

   (a)    all persons furnishing information upon which your answers are based, stating for each such person the person's address and the interrogatory for which information was furnished;

   (b)    all persons, in addition to those referred to directly above, who you have reason to believe may have personal knowledge relative to these interrogatories; and

   (c)    all documents referred to in answering these interrogatories not otherwise identified herein.

**Answer:**    I am the only one who supplied the information upon which these answers are based.

19.    Please identify all persons whom you expect to call as witnesses at a trial of this matter,

7

specifying the subject and substance of each witness's testimony.

**Answer:**     My attorney advises me that discovery is ongoing at this time and he has not yet

conducted depositions or received responses to discovery. However, I do expect that

Gayle Donovan, Michael Donovan, the defendant members of the Zoning Board of

Appeals, the Building Inspector and the Selectman in the Town of Montgomery will

testify. I do not know the identity of any other possible witnesses my attorney intends

to call to the trial list matter as discovery is not complete. I respectfully request the

opportunity to supplement this answer once that discovery has been completed.

20.     Please identify all expert witnesses whom you expect to call at a trial of this matter,

stating fully, and in detail, for each such expert: a) the name, address, and occupation and/or

profession of such experts; b) the subject matter about which each such expert is expected to

testify; c) the substance of the facts and opinions about which each such expert is expected to

testify; and d) a summary of the grounds for each such opinion.

**Answer:**     I do not know whom my attorney intends to call as an expert in this case. However, I

do believe that he may call Mr. Ron Dahle, P.O. Box 344, Farmington, CT 06034-

0344. Mr. Dahle is the owner and operator of quarries and graveling operations in

Massachusetts and Connecticut. I believe that Mr. Dahle would qualify as an expert

in being able to provide and estimate as to the amount of lost income because of

Donovan Brothers ability to be able to gravel the property in question. I believe that

Mr. Dahle will testify upon his training, education and experience in the aggregates

business as well as his personal observations of the property in question and his

extensive knowledge of the economics of the sand and gravel business. I believe that

the grounds upon which he will be testifying will be his personal observation and

information provided to him by Donovan Brothers regarding their operation. I

reserve the right to supplement this information and possibly identify other expert

witnesses because discovery is not complete at this time.

21.    Please identify all documents you intend to introduce as evidence in a trial of this matter

not otherwise identified herein.

**Answer:**    I do not know what documents my attorney intends to offer at the trial of this matter.

However, I expect he will offer into evidence certified copies of the deeds in

questions, the Purchase and Sale Agreement, the Town bylaws that have been in

affect over the past 50 years in the Town of Montgomery as well as documents that

would identify the loss that I have sustained as a result of this situation.

22.    Please identify, and state the basis for your identification, each and every authorization,

permit or decision you or anyone else you are aware of has applied for or received, from any

legislative, administrative, quasi-judicial, or judicial body, facilitating use of the Property for

earth removal purposes.

**Answer:**    I do not understand this question but I do not have a permit or license from the Town

of Montgomery.

23.    Please state the basis for your contention that the alleged acts of the Defendants were

based upon a legally untenable ground.

**Answer:**    I am relying upon my attorney to draft the Complaint and pursue my claim.  I do not

know what he feels legally untenable grounds are.  However, I do know that I am not

being treated the way other individuals who operate gravel pits in the Town of

Montgomery are treated.

24.    Please state the basis for your contention that the alleged acts of the Defendants were

arbitrary and capricious.

**Answer:**    I am relying upon my attorney to draft the Complaint and pursue my claim.  I do not

know what he feels ~~legally untenable grounds are~~ constitutes arbitrary + capricious action. However, I do know that I am not

being treated the way other individuals who operate gravel pits in the Town of

9

Montgomery are treated.

25.     Please identify all insurance agreements which may provide you coverage for the losses

alleged in the Complaint.

**Answer:**     None.

Signed under the pains and penalties of perjury this _22_ day of ~~October~~ December 2005.

_Elsie M. LaFond_
Elsie M. LaFond


THE PLAINTIFF
ELSIE M. LAFOND,
BY HER ATTORNEY,


_Frank E. Antonucci_
Frank E. Antonucci, Esq.
83 State Street, Suite 203
Springfield, MA 01103-1009
(413) 737-4667 (ph)
(413) 731-0602 (fax)
BBO#020260


## CERTIFICATE OF SERVICE

I, Frank E. Antonucci, hereby certify that I have served a copy of the foregoing Answers on the defendants in this matter via electronic mail and regular first class mail on this 28th day of ~~October~~ December 2005 to counsel of record as follows:

Joel B. Bard and Jonathan D. Eichman, Kopelman and Paige, P.C., 31 St. James Avenue, Boston, MA, 02116.

_Frank E. Antonucci_
Frank E. Antonucci, Esq.

# EXHIBIT L

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-30136-KPN

| | |
|---|---|
| DONOVAN BROTHERS, INC., and<br>ELSIE M. LAFOND,<br><br>       Plaintiffs<br><br>v.<br><br>JOSEPH FONTAINE, JOANNE HEBERT and<br>ROBERT W. PIKE, JR., as they are the Zoning<br>Board of Appeals of the Town of Montgomery,<br>and ELWIN R. CLARK, JR., as he is the Building<br>Inspector & Zoning Enforcement Officer of the<br>Town of Montgomery,<br><br>       Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S, DONOVAN BROTHERS, INC., RESPONSES TO
DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS**

1.    All plans, maps, sketches, photographs, or metes and bounds descriptions depicting or concerning any part of the Gravel Bank or the Property.

*Response:*    *See description within the Purchase and Sale Agreement attached.*

2.    All deeds, licenses or leases allowing for or otherwise concerning the use, purchase, or sale of the Gravel Bank or the Property.

*Response:*    *See Purchase and Sale Agreement attached.*

3.    All documents upon which you relied to provide, or otherwise concern, your answer to Interrogatory No.4 of the Defendants' First Set of Interrogatories Propounded to the Plaintiff, Donovan Brothers, Inc.

*Response:*    *Primarily I answered based on my recollection, however, I did review some checking accounts.*

4.    All documents identified in your answer to Interrogatory No.5 of the Defendants' First

1

Set of Interrogatories Propounded to the Plaintiff, Donovan Brothers, Inc., including, without

limitation, contracts or receipts for the previous ten years concerning:

a.     purchase or sale of the Property;

b.     use of the Property;

c.     sale of earth materials taken from the Gravel Bank;

d.     excavation, blasting, crushing, screening, and otherwise preparing earth materials taken

from the Gravel Bank to allow for their sale;

e.     sale, purchase, or rental of equipment and vehicles for use in relation to the Gravel Bank;

f.     hiring of and wages paid to persons working in or using the Gravel Bank;

g.     improvements added or made to the Gravel Bank, or to the Property for use in relation to

the Gravel Bank;

h.     purchase of materials for use in working the Gravel Bank;

i.     use of the Gravel Bank for purposes other than the removal of earth materials;

**Response:**    *a)*     *Please see attachment #2.*

              *b)*     *There are no contracts or documents of this nature.*

              *c)*     *There are no  documents of this nature in my possession.*

              *d)*     *There are no such documents in my possession.*

              *e)*     *I did not purchase any equipment specifically for the purpose of this gravel*

*bank.  Therefore, no such documents exist.*

              *f)*     *There are no employment contracts.  Payroll is done through ADP located in*

*West Springfield, MA.  I do not keep those records.*

              *g)*     *None*

              *h)*     *None*

              *i)*     *None.*

5.    All commercial general liability, automobile liability, and excess liability insurance

policies and declaration sheets providing coverage to Donovan Brothers for activities or

occurrences directly related to use of the Gravel Bank.

*Response:    Please see answer to Interrogatory # 25.*

6.    All documents setting forth facts supporting your contention that use of the Property for

the removal and sale of earth materials is a lawful use under both the Town's zoning and general

bylaws.

*Response:    Please refer to the Town's Zoning Ordinances in effect over the past 50 years, copies of*

*which I assume are in the defendants' possession.*

7.    All documents setting forth facts supporting your contention that the Defendants applied

a residency requirement in taking the actions alleged in the Complaint.

*Response:    The Plaintiff does not have any such documents in his possession at this time.*

*Discovery is ongoing and this Response will be supplemented if appropriate.*

8.    All documents setting forth facts supporting your contention that other persons are similarly

situated to you for purposes of demonstrating the deprivation of equal protection you allege in the

Complaint.

*Response:    The Plaintiff does not have any such documents in his possession at this time.*

*Discovery is ongoing and this Response will be supplemented if appropriate.*

9.    All documents setting forth facts supporting your contention that the Defendants, Town,

or Selectmen acted with malice and/or bad faith to deprive you of your rights secured under the

Constitution and laws of the United States.

*Response:    The Plaintiff does not have any such documents in his possession at this time.*

*Discovery is ongoing and this Response will be supplemented if appropriate.*

10.    All documents that identify or concern each action you allege the Defendants, the Town,

or the Selectmen took that ultimately resulted in the deprivation of your rights secured under the

Constitution and laws of the United States.

**Response:**    *The Plaintiff does not have any such documents in his possession at this time.*

*Discovery is ongoing and this Response will be supplemented if appropriate.*

11.    All documents offering factual support for, or otherwise detailing or concerning those

losses which you claim were incurred as a result of actions taken by the Defendants, the Town, or

the Selectmen that deprived you of rights secured by the Constitution and laws of the United

States.

**Response:**    *The Plaintiff does not have any such documents in his possession at this time.*

*Discovery is ongoing and this Response will be supplemented if appropriate.*

12.    All documents setting forth facts supporting your contention that the alleged acts of the

Defendants were based upon a legally untenable ground.

**Response:**    *The Plaintiff does not have any such documents in his possession at this time.*

*Discovery is ongoing and this Response will be supplemented if appropriate.*

13.    All documents setting forth facts supporting your contention that the alleged acts of the

Defendants were arbitrary and capricious.

**Response:**    *The Plaintiff does not have any such documents in his possession at this time.*

*Discovery is ongoing and this Response will be supplemented if appropriate.*

14.    All employment records maintained by you for persons you employed who had or have

duties concerning the operation of the Gravel Bank, as such records reference those duties.

**Response:**    *No such documents in the plaintiff's possession.  Discovery is ongoing and this*

*Response will be supplemented if appropriate..*

15.    Your Federal Income Tax returns for the years 2000 to the present as they reference or

directly concern your ownership or use of the Gravel Bank.

**Response:**    *No such documents in the plaintiff's possession.  Discovery is ongoing and this*

*Response will be supplemented if appropriate.*

4

16.  All permits or other authorizations obtained from Federal, State or local authorities

providing for use of the Gravel Bank.

*Response:*    *None.*

17.  All ledgers and accounts kept by you concerning the operation of the Gravel Bank.

*Response:*    *No such documents in the plaintiff's possession. Discovery is ongoing and this*
*Response will be supplemented if appropriate.*

18.  All appraisals, appraisal reports, and any documents related thereto, concerning the

Gravel Bank or the Property.

*Response:*    *No such documents in the plaintiff's possession. Discovery is ongoing and this*
*Response will be supplemented if appropriate.*

19.  All reports, studies, test results or surveys concerning the Gravel Bank or the Property,

including environmental studies and groundwater testing.

*Response:*    *No such documents in the plaintiff's possession. Discovery is ongoing and this*
*Response will be supplemented if appropriate.*

20.  All documents identified in your answer to Interrogatory No.6 of the Defendants' First

Set of Interrogatories Propounded to Plaintiff, Donovan Brothers, Inc., and all documents not so

identified that nonetheless support your answer to said Interrogatory.

*Response:*    *No such documents in the plaintiff's possession.  Discovery is ongoing and this*
*Response will be supplemented if appropriate.*

21.  All documents identified in your answer to Interrogatory No. 7 of the Defendants' First Set of

Interrogatories Propounded to Plaintiff, Donovan Brothers, Inc., and all documents not so

identified that nonetheless support your answer to said Interrogatory.

*Response:*    *No such documents in the plaintiff's possession that document this meeting other than*
*referred to in the answer to Interrogatory # 17.*

22.  All documents identified in your answer to Interrogatory No. 8 of the Defendants' First Set of

5

Interrogatories Propounded to Plaintiff, Donovan Brothers, Inc., and all documents not so

identified that nonetheless support your answer to said Interrogatory.

**Response:**        *No such documents in the plaintiff's possession that document this meeting other than*

*referred to in the answer to Interrogatory # 17.*

23.    All documents identified in your answer to Interrogatory No. 18© of the Defendants' First Set of

Interrogatories Propounded to Plaintiff, Donovan Brothers, Inc., and all documents not so

identified that nonetheless support your answer to said Interrogatory.

**Response:**        *No such documents in the plaintiff's possession that document this meeting other than*

*referred to in the answer to Interrogatory # 17.*

24.    All documents identified in your answer to Interrogatory No. 21 of the Defendants' First Set of

Interrogatories Propounded to Plaintiff, Donovan Brothers, Inc., and all documents not so

identified that nonetheless support your answer to said Interrogatory.

**Response:**        *No such documents in the plaintiff's possession that document this meeting other than*

*referred to in the answer to Interrogatory # 17.*

25.    All statements identified in your answer to Interrogatory No. 12 of the Defendants' First Set of

interrogatories Propounded to Plaintiff, Donovan Brothers, Inc., that are in your possession,

custody and control.

**Response:**        *No such documents are in the plaintiff's' possession. Discovery is ongoing and this*

*Response will be supplemented if appropriate.*

26.    All documents, not otherwise produced in response to the herein Requests, concerning your use of

the Gravel Bank, or others use of the Gravel Bank during the time you used the Gravel Bank.

**Response:**        *No such documents are in the plaintiff's possession. Discovery is ongoing and this*

*Response will be supplemented if appropriate.*

THE PLAINTIFF
DONOVAN BROTHERS, INC.
BY THEIR ATTORNEY


Frank E. Antonucci, Esq.
83 State Street, Suite 203
Springfield, MA 01103-1009
(413) 737-4667 (ph)
(413) 731-0602 (fax)
Mass. BBO#: 020260


### CERTIFICATE OF SERVICE

I, Frank E. Antonucci, hereby certify that I have served the foregoing document on the defendants in this matter by mailing a copy via first class mail; postage prepaid, and via electronic mail on this 28th day of December 2005 to counsel of record as follows:

Jonathan D. Eichman, Esq.
KOPELMAN and PAIGE, P.C.
31 St. James Avenue
Boston, MA  02116
Fax (617) 654-1735


Frank E. Antonucci, Esq.
83 State Street, Suite 203
Springfield, MA  01103-2009
(413) 737-4667 (ph)
(413) 731-0602 (fax)
Mass. BBO #020260

7

# LAND REAL ESTATE AGREEMENT

**AGREEMENT** made this _____ day of November 2004 between **ELSIE M. LAFOND** of 32 Littleville Road, Huntington, Massachusetts (hereinafter referred to as the "SELLER"), owner of real property located and described as **13 ACRES +/- ON CARRINGTON ROAD, MONTGOMERY, HAMPDEN COUNTY, MASSACHUSETTS**, who agrees to SELL, and **DONOVAN BROS, INC.**, a Massachusetts Corporation having its principal place of business at Worthington Road, Huntington, Massachusetts (hereinafter referred to as the "BUYER"), who agrees to BUY, upon the terms and conditions hereinafter set forth:

1. DESCRIPTION - The following bounded and described premises: **THE PROPERTY KNOWN AS 13 +/- ACRES ON CARRINGTON ROAD, MONTGOMERY, HAMPDEN COUNTY, MASSACHUSETTS**, being a portion of the land of the SELLER more particularly described in Deeds recorded with the Hampden County Registry of Deeds at Book. 9540, Page 417, Book 9540, Page 419, Book 9546, Page 297, Book 9965 Page 18 and Book 9540, Page 413 excepting so much of the property as was previously deeded to various parties and constituting her remaining property on Carrington Road in Montgomery, Massachusetts.

2. PLANTINGS, TOPSOIL, ETC. – Included in the sale as part of said premises are all trees, shrubs, plants and topsoil located thereon. The SELLER agrees not to remove, cut or otherwise alter same during the term of this Agreement.

3. TITLE - Said premises are to be conveyed on or before **DECEMBER 31, 2004** by a good and sufficient Deed of equal covenant held by the SELLER, conveying a good and clear, record, and marketable title to the same free from all encumbrances, except:

   (a) Usual public utilities servicing the premises, if any;
   (b) Such taxes for the current year as are not due and payable on the date of delivery of such Deed;
   (c) Liens for municipal assessments and/or orders for which such may be made after the date of this Agreement;
   (d) Subject to restrictions and easements of record, if any, which do not materially affect the value or intended use of the property; and
   (e) Provisions of existing building and zoning laws.

4. CONSIDERATION - For such Deed and conveyance the BUYER is to pay the sum of **FORTY SEVEN THOUSAND AND 00/100 ($47,000.00) DOLLARS** of which **FOUR THOUSAND SEVEN HUNDRED AND 00/100 ($4,700.00) DOLLARS** has been paid this date as a deposit and the balance of **FORTY TWO THOUSAND**

**THREE HUNDRED AND 00/100 ($42,300.00) DOLLARS** is to be paid in cash or by certified or Attorney's Trustee check upon delivery of said Deed.

5.  PERFORMANCE - The Deed is to be delivered and the consideration paid at the office of the BUYER'S attorney on or before **DECEMBER 31, 2004** unless some other place and time should be mutually agreed upon in writing signed by both the BUYER and the SELLER.

   To enable the SELLER to make conveyance as herein provided, the SELLER may, at the time of the delivery of the Deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests; all instruments so procured to be recorded simultaneously with the delivery of said Deed. The acceptance of the Deed by the BUYER shall be deemed to be a full performance and discharge of the terms and obligations set forth herein, except such as are by their terms to be performed after the delivery of the Deed.

6.  POSSESSION - Full possession of the premises, free of all tenants and occupants, is to be delivered to the BUYER at the time of the delivery of the Deed, the said premises to be then in the condition required by this Agreement. The BUYER shall have the right to inspect the premises for compliance with this paragraph prior to delivery of the Deed upon reasonable notice to the SELLER.

7.  ADJUSTMENTS – Taxes and other municipal assessments shall be apportioned as of the day of delivery of the Deed. If the amount of said taxes is not known at the time of the delivery of the Deed, said amount shall be apportioned on the basis of the taxes assessed for the preceding year with a reapportionment as soon as the new tax rate and valuation can be ascertained, which latter provision shall survive the delivery of the Deed.

8.  DEPOSITS - All deposits made hereunder shall be held in trust by Morisi & O'Connell and shall be duly accounted for at the time for performance of this Agreement. No interest shall be paid on said deposit.

9.  DEFAULT - If the BUYER shall fail to fulfill the BUYER'S agreements herein, all deposits made hereunder by the BUYER shall be forfeited by the BUYER and retained by the SELLER and shall be the SELLER'S sole remedy in equity and at law.

10. BROKERS - There are no brokers involved in this transaction. The BUYER and the SELLER hereby agree to mutually indemnify each other from and against any claim of commission or fee by any individual or entity related to this transaction.

11.  MORTGAGE FINANCING - This Agreement is not contingent on the BUYER'S ability to obtain a mortgage loan commitment.

12.  RIGHT TO INSPECT - This Agreement is subject to the right of the BUYER to obtain at the BUYER'S own expense, an inspection of the premises and written report to include, but not be limited to, the existence and condition of underground storage tanks, if any, the presence of insect infestation, the presence of hazardous materials on the premises or the likelihood of release of hazardous materials on or from the premises, the presence of asbestos, urea-formaldehyde foam insulation, lead based paint and/or radon gas, the adequacy and suitability of the water supply and the condition and adequacy of the sewerage system, by the consultant(s) of the BUYER'S own choosing. The BUYER'S right to inspection shall expire on **DECEMBER 15, 2004.** The BUYER and the BUYER'S consultant(s) shall have the right of access to the premises at reasonable times and in the presence of the SELLER or the SELLER'S authorized representative upon twenty-four (24) hours advance notice, for the purpose of inspecting, as aforesaid, the condition of said premises. If the BUYER is not satisfied with the results of such inspection(s), this Agreement may be terminated by the BUYER, at the BUYER'S election, without legal or equitable recourse to either party, the parties hereby releasing each other from all liability under this Agreement, and the deposit shall be returned to the BUYER, provided however, that the BUYER shall have notified the SELLER, in writing, together with a copy of the written report(s) of the inspection(s) on or before the inspection expiration date hereinabove specified, of the BUYER'S intention to so terminate. If such notice and written report(s) are not received on or before the inspection expiration date hereinabove specified, the BUYER shall be bound to perform the BUYER'S obligations under this Agreement.

THE BUYER ACKNOWLEDGES THAT: (a) INFORMATION WAS SUPPLIED BY THE SELLER BUT SHOULD BE CHECKED FOR ACCURACY BY THE BUYER; (b) PUBLIC INFORMATION WAS SUBJECT TO THE BUYER'S VERIFICATION; (c) EACH ITEM WAS SUBJECT TO DIRECT INQUIRY BY THE BUYER, AND THE BUYER HAS BEEN SO ADVISED; (d) THE SELLER MAKES NO REPRESENTATIONS REGARDING THE CONDITION OF THE PREMISES, STRUCTURE(S) THEREON OR THE MECHANICAL COMPONENTS THEREOF: AND (e) THE BUYER HAS NOT BEEN INFLUENCED TO ENTER INTO THIS AGREEMENT NOR HAS THE BUYER RELIED UPON ANY WARRANTIES OR REPRESENTATIONS NOT SET FORTH OR INCORPORATED IN THIS AGREEMENT OR PREVIOUSLY MADE IN WRITING, EXCEPT FOR THE FOLLOWING ADDITIONAL WARRANTIES OR REPRESENTATIONS, IF ANY, MADE BY THE SELLER.

Received Time Dec. 3. 3:45PM

(If none, state "none", if any listed, indicate by whom the warranty or representation was made).

13.   UNDERGROUND OIL TANK - The SELLER hereby states there are _____ are not __X__ underground oil tanks or any other underground storage tanks located on the premises.

14.   MISCELLANEOUS REPRESENTATIONS:

(a)   A private water source is not servicing the premises, the SELLER makes no representations that the water source is providing adequate amounts of potable water for normal household use as of the date hereof.

(b)   A private sewerage system is not servicing the premises, the SELLER makes no representations regarding sewerage systems.

(c)   The premises are not considered to be a building lot and SELLER makes no representation regarding use of the premises as a building lot.

(d)   The premises have been used for mining and graveling operations in the past and BUYER takes the premises "as is" in the condition that is exists on the date of sale with no obligation on the part of the SELLER to improve, regrade or in any way change the condition of the property on the date of sale.

(e)   It is understood that the BUYER is aware of concerns regarding the effect of various historic gravel removal and mining operations on the property and possible harm or damage which may or may not have occurred to the abutters as indicated in the letter attached hereto.

(f)   The BUYER agrees that in consideration of the purchase of the property at the price stated herein the BUYER will indemnify and hold harmless the SELLER from and against any and all claims of Dennis and Joann Page or Daniel and Tina Jacques as alleged in the attached letter.

(g)   The SELLER hereby represents and warrants that the premises is not subject to any leases of which the BUYER should be made aware.

15.   CONDITIONS PRECEDENT TO BUYER'S PERFORMANCE - Receipt of a satisfactory title report on or before DECEMBER 31, 2004.

16.   CONSTRUCTION OF AGREEMENT - This Agreement has been executed in one or more counterparts and each executed copy shall be deemed to be an original, is to be construed under the laws of the Commonwealth of Massachusetts, is to take effect as a sealed instrument, sets forth the entire agreement between the parties, is binding upon and inures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be canceled, modified or amended only by a written instrument executed by the parties hereto or their legal

4

representatives.  If two or more persons are named herein as the SELLER or the BUYER, their obligations hereunder shall be joint and several.

17.  NOTICE – Any notice required to be given in this Agreement shall be in writing and shall be deemed to be duly given when delivered to the party entitled to such notice at their address set forth herein.  Said notice may be given by facsimile transmission.

**If to Seller to:**

Martin O'Connell,Esquire
155 Maple Street, Suite 300
Springfield, MA 01105-1895
Telephone (413) 785-5100
Facsimile (413) 733-4024

**If to Buyer to:**

Frank E. Antonucci, Esquire
83 State Street
Springfield, MA 01103
Telephone (413) 737-4667
Facsimile (413) 731-0602

18.  ADDITIONAL PROVISIONS – Set forth below are additional provisions that are incorporated herein and made a part hereof:

(a)  Any matter or practice arising under or relating to this Agreement which is the subject of a Title Standard or a Practice Standard adopted by the Massachusetts Real Estate Bar Association shall be governed by such Standard to the extent applicable.

(b)  The SELLER represents that they are not party to bankruptcy, divorce or other proceeding that may affect their ability to convey clear and marketable title to the property.

(c)  Notwithstanding the BUYER'S right to inspect as set forth in ¶12 herein, the premises are being sold in "as-is" condition.

19.  ADDENDUM(S) TO AGREEMENT - Attached hereto is/are addendum(s) which is/are incorporated herein and made a part hereof.  (If none, state "none"):

•   NONE

Executed as a sealed instrument on the date first above written.

_____
ELSIE M. LAFOND, Seller

_____
DONOVAN BROS, INC., Buyer
by

5

# EXHIBIT M

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-30136-MAP

| | |
|---|---|
| DONOVAN BROS, INC., and<br>ELSIE M. LAFOND,<br><br>                              Plaintiffs<br><br>vs.<br><br>JOSEPH FONTAINE, JOANNE HEBERT, and<br>ROBERT W. PIKE, JR., as they are the<br>Zoning Board of Appeals of the Town of Montgomery;<br>ELWIN R. CLARK, JR., as he is the Building Inspector &<br>Zoning Enforcement Officer of the Town of Montgomery;<br>and<br>WAYNE L. MORSE, CHAIRMAN, CHARLES R. PECKHAM,<br>and DANIEL JACQUES, as they are the<br>Board of Selectmen of the Town of Montgomery,<br>                              Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF DONOVAN BROTHERS INC.'S SUPPLEMENTAL AND AMENDED ANSWERS TO DEFENDANTS' INTERROGATORIES

11.    Please describe in detail all losses which Donovan Brothers claims were incurred as a result of actions taken by the Defendants, the Town, or the Selectmen that deprived Donovan Brothers of rights secured by the Constitution and laws of the United States.

**Supplemental Answer:**    Because of my inability to obtain gravel from the property in question I have virtually run out of sand and gravel to sell.  I have recently had to turn down offers to purchase gravel.  This has caused me to lose a substantial amount of money in several instances.  Additionally, I usually bid to supply several towns with sand throughout the winter months.  Because of the lack of available aggregate, I was unable to bid on those contracts and win them, as I normally would do.  Therefore, I have sustained financial loss because of having to turn down prospective customers.  I am out of inventory at this time.  If this continues much longer I will be out of business.

13.    Please provide the name, address, and relation to Donovan Brothers of each person (other than your attorney) known by Donovan Brothers to have witnessed or to have factual knowledge concerning the allegations set forth in the Complaint, and describe in detail what was witnessed or what knowledge such person possesses.

**Supplemental Answer:**    The Plaintiff, Gayle Donovan and the Plaintiff, Elsie Lafond, the son of Elsie Lafond – Sonny Lafond and Charles Peckham, member of the Board of Selectmen for the Town of Montgomery.  I do not know for certain the matter of the testimony of these individuals but I believe that some or all will provide information concerning the use of the land in question from the mid-1950's to the present time.  Further, these individuals will testify as to the existence of other graveling pit operations in the Town of Montgomery that have not been inspected by

1

the Building Inspector or have been subject to a *Cease and Desist Order* even though they operate on the same basis on which I operated the Lafond property.

14.    Please provide the name and address of each person whom Donovan Brothers believes is similarly situated to itself for purposes of demonstrating the deprivation of equal protection alleged in the Complaint.

**Supplemental Answer:**    There is a gravel pit on Southampton Road now or formerly known as the "Finn" gravel pit.  Also, it appears that there is another pit operation that may or may not be partially in the Town of Montgomery located in the southern portion of the town.  I do not know the name of the operation or the owner of that property.

15.    Please describe in detail what facts Donovan Brothers contends support its allegation that the Defendants, Town, or Selectmen acted with malice and/or bad faith to deprive Donovan Brothers of its rights secured under the Constitution and laws of the United States.

**Supplemental Answer:**    The other similarly situated gravel pit owners and operators were operating without permit or license; further, when other similarly situated gravel pit owners and operators had disputes with neighbors or with the Town regarding their operation, it was the practice of the Town of Montgomery for the Selectmen to review the complaints and mediate the disputes between the pit operators and/or owners and the complaining party as opposed to the issuance of a *Cease and Desist Order* as was done in the case of my operation.  The information that I have indicates that the other similarly situated owners and operators were residents of Montgomery and, in two instances, were relatives of certain members of the Selectmen.

Further, the Building Inspector had never operated previously in the manner in which he did when issuing the *Cease and Desist Order* to Mrs. Lafond and me.  The Building Inspector and Board of Selectmen continue to allow other gravel pits to operate while maintaining such operations are not lawful under the town bylaws.  The issuance of the *Cease and Desist Order* was based upon an unauthorized request for a legal opinion by a party in interest.  The request for legal opinion and subsequent action by the Board of Selectmen was not authorized by the full Board of Selectmen.

In addition, the failure of the town either by way of a *Cease and Desist Order* or the Zoning Board of Appeals decision to clearly identify the wrongful conduct of Donovan Brothers or justify the reason for upholding the *Cease and Desist Order* while allowing other pits to operate in the town is a clear violation of my rights.  The obvious dual standard established by the Building Inspector, Zoning Board of Appeals and Board of Selectmen for the Plaintiffs as opposed to others operating pits within the town further provides a deprivation of equal protection for Mrs. Lafond and me.

16.    Please describe in detail what, if any, residency requirement was applied by the Defendants in taking the actions alleged in the Complaint.

**Supplemental Answer:**    Please see Answer #15.  Additionally, there is a dual standard that has been established for the Plaintiffs who reside outside of the Town of Montgomery as opposed to those who are residents of the Town of Montgomery and own property with pits and have been allowed to continue their operations free of any oversight, supervision or *Cease and Desist Orders*.

17.    Please describe in detail each action Donovan Brothers alleges the Defendants, the Town, or the Selectmen took that ultimately resulted in the deprivation of Donovan Brothers' rights secured under the Constitution and laws of the United States.

**Supplemental Answer:**    Please see Answer #15 and #16.

18.    Please identify:

(a)    all persons furnishing information upon which your answers are based, stating for each such person the person's address and the interrogatory for which information was furnished;

(b)    all persons, in addition to those referred to directly above, whom Donovan Brothers has reason to believe may have personal knowledge relative to these interrogatories; and

(c)    all documents referred to in answering these interrogatories not otherwise identified herein.

**Supplemental Answer:**

(a), (b) and (c):    In addition to Gayle Donovan of Huntington, MA and Elsie Lafond of Huntington, MA, information has been furnished through discovery obtained from the defendants, including their depositions.

19.    Please identify all persons whom Donovan Brothers expects to call as witnesses at a trial of this matter, specifying the subject and substance of each witness's testimony.

**Supplemental Answer:**    My attorney informs me that I will be called as a witness as well as Elsie Lafond and Sonny Lafond, all of whom will testify as to the ownership and use of the property in question from the mid-1950's to the present time. Additionally, I believe that all of the Board of Selectmen and members of the Zoning Board of Appeals and the Building Inspector will be called to testify and will be generally asked for information and questions as they were in their respective depositions. My attorney says that he anticipates that these witnesses will be consistent with their testimony as expressed in their deposition transcripts. Furthermore, the Keeper of Records may be called as a witness in order to provide additional information, records and documents.

20.    Please identify all expert witnesses whom Donovan Brothers expects to call at a trial of this matter, stating fully, and in detail, for each such expert:

a) the name, address, and occupation and/or profession of such experts;

b) the subject matter about which each such expert is expected to testify;

c) the substance of the facts and opinions about which each such expert is expected to testify; and d) a summary of the grounds for each such opinion.

**Supplemental Answer:**    In addition to the individual witnesses identified in my answers to interrogatories, my attorney tells me that he may call as an expert

witness Mr. Lester E. Garvin whose professional qualifications are attached to this document.  It is anticipated that if he is called, he will testify based upon his observations, research and studies of the property in question, that it has, in fact been continuously operated as a gravel pit since the mid-1950's through the present time on a continuous basis.  Mr. Garvin has not compiled and will not be compiling any written reports, studies or other documentation that is discoverable at this time.  Should such items be prepared and completed prior to the time of trial, they will be promptly provided to defense counsel.

21.    Please identify all documents Donovan Brothers intends to introduce as evidence in a trial of this matter not otherwise identified herein.

**Supplemental Answer:**    My attorney advises me that he may introduce various records of the Town, including Assessors' maps, reports and studies, minutes of various Board of Selectmen's meetings and photographs or aerial photographs of the site in question over a number of years.

Signed under the pains and penalties of perjury this 13th day of March 2006.

Gayle Donovan

The Plaintiffs, By Their Attorney,

Frank E. Antonucci, Esq.
BBO #020260
83 State Street, Suite 203
Springfield, MA  01103-2009
(413) 737-4667 (ph)
(413) 731-0602 (fax)

## CERTIFICATE OF SERVICE

I, Frank E. Antonucci, Esq., counsel for the Plaintiffs, hereby certify that I have served a copy of the foregoing document on the Defendants in this matter by mailing a copy of the same on this 14th day of March 2006 to counsel of record:

Joel E. Bard, Esq.                    Attorney Nancy Frankel Pelletier
Jonathan D. Eichman, Esq.             Robinson Donovan P.C.
Kopelman And Paige, P.C.              P.O. Box 15609
31 St. James Avenue                   Springfield, MA  01115-5609
Boston, MA  02116

Frank E. Antonucci, Esq.

4

## Professional Qualifications
### of
### Lester E. Garvin, Vice President
### Resource Management Systems, Incorporated
### 19 No Name Road
### Stow, Massachusetts 01775
### (978) 897-4324

## EXPERIENCE

I am a professional aerial photograph interpreter and expert witness with more than 40 years of experience analyzing aerial photographs. I have studied images on black and white, true color and color infrared (false color) photographic emulsions from vertical, oblique and panoramic perspectives. I have also analyzed multi-sensor imagery from plan position indicator (PPI) and synthetic aperture radars, emitted infrared, laser and ultra violet remote sensing systems. During the last four years I have extended this experience into the computer processing realm using remote sensing image processing software to analyze images using supervised and unsupervised classification programs. As part of my working experience I have also become knowledgeable of technology related to photo interpretation, i.e., photogrammetry, thematic mapping, surveying and Geographic Information Systems (GIS).

My photo interpretation experience is summarized below in three categories: Natural Resources Management, Military/Intelligence and Environmental/Legal applications.

### Natural Resources Management

I took my first course in air photo interpretation in the Spring of 1953 in the Department of Forestry and Wildlife Management, University of Massachusetts at Amherst. Graduate studies in Wildlife Management and aerial photograph experience began in depth in the Fall of 1953 with the initiation of a graduate school program to develop a methodology for thematically mapping the forests and land use in Massachusetts using 1951 - 52 aerial photographs. During two years as

a student and an additional year in post graduate work I developed a statewide classification system, minimum sized typing units, delineation transfer methods onto base maps and compilation of forest and land use area data on a municipality, county and statewide basis. During this period I personally spent over 3,000 hours analyzing photographs stereoscopically to determine species, height and density of forest types, urban boundaries and activity status of agricultural land.

During the 1970's, while employed by Autometric-Raytheon and Resource Mapping Systems, Inc. I undertook extensive forest type mapping projects for the Bureau of Indian Affairs on Indian reservations in the western part of the US; Forest mapping projects included Northern Cheyenne, Crow, Wind River, Rocky Boy's, Colville and San Carlos Apache Reservations. I also did extensive wetland resource inventory projects in the Northeastern US during this same period.

These projects included the wetlands in the Maryland part of Chesapeake Bay and Dukes, Nantucket and Barnstable county-wide inventories in Massachusetts. Watershed specific inventories were done in the Upper Charles and Nashua Watersheds and regional groups of towns on the North Shore and South Shore of Massachusetts.

### Military/Intelligence

Based on my extensive photo interpretation experience from graduate school I was able to enlist in the Navy as a pre-designated photo intelligence officer. Upon completion of Officer Candidate School in Newport, RI and commissioning, I spent part of my active duty tour as a radar intelligence officer in a Heavy Attack Squadron and the remaining part as an aerial photograph interpretation instructor at the Naval Intelligence School in Washington, D.C. Upon release from active duty, I continued to serve in the Naval Reserve for a period of 20 years, retiring with the rank of Captain in 1980. During this period I worked in a number of photo interpretation billets developing encyclopedic intelligence for Fleet Intelligence Centers. The last five years in the program were spent in Production Head, Executive Officer and Commanding Officer positions.

During most of my Naval Reserve career I was employed by Autometric-Raytheon Company, a high technology firm performing research and development on overhead reconnaissance systems for the Department of Defense and National Intelligence Agencies. As a Group Manager and Senior Scientist, I analyzed a wide variety of multi-sensor imagery for both tactical and strategic applications.

### Environmental/Legal

During the last fifteen years I have worked on more than thirty cases where I used aerial photographic information to support land use litigation. Expert testimony and/or depositions were given on four cases. Brief descriptions of selected cases are presented below:

**\* Charles George Landfill, A Superfund Site in Tyngsboro, Massachusetts**
**Law Firm: Gaston Snow and Ely Bartlett**
　　Collected aerial photographs for 13 different dates to monitor the development of the landfill over a 35 year period. Analyzed changes and provided incremental volume estimates for periods between photo coverages.

**\* Cohasset Heights Landfill, Cohasset, Massachusetts**
**Law Firm: Moehrke, Mackie & Shea**
　　Collected aerial photographs to support a case where a landfill operator was being accused of contaminating a municipal well with sodium chloride. The photographs supported the claim that the contamination occurred well before the landfill was in operation as evidenced by open road salt storage and stressed vegetation.

**\* Wychmere Harbor Adverse Possession, Harwich, Massachusetts**
**Law Firm: Moehrke, Mackie & Shea**

Neighbors to the owners of Thompson's Clam Bar in Harwich made claim to a hedge which shielded their property from Wychmere Harbor. In an attempt to accurately define their property boundary, the owners of the Clam Bar had their property surveyed, the hedge removed and a fence put in its place. The neighbors claimed that they owned the hedge through continuous, notorious and open maintenance for over twenty years. I collected and analyzed vertical and oblique aerial photographs to show the condition, growth and maintenance of the hedge over time. The neighbors lost the hedge ownership issue but retained visual access to the harbor by being allowed to walk on the roof of the Clam Bar boathouse which was adjacent to their property.


**\* Grandfathered Zoning, Dorchester, Massachusetts**
**Law Firm: Moehrke, Mackie & Shea**

Collected and analyzed land use maps and archived aerial photographs to support a continued land use contention. The case is still ongoing.

**\* Adverse Possession, Cohasset, Massachusetts**
**Law Firm: Hill and Barlow**
Collected and analyzed archived aerial photographs to assist in resolution of a property boundary dispute.

**\* Norwood PCB Superfund Site, Norwood, Massachusetts**
**Law Firms(s): Foley, Hoag and Eliot, Boston, Massachusetts**
                **Morgan, Lewis and Bockius, Washington, D.C.**
Collected and analyzed aerial photographs taken over a 40 year period to assist industrial clients in reaching equitable liability with the federal government as principal responsible parties.

**\* Sullivan's Ledge Superfund Site, New Bedford, Massachusetts**
**Law Firm: Morgan, Lewis and Bockius, Washington, D.C.**
Collected and analyzed aerial photographs to assist industrial client in reaching equitable liability as principal responsible party.

**\* Macon, Georgia; County vs. Power Company**
**Law Firm; Sell and Melton, Macon, Georgia**

Collected and analyzed vertical and oblique aerial photographs to resolve issues concerning historical placement of utility poles and maintenance/ownership rights-of-way.

**\* Boston, Massachusetts; Adverse Possessio/Right-of-way Issue**
**Law Firm; Wysocki & Slattery, Attorneys at Law, Inc., Boston, Massachusetts**

Collected and analyzed vertical aerial photographs to help resolve issues concerning right-of-way usage and parked vehicles.

\* **Pittsfield, Massachusetts; City of Pittsfield vs. General Electric Corporation**
**Law Firm; Bernstein, Cushner & Kimmell, P.C., Attorneys at Law, Boston, Massachusetts**

Analyzed vertical aerial photographs to determine the historical sequence of events relative to a series of landfill operations.

## EDUCATION

University of New Hampshire, Durham, New Hampshire
    Bachelor of Science in Forestry

University of Massachusetts, Amherst, Massachusetts
    Master of Science in Wildlife Management

## SPECIAL ACCOMPLISHMENTS

Presented the American Society of Photogrammetry Meritorious Service Award, 1971
Retired Captain, U.S. Naval Intelligence

TCB Data Systems, Incorporated, Houston, Texas; 1983 to 1984
    -Consultant, Business Development
    -Developed contacts and met with potential clients in public utilities, military
    organizations, petroleum companies, municipalities and natural resource management
    firms.
    -Prepared proposals, presentations, and demonstrations showing company capabilities in
    consulting, data conversion, software development and training/documentation as
    related to computer graphic system applications.

Chas. T. Main, Engineers, Incorporated, Boston, Massachusetts; 1979 to 1983
    -Manager of Projects, Computer Graphics Department
    -Managed a broad range of utility, municipal, and industrial digital mapping and CAD
    support projects
    -Developed schedules, budgets and support requirements.
    -Met with clients and in-house managers to communicate status of projects.
    -Analyzed market opportunities, developed client contacts through mailing programs and
    technical meetings and prepared technical proposals to address client needs.

Resource Mapping Systems, Incorporated, Wayland, Massachusetts; 1977 to 1979
    -President and Natural Resource Scientist
    -Project manager for forest type mapping projects for the Wind River Indian Reservation,
    Wyoming and Rocky Boy's Indian Reservation, Montana.
    -Project manager and primary aerial photograph interpreter for wetlands mapping
projects in the Upper Charles River Basin, Nashua River Basin and Barnstable, Dukes
and Nantucket Counties.
    -Contacted clients, developed technical proposals and managed technical and business
    matters for the company.

Autometric Operation of Raytheon Company, Incorporated, Wayland, Massachusetts;
    1971 to 1977
    -Natural Resource Scientist
    -Delineated forest types on aerial photographs and managed forest mapping projects
    for the following Indian Reservations:
      -Crow, Montana; 1973
      -Northern Cheyenne, Montana; 1973
      -Colville, Washington; 1974
      -San Carlos, Arizona; 1975.
    -Delineated wetland boundaries and mapped the wetlands in Chesapeake Bay for the
    State of Maryland, Department of Natural Resources.
    -Team member on Department of Interior Natural Resource Information System Project.

Autometric Operation of Raytheon Company, Inc., Rome, New York; 1963 to 1971
  -Manager, Rome Office, Interpretation and Intelligence Department
  -Responsible for all business development and project management functions relative to contracted overhead reconnaissance and intelligence projects for the U.S. Air Force, Rome Air Development Center.
  -Met with contracting and technical personnel; prepared technical proposals and managed personnel.
  -Responsible for R&D project tasks relative to overhead reconnaissance and intelligence data systems for the Department of Defense.

Autometric Operation of Raytheon Company, Inc., New York, New York, 1960 to 1963
  -Reconnaissanc Analyst on a broad range of contracted overhead reconnaissance and intelligence projects for the Department of Defense and Intelligence Agencies.

United States Navy; 1956 to 1960
  -Responsible for analysis of photograph and radar records and air crew briefing while assigned to a heavy attack squadron (VAH-5)
  -Instructed officer and enlisted personnel in air photo interpretation, photo metrics and aerial photogrammetry while assigned to the Naval Intelligence School, Air Division, Washington, D.C.

Commonwealth of Massachusetts, Division of Fisheries and Game, Boston, Massachusetts; 1956
  -Aerial Photograph Interpreter
  -Interpreted aerial photographs and delineated land use and vegetated cover for a state-wide inventory project begun as a Research Fellow in graduate school. Managed the project and coordinated production tasks associated with mapping and tabulating data.

University of Massachusetts, Amherst, Massachusetts; 1953 to 1955
  -Research Fellow, Cooperative Wildlife Research Unit
  -Assigned the project of researching and developing air photo interpretation and mapping techniques for inventorying forest land resources in Massachusetts.

**SPECIAL ACCOMPLISHMENTS**

  -Presented the American Society for Photogrammetry Meritorious Service Award, 1971
  -Retired Captain, U.S. Naval Intelligence

**PUBLICATIONS AND PRESENTATIONS**

  -Garvin, L.E., 1992. Low-End GIS Software. Presented at the Greenways Conference, Amherst, Massachusetts, September, 1992.
  -Garvin, L.E., 1992. GIS Technology and the Insurance Industry. Presented at the Factory Mutual Corporation Technology Days Conference, July 1992.

-Garvin, L.E., and B.Flynn, 1992. Anatomy of a Database. Published in P.O.B. (Point Of Beginning), Volume 17, Number 3, February-March 1992. Front cover and page 20.

-Garvin, L.E., Development of a GIS in Hard Times: By Stages. Prepared a poster using ARC/INFO software and presentation for the New York Annual GIS Conference, Albany, New York, October, 1991.

-Garvin, L.E., 1990. Development and Application of a GIS Database to Support Environmental Legislation. Presented at the New York State Annual GIS Conference, Syracuse, New York and also at the State of New York Association of Towns Annual Meeting in New York City, February, 1991.

-Garvin, L.E. and M.Costello, 1983. A Map-Based Information System to Support City Management. Presented at the Harvard Computer Graphics Conference and Keystone Conference.

-Garvin, L.E. and M. Costello, 1982. A Map-Based Information System to support Reappraisal. Presented at the International Association of Assessing Officers Conference, Kansas City, Missouri.

-Garvin, L.E., 1976. Resource Mapping and the Profit Motive. American Society for Photogrammetry Conference, Washington, D.C., March 1976.

## PROFESSIONAL SOCIETY MEMBERSHIPS
-American Society for Photogrammetry and Remote Sensing

## GOVERNMENT SERVICE
-Conservation Commission, Stow, Massachusetts; 1971 to 1979 and 1985 to 1991
-Board of Health, Stow, Massachusetts; 1979 to 1983
-Local Growth Policy Committee, Stow, Massachusetts; 1975 to 1976.
-Stow Open Space Prioritization Committee; 1998 present.
-Stow Town Common Improvement Committee, 1997 to present.

# EXHIBIT N

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-30136-MAP

| | |
|---|---|
| DONOVAN BROS, INC., and<br>ELSIE M. LAFOND,<br><br>                   Plaintiffs<br><br>vs.<br><br>JOSEPH FONTAINE, JOANNE HEBERT, and<br>ROBERT W. PIKE, JR., as they are the<br>Zoning Board of Appeals of the Town of Montgomery;<br>ELWIN R. CLARK, JR., as he is the Building Inspector &<br>Zoning Enforcement Officer of the Town of Montgomery;<br>and<br>WAYNE L. MORSE, CHAIRMAN, CHARLES R. PECKHAM,<br>and DANIEL JACQUES, as they are the<br>Board of Selectmen of the Town of Montgomery,<br>                   Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF DONOVAN BROTHERS INC.'S SECOND SET OF SUPPLEMENTAL ANSWERS TO DEFENDANTS' INTERROGATORIES

<u>INTERROGATORY NO. 3</u>     Please describe in detail:

a).    the interests Donovan Brothers hold in the Property; the name of the person(s) from whom it acquired such interest; the consideration paid for such interest; and the date and recording information for the instrument by which Donovan Brothers took title to such interest;

<u>Supplemental Answer</u>:    Fee simple; Elsie LaFond; $47,000.00; Hampden County Registry of Deeds, Book 16254, Page 561, closing date 10/13/06.

b).    all persons other than Donovan Brothers, holding at the same time as Donovan Brothers, an interest in the Property; the location, nature and extent of such interest; the name of the person from whom such interest was acquired; the consideration paid for such interest; and the date and recording information for the instrument establishing record title to such interest.

<u>Supplemental Answer</u>:    No other person holds any interest in the Property at this time.

c).    the interests Donovan Brothers hold in any property abutting the Property; the name of the person(s) from whom it acquired such interest; the consideration paid for

1

such interest; and the date and recording information for the instrument by which Donovan Brothers took title to such interest.

<u>Supplemental Answer:</u>    None at this time.

<u>INTERROGATORY NO.</u>4    Please describe in detail when Donovan Brothers first began using the Gravel Bank for earth removal operations, and set forth the periods of time Donovan Brothers used the Gravel Bank for such purpose between the time it first came into operation and the present. "In operation" shall include those periods of time when the Gravel Bank was not being actively used for earth removal purposes, but had not been reclaimed for other uses.

<u>Supplemental Answer:</u>    To the best of my knowledge and recollection, Donovan Brothers has records indicating payments to the LaFond family for gravel taken off of the Property in question from the 1970's through the time of the *Cease & Desist Order*. Upon further research and discovery, it appears that the first time that gravel was taken from the Property by Donovan Brothers was in 1955. Thereafter, Donovan Brothers took gravel from the Property more or less continuously until the 1970's, when the aforementioned documentation appears.

<u>INTERROGATORY NO.5</u>    Please describe in detail all Donovan Brothers' use of the Gravel Bank that took place in the ten years prior to the date of your answer, and please identify each document or other source on which you rely to provide such description. Include in your description:

b.    the price or other consideration paid for each sale of such earth material, the dates of such sales, and the full name and address of each buyer;

<u>Supplemental Answer:</u>    I do not have records as to the price paid for gravel from 1955 through the 1970's.

<u>INTERROGATORY NO. 11</u>    Please describe in detail all losses which Donovan Brothers claims were incurred as a result of actions taken by the Defendants, the Town, or the Selectmen that deprived Donovan Brothers of rights secured by the Constitution and laws of the United States.

2

**Supplemental Answer:**    From reviewing records from the years 2000 – 2004, it would appear that my inventory of gravel remained the same each year.  I averaged purchases of gravel in the amount of approximately $18,000.00 per year for that time period.  In the year 2005 I made purchases of approximately $33,585.40.  In the year 2006 to date I have already purchased $50,045.34 worth of gravel.  Additionally, I have used up the inventory that I had on hand that was worth approximately $12,525.00 as well as having used up approximately 30,000 cubic yards of gravel on my property.  I would not have used up my inventory and reserve supply or had to purchase all of this gravel had I been able to access it from the LaFond Property.  My total expenditure in purchased gravel and depleting my own inventory as well as digging all available sources totals approximately $276,155.00 in gravel costs.

INTERROGATORY NO. 11    Please provide the name, address, and relation to Donovan Brothers of each person (other than your attorney) known by Donovan Brothers to have witnessed or to have factual knowledge concerning the allegations set forth in the Complaint, and describe in detail what was witnessed or what knowledge such person possesses.

Supplemental Answer:    The Zoning Enforcement Officer for the Town of Montgomery, Mrs. Page and Mrs. Jacques.

INTERROGATORY NO. 15    Please describe in detail what facts Donovan Brothers contends support its allegation that the Defendants, Town, or Selectmen acted with malice and/or bad faith to deprive Donovan Brothers of its rights secured under the Constitution and laws of the United States.

Supplemental Answer:    Now that discovery of all of the Selectmen is completed, it appears that they all are aware of the fact that there are other gravel pits operating in the Town of Montgomery at this time.  This includes one pit owned by Mr. Peckham and one by Mr. Pomeroy's father-in-law.  Additionally, it appears that Mr. Jacques and Mr. Page attempted to purchase the Property at the same time that I was negotiating the purchase of the Property.  When they failed to be able to persuade Mrs. LaFond to sell them the Property, it appears from the information obtained through discovery that they worked in unison to

3

make sure that I could not use the Property for the purposes that I had intended; namely obtaining gravel. Review of the deposition transcripts outlines these facts and substantiates them.

<u>INTERROGATORY NO. 16</u>    Please describe in detail what, if any, residency requirement was applied by the Defendants in taking the actions alleged in the Complaint.

<u>Supplemental Answer:</u>    To the best of my knowledge, I am the only out of town operator and Mrs. LaFond is the only out of town owner of property used for a gravel pit for the time period in question. It appears that the Selectmen and, in particular, Mr. Jacques, chose to treat me differently than other gravel pit operators located in the same area and in the Town of Montgomery. No other gravel pit has been served with a *Cease & Desist Order* despite the fact that the town alleges that they are illegal in the Town of Montgomery. Mr. Jacques along with Mr. Page attempted to purchase an interest in the Property. He sought the advice of the Town Counsel to justify his actions in having a *Cease & Desist Order* issued against my operations and, at the same time, he compensated a private attorney to further the complaint against me to the town through Mr. Page about my operations. No other gravel pit has been subjected to this. I am the only person from out of town. I believe that I have been treated differently than similarly situated individuals. I am basing this upon the information that was provided to me through the discovery process, particularly the deposition transcripts of the three Selectmen as well as Mr. Page. I have also reviewed the Town's meeting minutes and records.

<u>INTERROGATORY NO. 18</u>    Please identify:

(b)    all persons, in addition to those referred to directly above, whom Donovan Brothers has reason to believe may have person knowledge relative to these interrogatories;

<u>Supplemental Answer:</u>    I do not know who else in the Town of Montgomery government has access to or knowledge of this information but I believe that all of the Selectmen are aware of this situation as well as the members of the Zoning Board of Appeals.

<u>INTERROGATORY NO. 21</u>    Please identify all documents Donovan Brothers intends to introduce as evidence in a trial of this matter not otherwise identified herein.

4

<u>Supplemental Answer:</u>    As my attorney has recently been afforded the opportunity to review Town records produced in response to a request for production of documents, it is possible that certain meeting minutes, town bylaws, correspondence from Mr. Page's attorneys to him, records from Mr. Page's attorneys' offices, correspondence from Mr. Page's office to Mrs. LaFond and records of the Town Collector and Town Assessor may be introduced as evident at the trial of this matter.

Signed under the pains and penalties of perjury this 9th day of ~~October~~ November 2006.

Gayle Donovan
Donovan Brothers, Inc.

The Plaintiffs, By Their Attorney,

Frank E. Antonucci, Esq.
BBO #020260
83 State Street, Suite 203
Springfield, MA  01103-2009
(413) 737-4667 (ph)
(413) 731-0602 (fax)

## CERTIFICATE OF SERVICE

I, Frank E. Antonucci, Esq., counsel for the Plaintiffs, hereby certify that I have served a copy of the foregoing document on the Defendants in this matter by mailing a copy of the same on this 15th day of November 2006 to counsel of record:

Joel E. Bard, Esq.
Jonathan D. Eichman, Esq.
Kopelman And Paige, P.C.
101 Arch Street
Boston, MA  02110-1109

Attorney Nancy Frankel Pelletier
Robinson Donovan P.C.
P.O. Box 15609
Springfield, MA  01115-5609

Frank E. Antonucci, Esq.
BBO #020260
83 State Street, Suite 203
Springfield, MA  01103-2009
(413) 737-4667 (ph)
(413) 731-0602 (fax)

5

# EXHIBIT O

SELECTMEN MINUTES
December 23, 2004

7:32 P.M.  Meeting called to order
Present:  Charles Peckham, Wayne Morse, Dan Jacques  and Jane Thielen.

1.  Board signed the warrants.
2.  Board reviewed and signed a letter to Brian Bossie of Herrick Road regarding clearing the turnaround for this road.  It was filled with his equipment and there was not enough room for the town truck to plow.
3.  Dan had spoken to Eric Lemoine of 19 Main Road about the stakes being moved 4' or 5' off the road.  Mr. Lemoine said he would try if they were not frozen in the ground.  If problem still exists at the next meeting, may have to send a letter.
4.  Board reviewed contract to deliver recyclable materials to the Springfield Recycling Facility.  This contract is a renewal as the original contract is due to expire in 2005.  Dan wanted more time to review it, taking a copy home with him.  It must be signed and returned by January 30, 2005.
5.  Dan notified the Board that he had spoken to Joel Bard of town counsel regarding zoning ordinances and wrote up his conversation with Joel which he passed out.  Charles was not happy about this because he did not know that Dan was contacting town counsel.  He felt that he should have been informed as Chairperson.  Dan stated that in light of time constraints between meetings, he felt he did it for the best interest of the town.

7:55 PM  Charles left the meeting.

6.  Appointments were made to the local Cultural Council.  Dan made a motion to appoint Laurie Flechsig for 2 years effective from December 1, 2004 – October 31, 2005; Julie Pike from December 1, 2004 – October 31, 2005; Christine Brown from December 1, 2004 –October 31, 2006; William Hughes from December 1, 2004 –October 31, 2006.  Hap seconded motion; vote was 2 ayes.
7.  Dan made a motion to create a recycling committee and appoint members to the committee for the purpose of researching ways to recycle hazardous waste, bulk collections and recyclables working with other communities.  Hap seconded the motion; vote was 2 ayes.  Dan moved to appoint Christine Brown, Kate Griffen, Ted Brahm, Jane Thielen and Karen Bouquillon to this committee effective December 1, 2004 through June 30, 2005.  Hap seconded the motion; vote was 2 ayes.

8:05 P.M.  Tim Baker, one of the Assessors, attended the meeting to discuss the tax classification for fiscal year 2005.  He explained the percentages for each classification.  The tax rate will be $13.20 and he recommended the Board approve using one rate for all classifications.  Dan made a motion to adopt one tax rate for all classifications – commercial, industrial, personal property and residential.  Hap seconded the motion;  vote was 2 ayes.  The Board signed the LA 5 tax form.

Dennis Page of 122 Carrington Road attended the meeting to discuss zoning issues and land use on property behind his residence.  He stated his case regarding the gravel pit operation.  He wondered why there are two parcels, one classified as undeveloped and one classified as a gravel pit.  Dan spoke for the record that the Board cannot speak to this issue due to conflicts for each member of the Selectboard.  Mr. Page must direct his issue to the Building Inspector and Zoning Board of Appeals.  Mr. Page left the meeting.  On this issue, if Tommy, the Building Inspector, has questions, Dan and Hap agreed to give him permission to contact town counsel.  There are time frames that certain things need to be done once he receives a written complaint.

Board read and approved the minutes for the November 10th and November 23rd meetings.
Dan discussed the meeting with the Gateway school and town officials on December 19th.  One of the topics discussed was vocational education busing but it was decided to wait until the legislator meeting to receive more information which is to be held in January.

8:30 P.M.  Charles returned to the meeting.  He brought a tape recorder and stated he would tell the Board members when he turns it on.

Selectmen Minutes – December 23, 2004                                                    Page 2

Dan apologized to Charles stating that he did not realize that there was a steadfast agreement between board members about contacting town counsel.  Dan said he only dealt with clarification on procedure of how zoning bylaws are enforced and who enforces them to town counsel.

It was reiterated that you should always ask the Selectboard permission for contacting Town Counsel.  The law gives Tommy, the building inspector, the direction so Dan found out from speaking to Joel Bard.  Hap and Dan told Charles that they agreed Tommy could contact town counsel if he needed advice on the gravel pit issue.

Jim Stevens is to be contacted to see if he filled out the grant paperwork for the police vehicle.

Dan noted that he had spoken to Eileen Kolodziej of Fuller Road about her mailbox.  Basically she will try to move it to other side of Fuller Road.

9:05 P.M.  Closed the Selectboard meeting and opened the Planning Board meeting.
9:08 P.M.  Closed the Planning Board meeting and opened the Board of Health meeting.
9:15 P.M.  Closed the Board of Health meeting.

9:15 P.M.  Adjourned the entire meeting.

Approved: _____

**Kopelman & Paige**
Richard Bowen
Joel Bard
(617) 556-0007

Spoke with Joel Bard on 22 December 2004.  Joel confirmed that in the Town of
Montgomery, the Building Inspector *is* charged with the enforcement of zoning
ordinances and/or by-laws (pursuant to MGL c. 40A, §7).

Joel noted that the Telecom provision, §I.2 states that "this bylaw shall be enforced by
the Selectmen," although this is interpreted to be confined to the Telecom portion of the *Town*
bylaw.                                                             *(telecommunication bylaw)*

Complaints relative to zoning issues should be directed to the Building Inspector, not the
Board of Selectmen.

Also, the Handbook for Massachusetts Selectmen states that "a land use must be
specifically allowed, or it is presumed to be prohibited."  Joel stated that this is a
generalization and not always applicable.  In Montgomery's case, however, the by-laws
support this statement and it *is* directly applicable.

*Given to Board by Dan Jacques on Dec. 23rd*

## SELECTMEN MINUTES
### February 10, 2005

7:30 P.M.  Meeting called to order by Charles

Present:  Charles Peckham, Wayne Morse, Dan Jacques and Jane Thielen.  Sue Doran was also present.

7:30 P.M.  Opened the Planning Board meeting.

7:45 P.M.  Closed the Planning Board meeting and opened the Selectboard meeting.

Discussed Highway Department business with Curtis Bush, Jr.:

1. Rick Couture and Henry Lafleur of Sunset Lane attended meeting. Rick asked if it would be possible to extend the new turnaround location 30' or 20' further down from where it was approved at the special town meeting in December. He no longer has the ring where it had been located on the survey. Mr. Lafleur really would not like to have the location changed. There is a drainage outlet in that area. Turnaround should be reasonably flat. The Board stated they would walk the area when the weather gets better. The Board will let the order of taking voted at the January 13th meeting stand and will later review the site to see if a change can be made.

2. Discussed with Curtis the present year's winter budget. As of 2/5/05 there is $6,868.97 left. Salt costs had increased this fiscal year.

3. Discussed when to put the old FORD truck out to bid. There is a small problem with the new truck. Gaskets need to be replaced, parts are ordered but have not come in, yet. Will decide on a bid date at the next meeting.

4. Discussed FY 2006 budget. Birch Bluff Road and Main Road projects won't have Conservation issues resolved to do the work this fiscal year. Main Road must be done in the dry season. Birch Bluff Road drainage issue has to be changed from what had been planned. Curtis asked if he could carry over into FY 2006 the monies he had appropriated for this year's budget. Jane will contact the DOR to see if that is legal as funds are appropriated every year for Roads & Bridges Account. In the meantime, Curtis can contact the Conservation Commission to try to get things moving on the Birch Bluff drainage issue.

5. Curtis spoke to the Board about taking a comp day—7.5 hours for time he has not been paid. He had been keeping track of these times such as meetings on various roads and C.C. meetings, etc. If there is overtime this week, he asked if he could be paid overtime (time and a half). He wants to use his comp time for the Tuesday he took off during this week (next pay period). Charles made a motion that Curtis could use his comp. time for Tuesday and that he will receive overtime if he has to come in after hours this week. Hap seconded the motion and the vote was unanimous.

Phil Shaw attended the meeting to discuss the ambulance budget for FY 2006. He handed out a letter from the Hilltown Community Ambulance Board providing facts and figures. During 2004, the ambulance has gone out on 513 calls compared to 465 the year before. We have two ambulances now. Discussed what the ambulance service has been doing over the year. The budget has been level funded since the new organization began. Because of increased costs, the town will have an increase of $2,400 for FY 2006; total amount to be $6,797. Have done and still are doing fund raisers. Dan asked if he, Phil, could provide an expense and income report for the year. The organization is thinking of establishing advanced life support but it won't go into effect before the end of 2005 or in 2006. Phil noted that Carl Zinnack from Thomas Road is now a representative on the Hilltown Ambulance Board.

Terry & Susan Hall of 79 Pitcher Street attended the meeting to discuss applying for two business permits for their residence. Terry wants to build a building for his lawnmower service business and the other business would be a Pacas Farm Store to sell items made from the Pacas hair. Terry was not sure if he would be putting in another entryway to this building off of Pitcher Street or using his present driveway. He will have to go through the building permit process. The Board signed two business certificates, one for each business.

Jennifer Andrews of 4 Birch Bluff Road attended the meeting to discuss starting a specialty tea business from her residence. Her home address would be used for distribution. The general public will not be coming to her residence but only deliveries unless she finds another place for her business. The Board signed her business certificate.

Selectmen Minutes – February 10, 2005                                    Page 2

     Charles wanted to read and approve the December 23rd meeting minutes before any further business. He questioned the minutes regarding Dennis Page's attendance to discuss the gravel pit and why the issue was handled the way it was. Reviewed these minutes and made some changes.

     Bob Pike, Chairman of the Zoning Board of Appeals, attended the meeting to discuss this very issue of the gravel pit owned by Elsie Lafond located off Carrington Road. The Town Clerk had received a letter and check requesting that the ZBA have a hearing to appeal the Cease and Desist Order issued by Tommy Clark as the Zoning Enforcement Officer. Charles stated that he would like the ZBA to rescind the order and have the parties come to the Board of Selectmen about this issue. Charles also noted that a 1956 Zoning Bylaw was found regarding special permits for gravel pits and in the 1970's, the Bylaw Committee removed this requirement from the zoning bylaws. Copies of these were made for Bob Pike and Sue Doran. Charles gave some history to those present about this particular issue and how Dan had contacted Town Counsel without approval from the rest of the Board members. Bob felt that the Board of Selectmen could issue a stop order, why did the ZBA need to be involved. Charles stated that in the past the Board of Selectmen always had received zoning complaints or if it came to Tommy Clark as the building inspector, he would bring it to the Board's attention. Charles wanted a vote but Hap stated that he had questions regarding the Board overriding the Zoning Enforcement Officer's decision. Therefore, it was decided that a meeting would be posted to have a call placed to Town Counsel with Charles and Hap present. Charles did not feel Dan should be present but Dan said he wanted to be present. Bob reminded the Board that the ZBA has approximately 30 days to make a decision after he is officially notified by the parties requesting the appeal. Jane will contact Town Counsel and post a meeting for next Tuesday, the 15th whenever Rich Bowen can be available to talk on the phone in the office. Jane will notify the Selectmen of the time and Bob will do nothing until he hears from the Board.

     Bernard Edmunds, owner of property on Jourdan Road, attended the meeting to discuss what has been done regarding Jourdan Road and getting it approved as a town road. The Board stated that nothing has been done.

9:40 P.M.  Closed the Selectboard meeting and opened the Board of Health meeting.
9:50 P.M.  Closed the Board of Health meeting and reopened the Selectboard meeting.
9:50 P.M.  Dan left the meeting but before leaving he told the Board he would be out of town from the 17th through the 26th.

1. Discussed debt exclusion question for the new truck as the town has in the past placed debt for equipment on the election ballot thus allowing for the Town to go over the levy limit by the amount of the debt for each year of the loan payment. Charles made a motion that a debt exclusion question be placed on this year's election ballot for the new highway truck. Hap seconded the motion.
2. Charles made a motion to appoint Philip Shaw to the Finance Committee as the fifth member from February 1st, 2005 through June 30, 2007. Hap seconded the motion.
3. Reviewed and approved December's bill from Kopelman & Paige.
4. Board signed the warrants.
5. Reviewed and signed minutes for December 9th and January 13th meetings. Minutes for December 23rd needed revisions and were not approved at this time.
6. Discussed generator in basement. Jane will find someone to have the muffler fixed.

10:28 P.M.  Adjourned the meeting.

Approved: _____

## SPECIAL SELECTMEN MINUTES
### February 15, 2005

**Present:  Wayne Morse, Dan Jacques, and Jane Thielen**
**Charles called to say that he could not be at this meeting as he was delayed in traffic and Hap**
**could ask the questions that were on his mind and discussed at the last Board meeting.  Dan**
**had provided a speaker phone so that everyone could hear the responses of town counsel.**

**1:00 P.M.  Meeting called to order.**
    **Both Dan and Hap had contacted the Ethics Commission about each of their conflicts**
**regarding the Lafond gravel pit issue.  The Ethics Commission told them that they do have a**
**conflict but if two members on the Board are in conflict that the "rule of necessity" would**
**have to be invoked before discussion could take place on any issue.**
    **The purpose of this meeting is to discuss the zoning issue of the Lafond gravel pit off**
**Carrington Road as it relates to the Board of Selectmen becoming involved with zoning issues.**
    **Rich Bowen of Kopelman & Paige called the town office.  He stated that Jonathan**
**Eichman who was the attorney that Tommy Clark had spoken to about the cease and desist**
**order to Elsie Lafond was also present in his office.**
    **Dan stated that he is in conflict with this issue due to his being an abutter to the**
**property in question.  Hap stated that he is in conflict because his father-in-law has a gravel**
**pit and Donovan Bros., Inc. hauls gravel from his father-in-law's pit.  Because of these**
**conflicts, Dan made a motion that the Board invoke the "rule of necessity" in order to ask the**
**questions of town counsel regarding this particular zoning issue.  Hap seconded the motion to**
**invoke the "rule of necessity".**
    **Curtis Bush, Jr. and Phil Camp came in to the office and listened to the conversation.**
    **Dan asked Rich if he remembered when he had contacted him about who in the Town**
**of Montgomery should enforce the zoning bylaws.  Rich had explained to him that since the**
**Town does not have specific bylaws regarding zoning enforcement that the Building Inspector**
**becomes the zoning enforcement officer in most cases.  Rich agreed that he had stated this**
**information to Dan at that time.**
    **Another question Dan asked is that if a zoning use is not expressly allowed in the**
**Town's bylaw doesn't that mean the particular zoning use is not allowed.  Rich said this is**
**true most of the time.**
    **Dan explained how the Zoning Board of Appeals Chairperson, had attended the last**
**Selectboard meeting asking the Selectboard whether the Zoning Board should be involved in**
**this gravel pit zoning issue.  At that meeting, the suggestion was made that the Selectboard**
**rescind the Cease and Desist Order; thereby, eliminating the necessity for a Zoning Board of**
**Appeals hearing.  It was agreed to arrange a phone call to town counsel from the town office**
**with meeting posted to ask that question.  Rich stated that the Board of Selectmen have no**
**role in determining zoning issues.  Board cannot tell the Building Inspector as the Zoning**
**Enforcement Officer what he can and cannot do about zoning issues.  Zoning Board of**
**Appeals issues are not in the Board of Selectmen's jurisdiction either.  Dan asked the question**
**of what should the Board say to the Zoning Board in relation to the Chairperson's concerns.**
**Nothing except they can give ZBA permission to contact town counsel.**
**1:10 P.M.  Call with town counsel ended.  Board told Jane to contact Bob Pike and tell him to**
**do whatever the ZBA needs to do and he has permission to contact Town Counsel.**

**Selectmen Minutes – February 15, 2005**                           **Page 2**

**Phil Camp asked the Board if he could take Wednesday, the 16th off so he could attend his sister-in-law's funeral.  Dan made a motion to allow Phil to have a paid day off.  Hap seconded the motion.**

**1:17 P.M.  Meeting was adjourned.**

**Approved:** _____    _____

# EXHIBIT P

Page 1

Volume:  1

Pages:  1-71

Exhibits:  None

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. No. 05-30136-MAP

-------------------------------------

DONOVAN BROTHERS, INC.,                    )

AND ELSIE LAFOND,                          )

        Plaintiffs                        )

vs.                                        )

JOSEPH FONTAINE, JOANNE HEBERT             )

and ROBERT W. PIKE, JR., as                )

they are the Zoning Board of               )

Appeals of the Town of Montgomery,         )

and ELWIN R. CLARK, JR., as he             )

is the Building Inspector & Zoning         )

Enforcement Officer of the Town of         )

Montgomery,                                )

        Defendants                        )

                         )

-------------------------------------

DEPOSITION OF DANIEL JACQUES

TUESDAY, JANUARY 3, 2006

ANTONUCCI & ASSOCIATES

83 STATE STREET

SPRINGFIELD, MASSACHUSETTS  01103

- - - - - Sandra A. Deschaine, RPR - - - - -

COURT REPORTING SERVICES

P.O. BOX 15272          SPRINGFIELD, MA  01115

413.786.7233                    413.786.0299

Page 2

1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFFS
3  ANTONUCCI & ASSOCIATES
4     Frank Antonucci, Esquire
5     83 State Street
6     Springfield, Massachusetts 01103
7     (413) 737-4667 Fax (413) 731-0602
8
9  ON BEHALF OF THE DEFENDANTS
10 KOPELMAN AND PAIGE, P.C.
11    Jonathan D. Eichman, Esquire
12    31 St. James Avenue
13    Boston, MA  02116
14    (617) 556-0007 FAX (617) 654-1735
15
16
17
18
19
20
21
22
23
24

Page 4

1       DANIEL JACQUES, Deponent, having first
2  been satisfactorily identified by the
3  production of his Massachusetts driver's
4  license and duly sworn by the Notary Public,
5  was examined and testified as follows:
6
7       MR. ANTONUCCI:  Same?
8       MR. EICHMAN:  Same as the other
9  ones.
10       MR. ANTONUCCI:  Read and sign?
11       MR. EICHMAN:  Yes.
12
13  EXAMINATION BY MR. ANTONUCCI:
14       Q.  Mr. Jacques, I'm Frank Antonucci.
15  I represent the Donovan Brothers and Elsie
16  LaFond involving a lawsuit with the Town of
17  Montgomery and the Zoning Board of Appeals,
18  selectmen, etc.  I'm going to ask you some
19  questions about yourself and about that
20  situation.  If you don't understand them,
21  let me know, and I'll try to rephrase it.
22  If you need time to talk with your attorney,
23  who's here with you, let me know, and I'll
24  leave the room so you have some

Page 3

1           I N D E X
2  -------------------------------------------
   WITNESSES:                    PAGE
3  -------------------------------------------
4  Daniel Jacques
5     By Mr. Antonucci          4
      By Mr. Eichman
6
   -------------------------------------------
7  EXHIBITS:    DESCRIPTION        PAGE
   -------------------------------------------
8
   (No exhibits marked.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1  confidentiality in that regard.
2       Make sure you answer full answers
3  as opposed to auh-huh and nods of the head
4  because she can't get that down.
5       A.  Okay.
6       Q.  Have you been in depositions
7  before?
8       A.  No.  This is my first one.
9       Q.  We'll hope to go along as quickly
10 as possible.  And again, if you don't
11 understand a question, ask me to repeat it.
12       For the record, would you give me
13 your full name and address.
14       A.  Daniel Jacques, 132 Carrington
15 Road in Montgomery, Massachusetts.
16       Q.  And your Social Security number.
17       THE WITNESS:  That's necessary?
18       MR. EICHMAN:  We'll object to
19 that.
20       MR. ANTONUCCI:  We'll waive that.
21       Q.  Date of birth?
22       A.  6/23/63.
23       Q.  And your current occupation?
24       A.  Director of Information

2 (Pages 2 to 5)

Case 3:05-cv-30136-MAP     Document 45-11     Filed 11/30/2006     Page 12 of 17

DEPOSITION OF: DANIEL JACQUES     VOLUME I     January 3, 2006
DONOVAN BROTHERS, ET AL. vs. JOSEPH FONTAINE, ET AL.

Page 34

1  year.
2      Q.  And you don't have any specific
3  recollection, other than the fact that at
4  some point the people stopped complaining?
5      A.  They came for that meeting, and
6  as a selectmen I never heard anything
7  further.  We never -- no one came before the
8  Board about the issue.
9      Q.  Were there any complaints about
10 any other gravel pits, other than
11 Southampton Road, and the LaFond property?
12     A.  Not received by the Board, no.
13     Q.  Was the building inspector
14 involved in the Southampton Road controversy
15 or complaints, however you want to
16 categorize it, when that issue arose?
17     A.  Not that I know of.
18     Q.  Could you tell me why not?
19     A.  No one filed a complaint with
20 him.  They came to the Board of Selectmen.
21     Q.  Did the Board of Selectmen refer
22 the matter to the building inspector?
23     A.  No.
24     Q.  Why was it, in the situation with

Page 35

1  the LaFond property, that the matter ended
2  up with the building inspector?
3      A.  More information was brought to
4  light, as far as the procedure how to handle
5  those types of complaints.
6      Q.  What specific information?
7      A.  Our bylaws, looking into our
8  bylaws and other state laws and some advice
9  from Kopelman And Paige.
10     Q.  And without telling me what
11 Kopelman And Paige told you, when was it
12 that you received the information from them?
13     A.  December 22nd, 2004.
14     Q.  And who received that
15 information?
16     A.  I did.
17     Q.  And did you do that in your
18 capacity as a member of the Board of
19 Selectmen?
20     A.  Yes.
21     Q.  And did the Board of Selectmen,
22 prior to December 22nd, authorize you to
23 obtain that information?
24     A.  No, there was no specific

Page 36

1  authorization.
2      Q.  You simply called town counsel
3  and requested that they provide you some
4  information?
5      A.  Correct.
6      Q.  Did you bring that to the
7  attention of the other selectmen?
8      A.  The following night I did, yes.
9      Q.  On the 23rd?
10     A.  Yes, which would be before
11 Mr. Page showed up.
12     Q.  And you contacted them on the
13 22nd?
14     A.  Yes.
15     Q.  And then he showed up on the
16 23rd?
17     A.  Yes, sir.
18     Q.  And what happened from that
19 point?
20     A.  We made Mr. Paige aware of what
21 town counsel had advised us, that it was a
22 zoning issue, and that the zoning issues are
23 handled by the zoning enforcement, which is, in
24 our town, apparently, is the building

Page 37

1  inspector.
2      Q.  Did Mr. Paige provide you with a
3  written complaint as to what problems he
4  had?
5      A.  I don't think he had -- I don't
6  remember him having anything in writing that
7  night, no.
8      Q.  Did you receive, at some point in
9  time, a written complaint from his counsel
10 or attorney with respect to complaints that
11 Mr. Paige had?
12     A.  As a select board?
13     Q.  Yes.
14     A.  No, not that I can remember.
15     Q.  Did his attorney at some point in
16 time provide such a letter to the building
17 inspector?
18     A.  Yeah.  I saw a copy of it, yes.
19     Q.  When did you see a copy of it?
20     A.  I don't remember the exact date.
21 I don't remember how long afterwards it was.
22     Q.  Well, in relationship to the
23 23rd, was it within a week, two weeks?
24     A.  I believe the letter was

COURT REPORTING SERVICES
(413) 786-7233  FAX: 786-0299

DEPOSITION OF DANIEL JACQUES VOLUME I                                                    January 3, 2006
DONOVAN BROTHERS, ET AL. vs. JOSEPH FONTAINE, ET AL.

Page 38

1   presented to the select board -- actually, I
2   really don't remember.  I'm assuming it was
3   within the next couple of weeks or three or
4   four weeks that it came -- that it was made
5   available, but I really don't remember.
6       Q.  Were you aware of the fact that
7   that complaint was being formalized and sent
8   to the building inspector by Mr. Paige's
9   attorney?
10      A.  As a selectmen?
11      Q.  Yes.
12      A.  Through my relationship with
13  Mr. Paige as a neighbor, I was aware of what
14  he was doing.
15      Q.  In fact, who wrote that letter of
16  complaint?
17      A.  It was written by Mr. Paige's
18  attorney.
19      Q.  Who was his attorney?
20      A.  Nelson Costa.
21      Q.  That's the same attorney that was
22  representing the two of you in the attempt
23  to purchase the property?
24      A.  That's correct.

Page 39

1       Q.  So you were aware it was coming
2   because of your neighborly relationship with
3   Mr. Paige?
4       A.  Correct.
5       Q.  What, if any, discussions did you
6   have with the building inspector once the
7   letter had been provided to him?
8       A.  None.
9       Q.  Did you provide the building
10  inspector any information that you had
11  obtained from Kopelman And Paige or any
12  other legal source?
13      A.  No.
14      Q.  Did you provide the building
15  inspector your opinion with respect to the
16  legality of the operation on Carrington Road
17  by Mr. Donovan?
18      A.  No.
19      Q.  Did you receive anything in
20  writing from Kopelman And Paige on the 22nd
21  of December regarding legal procedures?
22      A.  No.
23      Q.  Was it all oral that you received
24  it?

Page 40

1       A.  Yes.
2       Q.  Did you relay that to the Board?
3       A.  Yes.
4       Q.  And when did you relay it to the
5   board?
6       A.  At the select board meeting on
7   the following night, the 23rd.
8       Q.  On the 23rd?
9       A.  Yes, sir.
10      Q.  And that would be in the minutes
11  of that meeting?
12      A.  Yes.
13      Q.  And you had no conversation with
14  the building inspector?
15      A.  Nope.
16      Q.  Did you contact the building
17  inspector to inform him of the fact that
18  this was going to be, so to speak, dropped
19  in his lap or something that he was going to
20  have to do?
21      A.  No.
22      Q.  Did Jane Thielen contact him at
23  the request of the Board to tell him that
24  this is a matter that he was going to have

Page 41

1   to deal with?
2       A.  Yes.
3       Q.  And when was it that Jane Thielen
4   was directed by the Board to inform
5   Mr. Clark, the building inspector, that he
6   was going to have to deal with that?
7       A.  I believe on the same night, the
8   23rd.
9       Q.  Would that be in the minutes of
10  the meeting?
11      A.  Yes.
12      Q.  And what was it, your best
13  recollection, that Ms. Thielen was told to
14  tell the building inspector?
15      A.  Well, gave him permission to
16  contact town counsel and said, you know, get
17  the information from them.  That's basically
18  it.
19      Q.  Now, again, without telling me
20  anything that was told to you by town
21  counsel, could you identify who it was you
22  spoke with at Kopelman And Paige, knowing
23  that they have many associates?
24      A.  If I remember, it was Joel Bard.

11 (Pages 38 to 41)

Page 42

1    Q.  Was Mr. Clark told to contact
2   Mr. Bard?
3      **A.  Not specifically, no.**
4      Q.  Just to contact Kopelman And
5   Paige?
6      **A.  Yes.**
7      Q.  To your knowledge, is there a
8   particular attorney or group of attorneys at
9   Kopelman And Paige that are assigned the
10  Town of Huntington, that you normally
11  contact?
12         MR. EICHMAN:  Objection.  Town of
13  Huntington?
14  BY MR. ANTONUCCI:
15     Q.  Town of Montgomery.  I'm sorry.
16     **A.  Sometimes relative to certain**
17  **aspects of what we're dealing with; normally**
18  **no, place a call and an attorney might be**
19  **assigned based on what the subject matter**
20  **is.**
21     Q.  Now, at the same time, was there
22  any indication to town counsel that in
23  addition to contacting Kopelman And Paige,
24  relative to the LaFond property, that he

Page 43

1   should also look into the other gravel pits
2   in town in terms of their operation?
3      **A.  I don't believe so.  The Board's**
4   **direction was simply to contact town counsel**
5   **about this case.**
6      Q.  Why weren't the other gravel pits
7   considered in terms of their legality or
8   lack of legality?
9      **A.  That would be a question for**
10  **Mr. Clark.**
11     Q.  In other words, if there's a lack
12  of enforcement with respect to other gravel
13  pits, it's your opinion that that's
14  Mr. Clark's purview?
15     **A.  Based on the current knowledge**
16  **that he's in zoning enforcement, I would**
17  **have to say yes.**
18     Q.  Has there been any operation at
19  the LaFond property since the cease and
20  desist order?
21     **A.  Not that I've seen, no.**
22     Q.  Did you attend the Zoning Board
23  of Appeals hearings on this matter?
24     **A.  As a selectmen or as an abutter?**

Page 44

1      Q.  In any capacity?
2      **A.  As an abutter only.**
3      Q.  Did you speak?
4      **A.  Yes.**
5      Q.  Did you present documents?
6      **A.  I presented some aerial**
7   **photographs.**
8      Q.  Anything else that you presented?
9      **A.  I don't remember presenting**
10  **anything else.  I don't think so.**
11     Q.  Did you present any legal
12  opinions that had been provided to you by
13  any source?
14     **A.  Absolutely not.**
15     Q.  Were there any lawyers that were
16  present at that time?
17     **A.  The first meeting you were**
18  **present.  And at the second meeting**
19  **Mr. Paige had brought counsel.**
20     Q.  And who was that counsel, if you
21  know, or what firm did they come from?
22     **A.  It was from Mr. Costa's firm.  I**
23  **think his first name was Shawn, but I can't**
24  **remember his last name.**

Page 45

1      Q.  With respect to Mr. Clark, was he
2   present at either of those meetings?
3      **A.  I don't remember seeing him**
4   **there, no.**
5      Q.  Did he present, if not in person,
6   through any documents, to the best of your
7   recollection, any detail of the reasons why
8   he had issued the cease and desist order,
9   other than the cease and desist order
10  itself?
11     **A.  I couldn't tell you.  Nothing**
12  **that I saw.**
13     Q.  Subsequent to the Zoning Board of
14  Appeal's decision in this case, have there
15  been further meetings of the Board of
16  Selectmen and public session whereby they've
17  dealt with this issue, the issue of the
18  operation on Carrington Road by Mr. Donovan?
19     **A.  There had been occasional**
20  **discussions, yes.**
21     Q.  Have they all been on the record
22  and noted in the minutes of the meeting?
23     **A.  Many were in executive session,**
24  **which were so noted in the meeting minutes.**

12 (Pages 42 to 45)

Page 46

1    Q.  Would that be dealing with
2  strategies in litigation?
3    A.  I don't know if I can answer
4  that.
5    Q.  All I want to know is the purpose
6  for which you went into executive session,
7  not what you talked about in executive
8  session?
9        MR. EICHMAN:  You can answer it.
10    A.  Some of it, yes.
11  BY MR. ANTONUCCI:
12    Q.  Other than the issue of
13  litigation -- again, I don't want to know
14  specifically what was said at this time --
15  what would be the reason for going into
16  executive session, if it wasn't dealing with
17  litigation?
18    A.  I'm trying to recall.  I can't
19  think of any instance where we didn't go
20  into specifically to discuss the case and/or
21  strategy and/or review documents.
22    Q.  Now, with regard to the Zoning
23  Board of Appeals and the members of the
24  Board of Selectmen, are you familiar with

Page 47

1  all of them, Joseph Fontaine, Joanne Hebert,
2  and Robert Pike?
3    A.  Pike is the only one that I had
4  met beforehand.  I bought Christmas trees
5  from him.
6    Q.  Had you had any discussions with
7  the zoning board members, other than at the
8  meeting, prior to the meeting, regarding
9  this subject matter?
10    A.  I had one discussion with Bob
11  Pike, but I can't remember if it was before
12  or after the meeting.
13    Q.  Where did that discussion take
14  place?
15    A.  He had come to one of the select
16  board meetings seeking guidance from the
17  Board, and subsequent to the meeting -- the
18  next morning I had called him, and I said
19  two things to him.  I said -- first of all,
20  I basically said beholding the Board of
21  Selectmen, and then I said as an abutter, I
22  had information, that if you wanted to talk,
23  that I would be happy to share with him.
24    Q.  Did you share that with him?

Page 48

1    A.  No.  He never followed up on any
2  conversation.
3    Q.  Did you tell him what information
4  you had?
5    A.  No.
6    Q.  Did you express your opinion as
7  an abutter as to what the situation was?
8    A.  No.  It wasn't my place.
9    Q.  But he did come to the selectmen
10  at some point, you said, seeking guidance?
11    A.  That's what I remember, yes.
12    Q.  What specifically was he looking
13  for in the way of guidance?
14    A.  I don't remember the full context
15  of the discussion.  That was a meeting where
16  discussions ensued about whether or not it
17  was a select board issue and that was
18  basically the extent of the discussion, I
19  think.  Again, that part of the public --
20  it's all in meeting minutes.
21    Q.  Was any part of it in executive
22  session?
23    A.  I don't believe that meeting was
24  in executive session.

Page 49

1    Q.  And would that have come about
2  after the cease and desist order was issued?
3    A.  I believe so, yes.
4    Q.  Before the Zoning Board of
5  Appeal's decision?
6    A.  Before the decision, yes.
7    Q.  And it would have been at a
8  selectmen's meeting?
9    A.  It was at a selectmen's meeting,
10  yes.
11    Q.  Did you have any discussion with
12  him, other than in the capacity of the
13  meeting itself, after the meeting, before
14  the meeting, during any breaks regarding
15  this guidance he was seeking?
16    A.  No.
17    Q.  Did any other members of the
18  selectmen have any discussion with him off
19  the record, to your knowledge?
20    A.  I wouldn't know.
21    Q.  How about the other members of
22  the Zoning Board of Appeals, have you
23  discussed this issue with them at any time
24  prior to the cease and desist order?

13 (Pages 46 to 49)

Case 3:05-cv-30136-MAP    Document 45-11    Filed 11/30/2006    Page 16 of 17

DEPOSITION OF DANIEL JACQUES    VOLUME I    January 3, 2006
DONOVAN BROTHERS, ET AL. vs. JOSEPH FONTAINE, ET AL.

Page 50

1    A.  No.
2    Q.  Any time after the cease and
3  desist order?
4    A.  No.
5    Q.  Did you have any discussion with
6  the building inspector at any time after he
7  issued the cease and desist order?
8    A.  No.  The only call I made to the
9  building inspector was to let him know that
10  Mr. Eichman was looking for him.
11    Q.  And how did you know that
12  Mr. Eichman was looking for him?
13    A.  I was told by Jane Thielen.
14    Q.  When was it that that
15  conversation took place?
16    A.  Shortly before his deposition.
17    Q.  And could you explain to me why
18  it was it fell to you to contact Mr. Clark,
19  as opposed to one of the other selectmen, or
20  anybody else in the town?
21    A.  I don't remember.  Perhaps I was
22  on the phone with Jane that day.
23    Q.  With respect to the other gravel
24  pits on Carrington Road, are you familiar

Page 51

1  with the Pomeroy gravel pit, the one across
2  from Mr. Morse?
3    A.  I know where it is.
4    Q.  Which side of the road is that
5  on, the river side or the mountain side?
6    A.  The mountain side.
7    Q.  And in terms of its operation, is
8  it a gravel pit, or a quarry, or both?
9    MR. EICHMAN:  Objection.
10    Q.  If you know.
11    MR. EICHMAN:  You can answer.
12    A.  I'm not an expert.  I couldn't
13  tell you.
14    Q.  Could you observe what it is that
15  they extract from the property there?
16    A.  From what I can see, I've seen
17  what I can see.  I couldn't tell you.  I'm
18  not an expert.
19    Q.  How about Peckham's property,
20  which side of the road is that on?
21    A.  On the river side.
22    Q.  Is there any operation on the
23  other side, on the mountain side?
24    A.  I believe there's an old one, but

Page 52

1  I couldn't tell you the history.  That shows
2  up on the maps.
3    Q.  Have you personally, as an
4  abutter, or in your capacity as a selectmen,
5  reviewed any records for the Town of
6  Montgomery relative to the issuance of any
7  permits, licenses, or authorizations for any
8  pits in the town to operate?
9    A.  No.
10    Q.  No, you haven't looked?
11    A.  I haven't looked for permits or
12  anything like that.
13    Q.  Has anybody in the town brought
14  to your attention the fact that any of the
15  pits operating in town currently, in fact,
16  have licenses, authorizations, or permits?
17    A.  No one has brought that to my
18  attention.
19    Q.  Do you know, from any source, as
20  to whether or not any of the current pits in
21  town have authorizations, licenses, permits,
22  permission from the town to operate?
23    A.  Again, I don't know.
24    Q.  Are you aware of the length of

Page 53

1  the operation of the Peckham property, in
2  other words, how long it's been in existence
3  as a gravel pit?
4    A.  I couldn't tell you the start
5  date, no.
6    Q.  How about the Pomeroy pit?
7    A.  I couldn't tell you, no.
8    Q.  Southampton Road?
9    A.  No.
10    Q.  And the Donovan pit, do you know
11  how long that's been in operation?
12    A.  Not to the date, no.  Just what
13  was revealed at the ZBA hearing.
14    Q.  When what was revealed at the ZBA
15  hearing?
16    A.  I believe early mid '70s, if I
17  remember the date right.
18    Q.  Are you aware of any, or could
19  you identify for me any ordinance in the
20  Town of Montgomery that governs or in any
21  way governs the operation of gravel pits in
22  the Town of Montgomery?
23    A.  The bylaws don't specifically
24  allow it.

14 (Pages 50 to 53)

Page 66

1      Q.  When you heard from her it was
2  for sale, did you discuss with Mr. Paige
3  making an offer for the property?
4      A.  Yes.
5      Q.  Did you make a verbal offer for
6  the property before the expansion started to
7  cross?
8      A.  Yes.
9      Q.  When Bob Pike appeared before the
10  Board of Selectmen, you said that he came
11  seeking guidance, if I remember your words
12  correctly.  Do you recall if the Board of
13  Selectmen gave him any guidance?
14      A.  I remember a discussion ensuing
15  between the other Board members as to how
16  this should or shouldn't be a selectmen's
17  issue.  I don't remember the exact
18  conversation.  And I remember suggesting, at
19  the time, that this is something we should
20  not be discussing.
21      Q.  Why did you say that?
22      A.  Because we were conflicted, and
23  we turned the matter over to the zoning
24  enforcement officer.

Page 67

1      Q.  Why did you feel you were
2  conflicted?
3      A.  That we shouldn't be offering --
4  that I felt that the Board was conflicted,
5  that it shouldn't be dealing with this
6  issue.
7      Q.  Why did you feel that you
8  personally were conflicted as a Board
9  member?
10      A.  I'm an abutter to the property in
11  question.
12      Q.  You said you attended the Board
13  of Appeals meetings on the cease and desist,
14  correct?
15      A.  Yes.
16      Q.  And you said that information was
17  given at those hearings that the Donovan
18  Brothers began operating the gravel pit at
19  the LaFond property sometime in the '70s; is
20  that correct?
21      A.  If I remember correctly, yes.
22      Q.  Do you remember who gave that
23  information?
24      A.  I believe it was Mr. Antonucci.

Page 68

1      Q.  In testimony before the Zoning
2  Board of Appeals?
3      A.  The meeting was open.  Yes.
4      Q.  Were you aware of anyone from the
5  Donovan Brothers who was at that meeting?
6      A.  There were representatives from
7  Donovan Brothers, several.
8      Q.  Did they contradict
9  Mr. Antonucci's testimony as to when the
10  Donovan Brothers started operating the
11  gravel pit?
12      A.  No.  The other comment was made
13  that pretty much that's all the records
14  would show at the time.
15      Q.  Who's they?
16      A.  The operation, the Donovan
17  Brothers, their office, whoever.
18      Q.  Who made the comment that that's
19  all the records would show?
20      A.  Again, not those exact words, but
21  Mr. Antonucci had mentioned that.
22      Q.  Has the building inspector, or
23  the building inspector I mean Tommy
24  Clark, ever attended a Board of Selectmen

Page 69

1  meeting where the LaFond gravel pit was
2  discussed, to your knowledge?
3      A.  No.
4      Q.  At any time?
5      A.  None that I was present for.
6      MR. EICHMAN:  That's it.
7  FURTHER EXAMINATION BY MR. ANTONUCCI:
8      Q.  With respect to the Zoning Board
9  of Appeals meetings, and there were two of
10  them; is that correct?
11      A.  Yes, two meetings.
12      Q.  Did you speak at those meetings?
13      A.  I spoke at the first one.  I
14  don't remember if I spoke at the second one.
15      Q.  And was anybody sworn to testify,
16  such as in a courtroom, raise your right
17  hand?
18      A.  Not that I remember, no.
19      Q.  Is it fair to say that people
20  raised their hand and were free to discuss
21  their opinions or thoughts regarding the
22  subject matter?
23      A.  As long as the ZBA permitted them
24  to.

18 (Pages 66 to 69)

# EXHIBIT Q

Page 1

VOLUME:      I
PAGES:       1-103
EXHIBITS:    None

UNITED DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. No. 05-30136-MAP

---------------------------------------

                                        )
DONOVAN BROTHERS, INC.,                 )
AND ELSIE LAFOND,                       )
            Plaintiffs                  )
vs.                                     )
JOSEPH FONTAINE, JOANNE HEBERT          )
and ROBERT W. PIKE, JR., as             )
they are the Zoning Board of            )
Appeals of the Town of Montgomery,      )
and ELWIN R. CLARK, JR., as he          )
is the Building Inspector & Zoning      )
Enforcement Officer of the Town of      )
Montgomery,                             )
            Defendants                  )
                                        )

---------------------------------------


DEPOSITION OF CHARLES R. PECKHAM
TUESDAY, JANUARY 3, 2006
ANTONUCCI & ASSOCIATES
83 STATE STREET
SPRINGFIELD, MASSACHUSETTS  01103


- - - - - Sandra A. Deschaine, RPR - - - - -


COURT REPORTING SERVICES
P.O. BOX 15272          SPRINGFIELD, MA  01115
413.786.7233                      413.786.0299

Case 3:05-cv-30136-MAP    Document 45-12    Filed 11/30/2006    Page 3 of 20

DEPOSITION OF CHARLES PECKHAM VOLUME I                January 3, 2006
DONOVAN BROTHERS, ET AL. vs. JOSEPH FONTAINE, ET AL.

Page 2

```
 1   APPEARANCES:
 2   ON BEHALF OF THE PLAINTIFFS
 3   ANTONUCCI & ASSOCIATES
 4      Frank Antonucci, Esquire
 5      83 State Street
 6      Springfield, Massachusetts 01103
 7      (413) 737-4667 Fax (413) 731-0602
 8
 9   ON BEHALF OF THE DEFENDANTS
10   KOPELMAN AND PAIGE, P.C.
11      Jonathan D. Eichman, Esquire
12      31 St. James Avenue
13      Boston, MA  02116
14      (617) 556-0007 FAX (617) 654-1735
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1            I N D E X
 2   ------------------------------------
     WITNESSES:                 PAGE
 3   ------------------------------------
 4   Charles R. Peckham
 5      By Mr. Antonucci          4
        By Mr. Eichman           98
 6
     ------------------------------------
 7   EXHIBITS:   DESCRIPTION     PAGE
     ------------------------------------
 8
     (No exhibits marked.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1      CHARLES R. PECKHAM, Deponent, having
 2   first been satisfactorily identified by the
 3   production of his Massachusetts driver's
 4   license and duly sworn by the Notary Public,
 5   was examined and testified as follows:
 6
 7      MR. ANTONUCCI:  Would you like
 8   the usual stipulations?
 9      MR. EICHMAN:  Yes, that's fine.
10      MR. ANTONUCCI:  Do you want
11   Mr. Peckham to read and sign?
12      MR. EICHMAN:  Yes, please.
13
14   EXAMINATION BY MR. ANTONUCCI:
15      Q.  Mr. Peckham, as I've already
16   introduced myself, or we've introduced
17   ourselves to each other, I'm Frank
18   Antonucci.  I represent Mr. Donovan and
19   Donovan Brothers, Inc., as well as Elsie
20   LaFond in an action against the selectmen
21   and the Zoning Board of Appeals dealing with
22   the LaFond property on Carrington Road.  Are
23   you familiar with that situation?
24      A.  Yes, I am.
```

Page 5

```
 1      Q.  I'm going to be asking you some
 2   questions.  If you don't understand them,
 3   let me know, and I'll try to rephrase the
 4   question so it's more understandable.  If
 5   you need time at any point to talk with your
 6   lawyer, simply let us know, and we'll take a
 7   break, and I'll leave the room so you can
 8   talk with him in confidence.
 9      A.  Okay.
10      Q.  If you need to take a break for
11   any other reason, water, men's room,
12   whatever, let me know, and we'll accommodate
13   you in that regard.
14      A.  Appreciate it.
15      Q.  Would you please state your name
16   and current address?
17      A.  It's Charles R. Peckham, 20
18   Chamberlain Road, Montgomery, Mass., 01050.
19      Q.  How long have you resided there?
20      A.  It was my father's property.  My
21   wife and I moved into a house there in '71.
22      Q.  And your date of birth, sir?
23      A.  3/14/40.
24      Q.  And your Social Security number?
```

2 (Pages 2 to 5)

Page 30

1  he stopped that also.
2      Q.  When you say "John," you mean
3  Risotti?
4      A.  Risotti.
5      Q.  What, if any, other complaints
6  were there in the year 2004 with the
7  operation of any of the pits on Carrington
8  Road?
9      A.  Tell me the same thing.
10     Q.  Were there any complaints with
11 regard to the operation of the pits that the
12 Board of Selectmen discussed in the year
13 2004?
14     A.  LaFond pit, yeah.
15     Q.  And when did the LaFond pit first
16 get discussed by the selectmen?
17     A.  Like I told you, I was on the
18 Board waiting for a complaint to come
19 forward.  We heard there was a letter out
20 there that somebody sent someone, but we
21 didn't see it as a Board.  And it was --
22     MR. ANTONUCCI:  Let's take a
23 break at this point.
24     (Pause in proceedings.)

Page 31

1      A.  From the top.
2
3      MR. ANTONUCCI:  What was the last
4  question?
5      (Record read by the court
6      reporter.)
7  BY MR. ANTONUCCI:
8      Q.  Who did you hear that from, that
9  there was, quote, a letter out there?
10     A.  Wayne Morse.
11     Q.  And did Mr. Morse explain to you
12 how it was that he knew there was a letter
13 out there?
14     A.  It was sent to Gail, I think, one
15 of the first letters and he viewed it.  I
16 never saw it.
17     Q.  And what did he tell you about
18 this letter?
19     A.  He said there was language in it
20 about the complaint about the gravel pit,
21 was the walls were cracking in Paiges house
22 and plates and dishes were rattling on the
23 shelf.  That's all I remember, exactly.
24     Q.  Did you talk with Mr. Jacques

Page 32

1  about this complaint?
2      A.  No.
3      Q.  Well, Mr. Jacques is an abutter
4  of the pit in question to the LaFond
5  property?
6      A.  Right.
7      Q.  And a neighbor to Mr. Paige?
8      A.  Right.
9      Q.  Was he asked if he was having any
10 problems of that nature?
11     A.  No.
12     Q.  Did he add anything in that
13 regard?
14     A.  He just said that Dennis Paige
15 had a complaint, and he was coming before
16 the Board with the complaint.
17     Q.  Did Mr. Paige in fact come before
18 the Board with a complaint?
19     A.  Not right away.
20     Q.  What's the next thing you heard
21 about the LaFond property after hearing from
22 Mr. Morse that there was a letter out there
23 and that Mr. Paige had a complaint?
24     A.  Next thing I heard was -- getting

Page 33

1  them in order in my head here.  While we
2  were waiting for a complaint to come
3  forward, I got a call from Dan Jacques,
4  probably 8:30, nine o'clock at night, and he
5  talked about talking with our town
6  attorneys, and I was half asleep because I
7  had to get up early.  And I told him, I
8  said, "Dan," I said, "You can't talk with
9  the town attorneys.  You're an abutter and
10 it's a conflict of interest.  That's never
11 been done in the past with this Board, and I
12 strongly suggest, and I will not," because I
13 was chairman of the board then, "and I will
14 not give you permission to call our
15 attorneys."  That was the first.
16     Q.  Now, just to give this some time,
17 when was it, if you know, that you first
18 heard of the letter being out there?  Was
19 that in the fall of 2004?
20     A.  Yes, I would say fall or maybe a
21 little early.
22     Q.  Summer?
23     A.  Late summer.
24     Q.  Late summer, early fall, okay.

9 (Pages 30 to 33)

Page 34

1  In relationship to when you heard of that
2  letter being out there from Mr. Morse, when
3  was it that Dan Jacques gave you a call?
4      A.  I'm really unclear about that,
5  but I would say it was probably like middle
6  of the fall.
7      Q.  In relationship to the
8  conversation with Mr. Morse and Mr. Jacques,
9  the initial one, was it a matter of days or
10 weeks or hours?
11     A.  One more time, please.
12     Q.  First thing you heard was
13 something from Mr. Morse?
14     A.  Yes.
15     Q.  Mr. Jacques also had some
16 comments at that time?
17     A.  Yes.
18     Q.  And then the next thing you heard
19 was Mr. Jacques calling you?
20     A.  Yes.
21     Q.  At 8:30 in the evening or
22 thereabouts?
23     A.  Yep.
24     Q.  What was the time frame between

Page 35

1  the first conversation and that call?
2      A.  Maybe three weeks, maybe five
3  weeks.
4      Q.  And without -- why was it that he
5  wanted to call the town attorneys?
6      A.  He did not think, because the way
7  we acted on controlling gravel pits in the
8  past, the problems with them, that the Board
9  should handle it because we were all in a
10 conflict of interest, so he was trying to
11 look for another avenue to have, I think
12 what he said, is a fair judgment on this
13 complaint action, and he knows how we
14 handled it in the past, and that's what --
15 the conversation all come together, and then
16 I realized in the tail end he was asking for
17 permission to get to our attorneys.  I said
18 definitely not, definitely not, because
19 that's not the way we handled it in the
20 past.
21     Q.  How were issues of gravel pits
22 handled in the past?
23     A.  Well, when they came, people come
24 forward and they say, Look, we have no bylaw

Page 36

1  that specifically says we have any control
2  over gravel pits.  That's what we -- since I
3  was on and before, that's what was said.
4  But if someone had a complaint, it was
5  easier for us to handle it as a nuisance
6  thing and then get a compromise between
7  parties and go forward.  We never shut
8  anyone down.
9      Q.  Now, we've discussed three pits
10 in the Town of Montgomery?
11     A.  Right.
12     Q.  LaFond, across from Pomeroy's,
13 yours?
14     A.  Right.
15     Q.  And there's a fourth one that may
16 or may not be in the Town of Montgomery?
17     A.  Right.
18     Q.  How many others that you're aware
19 of?
20     A.  We have one on Southampton Road
21 going out off Montgomery, use to be the Finn
22 gravel pit.  We had a few complaints about
23 that because a lot of people down in there,
24 but that's still going.  And there is some

Page 37

1  small ones here and there that they take a
2  little gravel out of them, but I'm not
3  comfortable in telling you who they are
4  because they never had a complaint, but I
5  know they're used now and again.
6      Q.  Is it fair to say there is about
7  four or five substantial pits?
8      A.  There's four substantial.
9      Q.  And then other smaller
10 operations?
11     A.  Yes.
12     Q.  If I understand you correctly,
13 there's no ordinance or bylaw that controls
14 pits in town?
15     A.  Yes.
16     Q.  Have all of these pits been
17 operating along the mountainside of Peckham
18 property?
19     A.  Yes.
20     Q.  Has the LaFond property been used
21 as a gravel pit going back a number of
22 years?
23     A.  Yes.
24     Q.  Do you remember when the LaFond

10 (Pages 34 to 37)

Page 42

1   A.  Yes.
2       Q.  And if complaints come up, then
3   the Board attempts to, if I understand you
4   correctly, mediate between the complaining
5   parties and the pit in question?
6       A.  Exactly.
7       Q.  And I take it over the years that
8   policy has worked?
9       A.  Yes, it has.
10      Q.  And that policy is known to the
11  pit operators?
12      A.  Yes.
13      Q.  And to the general public?
14      A.  Yes.
15      Q.  And for that reason, complaints
16  with regard to the operation of the pits,
17  for instance, the truck noise, would come to
18  the selectmen?
19      A.  That's right.
20      Q.  And that's how it's operated in
21  the Town of Montgomery?
22      A.  Exactly.
23      Q.  After the complaint -- after the
24  telephone call with Mr. Jacques, what next

Page 43

1   transpired in terms of your conversation
2   with him, wherein you indicated he could not
3   call the town attorneys?
4       A.  I think I remember it well.  I
5   went to the select board meeting.
6       Q.  This is the next select board
7   meeting?
8       A.  The next select board meeting.
9   So it was pretty close to that, or I might
10  have -- our meeting is every two weeks,
11  might have skipped one or two meetings, but
12  I got to the select board meeting, and there
13  was a lot of discussion about this gravel
14  pit complaint and Mr. Paige coming in.  He
15  gets there and an agenda is set up, and I
16  get there, and I have Dan Jacques, at the
17  Town Hall, got some information from
18  Kopelman And Paige; and this was three weeks
19  after or two weeks after I give him the
20  no-go for talking with our town attorneys.
21  I got up.
22      I said, "What the heck is this?"
23      And he didn't say anything.  Dan
24  was there.  Jane Thielen was there.  Nobody

Page 44

1   said anything.  I walked out of the meeting
2   just before eight o'clock.  Dennis Paige was
3   supposed to be there at 8:30.  I went home,
4   got my own recorder, went back up, walked in
5   there at 8:30.  Dennis Paige was come and
6   gone.  And I said, "I'm going to talk to
7   myself.  I'm going to record it.  I'll tell
8   you when it's on."  My exact words.
9       Q.  What was the select board's
10  policy with regard to the use of legal
11  counsel or seeking opinions of legal
12  counsel?  Was it something that was subject
13  to a vote by the Board, or was it the
14  selectmen chairman's call or what?
15      A.  We had -- Jane Thielen, our
16  executive assistant, got permission from the
17  Board of Selectmen to use our town
18  attorneys.  The Board of Selectmen do it,
19  every article, per se, that we thought we
20  needed a town attorney or clarification on
21  after we discussed it, and then we'd ask for
22  definition from our town attorneys.
23      Q.  In other words, the Board would
24  discuss it in public session or executive

Page 45

1   session, if necessary?
2       A.  One or the other.
3       Q.  And then authorize Jane
4   Thielen --
5       A.  The town administrator.
6       Q.  Is that her position?
7       A.  Yes.
8       Q.  -- to contact the attorneys with
9   the specific question?
10      A.  Yes.  If one selectmen had a
11  problem with the determination and wanted to
12  get another other, we'd give him permission,
13  but it was talked about and passed on.
14      Q.  But it was not done in this case?
15      A.  No.
16      Q.  And did you make a determination
17  as to who it was that contacted your
18  attorneys, whether it was Jane Thielen or
19  Mr. Jacques directly?
20      A.  I believe it's in the minutes.
21  I'm pretty sure it's Dan Jacques.
22      Q.  It would be in the minutes of the
23  meeting?
24      A.  Right.

12 (Pages 42 to 45)

Case 3:05-cv-30136-MAP    Document 45-12    Filed 11/30/2006    Page 7 of 20

DEPOSITION OF CHARLES PECKHAM, VOLUME I                January 3, 2006
DONOVAN BROTHERS, ET AL. vs. JOSEPH FONTAINE, ET AL.

Page 46

1    Q.   And that would be in the fall of
2  2004?
3    A.   It was just prior to December
4  23rd, when that order came down for the
5  cease and desist.
6    Q.   And was there any further
7  discussion in the public session that night
8  about the use of attorneys or the authority
9  of Mr. Jacques to request that opinion?
10   A.   Yes, there was.
11   Q.   And what was the substance of
12 that discussion?
13   A.   Two selectmen had to vote to use
14 the town attorneys and sign a paper for
15 permission before the town attorneys could
16 be contacted.
17   Q.   Was that the policy before or
18 after?
19   A.   That was made after.  Before, it
20 was never in writing, but it was in the
21 minutes, but not a policies kind of a thing.
22   Q.   Did Mr. Morse -- was Mr. Morse,
23 if you know, aware of the fact that
24 Mr. Jacques had contacted the town

Page 47

1  attorneys?
2    A.   Yes.
3    Q.   Was he aware of that prior to the
4  meeting?
5    A.   Yes.
6    Q.   But you were not?
7    A.   No.
8    Q.   Is there any reason why you as
9  chairman of the Board of Selectmen were not
10 notified of that?
11   A.   I can't tell you that.  I don't
12 know.
13   Q.   And Mr. Morse, did he express
14 himself, on the record, as to whether he was
15 in favor or opposed to this action by
16 Mr. Jacques?
17   A.   When the minutes were wrote up,
18 and they were redone and formalized, Jane
19 Thielen had the wording in there that the
20 Board approved this request; and I said,
21 "Don't use the Board because I wasn't
22 involved with it.  I didn't vote for it."
23        And that's when Wayne says,
24 "That's right.  Charlie got up and left when

Page 48

1  we had that discussion," so he wasn't here."
2        So then she changed the minutes
3  and wrote in the names who voted for it.  So
4  it was Dan Jacques and Wayne.
5    Q.   Did your attorneys at that time
6  provide a specific opinion on a point of law
7  or a request that Mr. Jacques had made?
8    A.   I don't know what they advised.
9    Q.   Well, was that --
10   A.   They were discussing the pit.
11   Q.   Is that letter or opinion made
12 public to the town or to anybody else, or
13 does it remain part of the selectmen's
14 relationship with your attorney?
15   A.   You lost me a little bit.
16   Q.   Well, I don't want to get
17 involved in receiving information from you
18 about what you and Mr. Eichman or any other
19 attorney for the town has discussed with
20 you, unless it's something that has been
21 made public.  And I'm trying to make a
22 determination if the information received by
23 Mr. Jacques from town attorneys was made
24 public, or was that kept within the Board?

Page 49

1    A.   It was made public, because I had
2  it in front of me and all our discussions
3  were at open meeting.
4    Q.   What was the request from
5  Mr. Jacques, and what was the opinion by the
6  town attorneys?
7    A.   I'm unclear on what that was.
8    Q.   Was there a document that you
9  were given that was made public?
10   A.   In the minutes of that meeting
11 that I went to, it referred to a document,
12 but I don't know what, to repeat it to you.
13   Q.   So this would have been minutes
14 of a meeting in December prior to the 23rd?
15   A.   Correct.
16   Q.   What other action did the Board
17 take at that meeting with respect to the
18 LaFond property?
19   A.   I believe I'm accurate in Wayne
20 Morse had a problem with some of the
21 language on the cease and desist and such.
22   Q.   I'm talking about before the
23 cease and desist.  At the town meeting,
24 where the issue of using town counsel came

13 (Pages 46 to 49)

Page 50

1  up, was there any other discussion of the
2  LaFond property?
3      A.  No.
4      Q.  Did the Board meet before the
5  cease and desist order issued on this
6  property?
7      A.  I okay'd a meeting because Wayne
8  was unclear of the law and what rights the
9  town had.  And I said, "Well, if you're
10  unclear, we'll have the town attorneys come
11  out, because it's an attorney issue and you
12  talk to them, and Jane is supposed to have
13  an informational meeting; and Jane set it up
14  as a full meeting of the Board, posted
15  meeting.  Wayne was there; Dan was there;
16  and town attorneys was there.  I wasn't.  I
17  was stuck in traffic in Westfield.  I didn't
18  get back in time.  And I didn't really think
19  that was important.  I thought we agreed
20  that it was going to be for informational
21  purposes, not decision-making and that was
22  the end of that.
23      Q.  That was a public meeting?
24      A.  Yes, it was.

Page 51

1      Q.  And what, if any, votes did the
2  Board take?
3      A.  I wasn't there, but I'm sure
4  they -- well, I can't say.  I wasn't there.
5  That's when the cease and desist came, so
6  I'm sure that that was the vote.
7      Q.  Now, you indicated the procedure,
8  prior to this particular situation arising,
9  was for complaining parties to come before
10  the Board?
11      A.  Correct.
12      Q.  In this case, the matter was
13  referred to the town building inspector?
14      A.  Yes.
15      Q.  When was that done?
16      A.  I don't know.
17      Q.  Who did that?
18      A.  Who gave it to the --
19      Q.  Building inspector.
20      A.  -- building inspector?  Got the
21  okay from the town attorneys to do that.  I
22  don't know who handled it from there, quite
23  frankly.
24      Q.  Would that have occurred at the

Page 52

1  public meeting with the town attorneys?
2      A.  Yes.
3      Q.  So you weren't present at that
4  time?
5      A.  No.
6      Q.  So in your numerous years on the
7  select board, is it fair to say that this is
8  the first time that this procedure, with
9  regard to a complaint regarding a gravel
10  pit, was employed?
11      A.  As I know it, yes.
12      Q.  Did you or any member of the
13  Board have any discussion with the building
14  inspector, Mr. Clark, prior to handing him
15  this assignment?
16      A.  Not me, I didn't.
17      Q.  Do you know if Mr. Jacques did?
18      A.  Don't know.
19      Q.  Do you know if Mr. Morse did?
20      A.  Don't know.
21      Q.  And after the building inspector,
22  Mr. Clark, undertook this task -- by the way
23  who gave him the task?  Who told him to go
24  out and do this?

Page 53

1      A.  It's got to be in the record.  I
2  can't tell you who.
3      Q.  That would be the select board
4  meetings?
5      A.  Yes.
6      Q.  Was there anything in writing
7  from the select board to Mr. Clark regarding
8  this situation, if you know?
9      A.  Not that I'm aware.
10      Q.  And so either the other two
11  selectman or Jane Thielen spoke with him, if
12  anybody spoke with him?
13      A.  Yes.
14      Q.  And after he undertook the
15  investigation of the situation, did he
16  report back to the Board?
17      A.  He never came to the Board of
18  Selectmen.
19      Q.  Did he talk with any individual
20  members of the Board?
21      A.  He talked with me.
22      Q.  When was that?
23      A.  I think it was the day after he
24  served notice.  I was working in my pit, and

14 (Pages 50 to 53)

Page 94

1   A.  No.  As a matter of fact, Wayne
2   was waiting for the complaint to come to us,
3   to know what they were handling, because we
4   had a discussion on the pit down in
5   Southampton seven months prior to that and
6   we handled it the same way as we handled it
7   before, and it went away.
8       Q.  Why did you have that discussion
9   about the Southampton pit?
10      A.  When it come down to it, it was
11  all about trucks and speed and dust, and we
12  saw the parties involved, and said we can do
13  this and this or this and this, and we had a
14  compromise and had a time frame, what their
15  working hours were going to be, and they
16  honored it and that was the last I heard of
17  it.
18      Q.  And you say that -- you
19  understand that the Board of Selectmen, not
20  the Board of Selectmen, but Hap and Dan
21  voted to refer the Paiges' complaint to the
22  building inspector for action; is that
23  correct?
24      A.  I heard he did that.

Page 95

1       Q.  You weren't at the meeting?
2       A.  I wasn't at the meeting.
3       Q.  And there are three members on
4   the Board of Selectmen?
5       A.  Yes.
6       Q.  And after they voted to refer to
7   the building inspector, you did not have any
8   discussions with the building inspector
9   until he came to see you at your property?
10      A.  Yes.
11      Q.  No discussions until that time?
12      A.  No.
13      Q.  Did the building inspector ever
14  ask you what your opinion was about whether
15  the LaFond gravel pit was a lawful use in
16  the town?
17      A.  He came to me one day.
18      Q.  After the cease and desist?
19      A.  Yes.
20      Q.  Did he ask you before he issued
21  the cease and desist?
22      A.  No.
23      Q.  Did you ever speak with the
24  Zoning Board of Appeals members after you --

Page 96

1   after the Board of Appeals selected to vote,
2   did you ever speak with -- after the cease
3   and desist order was issued, excuse me,
4   strike that.
5       After the Board of Selectmen
6   instructed the building inspector to handle
7   the Paiges' complaint about the LaFond
8   gravel pit, did you ever speak to the Zoning
9   Board of Appeals members about the LaFond
10  gravel pit?  Charlie, that's for you.
11      A.  I was lulling to sleep here.
12  Sorry about that.
13      Q.  Go ahead.  Did you ever speak
14  with the Zoning Board of Appeals members
15  about the LaFond gravel pit after the Board
16  of Selectmen referred the matter to the
17  building inspector for action?
18      A.  No.
19      Q.  The one time that the Board of
20  Selectmen -- that you've indicated the Board
21  of Selectmen talked about whether the LaFond
22  gravel pit was a lawful use in the town, did
23  anyone, any member of the Board of
24  Selectmen, ever discuss Mr. Donovan's

Page 97

1   residency, where he lived?  Did anyone bring
2   that up?
3       A.  No.
4       Q.  Has the Board of Selectmen ever
5   discussed, at a public meeting, where owners
6   of gravel pits live?
7       A.  No.
8       Q.  You said that prior to the LaFond
9   gravel pit the Board of Selectmen would
10  informally deal with complaints regarding
11  gravel pits?
12      A.  Yes.
13      Q.  Did any of those complaints ever
14  involve the residency of the person
15  operating the pit?
16      A.  No.
17      Q.  Say it another way.  Did anyone
18  complain about the operation of it because
19  the person owning it lived out of town?
20      A.  No.
21      Q.  Did anyone ever come to the Board
22  of Selectmen and complain about Donovan
23  Brothers operating the LaFond pit because
24  Donovan Brothers were not residents of

25 (Pages 94 to 97)

DEPOSITION OF: CHARLES PECKHAM  VOLUME I                January 3, 2006
DONOVAN BROTHERS, ET AL. vs. JOSEPH FONTAINE, ET AL.

Page 62

```
1   property?
2       A.  Yes, he did.  Yeah.
3       Q.  How did you come to find that
4   out?
5       A.  He told me.
6       Q.  And what did he tell you about
7   those meetings?
8       A.  That they just had a walk-on with
9   the neighbors so Mr. Donovan could explain
10  his position, what he was doing, and try to
11  get a compromise on how the land was going
12  to look or put back.
13      Q.  And that was before the cease and
14  desist order?
15      A.  Yes.
16      Q.  Do you know if that was with
17  Mr. Paige and Mr. Jacques?
18      A.  I remember Dan Jacques, Dennis
19  Paige, maybe their wives, and a Cheryl Bush
20  who was also a neighbor.
21      Q.  Met with Mr. Donovan?
22      A.  Yes.
23      Q.  What did he tell you about the
24  outcome of that meeting?
```

Page 63

```
1       A.  Unsatisfactory, not successful,
2   whatever they were discussing.  Couldn't get
3   Mr. Donovan to move on his decision.
4       Q.  What did he want Mr. Donovan to
5   do?
6       A.  I think he just wanted to know
7   what the timetable was going to be, what the
8   land was going to look like, such as that.
9       Q.  Do you know who owned the
10  property at that time?
11      A.  He did, yes.
12      Q.  Who did?
13      A.  Elsie LaFond.
14      Q.  And do you know who at that time
15  was the prospective buyer, who she had
16  decided to sell it to?
17      A.  Yes.
18      Q.  Who was that?
19      A.  Gail Donovan.
20      Q.  So at this point in time that you
21  had this discussion, Mr. Donovan had
22  apparently secured an agreement with
23  Mrs. LaFond; is that correct?
24      A.  Right.
```

Page 64

```
1       Q.  And had a meeting with Mr. Paige,
2   Mr. Jacques, their wives, and maybe another
3   neighbor?
4       A.  Right.
5       Q.  And as a result of that,
6   Mr. Jacques indicated he wasn't happy?
7       A.  Right.
8       Q.  With the outcome?
9       A.  Right.
10      Q.  And it was after that that the
11  cease and desist order issued?
12      A.  Yes.
13      Q.  Now, since the cease and desist
14  order issued, other than the conversation
15  you indicated that you had with Mr. Clark,
16  when he drove down to your property, have
17  you had any other conversations with
18  Mr. Clark?
19      A.  No, not since.
20      Q.  Regarding this property?
21      A.  Regarding anything.
22      Q.  Regarding anything.  Okay.  Have
23  you had any conversations with any members
24  of the Zoning Board of Appeals regarding
```

Page 65

```
1   this matter?
2       A.  Not since the cease and desist.
3       Q.  Did you attend any of the
4   meetings that the Zoning Board of Appeals
5   had with respect to this property?
6       A.  Yes.
7       Q.  And there were two meetings?
8       A.  Yes, there was.
9       Q.  Did you attend both of them?
10      A.  Yes, I did.
11      Q.  Did you speak at those meetings?
12      A.  Yes, I did.
13      Q.  Did you present any information
14  or evidence?
15      A.  All I had was the years living on
16  Carrington Road, whatever they asked.
17      Q.  Did Mr. Clark attend either one
18  of those meetings?
19      A.  No.
20      Q.  Did he provide any information to
21  the Board as to the basis of his issuing the
22  cease and desist order?
23      A.  No.
24      Q.  Did Mr. Jacques speak at that
```

17 (Pages 62 to 65)

Page 66

1  meeting?
2      **A. Yes.**
3      Q. Did he speak at both meetings?
4      **A. Yes.**
5      Q. And I take it he was in
6  opposition to lifting the cease and desist
7  order?
8      **A. Yes.**
9      Q. Did he present any documents to
10 the Board at that time?
11     **A. Yes.**
12     Q. What did he present?
13     **A. Maps and some documentation of**
14 **law.**
15     Q. And some photographs?
16     **A. Yes.**
17     Q. Did anybody else present any
18 documents to the Board that night, on either
19 night, if you recall?
20     **A. I don't recall anybody else**
21 **having maps like Dan did.**
22     Q. Did you attend the second
23 meeting?
24     **A. Yes.**

Page 67

1      Q. And at that time, did the Board,
2  prior to their vote, indicate the reasons
3  for their vote? Did they indicate any
4  reason why they were upholding the cease and
5  desist order, verbally?
6      **A. No.**
7      Q. Since the cease and desist order
8  has been in place, has there been any
9  further discussion by the selectmen with
10 regard to this issue, the LaFond property?
11     **A. Probably nothing pertinent to the**
12 **outcome, but there's been a lot of**
13 **discussion on protocol.**
14     Q. On the record?
15     **A. There may be on record. I'm**
16 **unclear.**
17     Q. That would be in the minutes of
18 the meeting?
19     **A. That's correct.**
20     Q. Were there any executive
21 committee session meetings, either before or
22 after the cease and desist order, with
23 respect to the LaFond property?
24     **A. Yes, there was.**

Page 68

1      Q. And do you recall when they took
2  place?
3      **A. I think they were before or**
4  **after. I don't have the exact timing of**
5  **those in my mind.**
6      Q. Do you remember the basis for the
7  Board going into executive session regarding
8  the LaFond property?
9      **A. When the lawsuit was formalized,**
10 **then we had the executive session.**
11     Q. So it was to discuss strategy and
12 litigation?
13     **A. Yes.**
14     Q. Was there anytime when you
15 exempted yourself from discussing the issues
16 of the LaFond property because of any
17 conflict and the conflict as being a pit
18 owner?
19     **A. Not after the lawsuit started.**
20     Q. Were there any beforehand, before
21 the lawsuit that you --
22     **A. No.**
23     Q. How about Mr. Morse?
24     **A. No.**

Page 69

1      Q. How about Mr. Jacques?
2      **A. No.**
3      Q. Are there any ordinances in the
4  Town of Montgomery which provide, or in any
5  way govern the operation of gravel pits?
6          MR. EICHMAN: Objection.
7      Q. That you're aware of?
8      **A. Not that I'm aware of.**
9      Q. Has the Board of Selectmen, to
10 your knowledge, ever granted any permits,
11 special permit licenses or grants of
12 authority to any pit operators?
13     **A. No.**
14     Q. Have any of the four substantial,
15 as we've described them, and smaller pits
16 been inspected by the building inspector
17 since the LaFond property cease and desist
18 order?
19     **A. Not to my knowledge.**
20     Q. Are there any plans, that you're
21 aware of, that the select board intends to
22 have all of the pits in town examined as to
23 their legal status?
24     **A. No discussion.**

18 (Pages 66 to 69)

# EXHIBIT R

**1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DONOVAN BROTHERS, INC., )
and                       )
ELSIE M. LAFOND,          )
    Plaintiffs            )
                          )
VS.                       )    Civil Action
                          )    #05-30136-MAP
JOSEPH FONTAINE,          )
JOANNE HEBERT and         )
ROBERT W. PIKE, JR.,      )
as they are the Zoning    )
Board of Appeals of the   )
Town of Montgomery, and   )
ELWIN R. CLARK, JR., as   )
he is the Building        )
Inspector & Zoning        )
Enforcement officer of    )
the Town of Montgomery,   )
    Defendants            )

THE DEPOSITION OF: WAYNE L. MORSE,
taken before Julia A. McLeod, Shorthand
Reporter and Notary Public, pursuant to the
Federal Rules of Civil Procedure at the court
reporting offices of Antonucci & Associates,
83 State Street, Second Floor, Springfield,
Massachusetts at 4:00 p.m. on Tuesday,
October 24, 2005.

APPEARANCES:

(Please, see page two.)

Julia A. McLeod
PHILBIN & ASSOCIATES, INC.
Certified Shorthand Reporters
Certificate of Proficiency
Certificate of Merit

---

**2**

APPEARANCES:

IN ATTENDANCE:

ANTONUCCI & ASSOCIATES, 83 State Street,
Springfield, Massachusetts 01103,
representing the Plaintiffs, Donovan Brothers,
Inc. And Elsie M. LaFond,
BY: FRANK E. ANTONUCCI, ESQUIRE.

KOPELMAN and PAIGE, P.C., 101 Arch Street,
Boston, Massachusetts 02110-1109 representing
the Defendants, Joseph Fontaine, Joanne Hebert
and Robert W. Pike, Jr., as they are the
Zoning Board of Appeals of the Town of
Montgomery, and Elwin R. Clark, Jr., as he is
the Building Inspector & Zoning Enforcement
Officer of the Town of Montgomery,
BY: JONATHAN D. EICHMAN, ESQUIRE.

ROBINSON DONOVAN, P.C., Tower Square, 1500
Main Street, Suite 1600, P.O. Box 15609,
Springfield, Massachusetts 01115-5369,
representing the Defendants, Joseph Fontaine,
Joanne Hebert and Robert W. Pike, Jr., as they
are the Zoning Board of Appeals of the Town of
Montgomery, and Elwin R. Clark, Jr., as he is
the Building Inspector & Zoning Enforcement
Officer of the Town of Montgomery,
BY: DAVID S. LAWLESS, ESQUIRE.

*****

---

**3**

I N D E X

------------------------------------------
WITNESS    DIRECT CROSS REDIRECT RECROSS
------------------------------------------

Wayne
Morse        5    22    24
   (Antonucci)(Eichman)(Antonucci)


------------------------------------------
EXHIBITS:     DESCRIPTION          PAGE
------------------------------------------

(NONE)

*****

---

**4**

S T I P U L A T I O N S

It is agreed by and between the
parties that all objections, except objections
as to the form of the question, are reserved
to be raised at the time of trial for the
first time.

It is further agreed by and between
the parties that all motions to strike
unresponsive answers are also reserved to be
raised at the time of trial for the first
time.

It is further agreed that the deponent
will read and sign the deposition under the
pains and penalties of perjury, notary waived,
and that the sealing of the said deposition
will be waived.

It is further agreed by and between the
parties that notification to all parties of
the receipt of the original deposition
transcript is also hereby waived.

*****

5

1     WAYNE L. MORSE, Deponent, having been
2  first duly sworn, deposes and says as follows:
3
4  DIRECT EXAMINATION BY MR. ANTONUCCI
5
6     Q.  Mr. Morse, I'm Frank Antonucci and I
7  represent Donovan Brothers in a controversy
8  with the Town of Montgomery. I'm going to ask
9  you a few questions about that case. And, if
10  you don't understand the question, please let
11  me know and I will try to rephrase it. If you
12  need a break to talk to your attorney or
13  attorneys--
14     I'm not sure which one, or both, you
15  will talk to, Mr. Lawless and Mr. Eichman.
16     --let me know and I'll leave the room
17  so you can talk to them. Hopefully, we won't
18  reach that point.
19     Do you want him to read it and sign
20  it?
21     MR. EICHMAN: I think so. Yes.
22  Let's do that.
23     MR. ANTONUCCI: You know, none

6

1  of these depositions have we talked about
2  objections.
3     MR. EICHMAN: We missed the
4  first round.
5     MR. ANTONUCCI: We missed the
6  first round.
7     MR. EICHMAN: I have been
8  proceeding on objections as to form.
9     MR. ANTONUCCI: That's what I
10  thought. We didn't say it on the record.
11  We'll do that.
12     MR. EICHMAN: Fine.
13     Q.  Could you, please, state your full
14  name and current address?
15     A.  Wayne L. Morse, 102 Carrington Road,
16  Montgomery, Mass.
17     Q.  How long have you lived there,
18  Mr. Morse?
19     A.  I'm going to say sixteen years.
20     Q.  Are you a member of the Board of
21  Selectmen?
22     A.  Yes.
23     Q.  How long have you been a member of

7

1  the Board of Selectmen?
2     A.  I believe it's either seven or eight
3  years. I'm not a hundred percent sure. I've
4  done two full terms, so I think seven or eight
5  years.
6     Q.  Prior to these two full terms, did
7  you serve as a selectman in the past at all?
8     A.  No.
9     Q.  So this is your first seven or eight
10  years on the Board?
11     A.  Yes.
12     Q.  And the Board meets how often?
13     A.  Twice a month.
14     Q.  And at the Town Hall?
15     A.  Yes.
16     Q.  Do you have an individual who takes
17  minutes of the meeting?
18     A.  Yes, we do.
19     Q.  Who is that?
20     A.  Jane Thielan.
21     Q.  Has she been taking those minutes of
22  the meeting for a number of years?
23     A.  Yes.

8

1     Q.  What is her position with the Town?
2     A.  Administrative secretary.
3     Q.  In addition to being a selectman, do
4  you have some employment someplace? Who are
5  you employed by?
6     A.  Oh, Bob Wall right at the minute.
7     Q.  What do you do for him?
8     A.  General contracting.
9     Q.  And drawing your attention to the
10  property on Carrington Road owned by
11  Elsie LaFond back in 2004, are you familiar
12  with that piece of property?
13     A.  Yes, I am.
14     Q.  And you are familiar with the
15  controversy that surrounds the use of that
16  property?
17     A.  Uh-huh.
18     Q.  Is that correct?
19     A.  Yes.
20     Q.  At some point in time did you become
21  aware of the fact that a Mr. Page, who was an
22  abutter to the LaFond property, was going to
23  be bringing a complaint regarding the use of

**9**

1  that property to the Board?
2      A.  Yes. He came before the Board and we
3  told him there was too much of a conflict with
4  us, so we couldn't do anything about it at
5  all.
6          I guess he sent a letter.
7      Q.  Prior to the fact that he came to the
8  Board and complained, were you told he was
9  going to come to the Board?
10     A.  No. I had no idea.
11     Q.  With respect to the issue of
12  conflict, did any of the Board members take
13  any action whatsoever with regard to looking
14  into this matter and determining the legality
15  of the complaint?
16          MR. EICHMAN: Objection. You
17  can answer.
18          THE WITNESS:  Not that I know
19  of.
20     Q.  Well, do you recall if Mr. Jacques or
21  Mr. Peckham, either one of them, contacted
22  Town counsel seeking a legal opinion regarding
23  this issue?

**11**

1      A.  Yes.
2      Q.  Highway Department?
3      A.  Yes. I have been just with him then.
4          And the flip side of that is I'm a
5  selectman. So way too much of a conflict for
6  me to get involved.
7      Q.  That was based upon your personal
8  knowledge of Mr. Donovan?
9      A.  Yeah.
10     Q.  And having done business with him?
11     A.  Plus the fact he operated a gravel
12  pit that belongs to my father-in-law.
13     Q.  He extracted gravel from that?
14     A.  Yes.
15     Q.  And that's Pomeroy?
16     A.  Yes.
17     Q.  What is your father-in-law's name?
18     A.  Thomas.  Arthur Pomeroy.
19     Q.  And Mr. Donovan, is it fair to say he
20  has taken quite of a bit of gravel out of
21  there since the cease and desist order on the
22  LaFond property?
23     A.  No.

**10**

1          MR. EICHMAN: Objection.
2          THE WITNESS:  I really don't
3  recall, no.
4          I certainly didn't.
5      Q.  Well, I know you didn't. Okay? Do
6  you recall Mr. Peckham being upset with
7  Mr. Jacques because he, in fact, contacted
8  Town counsel without notifying you or
9  Mr. Peckham?
10     A.  I don't recall that either.
11     Q.  You have no recollection of that at
12  this time?
13     A.  No. None. You see, I've kept myself
14  totally out of this.
15     Q.  Why is that?
16     A.  Well, because of the conflict.
17     Q.  What is the conflict that you have?
18     A.  I've known Mr. Donovan for probably
19  forty-five, fifty years, friendships and
20  worked with him. He's worked for me, you
21  know, back and forth. I worked for the Town
22  years ago. I was on the Highway Department.
23     Q.  The Town of Montgomery?

**12**

1          MR. EICHMAN: Objection.
2          THE WITNESS:  He doesn't. But he
3  takes gravel. There's not much left. In
4  fact, he would have closed that pit, I think,
5  if it wasn't for this controversy.
6      Q.  In other words, he would have stopped
7  operating there?
8      A.  Yes.
9      Q.  Now, you said, and correct me if I'm
10  wrong, you felt it was a conflict for
11  everybody?
12     A.  Oh, yes. Definitely.
13     Q.  What was Mr. Peckham's conflict?
14     A.  Well, he owned the gravel pit and
15  he's a member of the Board of Selectmen.
16     Q.  Did you point that out to him and to
17  Mr. Peckham?
18     A.  Oh, he realizes it himself. As far
19  as I know, there was no need to point it out.
20     Q.  Where is Mr. Peckham's pit operating?
21     A.  On Carrington Road.
22     Q.  As is your father-in-law's?
23     A.  Yes.

13

1    Q.    What is Mr. Jacques's controversy, in
2    your opinion?
3            MR. EICHMAN:  Objection.
4            MR. ANTONUCCI:  Or conflict.
5            THE WITNESS:  I really don't
6    know what his problem is.
7    Q.    Well, he abuts the property in
8    question?
9    A.    Yes, he does.
10   Q.    Were you aware of the fact he was
11   attempting to purchase that property prior to
12   the fact that Mr. Donovan signed a purchase
13   and sale agreement with Mrs. LaFond?
14   A.    No,--
15           MR. EICHMAN:  Objection.
16           THE WITNESS:  --not prior to.  I
17   think I did have knowledge of it later on.  I
18   don't think it came directly from him.  But.
19   Q.    At some point you found out that he
20   had attempted to purchase the property?
21   A.    I would say, yes.  Yes.
22   Q.    Did you realize or did you come to
23   find out that attempt to purchase had failed?

14

1    A.    No.  I never heard what the story
2    was.
3    Q.    What the outcome was?
4    A.    Right.
5    Q.    Other than Mr. Page coming to the
6    Board of Selectmen and complaining about the
7    operation, what, if anything, else did you
8    learn about this controversy?
9            MR. EICHMAN:  Objection.
10           THE WITNESS:  I don't really
11   know exactly what you mean.  I mean, we know
12   there's a controversy there over the pit.
13   Q.    And the controversy is what?
14   A.    Well, to me it's the fact that we
15   don't have a bylaw.  That's where the
16   controversy all came.
17   Q.    Do you mean a bylaw dealing with
18   gravel pits?
19   A.    With gravel pits, yes.
20   Q.    Are gravel pits allowed to operate in
21   your Town, in your opinion?
22           MR. EICHMAN:  Objection.
23           THE WITNESS:  Well, they have,

15

1    let's put it that way, long before I was
2    there, and continue to do so.
3    Q.    Except for Mr. Donovan's use of the
4    LaFond property?
5            MR. EICHMAN:  Objection.
6            MR. ANTONUCCI:  Is that correct?
7            In other words, other pits are
8    operating at this time?
9            THE WITNESS:  They are
10   operating, yes.
11   Q.    But where Mr. Donovan was taking
12   gravel has stopped?
13   A.    Uh-huh.
14   Q.    Have there been any attempts to stop
15   the use of other gravel pits at this time?
16   A.    Not to my knowledge.
17   Q.    Why not?
18   A.    I have no clue.  Again, I stay right
19   out of it.  Whatever happens I have nothing to
20   do with because of conflict.
21           It wouldn't matter whose gravel pit
22   it was, I still have the conflict because my
23   father-in-law owns the gravel pit.

16

1    Q.    Well, in the past isn't it true that
2    when there were controversies regarding the
3    use of a gravel pit that people would come to
4    the Board of Selectmen?
5    A.    I have no knowledge of that.
6    Q.    You don't have any experience in that
7    regard?
8    A.    No.
9    Q.    Is there a gravel pit on Southampton
10   Road?
11   A.    Yes.
12   Q.    At one point the Finns owned it?
13   A.    I couldn't tell you who it is; but I
14   know there's one there.
15   Q.    Do you recall during your tenure in
16   either 2004 or 2003 residents in that area
17   coming to the Board of Selectman like Mr. Page
18   to complain about the operation of that pit?
19   A.    No.  They complained about the
20   traffic.
21   Q.    Well, that's part of the operation of
22   the pit; isn't that correct?
23   A.    Uh-huh.

**Page 13 to Page 16**

1    Q.    Isn't it true that the Board of
2  Selectmen dealt with that issue and worked out
3  some solution?
4    A.    No. Absolutely not.
5    Q.    Tell me what happened.
6    A.    They were told that we were too much
7  in conflict and there was nothing we could do
8  anyway, if we weren't.
9    Q.    Did they take any further action at
10  that point in time?
11    A.    Not that I know of, no. It hasn't
12  come before the Board.
13    Q.    This came before the Board once?
14    A.    Once.
15    Q.    And you are saying that the Board
16  indicated that they couldn't deal with it?
17    A.    Uh-huh.
18    Q.    And that would have been you and
19  Mr. Peckham--
20          MR. EICHMAN:  Objection.
21          MR. ANTONUCCI:   --that had
22  conflicts?
23          THE WITNESS:  Yeah.

1  anyone.
2    Q.    Not even with me today?
3    A.    Well, I have to today.  But.
4          You can ask my attorney.  He doesn't
5  know where I would stand on this issue right
6  today.
7    Q.    Who is your attorney?
8          Oh, I thought it was somebody other
9  than these people. I thought you had another
10  attorney.
11    A.    No.  No.  No.  I'm very conscious of
12  that conflict of interest and I try to stick
13  with it. No.
14    Q.    Did you seek any opinions in that
15  regard, regarding the ability of the Board to
16  deal with this issue?
17    A.    I've had other conflicts before with
18  my father-in-law being my father-in-law with
19  land issues.  And I have been told anything
20  like that to just stay totally away from.
21          No. No.
22    Q.    Does the Board have a policy with
23  regard to the use of or contacting Town

18

20

1    Q.    Yes?
2    A.    Yes.
3    Q.    And did you direct them to any other
4  board at that point in time?
5    A.    No.
6    Q.    And you are saying that the Board in
7  your eight years never dealt with gravel pits
8  at all?
9    A.    Not at all, not to my knowledge.
10    Q.    If anybody came, you sent them away?
11    A.    Well, we told them what the conflict
12  was and they would have to find other means of
13  taking care of it.
14    Q.    And in this particular case did you
15  have any conversations prior to the issuance
16  of the cease and desist order with Mr. Jacques
17  regarding this situation?
18    A.    No.
19    Q.    Have you had any discussions with him
20  subsequent to that?
21    A.    No.  He knows my position.
22    Q.    What is your position?
23    A.    That I won't talk about it with

1  counsel?
2    A.    Yes, we do.
3    Q.    What is that policy?
4    A.    We have to agree and that person--
5  you know, designate that person and allow him
6  to do it.
7    Q.    By agree, do you mean the Board has
8  to vote to contact Town counsel?
9    A.    Yes, to allow that person to.
10    Q.    And I take it that's in order to keep
11  costs down?
12    A.    For one, and to keep personal issues
13  out of everything.
14    Q.    In this particular case, did any of
15  the selectman at any time contact Town
16  counsel?
17    A.    I couldn't really answer that.
18    Q.    Do you recall anybody indicating that
19  they had contacted Town counsel?
20    A.    No, I don't.  No.
21    Q.    Do you remember Mr. Jacques
22  indicating he had contacted Town counsel?
23    A.    No.

1    Q.    Do you recall there being a vote
2  allowing any individual on the Board to
3  contact Town counsel regarding the use of the
4  LaFond property and whether it was legal or
5  illegal?
6         This is prior to the issuance of the
7  cease and desist order.
8    A.    No. No.
9    Q.    There was no advice?
10   A.    Not that I know of, no.
11   Q.    To the best of your knowledge, if
12 somebody did contact Town counsel, it would
13 have been without your recollection of there
14 ever being a vote authorizing it; is that
15 correct?
16   A.    Right.
17   Q.    Are all votes recorded in the Town
18 minutes?
19   A.    They should very well be, yes.
20   Q.    Do you recall having a discussion
21 with Mr. Peckham over the issue of contacting
22 Town counsel by Mr. Jacques?
23   A.    No. No.

22

1    Q.    You don't?
2    A.    No.
3    Q.    So, Mr. Morse, I take it that, other
4  than telling Mr. Page you couldn't do anything
5  about it, you have no other recollection or
6  knowledge of this situation?
7    A.    Well, pretty much, yes. I said I
8  stayed out of it from day one intentionally,
9  purposefully.
10        MR. ANTONUCCI:  Okay. I have no
11 further questions.
12        MR. EICHMAN:  I've got a few.
13
14        *****
15   CROSS EXAMINATION BY MR. EICHMAN
16
17   Q.    Maybe just to refresh your memory on
18 what Mr. Antonucci has been asking about, do
19 you remember in approximately December of 2004
20 a time when Charlie Peckham was at a meeting,
21 got upset and left and came back with a tape
22 recorder because he was upset at what was
23 going on at the meeting?

1    A.    Yes. I don't remember what that was
2  about, but I do definitely remember.
3    Q.    Is it possible that was the meeting
4  that Dennis Page attended to talk about the
5  gravel pit the Donovan Brothers were
6  operating?
7    A.    Geez, that is a possibility.
8         A lot of times, like I said, I take
9  myself totally out of it. I just draw a blank
10 because I don't want to get involved. But it
11 is very possible. It should be in our
12 minutes, if it is.
13   Q.    You referred to a policy earlier that
14 the selectmen now have in place that Town
15 counsel is not to be contacted until the
16 selectman vote to do so and designate someone
17 to do it.
18        Do you remember when that policy was
19 first put into place?
20   A.    I don't remember exactly when. I'm
21 going to guess we have been doing this for a
22 year now.
23        I don't remember the exact reason,

24

1  but there was something that happened that
2  caused that.
3    Q.    If I suggested to you that it might
4  have happened shortly after the meeting where
5  Dennis Page showed up to talk about the gravel
6  pit, that it happened within a month or two
7  after that, would that be a possibility?
8    A.    Yes. Yes. Yes, it would.
9    Q.    But you don't remember any one of the
10 selectmen contacting Town counsel about the
11 gravel pit at any time prior to December,
12 2004?
13   A.    No.
14        MR. EICHMAN:  That's all I have.
15        THE WITNESS:   Of course, it
16 could be my memory, too.
17        MR. EICHMAN:  I understand.
18
19        *****
20   REDIRECT EXAMINATION BY MR. ANTONUCCI
21
22   Q.    This policy about getting a vote from
23 the Board, it was made official at some point,

25

1   apparently?
2   A.   Yes.
3   Q.   After December of 2004?
4   A.   Yes. I guess that's right. Yes.
5   Q.   Was there, so to speak, an unofficial
6   policy before that with regard to contacting
7   Town counsel?
8   A.   No.
9         MR. EICHMAN:  Objection.
10        THE WITNESS:  To my knowledge
11  there never really was.
12  Q.   So anybody could contact Town
13  counsel, any one of the three selectmen, at
14  any time for any reason?
15  A.   Well, for Town business.  Always that
16  little thing in there was only for Town
17  business.
18  Q.   Okay.  And was there any requirement
19  or agreement of talking with the other
20  selectmen before such contact was made?
21  A.   Yes.  Generally there was, yes.
22  Q.   And why was that?
23  A.   Just policy, I assume.

27

1   Q.   --as opposed to Town business?
2   A.   Yes.
3         MR. ANTONUCCI:  I have no
4   further questions.
5         MR. EICHMAN:  I don't either.
6         MR. LAWLESS:  Nor do I.
7   (The deposition concluded.)
8
9
10                *****
11
12
13
14
15
16
17
18
19
20
21
22
23

26

1         You know, when I came on board,
2   that's the way they did things.  So.
3   Q.   When you came on board eight years
4   ago, they would talk about it before somebody
5   contacted them?
6   A.   Yes.
7   Q.   But then it became official in terms
8   of a rule, so to speak?
9   A.   Yes.
10  Q.   After December of '04?
11  A.   Yes.  I would say so.
12  Q.   Did that have anything to do with
13  Mr. Peckham being upset with Mr. Jacques
14  making a call regarding this issue?
15  A.   Oh, you are calling on my memory
16  again.
17        That is possible, but I'm not a
18  hundred percent sure.
19        I don't recall that.
20  Q.   And you indicated that this policy
21  was put into place to make sure people weren't
22  calling on personal--
23  A.   Personal, yes.

28

1   FEDERAL DISTRICT COURT
    DISTRICT OF MASSACHUSETTS
2
3         I, Julia A. McLeod, a Notary Public
    within and for the Commonwealth of
4   Massachusetts at large, do hereby certify that
    I took the deposition of Wayne L. Morse,
5   pursuant to the Federal Rules of Civil
    Procedure on October 24, 2006, at the offices
6   of Antonucci & Associates, Inc., 83 State
    Street, Springfield, Massachusetts.
7         I further certify that the
    above-named deponent was by me first duly
8   sworn to testify to the truth the whole truth
    and nothing but the truth concerning his
9   knowledge in the matter of the case of Donovan
    Brothers, et al vs. Joseph Fontaine, et al,
10  now pending in the United States District
    Court for the District of Massachusetts.
11        I further certify that the within
    testimony was taken by me stenographically and
12  reduced to typewritten form under my direction
    by means of COMPUTER ASSISTED TRANSCRIPTION;
13  and, I further certify that said deposition is
    a true record of the testimony given by said
14  witness.
          I further certify that I am neither
15  counsel for, related to, nor employed by any
    of the parties to the action in which this
16  deposition was taken; and further, that I am
    not a relative or employee of any attorney or
17  counsel employed by the parties hereto, nor
    financially or otherwise interested in the
    outcome of the action.
18
          WITNESS my hand and seal this  26th
19  day of October , 2006.
20
                    _____
21                  Julia A. McLeod
                    Notary Public
22
    My commission expires
23  April 21, 2011

SIGNATURE PAGE-ERRATA SHEET

(To be signed by deponent and returned to counsel within (30) days.)

I, the undersigned, Wayne L. Morse, do hereby certify that I have read the foregoing transcript of my testimony given in the matter of Donovan Brothers, Inc., et al vs. Joseph Fontaine, et al on October 24, 2006, and that to the best of my knowledge, said transcript is true and accurate with the exception of the following corrections listed below:

_____

Page:  Line: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

DEPONENT'S SIGNATURE: _____

DATE: _____

---

30

PHILBIN & ASSOCIATES, INC.
959 Main Street
Fourth Floor
Springfield, MA 01103
(413) 733-4078

October 26, 2006

JONATHAN D. EICHMAN, ESQUIRE
Kopelman and Paige, P.C.
101 Arch Street
Boston, MA   02110-1109

RE:  Donovan Brothers, Inc., et al
     vs. Joseph Fontaine, et al

Dear Attorney Eichman:

Attached to the transcript is the Signature Page-Errata Sheet for the deposition of Wayne L. Morse taken on October 24, 2006 in the above-captioned case.
Please note that according to the Rules of Civil Procedure the deponent has thirty (30) days in which to make corrections on the transcript.
When the deponent has signed and noted any corrections on the Signature Page-Errata Sheet indicating the page number, line number and the desired correction, please retain a copy for your records and return the original of same to Attorney Antonucci, as he holds the original transcript, as well as a copy of same to Attorney Frankel Pelletier.
Thank you for your cooperation.

Respectfully,

Julia A. McLeod

cc:  F. Antonucci, Esq.
     N. Frankel Pelletier, Esq.

# EXHIBIT S

Page 1

VOLUME:   1
PAGES:    1-41
EXHIBITS: 1-3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. No. 05-30136-MAP

------------------------------------
                                      )
DONOVAN BROTHERS, INC.,               )
AND ELSIE LAFOND,                     )
            Plaintiffs                )
vs.                                   )
JOSEPH FONTAINE, JOANNE HEBERT        )
and ROBERT W. PIKE, JR., as           )
they are the Zoning Board of          )
Appeals of the Town of Montgomery,    )
and ELWIN R. CLARK, JR., as he        )
is the Building Inspector & Zoning    )
Enforcement Officer of the Town of    )
Montgomery,                           )
            Defendants                )
                                      )
------------------------------------

DEPOSITION OF JOSEPH FONTAINE
TUESDAY, JANUARY 3, 2006
ANTONUCCI & ASSOCIATES
83 STATE STREET
SPRINGFIELD, MASSACHUSETTS  01103


- - - - - Sandra A. Deschaine, RPR - - - - -


COURT REPORTING SERVICES
P.O. BOX 15272        SPRINGFIELD, MA  01115
413.786.7233                413.786.0299

DEPOSITION OF JOSEPH FONTAINE VOLUME 3                                    January 3, 2006
DONOVAN BROTHERS, ET AL. vs. JOSEPH FONTAINE, ET AL.

Page 2

APPEARANCES:
ON BEHALF OF THE PLAINTIFFS
ANTONUCCI & ASSOCIATES
   Frank Antonucci, Esquire
   83 State Street
   Springfield, Massachusetts 01103
   (413) 737-4667 Fax (413) 731-0602

ON BEHALF OF THE DEFENDANTS
KOPELMAN AND PAIGE, P.C.
   Jonathan D. Eichman, Esquire
   31 St. James Avenue
   Boston, MA  02116
   (617) 556-0007  FAX (617) 654-1735

Page 4

1    JOSEPH L. FONTAINE, Deponent, having
2  first been satisfactorily identified by the
3  production of his Massachusetts driver's
4  license and duly sworn by the Notary Public,
5  was examined and testified as follows:
6
7  EXAMINATION BY MR. ANTONUCCI:
8    Q.  Mr. Fontaine, I'm Frank
9  Antonucci.  I represent Donovan Brothers and
10  Elsie LaFond.  I'm going to ask you some
11  questions regarding the controversy and
12  litigation involving the Town of Montgomery
13  Zoning Board of Appeals and my clients.  If
14  you don't understand the question, let me
15  know, and I'll try to clarify it by
16  restating it in a more discernable language.
17  If you need to talk to your attorney at any
18  time, I'll leave the room so you can do so.
19    Simple rule, address your answers
20  so that the stenographer can understand
21  them.  Don't nod your head or say auh-huh
22  because she can't get that down.
23    A.  Okay.
24    Q.  Would you please state your name

Page 3

INDEX

------------------------------------------------
WITNESSES:                          PAGE
------------------------------------------------
Joseph Fontaine
   By Mr. Antonucci      4/35
   By Mr. Eichman        32

------------------------------------------------
EXHIBITS:      DESCRIPTION      PAGE
------------------------------------------------

Exhibit 1  Letter dated 1/13/05        30

Exhibit 2  Letter dated 12/23/04       30

Exhibit 3  PPI Northeast, 1/25/05      30

Page 5

1  and address?
2    A.  Joseph L. Fontaine, Birch Bluff
3  Road, Montgomery, Mass.
4    Q.  What is your date of birth?
5    A.  April 4, 1942.
6    Q.  Are you employed at this time?
7    A.  No.
8    Q.  Were you employed at some point
9  in time?
10    A.  Yes.
11    Q.  Where were you employed and what
12  did you do?
13    A.  Most of my working career was
14  Western Mass Electric.
15    Q.  What did you do for them?
16    A.  I was operating engineer at the
17  generating station.
18    Q.  And how long have you been
19  retired?
20    A.  I retired in 1998.  Seven years.
21    Q.  How long have you resided in the
22  Town of Montgomery?
23    A.  Approximately ten years.
24    Q.  Prior to that, where did you

2 (Pages 2 to 5)

Case 3:05-cv-30126-MAP     Document 45-13     Filed 11/30/2006     Page 4 of 20

DEPOSITION OF JOSEPH FONTAINE - VOLUME I                         January 3, 2006
DONOVAN BROTHERS, ET AL. vs. JOSEPH FONTAINE, ET AL.

Page 6

1   reside?
2       A.  Holyoke.
3       Q.  How long have you been on the
4   Board of Appeals?
5       A.  Approximately five years.  It's
6   my second term.
7       Q.  Have you taken any courses run by
8   the state, or any regional agency of the
9   state, regarding your position as a member
10  of the Zoning Board of Appeals.
11      A.  I'm unsure of the government
12  entity that put the course on, but we do get
13  mailings from a regional cooperative that
14  puts on courses in the hill towns.  I've
15  attended one of those.  I'd have to look
16  back at my e-mails to find out some type of
17  government administrative-type of thing.
18      Q.  Prior to obtaining your position
19  on the Zoning Board of Appeals, did you
20  serve on any other town boards in the Town
21  of Montgomery?
22      A.  No.
23      Q.  How about any other city you've
24  resided in?

Page 7

1       A.  No.
2       Q.  So this is your first involvement
3   in municipal government, so to speak?
4       A.  Yes.
5       Q.  How do you receive your position
6   as a member of the Zoning Board of Appeals?
7   Do you run for office?
8       A.  We're appointed by the select
9   board.
10      Q.  What was your last appointment by
11  the select board?
12      A.  I'm halfway through my second
13  term, so probably two years ago.
14      Q.  Is it a three-year term?
15      A.  It's a three-year term, so within
16  a year, two years ago.
17      Q.  When you're appointed to the
18  Zoning Board of Appeals, do you formally go
19  before the Zoning Board of Appeals; and do
20  they ask you questions, or nominate you, or
21  do you just get a letter in the mail, or
22  phone call?
23      A.  You get a letter in the mail.
24      Q.  Did you go to the town clerk to

Page 8

1   be sworn in?
2       A.  Yes.
3       Q.  When did you first become aware
4   of the fact that there was a controversy
5   involving the LaFond property on Carrington
6   Road in the Town of Montgomery?
7       A.  I guess when we scheduled a
8   meeting, when Bob Pike asked to set up a
9   date that was available for the meeting.
10  And he said we've got a case, and that's the
11  first time I was aware of it.
12      Q.  Have you sat in such a position
13  previously as dealing with land uses in the
14  Town of Montgomery?
15          MR. EICHMAN:  Objection.
16      A.  I sat on the zoning board on a
17  few cases, and people who want to put in
18  structures that maybe don't fit the zoning
19  bylaws, if that's what you mean.
20      Q.  Yes.
21      A.  We have had cases before the
22  Zoning Board of Appeals.
23      Q.  Have you had any previous
24  dealings with any gravel pit operations in

Page 9

1   the Town of Montgomery in the five years
2   you've been on the Zoning Board of Appeals?
3       A.  No.
4       Q.  Is this the first time it came
5   before you?
6       A.  Yes.
7       Q.  Have you had any complaints
8   previously presented to you by the building
9   inspector regarding any issues in the Town
10  of Montgomery?
11      A.  No.
12      Q.  So prior to this particular
13  complaint, I should say cease and desist
14  order, which was appealed, you've always
15  dealt with situations where people came
16  before you seeking a variance of some kind
17  from the zoning rules?
18      A.  Yes.
19      Q.  When did the first meeting take
20  place regarding this subject matter?
21      A.  I'd have to refer to my notes.  I
22  think it was in April -- I mean, for the
23  Zoning Board of Appeals meeting?
24      Q.  Yes.  There were two meetings?

3 (Pages 6 to 9)

Case 3:05-cv-30136-MAP    Document 45-13    Filed 11/30/2006    Page 5 of 20

DEPOSITION OF: JOSEPH FONTAINE    VOLUME 1    January 3, 2006
DONOVAN BROTHERS, ET AL. vs. JOSEPH FONTAINE, ET AL.

Page 10

1    A.  There were two meetings:  One we
2  adjourned for sixty days or thirty days,
3  first date, whatever that was.
4    Q.  Would that have been in March?
5    A.  Was it?  March or April, yes.
6    Q.  Prior to that meeting in March,
7  the first meeting we'll call it, did you
8  have any discussion with any members of the
9  select board regarding this issue that was
10  coming before you?
11    A.  No.
12    Q.  Subsequent to that meeting and
13  the second meeting that took place -- strike
14  that.  Subsequent to, after that first
15  meeting, did you have any discussions with
16  any member of the Zoning Board of Appeals --
17  of the select board regarding this issue?
18    A.  No.
19    Q.  Did you have any discussions with
20  the building inspector regarding a cease and
21  desist order prior to the first meeting in
22  March of 2005?
23    A.  No.
24    Q.  Did the building inspector appear

Page 11

1  at the meeting in March of 2005, and explain
2  or answer any questions regarding the cease
3  and desist order?
4    A.  I don't recollect him there, but
5  I can't say for sure.
6    Q.  Did he offer any -- do you recall
7  him offering any evidence in the way of
8  testimony?
9    A.  No, nothing that sticks in my
10  mind that he was there.
11    Q.  Did you receive anything other
12  than a copy of the cease and desist order
13  prior to the meeting in March of 2005 in the
14  way of documents?
15    A.  I guess I'm unsure -- I did
16  receive a copy of the cease and desist
17  order, and I think there was a copy of --
18  from the law firm that he went to for
19  guidance.  I think there was a letter that
20  was attached to it.  Again, I'd have to go
21  back and look at my notes.
22    Q.  The law firm that he -- Mr. Clark
23  went to for guidance?
24    A.  I believe so, yes.

Page 12

1    Q.  What was your understanding as to
2  the reason for the issuance of the cease and
3  desist order?
4    A.  Well, I guess the reason would be
5  it wasn't permitted.  There was a
6  discrepancy in what they were doing and what
7  the bylaws allowed.
8    Q.  Did you receive, prior to the
9  meeting of March, 2005, the first meeting, a
10  copy of the letter of complaint issued by
11  Mr. Paige, the abutters' attorney?
12    A.  I have documentation that I
13  received, I guess.  I don't want to say to
14  yes unless I'm sure.  But I have quite a
15  volume of paper that I received over this,
16  and I just can't tell you exactly.  I mean,
17  it's here.  I can go look for it.  I'm not
18  sure if I have the letter that you're
19  talking about.
20    Q.  You have quite a bit of material.
21    A.  Well, the documentation that
22  you've sent.
23    Q.  Correspondence from my office?
24    A.  Yes.  Correspondence from

Page 13

1  Jonathan.
2    Q.  Copies of the cease and desist
3  order?
4    A.  Yes.
5    Q.  Copy of the decision issued on
6  April 18th?
7    A.  That's the --
8    Q.  Zoning Board of Appeals?
9    A.  Yes.
10    Q.  Copies of correspondence from
11  your own attorney?
12    A.  Yes.
13    Q.  Possibly a letter from
14  Mr. Paige's attorney, but you're not sure?
15    A.  Possibly, yes.
16    Q.  Anything else that you can recall
17  in terms of categories and materials that
18  you've accumulated?
19    A.  Copies of the meeting, zoning
20  bylaws of the town.
21    Q.  And with respect to the testimony
22  at the first meeting in March of 2005, was
23  anybody sworn to testify; in other words,
24  did they raise their right hands before they

4 (Pages 10 to 13)

Page 14

1  offered their opinions?
2      A.  Not that I -- no.
3      Q.  Is it fair to say it was an
4  informal hearing in terms of the procedure?
5  Let me characterize it this way.
6      A.  I don't know what's informal or
7  formal.
8      Q.  Is it fair to say that the
9  chairman of the Zoning Board of Appeals
10 recognized people and people could express
11 their opinions?
12     A.  Yes.
13     Q.  Or offer documents?
14     A.  Yes.
15     Q.  In fact, people did offer
16 documents?
17     A.  Yes.
18     Q.  Photographs?
19     A.  Yes.
20     Q.  Maps?
21     A.  Yes.
22     Q.  Other documents, letters?
23     A.  There was photographs of the
24 gravel pit in question, kind of a site map

Page 15

1  of the layout of Carrington Road. I'd have
2  to go back and look. I can't say what came
3  with what. Because you saw which ones they
4  were, but there were maps and photographs.
5      Q.  Whatever documents they are,
6  maps, photographs, or other documents, were
7  those kept by the Board after the meeting
8  and placed in the file?
9      A.  I have a copy that was given to
10 me. That's what I have.
11     Q.  And when the Board met, was there
12 a stenographer present?
13     A.  No.
14     Q.  Was the meeting taped?
15     A.  No.
16     Q.  How were the minutes of the
17 meeting kept, if they were kept?
18     A.  We all had a chance, if you want
19 to question, and I take a few -- when I
20 took -- I don't know what notes I took for
21 that meeting unless I go look at my book.
22 But sometimes at meetings, as people talk,
23 when it comes to my turn to ask questions, I
24 would have a few notes, but that's the only

Page 16

1  notes that I'm aware of; the ones I
2  personally kept.
3      Q.  Those were your own notes, if you
4  jot down if you have a question that you
5  want to ask that person?
6      A.  Yes.
7      Q.  Those aren't the official notes
8  or record of that meeting?
9      A.  No.
10     Q.  Does the Board have a recording
11 secretary or somebody who does that?
12     A.  I'm not aware of it.
13     Q.  So, to the best of your
14 recollection, there's no record of what was
15 said that night?
16     A.  No.
17     Q.  Would that be true also for the
18 meeting of April 2005, the second meeting?
19     A.  Yes.
20     Q.  And what was the reason for the
21 thirty day hiatus between the two meetings?
22     A.  Well, there seemed to be an
23 effort to compromise. There seemed to be an
24 effort on both parties to come up with a

Page 17

1  amicable solution, and we felt if they could
2  agree to come up with a solution to satisfy
3  Donovan and satisfy the abutters, that would
4  be the best case scenario. The meeting --
5  the atmosphere -- it wasn't the atmosphere
6  at that discussion. It was up to them to
7  have it on their own. So we decided to
8  adjourn for thirty days, reconvene, see if
9  they come up with a plan that's acceptable
10 to everybody.
11     Q.  And prior to the meeting in March
12 of 2005, did you or any member of the Board
13 seek any guidance from the select board?
14     A.  No. Not to my knowledge, no. I
15 didn't. I don't know what the other ones
16 did. Did I seek any guidance? No. I
17 really can't speak for anyone else.
18     Q.  Did you seek any clarification
19 from the building inspector as to the reason
20 for the cease and desist order?
21     A.  No.
22     Q.  Were you aware of the fact that
23 at the time this issue came before you, that
24 there were other operating gravel pits in

5 (Pages 14 to 17)

Page 18

1 the town?
2     A.  I become aware that there were
3 other gravel pits in the town.  It came to
4 light of other gravel pits when I learned --
5 I can't say it was before that
6 date or after that date; but during the
7 course of these events, I become aware of
8 other gravel pits being operated.
9     Q.  Has the Board taken any action
10 with regard to the other gravel pits in town
11 to this date?
12     A.  No.
13     Q.  Are there any issues pending with
14 respect to the operation of the other gravel
15 pits before the Board at this time?
16     A.  Not to my knowledge.
17     Q.  Are you aware of why the
18 operation of those other gravel pits has not
19 been brought to the Zoning Board of Appeals?
20     MR. EICHMAN: Objection.
21     A.  No.
22     Q.  Have you discussed that issue
23 with the building inspector at any time?
24     A.  No.

Page 19

1     Q.  Prior to the meeting in March of
2 2005, did you, or the Board, have any
3 discussions with any members of the
4 selectmen regarding the situation?
5     A.  I didn't have any discussions
6 with the selectmen.  I'm not aware of any
7 others.  I do not have any.
8     Q.  Did you, at any time, receive any
9 phone calls from any members of the Board?
10     A.  No.
11     Q.  Prior to the meeting in March of
12 2005, did you receive any phone calls or
13 communications of any kind from any abutters
14 regarding this situation?
15     A.  I got a letter from the abutters
16 stating their case.
17     Q.  When was that?  Prior to the
18 meeting in March?
19     A.  To me, March -- would be April,
20 but I believe it was prior to the meeting in
21 March.  I'd have to refer to my notes.  They
22 did send me a letter stating their case.
23     Q.  What did they state in their
24 case?

Page 20

1     A.  That the -- the building
2 inspector issued a cease and desist order
3 that they were the abutters, they were -- I
4 got to pick the right word.  I don't know if
5 they were challenging --
6     MR. EICHMAN:  If you remember.
7     A.  They were stating their case.
8 They were stating their case.
9     Q.  That was prior to making the
10 decision in April of 2005 that you received
11 that letter?
12     A.  Yes.  It was before at least the
13 second meeting.
14     Q.  And that was outside of the
15 second meeting and outside of the first
16 meeting?
17     A.  It was a letter I got in the
18 mail.
19     Q.  Who signed that letter?
20     A.  I'd have to look.
21     Q.  But you have that letter?
22     A.  I'm pretty sure I have it.  I'm
23 sure I have it.
24     Q.  Did you consider the content of

Page 21

1 that letter in arriving at your decision?
2     A.  No.
3     Q.  What documents did you consider
4 in arriving at your decision on April 18th,
5 2005?
6     A.  The zoning bylaws, and the bylaws
7 as they were changed in the early '70s, is
8 when the transition to the new set of
9 bylaws.  I've kind of looked at them, looked
10 at the case and made my decision with that.
11     Q.  So you looked at the current
12 zoning bylaws?
13     A.  Yes.  And the prior.
14     Q.  Prior bylaws?
15     A.  Yes.
16     Q.  What, if any, research was done
17 by the Zoning Board of Appeals with respect
18 to any permits or licenses that the LaFond
19 property had to operate in that town?
20     A.  I can't speak for what everybody
21 did.  I know what I did.  I looked at the
22 bylaws and listened to the people involved.
23     Q.  I think I already asked you, and
24 I don't mean to be redundant.  Did you

Page 22

1  contact the building inspector between the
2  first and second meeting to obtain any
3  information from him regarding his
4  investigation of this matter?
5      A.  No.
6      Q.  Is there anybody else you talked
7  with regarding the cease and desist, other
8  than the building inspector, between those
9  meetings?
10     A.  No.
11     Q.  Subsequent to issuing your
12  decision in this case, taking your vote,
13  have you talked with anybody regarding your
14  decision in this matter, other than your
15  attorney?  I don't want to know about
16  anything with counsel.
17     A.  I mean, the zoning board had a
18  meeting, and we discussed that this was
19  going to court, things like that.
20     Q.  That was in public session?
21     A.  No.
22     Q.  It was in executive session?
23     A.  I'm not sure it was in any
24  session.  It was just have you heard

Page 23

1  anything on the case, because we wondered
2  what was happening, and Jane said she thinks
3  it's going to go to court.  That's kind of
4  the conversation.
5      Q.  Did those conversations take
6  place in Town Hall?
7      A.  Yes.
8      Q.  Who was present, other than
9  yourself?
10     A.  I think I asked Jane Thielen if
11  she heard anything on the case, and I think
12  that was it.  I was there on other things.
13     Q.  Did you ever visit the gravel pit
14  in question, on the LaFond property?
15     A.  Yes.
16     Q.  When did you do that?
17     A.  Shortly before the March meeting?
18     Q.  And who did you do that with?
19     A.  I called Bob Pike to ask him
20  where it was, and he said he was going over
21  to look at it, so he gave me a ride over.
22     Q.  What did you observe at that
23  time?
24     A.  We just kind of walked the

Page 24

1  perimeter of it, to see what it was, what
2  the land use looked like in person.
3      Q.  Was anybody there other than you
4  and Mr. Pike?
5      A.  No.
6      Q.  Did you, at that time, discuss
7  the cease and desist order?
8      A.  Well, that's why we were there,
9  because that was being appealed.
10     Q.  So you did discuss it?
11     A.  I would have to answer I really
12  don't know.  I don't know what you mean by
13  discuss it.  We were there because we had an
14  appeals case pending, and I wanted to -- a
15  couple times when I went to a Board of
16  Appeals, I'd walk in there, and quite often
17  there would be very little information to
18  try to make a decision, so I tried to be a
19  little better prepared when these cases come
20  up.  I'll say, Tell me where they are, Bob.
21  I'll at least drive by, so that's what I
22  decided to do before this one, because some
23  of the other appeals would come in, and they
24  wanted to build something, and we weren't

Page 25

1  quite sure of the plan and everything.  So I
2  volunteered to myself that I would seek out
3  a little information before I walk in the
4  meeting and not be cold.
5      Q.  So you went and you walked the
6  pit with Mr. Pike?
7      A.  Yes.
8      Q.  Was the third member of the
9  Zoning Board of Appeals with you?
10     A.  No.
11     Q.  Was anybody else present?
12     A.  No.
13     Q.  And did you have a copy of the
14  cease and desist order?
15     A.  No.
16     Q.  And the basis for -- you voted to
17  uphold the cease and desist order?
18     A.  That's correct.
19     Q.  And if I understand you
20  correctly, the basis was your interpretation
21  of the zoning bylaws?
22     A.  Yes.
23     Q.  Anything else?
24     A.  In fact, all -- no.  It's

7 (Pages 22 to 25)

DEPOSITION OF: JOSEPH FONTAINE  VOLUME 1    January 3, 2006
DONOVAN BROTHERS, ET AL. vs. JOSEPH FONTAINE, ET AL.

Page 26

1 unfortunate that both sides had legitimate
2 reasons, and unfortunate the only thing we
3 could base it on was the bylaws, and that
4 was our guidance on our decision.
5      Q.  Did you receive any information,
6 from any source, as to how controversies
7 involving gravel pits in the Town of
8 Montgomery were handled prior to this
9 complaint and cease and desist order?
10      A.  No.
11      Q.  Is it fair to say that outside of
12 the public hearings, two of them, March and
13 April of 2005, you have not had any
14 communications with the zoning enforcement
15 officer, Mr. Clark, any of the selectmen, or
16 any other individuals?
17      A.  That's correct.
18      Q.  With respect to the cease and
19 desist order, what was your understanding,
20 specifically, of the complaint made by
21 Mr. Paige's attorney, in terms of what he
22 was complaining about?
23      A.  I don't think I understand that.
24      Q.  Well, did you see a letter from

Page 27

1 Mr. Costa, who represented Mr. Paige with
2 respect to his complaints, which eventually
3 turned into a cease and desist order?
4      A.  I believe I've seen that letter.
5      Q.  Did that letter, in fact,
6 identify a particular parcel on the LaFond
7 property that was the subject of his
8 complaint on behalf of Mr. Paige?
9      A.  Yeah.  I can't exactly say what
10 was in the letter, what parcels were
11 identified.
12      Q.  You can't say that?
13      A.  I can't, no.
14      MR. ANTONUCCI:  Let me see if I
15 have that letter.
16      MR. EICHMAN:  I might have in it
17 my bag.
18      (Off-the-record discussion.)
19 BY MR. ANTONUCCI:
20      Q.  I'm going to show you a letter
21 that we actually had marked as Exhibit 2 in
22 another deposition, that of Mr. Clark.  It's
23 a letter dated December 23rd directed to Tom
24 Clark.  Have you seen that letter before?

Page 28

1      A.  I believe this is a letter I
2 have, yes.
3      Q.  You want to take a minute to read
4 it just to refresh your recollection?
5      A.  Yeah.
6      Q.  Have you seen that letter before?
7      A.  I believe I have that, yes.
8      Q.  Now, earlier when you made
9 reference to a legal letter, is that the
10 letter you were referring to, if you know?
11      A.  Well, I believe it is, yes.
12      Q.  Now, in the complaint letter,
13 there's a reference to the property that
14 abuts Mr. Paige's property, and it's
15 identified as Parcel ID 1-350-8.  And
16 there's also a reference to another parcel,
17 ID Number 1-236-88, which apparently abuts
18 the other abutter, Mr. Jacques' property.
19      A.  Okay.
20      Q.  When you considered the cease and
21 desist order issued by Mr. Clark, did your
22 upholding of the cease and desist order
23 embody both of those parcels of property?
24      MR. EICHMAN:  If you know.

Page 29

1      A.  Yeah.  I mean, we ruled on the
2 cease and desist order.  What was ordered in
3 the cease and desist order, I can't —
4      Q.  You were upholding the cease and
5 desist order issued by Mr. Clark dated
6 January 13th?
7      A.  Yes.
8      Q.  Did you review Mr. Costa's letter
9 of December 23rd prior to coming to your
10 vote?
11      A.  Yes.
12      MR. EICHMAN:  Frank, could you
13 mark that letter Exhibit 1, please?
14      MR. ANTONUCCI:  Yes.
15 BY MR. ANTONUCCI:
16      Q.  Did you consider any other
17 documents, other than Mr. Clark's cease and
18 desist order and the letter of the 23rd?
19      A.  As I stated before, the zoning
20 bylaws.
21      Q.  And the zoning bylaws?
22      A.  Trying to interpret them as
23 applies to this.
24      Q.  And which zoning bylaw?

COURT REPORTING SERVICES
(413) 786-7233  FAX:  786-0299

Case 3:05-cv-30136-MAP   Document 45-13   Filed 11/30/2006   Page 10 of 20

DEPOSITION OF JOSEPH FONTAINE   VOLUME I                January 3, 2006
DONOVAN BROTHERS, ET AL. vs. JOSEPH FONTAINE, ET AL.

Page 30

1    A.  The current zoning bylaws in the
2    prior -- before 1973.
3    Q.  And the ones before '73, again,
4    this was marked at the previous deposition,
5    is that the ones you're referring to?
6    A.  Yes.
7    Q.  So the old bylaws, the new
8    bylaws, and these two documents?
9    A.  Yes.
10   Q.  Anything else that you
11   considered?
12   A.  I believe that's all the
13   correspondence I have.  I'm not sure if
14   there was any other documents.  That's all I
15   can think of.
16       MR. ANTONUCCI:  I'm going to mark
17   these three.
18       MR. EICHMAN:  That's fine.
19       MR. ANTONUCCI:  And I'll mark
20   them in the same order we did in the
21   previous deposition.
22       (Fontaine Exhibits 1, 2, 3, Marked
23       for identification.)
24   BY MR. ANTONUCCI:

Page 31

1    Q.  Did you receive any information
2    from Jane Thielen prior to either of the
3    meetings that took place regarding this
4    subject matter?
5    A.  No.
6    Q.  And other than the conversation
7    which you indicated you've had subsequent to
8    your decision as to whether or not there
9    will be litigation, have you had any other
10   discussions with her, either prior to or
11   subsequent to your meetings?
12   A.  No.
13   Q.  Did you take more testimony at
14   the second hearing?  I know you did at the
15   first hearing.  At the second hearing was it
16   strictly a matter of the Board voting, or
17   were there more comment and information put
18   forward, if you recall?
19   A.  I don't recall exactly.  It was a
20   short meeting.  I don't recall if there was
21   any testimony.
22   Q.  Do you know if there was any
23   difference in the type operation that
24   Donovan Brothers had on the LaFond property,

Page 32

1    as opposed to the other gravel pits in town?
2        MR. EICHMAN:  Objection.
3    A.  I don't understand.
4    Q.  Well, was there anything unique
5    to the manner in which they extracted
6    gravel, as opposed to the other people in
7    town?
8    A.  I'm not aware of the other ones,
9    and what would be a matter of extracting,
10   I'm not aware of.
11       MR. ANTONUCCI:  Again, I would
12   keep the deposition open for the reasons
13   stated in the initial deposition today of
14   Mr. Peckham, and your objection is noted.
15       MR. EICHMAN:  Thank you.  I do
16   have a couple questions.
17   EXAMINATION BY MR. EICHMAN:
18   Q.  Attorney Antonucci asked you a
19   question about a letter from the abutters
20   that was sent to you during the time that
21   the ZBA was holding a hearing on the cease
22   and desist order.  Do you remember that
23   discussion with Attorney Antonucci?
24   A.  Yes.

Page 33

1    Q.  Was that letter addressed to you
2    individually, or was it addressed to the
3    Zoning Board of Appeals, if you recall?
4    A.  It was a letter to the Zoning
5    Board of Appeals.  I believe it was
6    addressed to all three us.
7    Q.  Did you receive that letter after
8    the first hearing, ZBA hearing and before
9    the second, or was it some other time?
10   A.  I don't recall exactly when I
11   received it as in relation to the hearing
12   dates.
13   Q.  Did you bring that letter to any
14   ZBA hearing on the cease and desist issue?
15   A.  I keep a notebook, and I kind of
16   throw it in the notebook; and so I try to
17   keep my correspondence in one place.  So I
18   would assume whatever I've had to deal with
19   in that case, it was in my notebook.
20   Q.  Did you bring your notebook with
21   you to each meeting?
22   A.  Yes.
23   Q.  Do you recall if at either one of
24   those ZBA hearings on the cease and desist

9 (Pages 30 to 33)

Page 34

1   order for the LaFond property, that letter
2   was discussed by the ZBA?
3       A.  No, it wasn't.
4       Q.  No one mentioned it?
5       A.  No.
6       Q.  Did anyone in the audience refer
7   to that letter during those meetings?
8       A.  No.
9       Q.  Did you ever discuss the contents
10  of that letter with any other member of the
11  Zoning Board of Appeals?  So you read it,
12  put it in your file and that was it?
13      A.  Filed.
14      Q.  You were appointed to the ZBA
15  about five years ago?
16      A.  Yes.
17      Q.  Do you know how you were
18  appointed?
19      A.  Appointed by the select board.
20  They sent me a letter.
21      Q.  Who nominated you?
22      A.  I think I was just nominated by
23  the select board.  Which one of the select
24  board at the time, I'm unsure.

Page 35

1       Q.  Did you indicate to them before
2   then that you were interested in being a
3   member of the ZBA?
4       A.  No.
5       Q.  So they nominated you, and,
6   essentially, it was a surprise to you when
7   you got a letter saying you're nominated?
8       A.  Yes.
9       Q.  And prior to that time, do you
10  ever remember discussing with any members of
11  the Board of Appeals at that time what your
12  opinion was on the legality of the gravel
13  pits in the town?
14      A.  No conversations.
15      Q.  Did you ever remember discussing
16  with anyone in the town, prior to that time,
17  what your opinion was as to whether gravel
18  pits were legal in the town?
19      A.  No discussions.
20      MR. EICHMAN:  That's all I've
21  got.
22  FURTHER EXAMINATION BY ANTONUCCI:
23      Q.  With respect to this letter which
24  you've indicated, apparently, to the best of

Page 36

1   your recollection, came to your house, but
2   was addressed to all members of the Zoning
3   Board of Appeals, was that --
4       A.  To the best of my recollection,
5   yes.
6       Q.  You maintained your copy of that
7   letter?
8       A.  I believe I have it, yes.
9       Q.  And that's in your personal file?
10      A.  Yes.
11      Q.  It's not at town hall?
12      A.  Yeah.  It was a letter to me at
13  home, and so I put it with my Board of
14  Appeals --
15      Q.  Do you know for a fact if the
16  other members of the Zoning Board of Appeals
17  received a copy of that letter?
18      A.  No.
19      Q.  It was never discussed?
20      A.  No.
21      MR. EICHMAN:  I don't think we'll
22  have any objection to producing that.
23  BY MR. ANTONUCCI:
24      Q.  You will produce that for us?

Page 37

1       A.  I'll look.
2       MR. EICHMAN:  Frank, I have a
3   copy.  We can produce it.
4   BY MR. ANTONUCCI:
5       Q.  Is there any other
6   correspondence, records, or memorandums that
7   were, in any way, provided to you by any
8   individual, or entity regarding this subject
9   matter, that similarly you have in your own
10  personal records that are not in the town
11  hall?
12      A.  I have none.
13      Q.  Does the Zoning Board of Appeals
14  maintain a file or a file cabinet in the
15  town hall?
16      A.  I'm unaware.  I don't know.
17      Q.  Does the Zoning Board of Appeals
18  maintain minutes of all their meetings?
19      A.  I don't know.
20      Q.  Is there a specific file on this
21  subject matter at the town hall maintained
22  by either the chairman, or Jane Thielen, or
23  anybody from the Board of Appeals?
24      A.  I don't know.

10 (Pages 34 to 37)

## Page 38

1     MR. ANTONUCCI:  I have no further
2  questions.  Thank you very much.
3            (The deposition suspended at
4  3:33 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 40

February 7, 2006

Jonathan D. Eichman, Esquire
Kopelman And Paige, P.C.
Jonathan D. Eichman, Esquire
31 St. James Avenue
Boston, MA  02116

Re:  Donovan Brothers, Inc. vs Joseph
     Fontaine, et al.
Dear Attorney Eichman:
     Enclosed is a copy of the deposition of
Joseph Fontaine taken on January 3, 2006 in
the above-entitled action.
     According to Rule 30(e) of the
Massachusetts Rules of Civil Procedure, the
deponent has thirty days to sign the
deposition from the date of its submission
to the deponent, which is the above date.
     Please have the deponent sign the
enclosed Signature Page/Errata Sheet and
return a copy to Frank Antonucci, Esquire,
and a copy thereof to all counsel of record.

     Thank you for your cooperation in this
matter.


     Sandra A. Deschaine
     Registered Professional Reporter


     cc:  Jonathan Eichman, Esquire


     COURT REPORTING SERVICES
     P.O. BOX 15272       SPRINGFIELD, MA  01115
     413.786.7233         413.786.0299

## Page 39

1  COMMONWEALTH OF MASSACHUSETTS
   HAMPDEN SS.
2
3
       I, Sandra A. Deschaine, Registered
4  Professional Reporter and Notary Public
   within and for the Commonwealth of
5  Massachusetts at large, do hereby certify
   that the deposition of Joseph Fontaine, in
6  the matter of Donovan Brothers, Inc. vs.
   Joseph Fontaine, at the Law Offices of
7  Antonucci & Associates, 83 State Street,
   Springfield, Massachusetts, on January 3,
8  2006, was taken and transcribed by me; that
   the witness provided satisfactory evidence
9  of identification as prescribed by Executive
   Order 455 (03-13) issued by the Governor of
10 the Commonwealth of Massachusetts; that the
   transcript produced by me is a true record
11 of the proceedings to the best of my
   ability; that I am neither counsel for,
12 related to, nor employed by any of the
   parties to the action in which this
13 deposition was taken, and further that I am
   not a relative or employee of any attorney
14 or counsel employed by the parties thereto,
   nor financially or otherwise interested in
15 the outcome of the action.
16
17
18   Sandra A. Deschaine        DATE
19   Registered Professional Reporter
20
21
22
23
   My Commission Expires:
24 July 9, 2010

## Page 41

1        UNITED STATES DISTRICT COURT
         DISTRICT OF MASSACHUSETTS
2          C.A. No. 05-30136-MAP
3  DONOVAN BROTHERS, INC., ET AL.)
        Plaintiffs        )
4  vs.                    )
   JOSEPH FONTAINE, ET AL.    )
5        Defendants,       )
                          )
6
       I, JOSEPH L. FONTAINE, do hereby
7  certify, under the pains and penalties of
   perjury, that the foregoing testimony is
8  true and accurate, to the best of my
   knowledge and belief, with the addition of
9  the following changes/corrections:
10 Page| Line| Change/Correction
11 ___|___|_____
12 ___|___|_____
13 ___|___|_____
14 ___|___|_____
15 ___|___|_____
16 ___|___|_____
17 ___|___|_____
18 ___|___|_____
19 ___|___|_____
20 WITNESS MY HAND, this   day of    ,
   2005.
21
22 _____
23        JOSEPH L. FONTAINE
24 cc: Frank Antonucci

                                    11 (Pages 38 to 41)

# EXHIBIT T

Page 1

VOLUME:  I

PAGES:  1-23

EXHIBITS:  NONE

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. No. 05-30136-MAP

------------------------------------
                                              )
DONOVAN BROTHERS, INC.,                       )
AND ELSIE LAFOND,                             )
          Plaintiffs                          )
vs.                                           )
JOSEPH FONTAINE, JOANNE HEBERT                )
and ROBERT W. PIKE, JR., as                   )
they are the Zoning Board of                  )
Appeals of the Town of Montgomery,            )
and ELWIN R. CLARK, JR., as he                )
is the Building Inspector & Zoning            )
Enforcement Officer of the Town of            )
Montgomery,                                   )
          Defendants                          )
                                              )
------------------------------------


DEPOSITION OF ROBERT PIKE, JR.

TUESDAY, JANUARY 3, 2006

ANTONUCCI & ASSOCIATES

83 STATE STREET

SPRINGFIELD, MASSACHUSETTS  01103


- - - - - Sandra A. Deschaine, RPR - - - - -


COURT REPORTING SERVICES

P.O. BOX 15272          SPRINGFIELD, MA  01115

413.786.7233                      413.786.0299

Page 2

```
 1  APPEARANCES:
 2  ON BEHALF OF THE PLAINTIFFS
 3  ANTONUCCI & ASSOCIATES
 4    Frank Antonucci, Esquire
 5    83 State Street
 6    Springfield, Massachusetts 01103
 7    (413) 737-4667 Fax (413) 731-0602
 8
 9  ON BEHALF OF THE DEFENDANTS
10  KOPELMAN AND PAIGE, P.C.
11    Jonathan D. Eichman, Esquire
12    31 St. James Avenue
13    Boston, MA  02116
14    (617) 556-0007 FAX (617) 654-1735
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1      ROBERT PIKE, JR., Deponent, having
 2  first been satisfactorily identified by the
 3  production of his Massachusetts driver's
 4  license and duly sworn by the Notary Public,
 5  was examined and testified as follows:
 6
 7  EXAMINATION BY MR. ANTONUCCI:
 8      Q.  Good afternoon, Mr. Pike.  I'm
 9  Attorney Frank Antonucci, and I represent
10  Donovan Brothers and Elsie LaFond.  I've met
11  you previously at the hearings on this case.
12  And I'm going to ask you some questions
13  pertaining to this litigation.
14      If I don't make the question
15  understandable, just let me know, and I'll
16  try to rephrase it.  If you need to talk to
17  your attorney at any point in time, let me
18  know that, and I will leave the room so you
19  can have some privacy.  When you answer your
20  questions, you can't nod your head or go
21  auh-huh, because she can't take that down.
22      A.  She can't type that?
23      Q.  No, she can't.  So with those
24  simple rules, we'll go forward.
```

Page 3

```
 1          I N D E X
 2  -------------------------------------------
    WITNESSES:                 PAGE
 3  -------------------------------------------
 4  Robert Pike
 5    By Mr. Antonucci         4
      By Mr. Eichman          15
 6
    -------------------------------------------
 7  EXHIBITS:   DESCRIPTION      PAGE
 8
    (No exhibits marked.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1      MR. ANTONUCCI:  Usual
 2  stipulations?
 3      MR. EICHMAN:  Yes.
 4      MR. ANTONUCCI:  You want this
 5  gentleman also to read and sign?
 6      MR. EICHMAN:  Yes.
 7  BY MR. ANTONUCCI:
 8      Q.  Could you please state your name
 9  and current address, also your date of
10  birth?
11      A.  Robert William Pike, Junior, 1689
12  Russell Road, Montgomery, Mass., 01085.
13  Date of birth, 1/26/1939.
14      MR. EICHMAN:  Go slow so she can
15  take it all down.
16      Q.  And you're retired, Mr. Pike?
17      A.  I am.
18      Q.  Where were you employed when you
19  were employed?
20      A.  Lifeguard Security Systems.
21      Q.  And what did you do for them?
22      A.  I owned it.
23      Q.  And what sort of business is
24  that?
```

2 (Pages 2 to 5)

Page 6

1    A.  Burglar alarms and fire alarms.
2    Q.  And you've been appointed to the
3 Zoning Board of Appeals by the selectmen; is
4 that correct?
5    A.  Correct.
6    Q.  And you've been on the Board of
7 Selectmen since 1989?
8    A.  At least.
9    Q.  And that's the same year,
10 apparently, that Ms. Hebert joined the
11 Zoning Board of Appeals; is that correct?
12    A.  Likely, yes.
13    Q.  And with respect to the decision
14 of the Zoning Board of Appeals, could you
15 identify all documents that you considered
16 in arriving at your decision with respect to
17 the cease and desist order, that was issued
18 by the building inspector, and which was
19 voted on by the Zoning Board of Appeals in
20 April of 2005?
21    MR. EICHMAN:  Objection.
22    A.  You've got several questions in
23 there that don't make a lot of sense, Frank.
24    Q.  Did you consider any documents

Page 7

1 when you arrived at your decision to vote
2 against the cease and desist order?
3    A.  I voted for it.
4    Q.  You voted for Donovan Brothers?
5    A.  Right.  Which had been against
6 the cease and desist order, okay.
7    Q.  What documents did you consider
8 in arriving --
9    A.  There were none.
10    Q.  Did you look at the bylaws at
11 that time and consider them?
12    A.  No.  There were none that I know
13 of at that time.  We found out later that
14 there were none.
15    Q.  Well, what was the basis of your
16 vote against upholding the cease and desist
17 order?
18    A.  I felt that he had a case.
19    Q.  And with respect to the meetings
20 of the Zoning Board of Appeals, at any time
21 prior to the usual meeting in March, did you
22 have any contact with any members of the
23 select board regarding this issue?
24    A.  Yes.

Page 8

1    Q.  And when was that contact?
2    A.  I don't recall the date.
3    Q.  Did you go to the select board as
4 a group, or did you go to any particular
5 individual --
6    A.  No, I went to a meeting that they
7 were having, just as an interested
8 bystander.
9    Q.  And was that prior to the time
10 that the Zoning Board of Appeals met?
11    A.  Yes.
12    Q.  And what was the purpose of going
13 to that meeting as a bystander?
14    A.  I understood that this situation
15 was coming up before them, and I wanted to
16 see what the problem was.
17    Q.  And did it come up at that
18 meeting that you went to?
19    A.  Yes, it did.  And they recused
20 themselves from it.
21    Q.  Did they state a reason why they
22 recused themselves?
23    A.  No.
24    Q.  Did they discuss with you the

Page 9

1 fact that this matter would be coming to you
2 eventually?
3    A.  No.
4    Q.  Did they give you any direction
5 as to how to handle the situation if it did
6 come before you?
7    A.  No.
8    Q.  Since 1989, when you've been on
9 the Board, have you had previous situations
10 where the Board had to pass upon a cease and
11 desist order issued by the zoning
12 enforcement officer or the building
13 inspector?
14    A.  Run that by me again.
15    Q.  Has the Board, since 1989, since
16 you've been on the Board, had a similar
17 situation where they had to have a hearing
18 regarding a cease and desist order?
19    A.  No.  But when you say "similar,"
20 you mean similar to the Donovan situation?
21    Q.  Right.
22    A.  No.
23    Q.  At any time since 1989, have
24 there been any issues arising out of the

3 (Pages 6 to 9)

Page 10

1  operation or use of gravel pits in the town
2  that have come before the Zoning Board of
3  Appeals for decisions?
4      A.  No.
5      Q.  This is the very first time?
6      A.  Right.
7      Q.  At any time prior to the meeting
8  in March of 2005, other than the time that
9  you went to the select board, did you have
10  any other discussions with the selectmen,
11  individually, or as a group, regarding this
12  situation?
13      A.  None that I recall.
14      Q.  Did you have any discussions with
15  the Board of Selectmen between the first and
16  second meetings regarding the LaFond
17  property?
18      A.  No.
19      Q.  Did you, at any time prior to the
20  meeting in March of 2005, discuss the cease
21  and desist order with Elwin Clark, the
22  building inspector?
23      A.  No.
24      Q.  Did he provide you, as Chairman

Page 11

1  of the Board, anything other than the cease
2  and desist order, whereby you came to
3  understand the reason why the cease and
4  desist order was issued?
5      A.  No.
6      Q.  Did he provide you any letter of
7  explanation?
8      A.  No.
9      Q.  Did he appear at the meeting on
10  March 14th, 2005?
11      A.  No.
12      Q.  Did he appear at the meeting in
13  April of 2005?
14      A.  No.
15      Q.  So is it fair to say that other
16  than the cease and desist order itself, you
17  do not know what he did in the way of an
18  investigation, or how he arrived at his
19  conclusion?
20      A.  That's correct.
21      Q.  And did you visit the lot in
22  question?
23      A.  Yes.
24      Q.  With whom did you visit the

Page 12

1  property?
2      A.  Joe Fontaine.
3      Q.  When was that?
4      A.  I don't recall the date.  It was
5  prior to the March meeting.  Couple days
6  before.
7      Q.  Were you contacted by either,
8  orally or in writing, any of the abutters,
9  or any people in town concerning this issue
10  at any time prior to the first meeting?
11      A.  No.
12      Q.  How about prior to the second
13  meeting?
14      A.  No.
15      Q.  Did you have any discussion with
16  any abutters between the two meetings?
17      A.  No.
18      Q.  Subsequent to the second meeting,
19  and the decision issued by the Board, have
20  you had any discussions with any of the
21  abutters?
22      A.  No.
23      Q.  With any members of the select
24  board?

Page 13

1      A.  No.
2      Q.  Has the Zoning Board of Appeals
3  met to discuss this issue at any time since
4  their decision in April of 2005?
5      A.  No.  Why would we do that?
6      Q.  I don't know.
7      A.  Okay.
8      Q.  Did you have any telephone
9  conversations with either of the other two
10  members of the Zoning Board of Appeals
11  between the first and second meeting?
12      A.  No.
13      Q.  Are you aware of any minutes to
14  either the first or second meeting that were
15  kept by the Board?
16      A.  There is no minutes that were
17  kept.  None were kept.  The only things that
18  you would file would be in the file at the
19  Town Hall.
20      Q.  What is in the file, if you know?
21      A.  That's a good question.  Any
22  letters that were sent out to people,
23  signatures that came back, maybe one or two
24  sentences of something that I might have

4 (Pages 10 to 13)

Page 14

1  jotted down for whatever reason.
2      Q.  You mean your own personal notes?
3      A.  Correct.  That's about all.
4      Q.  Is it the practice of the Board
5  not to have a recording secretary?
6      A.  We've never had one.
7      Q.  You operate on your recollection
8  and your individual notes; is it fair to
9  say?
10     A.  Yes.
11     Q.  Who keeps the records of the
12  Zoning Board of Appeals?
13     A.  I just told you.  They're at the
14  Town Hall.
15     Q.  Are they kept by any particular
16  individual?
17     A.  No.
18     Q.  Is there a file that says --
19     A.  There's a file.
20     Q.  That says Zoning Board of
21  Appeals?
22     A.  That says Zoning Board of
23  Appeals, and Jane has access to it at any
24  time, as I do.

Page 16

1      A.  Yes.
2      Q.  Did you ask to be nominated for
3  that position?
4      A.  No.
5      Q.  How did you find out you were
6  nominated?
7      A.  They told me.
8      Q.  They nominated you without
9  telling you?
10     A.  Yep.
11     Q.  And then they told you?
12     A.  Yep.
13     Q.  And they appointed you?
14     A.  Yep.
15     Q.  In 1989, do you remember who the
16  selectmen were at that time?  Is that answer
17  a no?
18     A.  No.
19     Q.  Do you remember if any of the
20  current selectmen were on the Board at that
21  time?
22     A.  No.
23     Q.  You don't remember?
24     A.  I don't remember.

Page 15

1      Q.  Since 1989, has the Zoning Board
2  of Appeals provided any special permits,
3  variances, licenses, or authorizations to
4  any gravel pit operator to operate?
5      A.  No.  If we haven't had anything
6  to do with gravel pits, how could we do
7  that?
8      Q.  Don't know.  Just asking.
9      A.  Okay.  Just curious.
10     MR. ANTONUCCI:  I have no further
11  questions.
12     THE WITNESS:  This young lady is
13  amazing.
14     MR. EICHMAN:  Frank, do you want
15  to continue again as you did with the other
16  ones.
17     MR. ANTONUCCI:  Yes.  I'm sorry.
18  I will.  And your objection is noted.
19     MR. EICHMAN:  Go ahead and put
20  that on the record.  I got a couple
21  questions, I think.
22  EXAMINATION BY MR. EICHMAN:
23     Q.  You're appointed to the
24  selectmen, Bob?

Page 17

1      Q.  The ZBA file at Town Hall you
2  were talking about, how do documents get
3  placed in that file, if you know?
4      A.  I'm not trying to be funny, but
5  you open the thing and you put them in.
6      Q.  Who puts them in?
7      A.  I do.
8      Q.  Are you the only one?
9      A.  I'm the only one.
10     Q.  And do you put copies of whatever
11  letters are addressed to the ZBA regarding a
12  certain matter in that file?
13     A.  Yes.
14     Q.  So if you got a letter, for
15  instance, from the abutters to the LaFond
16  gravel pit addressed to the Zoning Board of
17  Appeals, you would know --
18     A.  It would be there.
19     Q.  And if you got documents that
20  were presented to the Zoning Board of
21  Appeals at a public hearing regarding the
22  LaFond gravel pit, would you place copies of
23  those in the file?
24     A.  It would be there.  Maps,

5 (Pages 14 to 17)

Page 18

1  anything like that.
2      Q.  Anything that was presented at
3  the public hearing?
4      A.  Would be in the file.
5      Q.  How do other members of the ZBA
6  get to look at those documents?  Is it only
7  at the public hearing?
8      A.  No.  I usually hand them to them.
9  If I think they need a copy, I will
10 photocopy them before the hearing and hand
11 them each a copy.
12     Q.  So if you get them in advance,
13 you would then send them along?
14     A.  I give them to them at the
15 hearing.
16     Q.  You don't send them to them
17 otherwise?
18     A.  No.  This is a low budget
19 operation.
20     Q.  Do you know of any documents
21 concerning the LaFond gravel pit that have
22 come before the ZBA that are not in that
23 file?
24     A.  No.

Page 20

1  COMMONWEALTH OF MASSACHUSETTS
   HAMPDEN SS.
2
3
       I, Sandra A. Deschaine, Registered
4  Professional Reporter and Notary Public
   within and for the Commonwealth of
5  Massachusetts at large, do hereby certify
   that the deposition of Robert Pike, in
6  the matter of Donovan Brothers, Inc. vs.
   Joseph Fontaine, at the Law Offices of
7  Antonucci & Associates, 83 State Street,
   Springfield, Massachusetts, on January 3,
8  2006, was taken and transcribed by me; that
   the witness provided satisfactory evidence
9  of identification as prescribed by Executive
   Order 455 (03-13) issued by the Governor of
10 the Commonwealth of Massachusetts; that the
   transcript produced by me is a true record
11 of the proceedings to the best of my
   ability; that I am neither counsel for,
12 related to, nor employed by any of the
   parties to the action in which this
13 deposition was taken, and further that I am
   not a relative or employee of any attorney
14 or counsel employed by the parties thereto,
   nor financially or otherwise interested in
15 the outcome of the action.
16
17
18 _____
   Sandra A. Deschaine        DATE
19 Registered Professional Reporter
20
21
22
23
   My Commission Expires:
24 July 9, 2010

Page 19

1      Q.  Every document that you've seen
2  as a member of the ZBA regarding the LaFond
3  gravel pit is in that file at Town Hall?
4      A.  Yes.
5      MR. EICHMAN:  That's it.  I'm
6  done.
7      (The deposition suspended at 4:34
8      p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 21

February 7, 2006

Jonathan D. Eichman, Esquire
Kopelman And Paige, P.C.
Jonathan D. Eichman, Esquire
31 St. James Avenue
Boston, MA  02116

Re:  Donovan Brothers, Inc. vs. Joseph
     Fontaine, et al.
Dear Attorney Eichman:
     Enclosed is a copy of the deposition of
Robert Pike, Jr., taken on January 3, 2006
in the above-entitled action.
     According to Rule 30(e) of the
Massachusetts Rules of Civil Procedure, the
deponent has thirty days to sign the
deposition from the date of its submission
to the deponent, which is the above date.
     Please have the deponent sign the
enclosed Signature Page/Errata Sheet and
return a copy to Frank Antonucci, Esquire,
and a copy thereof to all counsel of record.

     Thank you for your cooperation in this
matter.

Sandra A. Deschaine
Registered Professional Reporter

cc:  Jonathan Eichman, Esquire

COURT REPORTING SERVICES
P.O. BOX 15272     SPRINGFIELD, MA  01115
413.786.7233          413.786.0299

6 (Pages 18 to 21)

Page 22

```
1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2                 C.A. No. 05-30136-MAP
3    DONOVAN BROTHERS, INC., ET AL.)
              Plaintiffs      )
4    vs.                      )
     JOSEPH FONTAINE, ET AL.     )
5         Defendants,          )
                              )
6
        I, ROBERT PIKE, JR., do hereby certify,
7    under the pains and penalties of perjury,
     that the foregoing testimony is true and
8    accurate, to the best of my knowledge and
     belief, with the addition of the following
9    changes/corrections:
10   Page| Line| Change/Correction
11   _____|_____|_____
12   _____|_____|_____
13   _____|_____|_____
14   _____|_____|_____
15   _____|_____|_____
16   _____|_____|_____
17   _____|_____|_____
18   _____|_____|_____
19   _____|_____|_____
20   WITNESS MY HAND, this   day of       ,
     2005.
21
22         _____
              ROBERT PIKE, JR.
23
24   cc: Frank Antonucci, Esquire
```

7 (Page 22)

# EXHIBIT U

Page 1

VOLUME:   1

PAGES:    1-31

EXHIBITS:  None

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. No. 05-30136-MAP

-------------------------------------

                                         )

DONOVAN BROTHERS, INC.,                )

AND ELSIE LAFOND,                      )

        Plaintiffs                    )

vs.                                    )

JOSEPH FONTAINE, JOANNE HEBERT         )

and ROBERT W. PIKE, JR., as           )

they are the Zoning Board of          )

Appeals of the Town of Montgomery,    )

and ELWIN R. CLARK, JR., as he        )

is the Building Inspector & Zoning    )

Enforcement Officer of the Town of    )

Montgomery,                            )

        Defendants                    )

                                         )

-------------------------------------

DEPOSITION OF JOANNE HEBERT

TUESDAY, JANUARY 3, 2006

ANTONUCCI & ASSOCIATES

83 STATE STREET

SPRINGFIELD, MASSACHUSETTS   01103

- - - - - Sandra A. Deschaine, RPR - - - - -

COURT REPORTING SERVICES

P.O. BOX 15272          SPRINGFIELD, MA   01115

413.786.7233                    413.786.0299

Case 3:05-cv-30136-MAP    Document 45-14    Filed 11/30/2006    Page 3 of 11

DEPOSITION OF: JOANNE HEBERT    VOLUME I    January 3, 2006
DONOVAN BROTHERS, ET AL. vs. JOSEPH FONTAINE, ET AL.

Page 2

1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFFS
3  ANTONUCCI & ASSOCIATES
4    Frank Antonucci, Esquire
5    83 State Street
6    Springfield, Massachusetts 01103
7    (413) 737-4667 Fax (413) 731-0602
8
9  ON BEHALF OF THE DEFENDANTS
10  KOPELMAN AND PAIGE, P.C.
11    Jonathan D. Eichman, Esquire
12    31 St. James Avenue
13    Boston, MA 02116
14    (617) 556-0007 FAX (617) 654-1735
15
16
17
18
19
20
21
22
23
24

Page 3

1          I N D E X
2  -------------------------------------
   WITNESSES:              PAGE
3  -------------------------------------
4  Joanne Hebert
5    By Mr. Antonucci        4
     By Mr. Eichman          25
6
   -------------------------------------
7  EXHIBITS:   DESCRIPTION      PAGE
   -------------------------------------
8
   (No exhibits marked.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1          JOANNE HEBERT, Deponent, having first
2  been satisfactorily identified by the
3  production of her Massachusetts driver's
4  license and duly sworn by the Notary Public,
5  was examined and testified as follows:
6
7  EXAMINATION BY MR. ANTONUCCI:
8      Q.  Ms. Hebert, I'm Frank Antonucci.
9  I represent Donovan Brothers and Elsie
10  LaFond in a litigation involving the Zoning
11  Board of Appeals and the Selectmen, Town of
12  Montgomery.
13          I'm going to ask you some
14  questions about this.  If you don't
15  understand them, let me know, and I'll try
16  to rephrase it to make it more
17  understandable.  Please direct your answers
18  to the stenographer, and you can't nod your
19  head or go auh-huh, because she can't get
20  that down.
21      A.  Right.
22      Q.  As you've had a brief discussion
23  with your attorney already, if you need to
24  talk with him again, simply let me know.

Page 5

1  I'll leave the room so you can talk with him
2  in confidence.
3      A.  Okay.
4      Q.  Have you ever been involved in a
5  deposition before?
6      A.  No.
7      Q.  Please state your full name, date
8  of birth, and address?
9      A.  Joanne T. Hebert.  1582 Russell
10  Road, Montgomery.
11      Q.  And your date of birth?
12      A.  6/20/41.
13      Q.  And how long have you lived in
14  Montgomery?
15      A.  1965, so forty years.
16      Q.  And you were appointed to the
17  Zoning Board of Appeals by the selectmen?
18      A.  Yes.
19      Q.  And you've been on the Zoning
20  Board of Appeals since 1989?
21      A.  As near as I can figure, yes.
22      Q.  How long is that appointment?
23      A.  It's about three years.
24      Q.  And you've been renewed every

2 (Pages 2 to 5)

Page 6

1    three years since 1989?
2        A. Yeah.
3        Q. And when was the last time you
4    were renewed?
5        A. Renewed?
6        Q. Yes.
7        A. Oh, gosh. My guess is a year
8    ago. I'm not sure.
9        Q. Now, you were present on April
10    18th, 2005, when the Zoning Board of Appeals
11    made their decision regarding upholding the
12    cease and desist order issued by the
13    building inspector?
14        A. Yes.
15        Q. And what, if any, documents were
16    considered by you in arriving at your
17    decision with respect to upholding that
18    cease and desist order?
19        A. What do you mean by "documents"?
20    I listened to what the people had to say at
21    the meeting, and then there was, you know, a
22    sketch of the --
23        Q. Diagram of the property?
24        A. Diagram of the property.

Page 7

1        Q. And some photographs?
2        A. Yes.
3        Q. And those were the documents you
4    considered: The sketch and the photographs?
5        A. Yes.
6        Q. Is there anything else that you
7    considered in arriving at your decision?
8        A. Well -- now we're talking about
9    the first meeting, right?
10        Q. I'm talking about the decision
11    that eventually was made. The decision was
12    made in April.
13        A. The decision. Okay. Because I
14    was going back to the other --
15        Q. Right.
16        A. The actual decision to uphold it
17    was based on my -- it was based on what I
18    felt the -- how can I phrase it? The people
19    that were involved were supposed to get
20    together and have a meeting over the whole
21    thing, and they didn't until the last
22    minute, and then there was a lot of
23    objections from the neighbors around.
24        Q. The abutters?

Page 8

1        A. The abutters, yes.
2        Q. So you considered those two
3    points?
4        A. Yes.
5        Q. The fact that they had not met
6    until late?
7        A. And then one of the people that
8    were involved, one of the -- the two people
9    that were involved, was it Paiges and
10    Jacqueses, they were supposed to be meeting
11    with Mr. Donovan, or the son-in-law. I
12    can't remember his name. The Donovan
13    family, let's put it that way, and I don't
14    think they met until the very last minute,
15    before the second meeting was held; and then
16    they just, you know, they didn't come to an
17    agreement.
18        Q. And how did that affect your
19    decision?
20        A. I felt that they didn't do what
21    they were supposed to do.
22        Q. And by "they", who do you mean?
23        A. The ones that -- Jacqueses and
24    Paiges, and then with the objections of the

Page 9

1    neighbors too, that had a lot to do with it.
2        Q. How did the fact that they didn't
3    make -- didn't meet until late --
4        A. They were given a month to meet,
5    and they didn't meet until the very end. It
6    was just a few days before that hearing.
7        Q. And that troubled you?
8        A. Yeah, it did.
9        Q. And did you feel it was the
10    Donovan Brothers that were slow in meeting?
11        A. No.
12        Q. Were you upset with everybody for
13    not meeting sooner?
14        A. Personally, yes.
15        Q. And that played a part in your
16    decision?
17        A. Yes. Plus the fact that it's not
18    in the bylaws. I mean, that should be -- I
19    should say that would be the number one
20    thing. It's not in the bylaws, the current
21    set of bylaws that we have.
22        Q. By "not in the bylaws," you mean
23    that it's not permitted by the bylaws, in
24    your opinion?

3 (Pages 6 to 9)

DEPOSITION OF: JOANNE HEBERT       VOLUME I                    January 3, 2006
DONOVAN BROTHERS, ET AL. vs. JOSEPH FONTAINE, ET AL.

Page 10

1      A.   Under these bylaws, no, it's not
2   permitted.
3          MR. EICHMAN:  Objection to the
4   last question.
5   BY MR. ANTONUCCI:
6      Q.   Now, did the building inspector
7   testify as to the reason for his cease and
8   desist order at either of the meetings?
9      A.   No.
10     Q.   Did the building inspector talk
11  with the Zoning Board of Appeals at any time
12  between the two meetings?
13     A.   No, not to my knowledge.
14     Q.   Did he speak with any members of
15  the Zoning Board of Appeals prior to the
16  first meeting as to the reason for the cease
17  and desist order?
18     A.   Not that I'm aware of.
19     Q.   Did you receive any communication
20  from the building inspector other than a
21  copy of the cease and desist order?
22     A.   No.
23     Q.   Did you speak with any members of
24  the selectmen prior to the first meeting?

Page 12

1      Q.   Let me finish the question.
2        -- with either members of the
3   Zoning Board of Appeals prior to the
4   decision?
5      A.   No.
6      Q.   On April, 2005?
7      A.   No.
8      Q.   After the decision in April of
9   2005, did you speak with the other board
10  members regarding your decision or the
11  Board's decision?
12     A.   No, not really.  Right after the
13  meeting, you know, we talked a little bit
14  but that was it.
15     Q.   And what was said right after the
16  meeting?
17     A.   That we were probably going to
18  court, basically.
19     Q.   Did you discuss with the
20  selectmen, at any time after the April the
21  meeting and the decision in April, this
22  situation?
23     A.   I can't remember the date, but we
24  did have a meeting that didn't concern this

Page 11

1      A.   No.
2      Q.   Did you speak with any members of
3   the select board after the first meeting and
4   prior to the second meeting?
5      A.   No.
6      Q.   Do you know if any members of the
7   Zoning Board of Appeals spoke with the
8   select board at any time regarding this
9   subject matter prior to April, when the
10  decision was arrived at?
11     A.   No, I don't think so.
12     Q.   So if any member of the Zoning
13  Board of Appeals did speak to the select
14  board regarding this subject matter, it
15  wasn't communicated to you?
16     A.   Exactly.
17     Q.   Were there any meetings of the
18  Zoning Board of Appeals, either formal or
19  informal, regarding this subject matter
20  between the two meetings?
21     A.   No.
22     Q.   Did you discuss on the phone, or
23  in casual conversation in town hall --
24     A.   No.

Page 13

1   case.  We had to make a decision on some
2   property, so then the selectmen were meeting
3   that same night, and we had gotten notice
4   that we were going to have to -- I don't
5   know.
6          MR. EICHMAN:  Go ahead.
7      A.   That we were -- I don't know.  We
8   got some kind of a notice that we were
9   probably going to have to come for a
10  deposition or whatever.
11         MR. EICHMAN:  That's from town
12  counsel, I think.  Is it not?  Your notice?
13         THE WITNESS:  See, I didn't get a
14  copy, so I don't know.
15     A.   It was from someone that we were
16  probably going to have -- because Jane
17  Thielen was at the meeting, and the three
18  selectmen; and we said, While we're here,
19  we'll go out and talk to them, so we had to
20  sit and wait for a few minutes.
21     Q.   Was that discussion regarding
22  litigation?
23     A.   You mean like right here today?
24     Q.   Yes.

4 (Pages 10 to 13)

Page 14

1    A.  No.  It was the fact that
2  somewhere -- that town counsel, or whoever
3  it was, said we were probably going to have
4  to.
5    Q.  I don't want to know what town
6  counsel told you.
7    A.  I didn't talk to town counsel.
8  It was a letter form.
9    Q.  You got a letter form, and you
10  talked to the selectmen?
11    A.  Yes.
12    Q.  Was that meeting to discuss the
13  litigation or this subject -- or your vote?
14    A.  It wasn't to do with our voting.
15  It was the fact that we were -- something
16  was going to be taking place, let's put it
17  that way.
18    Q.  Now, in between the two meetings,
19  the one in March and the one in April, did
20  you talk to any of the abutters or any --
21    A.  No.
22    Q.  Did you talk with any citizens in
23  town regarding this controversy?
24    A.  No.  As far as I know, no.

Page 15

1    Q.  Did you receive any communication
2  in the form of letters or correspondence
3  regarding this subject matter?
4    A.  You mean from the people
5  involved?
6    Q.  Yes.
7    A.  No.  Only from attorneys that are
8  involved.
9    Q.  Did you ever receive any
10  correspondence from any person concerned
11  with this controversy stating their case?
12    A.  No.
13    Q.  Did you ever go to the subject
14  property, the LaFond property and look at
15  it?
16    A.  Yes, I did.
17    Q.  And when did you do that?
18    A.  I went after the first meeting.
19    Q.  And did you go with anybody?
20    A.  Yes.  My husband and I went down.
21  I didn't want to go alone.
22    Q.  Was there anybody there when you
23  went there?
24    A.  No, not a soul.

Page 16

1    Q.  Do you recall when it was that
2  that took place?
3    A.  Yes.  It was either the day
4  after -- day after or the two days after the
5  first meeting.
6    Q.  You've been on the Zoning Board
7  of Appeals since 1989.  Have there been any
8  other instances that you can recall where
9  the Board acted on a cease and desist order
10  involving a gravel pit?
11    A.  No.
12    Q.  Have there been any other
13  instances where the Board has been asked to
14  act upon a cease and desist order by the
15  building inspector?
16    A.  No.
17    Q.  This is the very first time?
18    A.  That I've been involved in
19  anything, yes.
20    Q.  Since 1989?
21    A.  Yep.
22    Q.  Now, with respect to the Zoning
23  Board of Appeals, are there minutes kept of
24  the meetings that the Zoning Board of

Page 17

1  Appeals has?
2    A.  Only what we personally write.
3    Q.  In other words, by that you mean
4  if any member of the Board takes notes on
5  their own, their personal notes, not the
6  official meeting notes of the Board?
7    A.  In other words, do we have a
8  secretary or something like that?
9    Q.  Yes.
10    A.  No.
11    Q.  And no one on the Board serves in
12  that capacity?
13    A.  No.  No one is designated as
14  secretary.
15    Q.  So there are no minutes of the
16  meetings kept?
17    A.  No.  Just what we personally
18  take.
19    Q.  Do all three members take their
20  own personal notes?
21    A.  Yes, I would say so.
22    Q.  And with respect to subsequent
23  meeting records, as in this case, the
24  subject matter, is it your own recollection,

5 (Pages 14 to 17)

DEPOSITION OF: JOANNE HEBERT       VOLUME I                January 3, 2006
DONOVAN BROTHERS, ET AL. vs. JOSEPH FONTAINE, ET AL.

Page 18

1  and all your own personal notes that you
2  rely upon as to what took place at the
3  meeting?
4      A.  Yes.
5      Q.  And do the individuals who
6  testified at the first meeting in March,
7  were they sworn as in a courtroom to tell
8  the truth?
9      A.  No.
10     Q.  Is it fair to say that the
11  proceedings was one in which the chairman of
12  the Board of Selectmen called on individuals
13  to --
14     A.  The Board of Selectmen wouldn't.
15     Q.  Zoning Board of Appeals.  I'm
16  sorry.
17     A.  What was the question?
18     Q.  Did Mr. Pike call on people to
19  talk or express their opinion?
20     A.  Yes.
21     Q.  And no one was under oath?
22     A.  No.
23     Q.  And anybody said what they felt,
24  be it factual or emotional?

Page 19

1      A.  Yes.
2      Q.  And it was quite emotional?
3      A.  Yes, it was.
4      Q.  The first meeting?
5      A.  Yes.
6      Q.  When did you first become aware
7  of this issue with regard to the LaFond
8  property?
9      A.  Probably when Mr. Pike called me
10  and asked me if a certain date was okay with
11  me; and I said, "Yes.  For what?"
12         And he told me regarding some
13  property down on Carrington Road.
14         And I said, "Okay, fine."
15         And so we set up the date.
16  Because he had to -- it has to be published
17  in the paper and then all the abutters --
18     Q.  Notified?
19     A.  -- notified, yeah.
20     Q.  And that's the first you found
21  out about it?
22     A.  Yes.
23     Q.  What did Mr. Pike tell you at
24  that time?

Page 20

1      A.  That was about it.
2      Q.  He didn't tell you what the
3  controversy was?
4      A.  No.
5      Q.  He didn't tell you it involved
6  the gravel pit?
7      A.  No.
8      Q.  Now, are you aware of the fact
9  that there are other gravel pits operational
10  in the Town of Montgomery?
11     A.  Yes.
12     Q.  How long have you been aware of
13  that?
14     A.  Since we've lived up there.
15     Q.  And has any of those other gravel
16  pits, at any time, been before the Zoning
17  Board of Appeals for any reason?
18         MR. EICHMAN:  Objection.
19     Q.  Since you've been on since 1989?
20     A.  Not to my knowledge, no.
21     Q.  There haven't been any cease and
22  desist orders, that you're familiar with,
23  since 1989?
24     A.  Not that I'm aware of.

Page 21

1      Q.  Is there any reason why the
2  Zoning Board of Appeals has not acted on the
3  enforcement of your interpretation of the
4  Zoning Board of Appeals against other pits
5  in the town?
6         MR. EICHMAN:  Objection.
7         THE WITNESS:  Do you want me to
8  answer that?
9         MR. EICHMAN:  If you know.
10     A.  How do I put it?  They've been in
11  existence for years and nobody has
12  bothered -- I mean, it never bothered
13  people.
14         MR. EICHMAN:  The question is why
15  hasn't the ZBA acted on this?
16     A.  It wasn't necessary.  They just
17  went and got the gravel.  Nobody ever
18  complained.
19  BY MR. ANTONUCCI:
20     Q.  This is the first time that there
21  has been a complaint that's come to the
22  Zoning Board of Appeals?
23     A.  As far as I know.
24     Q.  Are you aware of any complaints

6 (Pages 18 to 21)

DEPOSITION OF: JOANNE HEBERT     VOLUME I     January 3, 2006
DONOVAN BROTHERS, ET AL. vs. JOSEPH FONTAINE, ET AL.

Page 22

1　going to the select board, or any other
2　board, or authority in town about pits?
3　　**A.  No, I'm not.  The select board,**
4　**one of the people owns a gravel bank, and**
5　**the other one his father-in-law owns the**
6　**gravel bank, so, you know.**
7　　Q.  Were you aware of the fact that
8　Mr. Jacques was abutting this particular
9　gravel pit?
10　　**A.  I was after the meeting, yeah.**
11　　Q.  After which meeting?
12　　**A.  The first meeting.**
13　　Q.  Were you aware of the fact that
14　Mr. Jacques attempted to purchase the
15　property in question?
16　　**A.  Yes.  I learned that at the**
17　**meeting.  And Mr. Paige was going to -- I**
18　**think they were both interested in buying.**
19　　Q.  Were you aware of the fact that
20　their attempts to purchase it had failed,
21　and that Mr. Donovan had secured the option
22　to purchase the property?
23　　**A.  Not until the meeting.**
24　　Q.  Did you do any research with

Page 23

1　respect to looking in the records at the
2　town hall with regard to this property, the
3　LaFond property, to determine if they had
4　any permits, or how long they had been in
5　operation as a gravel pit?
6　　**A.  No.  I know it's been in**
7　**operation for years.**
8　　Q.  Do you know how long?
9　　**A.  Thirty something.**
10　　Q.  And what do you base that on?
11　　**A.  What I was told, and I know the**
12　**Donovans used that gravel bank for years.**
13　　Q.  Do you know if anybody other than
14　Donovans used it as a gravel bank?
15　　**A.  No, I don't.**
16　　Q.  So there are no records of
17　meetings at the Zoning Board of Appeals,
18　other than the notes that you kept?
19　　**A.  To my knowledge, no.  Bob might**
20　**have some.  Mr. Pike might have some.  I**
21　**don't know for sure.  There's no one**
22　**appointed as secretary.**
23　　Q.  Is there a folder in a file
24　cabinet that contains material regarding

Page 24

1　this particular subject matter?
2　　**A.  I honestly don't know.  There was**
3　**supposed to be something set up at the town**
4　**hall for each department or organization,**
5　**whoever was suppose to have their own**
6　**drawer, and I don't know if it ever took**
7　**place.**
8　　Q.  When did the town hall get
9　renovated?
10　　**A.  It's probably been longer than I**
11　**think.  Maybe ten years ago.**
12　　Q.  At that time, were there any
13　records of the Zoning Board of Appeals that
14　were lost, destroyed, or misplaced, if you
15　know?
16　　**A.  I don't know.  I really don't**
17　**know.**
18　　Q.  Is it fair to say since 1989, and
19　I apologize if I've already asked this, that
20　you have not had or been asked to permit a
21　variance to any gravel pit owner in the
22　town?
23　　**A.  No.**
24　　Q.  For operation purposes?

Page 25

1　　**A.  No.**
2
3　　　MR. ANTONUCCI:  I will keep the
4　deposition open for same reasons as
5　previously stated in the previous
6　depositions, and I note your objection.
7　　　MR. EICHMAN:  Okay.  I've got a
8　few questions.
9　EXAMINATION BY MR. EICHMAN:
10　　Q.  Joanne, do you recall sometime
11　around the time that the ZBA held hearings
12　of the cease and desist order to the LaFond
13　property, do you recall receiving a letter
14　signed by all the abutters addressed to the
15　Zoning Board of Appeals?
16　　**A.  No, I don't.**
17　　Q.  Never seen that?
18　　**A.  No.  I don't remember.  If I had**
19　**brought everything, you know, I might have**
20　**been able to look through, but I don't think**
21　**so.  I don't know.**
22　　Q.  You just said that someone told
23　you that the LaFond gravel pit was in
24　operation for around thirty years?

7 (Pages 22 to 25)

Page 26

1   A.  Auh-huh.  At that hearing, the
2   first hearing.
3   Q.  Do you remember who said that?
4   A.  No.  Because there were several
5   people there.
6   Q.  Was it a ZBA member that said
7   that?
8   A.  I don't think so.
9   Q.  Somebody testifying in the
10  audience?
11  A.  Yeah.  I think.
12  Q.  But you don't remember who?
13  A.  No.
14  Q.  Are you sure about the thirty
15  years?
16  A.  I'm positive it was thirty or
17  more.
18  Q.  Could it have been forty?
19  A.  It could have been.  It was
20  thirty something, let's put it at that way.
21  Q.  Just to clarify if it isn't
22  already clear on the record.  Has any member
23  of the Board of Selectmen ever contacted
24  you?

Page 27

1   A.  Personally?
2   Q.  Personally, to talk about the
3   LaFond gravel pit.
4   A.  No.
5   Q.  Not at any time?
6   A.  No.
7   Q.  Have you ever spoken to the
8   building inspector at any time --
9   A.  I haven't spoken to the building
10  inspector for -- I don't know how many
11  years.  I haven't even seen him.
12  Q.  Would you recognize him if you
13  saw him?
14  A.  Sure.
15  Q.  Who is the building inspector?
16  A.  Tom Clark.  Actually, it's Elwin
17  Clark.
18  Q.  Are you aware if the Zoning Board
19  of Appeals ever sought the advice of the
20  Board of Selectmen on how to rule on the
21  appeal that was in front of them regarding
22  LaFond property?
23  A.  Not to my knowledge, no.
24      MR. EICHMAN:  That's it.

Page 28

1       MR. ANTONUCCI:  Thank you very
2   much.
3       (The deposition suspended at 4:07
4       p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 29

1   COMMONWEALTH OF MASSACHUSETTS
    HAMPDEN SS.
2
3
4   I, Sandra A. Deschaine, Registered
    Professional Reporter and Notary Public
5   within and for the Commonwealth of
    Massachusetts at large, do hereby certify
6   that the deposition of Joanne Hebert, in the
    matter of Donovan Brothers, Inc. vs. Joseph
7   Fontaine, at the Law Offices of Antonucci &
    Associates, 83 State Street, Springfield,
8   Massachusetts, on January 3, 2006, was taken
    and transcribed by me; that the witness
9   provided satisfactory evidence of
    identification as prescribed by Executive
10  Order 455 (03-13) issued by the Governor of
    the Commonwealth of Massachusetts; that the
11  transcript produced by me is a true record
    of the proceedings to the best of my
12  ability; that I am neither counsel for,
    related to, nor employed by any of the
13  parties to the action in which this
    deposition was taken, and further that I am
14  not a relative or employee of any attorney
    or counsel employed by the parties thereto,
15  nor financially or otherwise interested in
    the outcome of the action.
16
17
18  _____
    Sandra A. Deschaine       DATE
19  Registered Professional Reporter
20
21
22
23
24  My Commission Expires:
    July 9, 2010

8 (Pages 26 to 29)

Page 30

February 7, 2006

Jonathan D. Eichman, Esquire
Kopelman And Paige, P.C.
Jonathan D. Eichman, Esquire
31 St. James Avenue
Boston, MA  02116

Re:  Donovan Brothers, Inc. vs. Joseph
    Fontaine, et al.
Dear Attorney Eichman:
    Enclosed is a copy of the deposition of
Joanne Hebert taken on January 3, 2006 in
the above-entitled action.
    According to Rule 30(e) of the
Massachusetts Rules of Civil Procedure, the
deponent has thirty days to sign the
deposition from the date of its submission
to the deponent, which is the above date.
    Please have the deponent sign the
enclosed Signature Page/Errata Sheet and
return a copy to Frank Antonucci, Esquire,
and a copy thereof to all counsel of record.

    Thank you for your cooperation in this
matter.


Sandra A. Deschaine
Registered Professional Reporter



cc:  Jonathan Eichman, Esquire


COURT REPORTING SERVICES
P.O. BOX 15272    SPRINGFIELD, MA  01115
413.786.7233        413.786.0299

---

Page 31

```
 1        UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS
 2             C.A. No. 05-30136-MAP
 3   DONOVAN BROTHERS, INC., ET AL.)
          Plaintiffs        )
 4   vs.                    )
     JOSEPH FONTAINE, ET AL.    )
 5        Defendants,      )
                           )
 6
          I, JOANNE HEBERT, do hereby certify,
 7   under the pains and penalties of perjury,
     that the foregoing testimony is true and
 8   accurate, to the best of my knowledge and
     belief, with the addition of the following
 9   changes/corrections:
10   Page| Line| Change/Correction
11   ____|____|_____
12   ____|____|_____
13   ____|____|_____
14   ____|____|_____
15   ____|____|_____
16   ____|____|_____
17   ____|____|_____
18   ____|____|_____
19   ____|____|_____
20   WITNESS MY HAND, this   day of      ,
     2005.
21
22        _____
               JOANNE HEBERT
23
24   cc:  Frank Antonucci
```

9 (Pages 30 to 31)